Michelle R Burrows OSB 861606
LAW OFFICE MICHELLE R. BURROWS P.C.
16869 SW 65th Ave # 367
Lake Oswego, OR 97035
503-241-1955
Michelle.r.burrows@gmail.com
www.oregoncivilrights.com

Anthony Rosta OSB 810970
ROSTA & CONNELLY, P.C.
795 W 7th Ave
Eugene, OR 97402
541-343-8111
tony@rosta-connelly.com

Attorneys for Plaintiff


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

| | |
|---|---|
| OFELIA HERNANDEZ SANTIAGO, Personal Representative of the Estate of Eliborio Rodrigues Jr., | No: 6:21-cv-01715 |
| Plaintiff, | |
| v. | COMPLAINT<br>4th Amendment Excessive Force; Wrongful Death |
| SAMUEL TYKOL, JOHN DOE SUPERVISORS 1-3, CITY OF EUGENE, a municipal subdivision of the State of Oregon, | 42 U. S. C. 1983 |
| Defendants. | DEMAND FOR JURY TRIAL |


**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, by and through her lawyer, Michelle R. Burrows, brings her complaint herein

alleging as follows:


1 COMPLAINT

## INTRODUCTORY STATEMENT

1.

This action is filed by Plaintiff under 42 U.S.C. § 1983 and ORS 30.265, for events occurring on or about November 30, 2019, alleging unreasonable use of deadly force, in violation of the Fourth Amendment to the United States Constitution, along with state torts of negligence and wrongful death, arising from the wrongful, unreasonable and unnecessary shooting of Eliborio Rodrigues Jr, causing his death.

2.

This court has jurisdiction over Plaintiff's claims of violations of federal Constitutional Rights under 42 U.S.C. 1983, 28 U.S.C. §§ 1331 and 1343.

3.

Venue is proper under 28 U.S.C. § 1391(b), in that one or more of the defendants reside in the District of Oregon and Plaintiff's claims for relief arose in this district.

4.

The court has supplemental jurisdiction over Plaintiff's pendent state law claims under 28 U.S.C. § 1367.

5.

Plaintiff is entitled to a reasonable attorney fee pursuant to 42 U.S.C. 1988.

## PARTIES

6.

Plaintiff Ofelia Hernandez Santiago is the Personal Representative of the Estate of Eliborio Rodrigues Jr. Ms. Santiago was appointed by the Lane County Circuit Court on April 2, 2020. The state case number is 20PB01960.

7.

Mr. Rodrigues is survived by four minor children.

8.

Defendant Samuel Tykol is a police officer with the City of Eugene Police Department and was acting under color of law at the time of the events alleged herein. He is sued in his individual capacity.

9.

Defendants John Doe Supervisors 1-3 are police officers with the City of Eugene Police Department and were acting under color of law at the time of the events alleged herein. They are sued in their individual capacity. It is alleged the Supervisor Defendants were responsible for supervising and monitoring and/or training Officer Tykol.

10.

Defendant City of Eugene ("City") was at all times a municipal subdivision of the State of Oregon. The City is a "person" pursuant to 42 U.S.C. 1983.

**GENERAL FACTS**

11.

Eliborio (Eli) Rodrigues Jr. lived in Eugene, Oregon. He was 40 years old when he was shot three times by Defendant Tykol. Mr. Rodrigues left four minor children.

12.

Mr. Rodrigues often collected cans and bottles at night to provide extra funds to feed his family and to make ends meet. He did this with Ms. Shoua Yang, the mother of his children and his partner of 20 years. They often took their bikes or walked in the evening. At the time Mr. Rodrigues was shot and killed, he had been doing this for over a year.

13.

Mr. Rodrigues lived with his entire family and had a number of friends in the community. He was raised in California but came to Oregon to raise his family and find peace. He was described as a "great human being" with "a BIG teddy bear heart for anyone who took the time to know [him]" who "taught [his] kids what it means to be family and to be loved." He was known in the community as a hard-working family man who wanted a good life for his kids so he worked as much as possible to make that happen.

14.

On October 27, 2018, Mr. Rodrigues was collecting cans near the University of Oregon when he was arrested by a U of O police officer. That officer committed perjury, hid video evidence from the prosecutor, and was eventually fired from his position. Mr. Rodrigues became nervous and afraid of officers after the incident in 2018.

15.

Five days after the University of Oregon fired the arresting officer in the October 2018 incident, Mr. Rodrigues was shot and kill by Eugene Police officer Samuel Tykol. At the time of the shooting, Officer Tykol had only been a certified police officer since 2016. He has since acquired both the Basic and Intermediate Certifications. Officer Tykol does not appear to have worked at any other law enforcement agency before the City of Eugene. He has a master's degree.

**FACTS OF SHOOTING**

16.

On November 30, 2019, Mr. Rodrigues was walking along the 1400 block of Acacia Avenue about 12:30 in the morning. He was walking in the street and looking for recyclable

bottles and cans that people might have put out in their open-topped blue bins for collection. He was carrying a white bag which held the bottles and cans he retrieved when Officer Tykol pulled up in his patrol car. The Eugene Police Department has refused to provide any police reports or the Use of Deadly Force review but much of that information has been provided to other public sources. There is no dash cam video of events but there is a body cam of the initial contact between Mr. Rodrigues and Officer Tykol.

17.

Officer Tykol allegedly stopped to question Mr. Rodrigues because he was walking in the street, failed to use the sidewalk and was wearing a dark hoodie and mask while carrying a white plastic bag. It was a cold evening. The Body cam footage stopped when Officer Tykol wrestled Mr. Rodrigues to the ground claiming the camera came off his uniform, managed to land on the off button, or break. No one has examined the camera to determine whether it was manually stopped or was broken.

18.

In the video Officer Tykol is fairly aggressive from the moment he approaches Mr. Rodrigues. Officer Tykol tells Mr. Rodrigues he was stopped because he was walking on the road and had ignored the sidewalk. Mr. Rodrigues is putting a plastic bottle in his bag when the officer approaches. At best this is a minor infraction which does not permit extended stops or arrests. The officer asks Mr. Rodrigues for his identification. Mr. Rodrigues had not been driving and there is no legal basis for the officer to ask for identification at that point. Mr. Rodrigues refused to provide his identification which is his Constitutional right.

19.

Mr. Rodrigues explains what he is doing to the officer who indicates that Mr. Rodrigues should have gotten back on the sidewalk. Mr. Rodrigues asks whether or not the officer needs a reason to stop him. Officer Tykol says casually, "No, I can stop you whenever I want." Mr. Rodrigues had the right to walk away or refuse to answer questions.

20.

Officer Tykol became more aggressive, asking Mr. Rodrigues numerous times if he had an ID on him. Mr. Rodrigues does not answer but continues to put the bottles in his bag. The officer gets angrier telling Mr. Rodrigues: "Put this down" (indicating the bag); "You're not free to leave"; and "Sit on the curb." At that point, Officer Tykol has effectively arrested Mr. Rodrigues for the infraction of "walking on the street." It is worth noting that Acadia Avenue only has sidewalks along a portion of the northern side of the street, and no sidewalks along the southern side. There is no discussion from Officer Tykol about what crime "walking on the street" actually constitutes and why it justifies detention and arrest. Officer Tykol reportedly called for non-emergency backup though no explanation is given for the need for additional officers. At the same moment Officer Tykol tells Mr. Rodrigues "You're not free to leave", the officer physically grabs Mr. Rodrigues who in turn asks to speak with a sergeant.

21.

Mr. Rodrigues begins to immediately ask for a sergeant or a "real police" officer. Officer Tykol tells him no and orders him to sit on the curb again. Mr. Rodrigues asks why the officer is touching him. Throughout the recorded encounter Mr. Rodrigues sounds worried and afraid. Rodrigues repeatedly calls the officer "sir" and asks for the sergeant. Officer Tykol does not let go of Mr. Rodrigues and orders him to sit down. Mr. Rodrigues is moving in a slow cumbersome

manner and appears to want to just walk away. Mr. Rodrigues is unarmed and makes no threatening statements or gestures to the officer.

22.

Mr. Rodrigues becomes visibly afraid and yells to anyone who can hear. "Somebody call a real officer" facing away from Officer Tykol but he does not pull away or try to run. Tykol becomes very upset and angry grabbing Rodrigues and pulling him down to the ground hard. There is still no indication of any crime.

23.

Tykol begins grabbing Mr. Rodrigues's hand and when Mr. Rodrigues asks: "Am I under arrest?", Tykol says yes. Mr. Rodrigues is not resisting, has complied with the command to get down, and is passively resisting the officer's questions which is his Constitutional right. Passive resistance cannot serve as the basis for charging someone for interfering with a police officer or resisting arrest. By this point, Mr. Rodrigues is alone on a dark street with an officer who has no basis for putting his hands on Rodrigues or even arresting him, and Mr. Rodrigues is extremely frightened.

24.

Mr. Rodrigues asks Officer Tykol why he's being arrested. Tykol responds, "For interfering with a police officer." Mr. Rodrigues is on his knees on the sidewalk with Tykol pushing on his back. Mr. Rodrigues is not fighting, touching or in any way engaging the officer who continues to push Mr. Rodrigues face down into the ground. Within two minutes of the encounter the officer has completely lost all control and tells Mr. Rodrigues "You're going to get pepper sprayed." He pulls out his canister of CS gas while holding Mr. Rodrigues by the

shoulder and arm forcing Rodrigues to the ground. Mr. Rodrigues begins to yell "officer" and screaming for help.

25.

While Mr. Rodrigues is in a nearly prone position on the ground, he begins to ask to speak to Tykol's sergeant. Tykol is somewhat desperate because he has chosen a course of action and is unwilling to back away. He orders Mr. Rodrigues to put his hands behind his back. Mr. Rodrigues does not comply but is being fully restrained face down on the ground. Mr. Rodrigues is not actively resisting the officer, has not touched the officer or made any threatening statements or gestures. The officer has escalated the encounter without cause or reason.

26.

At that point the body cam magically stops recording. There are no images of the camera flying away or landing. The official version by the Eugene Police Department is that the camera flew off the uniform and landed on the off button. The video of the event does not support this theory. The only person who can contradict the police version after the camera is disabled is now dead.

27.

According to statements by the Civilian Review Board, the officer's statements include that a "physical dispute" ensued, causing Tykol to spray Mr. Rodrigues in the face at close range with the CS spray. The Eugene Police Department has refused to release any forensic reports or other objective investigative material to support any of these allegations and has refused to provide the Estate with any police reports or the official Deadly Force Review report, despite giving it to reporters.

28.

Officer Tykol radioed as some point he was "fighting with one." Tykol reports Mr.
Rodrigues "got away and was running." At that point Tykol's radio microphone magically flew
off as well so no recording of the chase or exchange between the officer and Mr. Rodrigues
could be heard. There is no information available to Plaintiff from crime scene reports where the
microphone or body camera was located.

29.

Officer Tykol reportedly caught up to Mr. Rodrigues and there was "a fight" which
according to some reports was "supported by physical evidence." It is unknown what "physical
evidence' could support Mr. Rodrigues being anything but the victim of assault.

30.

The facts become confusing at that point and are exclusively from Officer Tykol's
statements. Tykol says Mr. Rodrigues was able to gain a physical advantage and "get on top" of
the officer. Tykol says he was able to get to his taser and deploy it. It is unknown whether it was
a contact tase or Tykol tried to deploy the cartridge. There is no Taser read out about how many
times Tykol deployed his taser and there is no physical evidence that the taser prongs or the front
of the taser made actual contact with Mr. Rodrigues. Officer Tykol testified that Mr. Rodrigues
used the taser against the officer by tasing the officer's groin and legs. There is a certain
recycling period when the Taser cannot be used and it is unknown whether Tykol was able to use
that pause in the action or whether he accidently tased himself.

31.

Tykol claims the two continued to fight and the officer was eventually able to grab his
sidearm and fire three times into Rodrigues until he "stopped fighting". Officer Tykol claims he

was able to grab his radio and call shots fired. It is unknown why Tykol tried to arrest Mr. Rodrigues, chased him on foot in the middle of the night, likely tackled him and began to wrestle with him. There are no other witnesses to the events after the Body Cam became disabled.

32.

The IDFIT team was called and responded to the shooting scene. The Police Auditor also responded. The District Attorney issued findings on December 13, 2019 that Tykol's use of deadly force was lawful. The Use of Force Board convened on March 5, 2020 and ultimately found that Tykol's actions up to the use of deadly force and the use of deadly force were within department policy. The police auditor disagreed finding that Tykol's actions violated four department policies including 402 (Police Stops), 820 (de-escalation), 800 (use of force) and 458 (foot pursuit). The police auditor issued his own report which was not released to the public and has been denied to the Estate.

**Eugene Police Policies**

33.

The Eugene Police Department has an exhaustive list of formal policies and procedures applicable to a variety of law enforcement scenarios. The pertinent policies to this discussion include, without limitation:

A. <u>Policy 300: Arrests</u>. EPD officers are sworn to enforce municipal, state and federal criminal laws and should take enforcement action where appropriate and consistent with department policy. Oregon law requires an officer to have probable cause to believe the person to be arrested or detained has committed a misdemeanor or any felony. Policy 300 allows an officer to arrest when the officer has probable cause to believe he or she has committed a crime, or when officers become aware of a warrant for his/her arrest. The

officer may release the person, cite in lieu of arrest, book into jail, retain the person for
another agency to retrieve or allow the person to post bail. Miranda warning are required.
An EPD officer is encouraged to use sound discretion in the enforcement of the law.

B. <u>Policy 402: Police S.T.O.P.'s:</u> This is an attempt to document all stops to avoid racial or
other bias.

C. <u>Policy 800: Use of Force</u>. It is the policy of EPD that an officer will use only that force
that reasonably appears necessary, given the totality of the circumstances perceived by
the officer at the time of the event, to effectively gain control of the incident. Officers
should endeavor to de-escalate confrontations through tactical communication, warning
and other common sense methods preventing the need to use force whenever reasonably
possible. Force is to be consistent with state and federal law, consistent with department
policies and consistent with department training. Force is to be judged by an objectively
reasonable standard including all the factors in Graham v. Connors.

D. <u>Policy 803: Oleoresin Capsicum Aerosol.</u> OC Spray is available to EPD officers has an
additional use of force option for defending themselves or gaining compliance of resistant
or aggressive individuals. The use of OC Spray is to be in compliance with Policy 800
Use of Force. Once a suspect is incapacitated or restrained and no longer a threat the use
of OC is no longer justified.

E. <u>Policy 809.1 Taser Use</u>. EPD has decided Tasers are a "less lethal device" designed to
temporarily incapacitate and permit control of a violent or potentially violent individual,
or an individual demonstrating the intent to harm himself. The use of the Taser must
comply with other relevant department policies including those involving use of force.
The use of the Taser is justified when the "totality of the circumstances known to the

officer indicate that the application of the Taser is reasonable to subdue or control

persons who have created an immediate credible threat of physical injury, someone who

is assaulting another or someone who is suspected of a felony or a misdemeanor

involving injury or threat to another, a sex crime or a violation of a restraining order." A

Taser is not permitted to be used against persons engaged only in passive or static

resistance to an arrest. The rule warns that multiple discharges of the Taser beyond the

standard five second duration may increase the risk of injury or death and should be

avoided.

F.   Policy 820.1 De-escalation. De-escalation is designed to reduce the need to use force,

recognize the sanctity of life, protect officers from harm, reduce injuries to subjects and

build community trust. Officers should make every reasonable effort to de-escalate

confrontations to prevent the need to use force. The various techniques suggested by the

rule include active listening, calling for an officer with greater rapport and empathy,

slowing down the encounter, evaluation of the physical/mental state of the subject,

maintaining distance from the subject, tactical positioning, repositioning and pause,

remaining calm and professional.

G.   Policy 458.1 Foot Pursuit. The policy recognizes that foot pursuit is inherently dangerous

and should be approached with caution and subject to numerous guidelines. The officer

should never engage in foot pursuit when alone. Generally, foot pursuit is discouraged

without greater need to protect the public.

34.

The official Eugene Police Department finding was that Officer Tykol did not violate any

department policies either in the events leading to the shooting or the shooting itself. On the

other hand, the Police Department Auditor issued a separate report finding the officer violated

Policy 402, 820 (de-escalation), 800 (Use of Force) and 458 (foot pursuit). The auditor found the

shooting was within policy based solely on Officer's Tykol's interview statements.

## Citizen Review Board

35.

Eugene has a Citizens Review Board (CRB) which reviews various police actions. It

conducted a review of the shooting of Mr. Rodrigues. The ERB had access to the Use of Force

Findings, the Police Auditor Findings, the videotape, the investigation from the Interagency

Deadly Force Investigative Team (IDFIT), the report from the Internal Affairs investigation and

statements from the various witnesses in interviews conducted by the City of Eugene Police

Department.

36.

The CRB found some aspects of the investigation troubling including the fact that no one

verified the account that the body cam video was in fact incomplete or that it had "accidentally"

terminated recording. They were concerned the interviews of the officer were coached or

supplemented by the officer's attorney who often answered questions or corrected the officer's

answers. In the discussion from the CRB board meeting on June 8, 2021 it appeared many board

members were concerned that officers, including Field Training Officers, were trying to provide

information which was not supported by the facts or designed to influence the findings without

support.

37.

The CRB were hesitant to trust the IDFIT investigation of the shooting especially since

they found officer's statements and testimony "unreliable" but there was no other witness alive

to provide information. CRB felt the IDFIT and Use of Force findings were "attempting" to control the narrative and put unfair and unsupportable motives on the victim. The CRB felt the Use of Force Board report was not thorough and was filled with bias, as opposed to the Police Auditor.

38.

Some CRB board members felt the investigators with the IDFIT had written out questions and was "on the side" of the officer rather than trying to objectively find the truth. They were also deeply concerned that the victim was called a "suspect" and that his character was being maligned as part of the justification for the shooting. There is no evidence Officer Tykol even knew anything about the man he killed prior to the encounter.

39.

Some ERB members were critical of the quality of the Use of Force Board investigation which ignored the fact that Tykol immediately put hands on Mr. Rodrigues, never specifically outlined what crime he alleged committed or how that "crime" was one for which arrest was warranted, the fact Tykol immediately and continuously escalated a situation which was at best a jaywalking incident. The CRB accused the Use of Force Board of a significantly lack of transparency and studiously avoided any details about the actual uses of force.

40.

Police Auditor Gissiner told the CRB he had never seen "such a poor investigation concerning an officer-involved shooting." He said the IDFIT meeting was not recorded. Gissiner told the CRB the incident happened because of the poor training of Tykol by EPD.

**FIRST CLAIM FOR RELIEF: Unreasonable Stop/arrest**
Officer Tykol
42 U.S. C. 1983: 4th Amendment

41.

Plaintiff incorporates all previously alleged matters herein.

42.

Eli Rodrigues Jr. was entitled to walk the streets freely without showing his identification or being subject to being shot. He had the Fourth Amendment protection to be free from the unlawful seizure of his person pursuant to the parameters of the 4th Amendment to the United States Constitution.

43.

The protections of the 4th Amendment inure to the citizen, not the officer. The officer must recognize and guard against any deprivation of the protected rights in all citizens. The officer can stop and momentarily detain a citizen and may then with adequate probable cause further detain the citizen but at some point there is no objectively supportable information to justify an arrest the officer must release the citizen. During such an encounter, the citizen is free to refuse to answer questions, refuse to provide his name and any documentation of identification. An officer may not arrest nor charge a citizen with a crime for exercising his protected Constitutional Rights including the right to be left alone.

44.

In this incident, Officer Tykol reportedly approached Mr. Rodrigues because Mr. Rodrigues was "walking in the street" which is not illegal and if any municipal restriction is imposed on a free and open use of public roadways it is *per se* unconstitutional. But the officer had not seen Mr. Rodrigues commit any crimes, brandish any weapons, trespass on private property or generally commit any felony or serious misdemeanor. Almost immediately the

officer told Mr. Rodrigues he was not free to leave. At that point, the officer had unlawfully arrested Mr. Rodrigues with no probable cause or justification.

45.

Shortly after approaching Mr. Rodrigues, the officer grabbed Mr. Rodrigues without justification. Mr. Rodrigues was not even facing the officer, had no weapon, was not moving away from the officer but was refusing to answer questions and asking the officer to call a sergeant. That should have been a signal to the officer to de-escalate the situation and call another officer who could develop better rapport with Mr. Rodrigues. The officer seriously and quickly escalated the situation by placing Mr. Rodrigues under arrest for not answering questions and by spraying him with pepper spray to get him to comply with questioning. When Mr. Rodrigues was sprayed with the OC spray, he was on his knees facing away from the officer. In fact, Mr. Rodrigues never once responded to the officer's physical escalation of the assault.

46.

The officer lacked probable cause to arrest or seriously detain Mr. Rodrigues though he had the authority to approach Mr. Rodrigues for "mere conversation". However, Officer Tykol became upset, angry and agitated escalating the situation into a premature arrest and eventually serious physical confrontation.

47.

Mr. Rodrigues repeatedly asked for a sergeant or a "real officer", with his voice tinged with fear and concern. There was something in Officer Tykol which made Mr. Rodrigues very afraid. As a result of this unlawful arrest, Mr. Rodrigues suffered the emotional distress, fear, and pain associated with the knowledge that the officer was going to do something very bad to him. This unlawful arrest resulted in Mr. Rodrigues being sprayed with OC gas which caused serious

pulmonary restrictions, burning in his eyes and burns to his face increasing his fear and sense of

doom. The illegal arrest ended with Mr. Rodrigues being shot three times by Officer Tykol.

48.

As a result of the above-described events, Mr. Rodrigues and his Estate suffered damages

to be determined at trial.

**SECOND CLAIM FOR RELIEF: Unreasonable Use of Deadly Force**
Officer Tykol
42 US.C. 1983: Fourth Amendment

49.

Plaintiff realleges all previous paragraphs as if more fully set forth.

50.

Mr. Rodrigues was entitled to be free from unlawful seizure of his person pursuant to the

parameters of the 4th Amendment to the United States Constitution. Mr. Rodrigues was also

entitled to be safe and secure from undue and unreasonable force including deadly force.

51.

The acts and omissions of Defendant Tykol in shooting Mr. Rodrigues without a

reasonable belief that Mr. Rodrigues presented an imminent and serious danger to the officer or

others is a violation of the 4th Amendment restriction on deadly force. Mr. Rodrigues was turned

away from or running away from the officer during the majority of his contact with him. The

officer escalated the situation at numerous times using force against a man who was simply

passively resistant to giving his name or identification and who was asking for a sergeant. The

officer used pepper spray against Mr. Rodrigues when he was on his knees facing away from

Tykol. The Officer used a taser on Mr. Rodrigues who was running away from the officer after

simply jaywalking. Mr. Rodrigues was only suspected of walking on the street which is likely not even a crime and certainly not a crime for which deadly force is justified.

52.

The officer failed to ascertain all reasonable and objective facts and used inaccurate information to justify shooting Mr. Rodrigues. Officer Tykol failed to de-escalate, and he failed to follow proper procedures that complied with department policy including: calling for alternative officers or calling for supervisors; engaging in a foot chase against a jaywalker while alone; assaulting a man who was not physically resistant; and providing an "unreliable" story about the events. There were numerous points in the encounter when the officer could have made different choices and avoided most of the violence he visited on Mr. Rodrigues but he chose to escalate and then contrived his own exigency. It is believed that the officer did everything wrong in approaching this situation creating his own exigency when none existed. This officer panicked and simply started shooting.

53.

Defendant's conduct was well-defined by law and he knew or should have known that his conduct was not only well below the standard prescribed by law, but illegal per se.

54.

As a result of these Constitutional violations, Mr. Rodrigues died. He suffered and endured conscious pain, and was denied the right to continue living and enjoying his life, all to his damage to be more fully determined at trial. Mr. Rodrigues's estate is entitled to recover said damages flowing from the deprivation of his constitutional rights as set forth above.

**THIRD CLAIM FOR RELIEF: Supervisor Liability**
John Doe Supervisors 1-3
42 U.S.C. 1983 Fourth Amendment

55.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

56.

Mr. Rodrigues had the right under the Fourth Amendment of the United States Constitution to be free from arrest not based on a probable cause belief that the particular person has committed, is committing, or is about to commit a crime.

57.

Defendant Tykol violated Mr. Rodrigues rights when he arrested him lacking probable cause to believe he had committed a crime. Tykol also violated Rodrigues protected and guaranteed Fourth Amendment right to be free from unreasonable use of force.

58.

Defendants in a supervisory capacity are held liable for constitutional violations due to their own culpable action or inaction either through (a) their own direct participation in the violations; (b) failure to train, supervise or control subordinates; (c) their own acquiescence in the constitutional deprivations; (d) failure to remedy a wrong after learning of the violation; (e) creating a custom, practice or policy that leads subordinate staff to commit constitutional violations or allowing such custom, practice or policy to continue; or (f) other conduct which shows a reckless or callous indifference to the constitutional rights of others.

59.

Upon information and belief, Defendant John Does authorized and/or acquiesced to the conduct alleged herein which caused Mr. Rodrigues injuries, arrest and mistreatment by Tykol. They are also responsible for failing to properly train and supervise Defendant Tykol.

60.

At all times material, the law was clearly established that Defendants' seizure of Mr. Rodrigues in the manner and under the circumstances was unreasonable and any objectively reasonable law enforcement Defendant would have known that the seizure of Mr. Rodrigues violated his clearly established Fourth Amendment rights. Defendants' conduct was well-defined by law and each Defendant knew or should have known that their conduct was not only well below the standard prescribed by law, but illegal *per se*.

61.

Defendants' conduct was malicious, oppressive, and/or in reckless disregard of Mr. Rodrigues Fourth Amendment rights.

62.

As a direct and proximate result of Defendants' unconstitutional acts, Mr. Rodrigues suffered physical injury and mental harms, outrage, betrayal, offense, indignity and insult, physical distress, and death causing damage in amounts to be determined at trial.

63.

Mr. Rodrigues is entitled to an award of punitive damages against Defendants to punish and deter them and others from similar deprivations of constitutional rights in the future.

### FOURTH CLAIM FOR RELIEF: *Monell*
**Unconstitutional/Illegal Custom, Policy or Procedure**

64.

Plaintiff realleges all previous matters as if more fully set forth.

65.

The City of Eugene has a policy, custom or procedure which allows officers to shoot suspects when there is no threat of deadly force, open fire without warning and without an

awareness of the totality of circumstances which would not justify such use of force. The City of Eugene also trains officers to fail to be aware of proper legal standards including probable cause, arrest of individuals suspected of minor infractions or non-arrestable offenses, escalation of minor incident, passive resistance, foot pursuit, failure to call for support, failure to use common sense.

66.

Despite a national trend toward doing so, The City of Eugene fails to have an adequate policy on training officers in several particulars relating to a response to a crisis situation, to wit:

A. Failing to properly train tactics on how to de-escalate when the circumstances warrant it;

B. Failing to properly train officers to address the specific needs of the situation including modification of tactical response when dealing with mentally or emotionally impaired individuals, and failing to train to obtain all critical information before use of extreme force;

C. Failing to properly train officers in the tactics to be used when a suspect fails to obey verbal instructions;

D. Failing to train officers in the proper and legal use of deadly force;

E. Failing to train in the proper use of OC spray against passively resistant suspects; and

F. Failing to properly train officers on the rights of citizens to exercise their protected Constitutional rights, including the rights to refuse to answer questions or show identification.

66.

As a result of the unofficial policies, customs or procedures described above, Mr. Rodrigues was subjected to unreasonable seizure, excessive force, and battery. Mr. Rodrigues

died because of these policies, customs or procedures, all to his general damages to be more specifically determined at trial.

## SUPPLEMENTAL STATE CLAIMS

### FIFTH CLAIM FOR RELIEF:  Wrongful Death
**All Defendants**

67.

Mr. Rodrigues realleges all previous paragraphs as if more fully set forth herein.

68.

The actions taken by defendants and the City in shooting and killing Mr. Rodrigues were unjustified and are not supported by the law. The use of force was not in the furtherance of official duties and there was no crime to justify the actions by the officers.

69.

Each of the actions described herein were performed by Defendant while he was on duty, carrying a badge and weapon, and working as a law enforcement officer. The act of shooting Mr. Rodrigues was reasonably foreseeable to cause his death and was not justified by the facts and circumstances then present.

70.

The death of Mr. Rodrigues was wrongful and caused the Estate damages in lost income potential, funeral expenses, and lost support for his children all to be fully explored at trial.

### SIXTH CLAIM FOR RELIEF: Negligence

**All Defendants**

71.

Plaintiff realleges all matters previously raised as if more fully set forth.

72.

Defendant Tykol is a City of Eugene police officer acting within the course and scope of his employment with the City when he falsely arrested, tased and gassed Mr. Rodrigues without justification or probable cause.

73.

Mr. Rodrigues's death was caused by the negligence of Defendant Tykol and Supervisor Defendants in one or more of the following particulars:

A.  In failing to allow the use of methods of non-lethal force to de-escalate the situation;

B.  In failing to conduct a reasonable and appropriate investigation of the stop including asking questions, forcing Mr. Rodrigues into a confrontation and using outmoded force response techniques against a passively resistant suspect;

C.  In failing to assess the danger properly and only use the amount and level of force to stop the perceived threat including using OC gas against a suspect on his knees facing away and not resisting;

D.  In failing to use proper tactics to maintain the safety and welfare of himself and others; and

E.  In using deadly force to shoot Mr. Rodrigues who was only suspected of jaywalking.

74.

Mr. Rodrigues's death was caused by the negligence of defendant City of Eugene in one or more of the following particulars:

A.  In having a policy and/or custom and/or practice of ratifying and approving unreasonable shooting deaths of citizens by City police officers without implementing methods and training necessary to prevent future deaths;

B.  In failing to properly train officers in the proper and legal use of deadly force and tasers;

C.  In failing to properly train officers to respect the exercise of protected Constitutional rights by citizens;

D.  In failing to properly train in the use of force against passively resistant suspects;

E.  In failing to properly train how to de-escalate a situation; and

F.  In failing to properly train in the use of force against a compliant suspect.

75.

As a result of the negligence alleged herein, Mr. Rodrigues was assaulted, gassed, tased, shot and killed. He suffered and endured conscious fear, pain and suffering, all to his general damage in the sum to be more fully proven at trial.

76.

Plaintiff has complied with the Oregon Tort Claims Act by filing in a timely manner and in providing proper notice pursuant to statute.

WHEREFORE Plaintiff requests that this Court grant judgment as follows:

1.  Judgment against Defendants for economic damages in an amount to be proven at trial;

2.  Judgment against Defendants for non-economic damages in an amount to be proven at trial;

3.  Judgment against Defendants for punitive damages in a fair and reasonable amount to be proven at trial;

4.  Judgment against Defendants for deterrence damages in a fair and reasonable amount to be proven at trial; and

5.      Judgment for costs, interest, attorney fees and such other and further relief as the

Court deems just and equitable.

DATED this 29th day of November 2021.

Respectfully submitted,


/s/Michelle R. Burrows_____
Michelle R. Burrows OSB861606
Of Attorneys for Plaintiff