**Ben Miller, OSB #074690**
**BMiller@eugene-or.gov**
Eugene City Attorney's Office
101 W. 10th Avenue, Suite 203
Eugene, OR 97401
Telephone: (541) 682-8447
Facsimile: (541) 682-5414

Of Attorneys for Defendants
Samuel Tykol and City of Eugene

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **OFELIA HERNANDEZ SANTIAGO,** Personal Representative of the Estate of Eliborio Rodrigues Jr., <br><br>            Plaintiff, <br><br>     v. <br><br> **SAMUEL TYKOL, JOHN DOE SUPERVISORS 1-3, CITY OF EUGENE,** a municipal subdivision of the State of Oregon, <br><br>                Defendants. | Case No: 6:21-cv-01715-MK <br><br><br> **DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT** <br><br> **Fed. R. Civ. P. 56** |

**LR 7-1(a) CERTIFICATION**

Counsel for defendants certifies he has made a good faith effort to confer with plaintiff's attorneys concerning this motion. Plaintiff's counsel agreed to dismiss the third claim for relief against John Doe supervisors and the fourth claim for relief against the City of Eugene. The parties have been unable to resolve the remaining issues prior to the filing deadline.

**MOTION**

This case concerns Officer Tykol's decision to shoot Mr. Rodrigues in self-defense. At the time of the shooting Mr. Rodrigues was on top of Officer Tykol and fighting for control of the officer's Taser. Officer Tykol was alone, had been punched multiple times, and was on his back on the asphalt street. Only a few minutes before the matter had started as a simple

pedestrian stop. Mr. Rodrigues would not follow lawful orders to sit down and then fought the officer's efforts to arrest him.

The estate of Mr. Rodrigues brings a number of claims that are at issue in this motion. The first claim under 42 U.S.C. § 1983 alleges that the attempted arrest of Mr. Rodrigues was not supported by probable cause in violation of the Fourth Amendment. The initial stop and attempted arrest were both lawful because Officer Tykol observed a pedestrian violation and Mr. Rodrigues later failed to follow lawful orders to sit down, committing the offense of interfering with a peace officer. Mr. Rodrigues later also committed other offenses, including resisting arrest and assault. Moreover, Officer Tykol would be entitled to qualified immunity.

The estate's second claim is for unreasonable use of deadly force in violation of the Fourth Amendment. Here, Officer Tykol's decision to utilize deadly force was justified to defend himself from Mr. Rodrigues' continuing assault. A reasonable officer in his position also would not have known deadly force was not justified, entitling him to qualified immunity.

Finally, at issue in this motion, are state law claims for wrongful death and negligence. If the court does not decline supplemental jurisdiction, the wrongful death claim is barred because the use of deadly force was justified as a matter of state law. The negligence claim is barred because intentional conduct cannot support a negligence claim under Oregon law and because the City does not fail to train or supervise in any of the ways described.

Pursuant to Fed. R. Civ. P. 56 defendants move for summary judgment on all of plaintiff's claims. This motion is based on the following memorandum, the declarations filed in support, and the court's file.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by whether a reasonable jury could return a verdict for the nonmoving party in light of the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

PAGE 2 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT

The moving party has the burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324.

Further, special rules of construction apply to summary judgment motions: all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## FACTUAL BACKGROUND

On Saturday, November 30, 2019, at approximately 12:30 a.m., Officer Sam Tykol was working routine patrol in north Eugene when he observed an individual, later identified as Eliborio Rodrigues, walking in the middle of Acacia Avenue. Declaration of Ben Miller in Support of Defendants' Motion for Summary Judgment ("Miller Decl.") Ex. 1 ("Tykol Depo.") at 192:1-11. Officer Tykol was specifically patrolling looking down the side streets for any activity when he observed Mr. Rodrigues. Officer Tykol continued south of Norkenzie Road before turning around and then driving westbound on Acacia. Officer Tykol drove past Mr. Rodrigues and observed he had his hood pulled all the way up and a mask concealing his face. Tykol Depo. at 47:5-18, 192:1-194:2, Declaration of Koren Evans in Support of Defendants' Motion for Summary Judgment ("Evans Decl."), Ex. 1 ("1575 Acacia Surveillance Footage") at 1:42-2:12.[1] Officer Tykol could not tell if Mr. Rodrigues was a "male or female" based on the level of clothing and mask and observed that Mr. Rodrigues was walking slowly in the roadway. Tykol Depo. at 194:3-13.

Officer Tykol continued to the end of the street, turned around and stopped his patrol vehicle. Tykol Depo. at 48:9-23. Officer Tykol did not activate any emergency lighting and, therefore, his In Car Video did not activate. Tykol Depo. at 120:17-24. Rather, Officer Tykol

---

[1] References to time in this motion refer to the elapsed time of the video or recording, rather than any time or date listed elsewhere.

PAGE 3 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT

radioed that he was conducting a person stop and manually activated his Body Worn Camera as he exited his marked patrol vehicle. Tykol Depo. at 120:8-121:16, 127:24-129:3; Declaration of Sam Tykol in Support of Defendants' Motion for Summary Judgment ("Tykol Decl.") Ex. 1 ("Tykol BWC"), at 0:16-0:30; Declaration of Christopher Stetson in Support of Defendants' Motion for Summary Judgment ("Stetson Decl."). Ex. 1 ("Radio Traffic") at 0:01-0:13. The authority for the stop was to investigate a pedestrian violation of ORS 814.070(1)(a) and Eugene Code 4.830.[2] Tykol Depo. at 140:15-141:6, Tykol Decl. ¶ 4.

Officer Tykol made initial contact with Mr. Rodrigues on the south side of the road, at approximately 1510 Acacia Avenue. There is a sidewalk on the north side of Acacia Avenue and extending east some distance from that location. Tykol Depo. at 54:22-56:5, 195:7-19; and Depo. Ex. 7. Officer Tykol said hello, asked how it was going and let Mr. Rodrigues know he was stopping to chat with him because he was walking in the road. Tykol BWC at 0:31-0:41. Mr. Rodrigues responded verbally, but it cannot be made out from the recording. Tykol BWC at 0:42-:049. Officer Tykol responded, "Well and then you continued, once the sidewalk was available, walking in the road." Tykol BWC at 0:50-0:56.

Next, Officer Tykol repeatedly asked Mr. Rodrigues if he had an I.D. on him. Mr. Rodrigues ignored him. Tykol BWC at 1:05- 1:15. Ultimately, Officer Tykol requested Code 1 cover and told Mr. Rodrigues he was not free to go. Tykol BWC at 1:14-1:17; Tykol Depo. at 57:20-58:8; Radio Traffic at 0:59-1:16. Officer Tykol then told Mr. Rodrigues to put his bag down and grasped ahold of Mr. Rodrigues right upper arm, to escort him away from the cans and their unknown contents. Tykol BWC at 1:20-1:35; Tykol Depo. 285:6-13.

---

[2] ORS 814.070(1)(a) provides: A pedestrian commits the offense of pedestrian with improper position upon or improperly proceeding along a highway if the pedestrian does any of the following: (a)Takes a position upon or proceeds along and upon the roadway where there is an adjacent usable sidewalk or shoulder[.]

Eugene Code 4.830 provides in relevant part: No unauthorized person shall make use of the portion of the street between the curbs reserved for vehicular traffic for any other purpose than vehicular traffic, except that: (a)  Pedestrians may cross the streets at crosswalks[.]

Officer Tykol told Mr. Rodrigues to sit down six different times. Tykol BWC at 1:27 - 1:41. Mr. Rodrigues did not sit down but instead resisted Officer Tykol's efforts to pull him down to a sitting position. Tykol BWC at -1:40-1:48; Tykol Depo. at 67:12-18. Officer Tykol then called for Code 3 cover. Tykol BWC at 1:38; Radio Traffic at 1:23-1:36; Tykol Depo. at 129:24-130:10. Officer Tykol confirmed that he would call a sergeant to the scene if Mr. Rodrigues would sit down. Tykol BWC at 1:41.

Officer Tykol struggled to push Mr. Rodrigues into a sitting position and Mr. Rodrigues asked whether he is being detained. Officer Tykol responded that he was and later that he was under arrest for interfering with police. Tykol BWC at 1:43-2:01. Ultimately, Officer Tykol and Mr. Rodrigues end up on the ground with Mr. Rodrigues facing away and Officer Tykol on his lower back/legs. Tykol Depo. at 85:21-86:18. Officer Tykol clearly enunciates to Mr. Rodrigues he is under arrest and to place his hands behind his back. Mr. Rodrigues refuses to comply and Officer Tykol tells him he is under arrest additional times. Tykol BWC at 1:53-2:01. Officer Tykol struggles to place Mr. Rodrigues' right arm behind his back to be handcuffed. Tykol BWC at 2:08-2:11; Tykol Depo. at 86:25-89:5, 211:17-212:23.

Next, Officer Tykol warned Mr. Rodrigues twice that he was going to get pepper sprayed if he did not put his hands behind his back. Tykol BWC at 2:14-2:18. Officer Tykol attempted to use his OC spray to take Mr. Rodrigues into custody, but the spray was deployed on the side of his face and seemed to have no effect. Tykol BWC at 2:27. Tykol Depo. at 91:24-93:23, 95:4-96:9, 98:11-17, 99:13-100:4. Officer Tykol then radioed "fighting with one." Tykol BWC at 2:41-2:43; Radio Traffic at 2:27-2:32.

Mr. Rodrigues was able to physically push or thrust Officer Tykol from his back at which point Officer Tykol's Body Worn Camera dislodged from its magnet on his uniform, struck the pavement, and turned off. Tykol Depo. at 124:23-126:13. There is no more video of what occurred until Officer Justin Russell arrived approximately one minute and 50 seconds later.

Mr. Rodrigues fled eastbound on Acacia Avenue. Tykol Depo. at 137:7-16. Officer Tykol pursued Rodrigues a short distance at which point, Mr. Rodrigues turned and took a fighting stance. Mr. Rodrigues punched Officer Tykol who punched back. Tykol Depo. at 162:12-17,

165:4-11, 214:25-215:13, 216:10-217:10, 224:14-227:8, 229:7-233:16 and Depo. Ex. 14 ("IDFIT Interview") at 25:17-26:19.[3]

Mr. Rodrigues broke free from Officer Tykol once again and attempted to flee eastbound. Officer Tykol pursued Mr. Rodrigues a short distance and ultimately tackled Mr. Rodrigues to the ground. Officer Tykol was initially on top of Mr. Rodrigues; however, Mr. Rodrigues was able to push Officer Tykol and ultimately end up on top of Officer Tykol. At this point Officer Tykol is on his back with Mr. Rodrigues on top of him. Mr. Rodrigues continued punching Officer Tykol from an elevated position while Officer Tykol was attempting to grasp and control Mr. Rodrigues' hands. Mr. Rodrigues punched him in the face and body. IDFIT Interview at 26:19-27:16; Tykol Depo. at 234:2-242:17.

Officer Tykol pulled his Taser out and deployed it in dart mode at Mr. Rodrigues' stomach with no effect. Mr. Rodrigues grabbed the barrel of the Taser and drove it into Officer Tykol's crotch and then into his leg. Officer Tykol reported that his legs were totally incapacitated at that point. Officer Tykol said at that point he could tell Mr. Rodrigues was not trying to get away, but was out to hurt him. Mr. Rodrigues then put the Taser to Officer Tykol's side as they continued to struggle over it. This was significant to Officer Tykol as his firearm is carried on his right side and, if his arm was incapacitated, he would no longer be able to use his firearm or defend his firearm from being taken. IDFIT Interview at 27:25-29:6; Tykol Depo. at 243:10-245:2, 245:22-253:18, 254:14-261:7.

Officer Tykol believed Mr. Rodrigues was going to kill him and Officer Tykol was scared for his life. Officer Tykol was able to create a little separation between himself and Mr. Rodrigues, drew his firearm, and shot Mr. Rodrigues three times in the abdomen to get Mr. Rodrigues to stop assaulting him. IDFIT Interview at 29:19-30:9; Tykol Depo. at 261:8-266:20.

Officer Russell was the first to arrive on the scene. He pulled onto Acacia Avenue and up to Officer Tykol just as he was attempting to place handcuffs on Mr. Rodrigues. Evans Decl. Ex. 2 ("Russell ICV") at 3:16-3:27. This was approximately 10 seconds after Officer Tykol had

---

[3] Citations to the IDFIT interview of Officer Tykol refer to the transcript page number and line.

initially radioed shots fired. Russell ICV at 3:10; Radio Traffic at 4:10-4:17. Officers began

lifesaving efforts on Mr. Rodrigues, including packing wounds and CPR until medics arrived.

Russell ICV at 5:00-11:30. Mr. Rodrigues was pronounced dead at the scene.

Officer Tykol was initially walked over to his patrol vehicle before being transported

from the scene and later to a hospital. Evans Decl. Ex. 3 ("Jentzsch BWC") at 0:30-7:32; Tykol

Depo. at 166:1-167:5, 168:22-169:1. Officer Tykol suffered a wound to his forehead, abrasions

to his legs, and burn marks from the taser to his side. Tykol Depo. at 169:2-11, 171:2-10, 229:18-

230:10, 277:9-12, 294:17-295:11; IDFIT Interview at 36:17-38:25, 39:21-40:8.

An investigation by the Lane County District Attorney concluded that Officer Tykol's

use of force was justified under the circumstances of self-defense. Tykol Depo. at 298:11-299:10

and Depo. Ex. 18. This lawsuit followed.

## POINTS AND AUTHORITIES

### 1. First Claim for Relief: 42 U.S.C. 1983 against Officer Tykol for False Arrest

The first § 1983 claim alleges "the officer had unlawfully arrested Mr. Rodrigues with no

probable cause or justification." Complaint, ¶ 43 [Doc 1]. This claim fails because the

undisputed facts show a reasonable officer could conclude she or he had probable cause to stop

and later to arrest Mr. Rodrigues. In the alternative, Officer Tykol is entitled to qualified

immunity.

Under the Fourth Amendment "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. A warrantless arrest is

lawful only if there is "probable cause to believe that the arrestee has committed, or is

committing, an offense." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1207 n.7 (9th Cir. 2008).

In *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S. Ct. 1536, 149 L.Ed.2d 549 (2001),

the Supreme Court held that an officer is deemed to act reasonably under the Fourth Amendment

in making a warrantless arrest if the officer had probable cause to believe that the arrested person

violated a criminal statute. *Id*. at 354, 121 S. Ct. 1536 ("If an officer has probable cause to

believe that an individual has committed even a very minor criminal offense in his presence, he

PAGE 7 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR
SUMMARY JUDGMENT

may, without violating the Fourth Amendment, arrest the offender."). A police officer has

probable cause to arrest a person without a warrant if, under the totality of the circumstances

known to arresting officers, there exists a "fair probability" that the person has committed a

crime. *Conner v. Heiman*, 672 F.3d 1126, 1132 (9th Cir. 2012); *Tatum v. City and County of San

Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006).

### A.  Insufficiency of Evidence

A person commits the crime of interfering with a peace officer or parole and probation

officer if the person, knowing that another person is a peace officer or a parole and probation

officer as defined in ORS 181A.355: (a) Intentionally acts in a manner that prevents, or attempts

to prevent, a peace officer or parole and probation officer from performing the lawful duties of

the officer with regards to another person; or (b) Refuses to obey a lawful order by the peace

officer or parole and probation officer. ORS 162.247(1) (2019 version).  Interfering with a peace

officer or parole and probation officer is a Class A misdemeanor. ORS 162.247(2).

In this case, Officer Tykol initially stopped Mr. Rodrigues after he observed pedestrian

violations. Tykol Depo. at 50:19-51:8; Tykol Decl., ¶ 4. Specifically, Officer Tykol observed Mr.

Rodrigues proceed along and upon Acacia Street where there was an adjacent usable sidewalk or

shoulder. He, therefore, had probable cause to stop Mr. Rodrigues and investigate a violation of

ORS 814.070(1)(a) or Eugene Code 4.830. Under ORS 153.039(3) Officer Tykol was authorized

to detain Mr. Rodrigues and determine his identity, to conduct any investigation reasonable

related to the observed violations, and to issue a citation. Tykol Decl., ¶ 4.

Later, Officer Tykol developed probable cause to arrest Mr. Rodrigues for interfering

with a peace officer. Officer Tykol was wearing his uniform and driving a marked patrol car. He

had passed Mr. Rodrigues, then turned around to stop him. During their encounter Mr. Rodrigues

asked to speak with Officer Tykol's sergeant. Officer Tykol believed Mr. Rodrigues knew he

was a Eugene police officer. Tykol Decl., ¶ 5. After Mr. Rodrigues ignored Officer Tykol's

initial attempts to speak with him, Officer Tykol attempted to escort Mr. Rodrigues to the curb

and have him sit down. Tykol Depo. at 69:1-15, 201:11-202:3; Tykol BWC at 1:20-1:35. Officer

Tykol was concerned that Mr. Rodrigues was attempting to disengage from the stop and wanted

PAGE 8 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR
SUMMARY JUDGMENT

to have him physically in a position of disadvantage. Tykol Depo. at 76:3-12, 78:15-79:5. As a result, Officer Tykol had officer safety reasons for ordering Mr. Rodrigues to sit down.

Mr. Rodrigues heard Officer Tykol's orders to sit down and did not comply. Tykol Depo. at 67:12-18; Tykol BWC at 1:20-1:35. Instead, Mr. Rodrigues physically resisted his efforts to get him to sit down. At that point Officer Tykol had probable cause to arrest Mr. Rodrigues under ORS 162.247(1)(b) (2019 version) when Mr. Rodrigues refused his repeated lawful orders to sit down. A lawful order is one that is authorized by, and not contrary to, substantive law. *State v. Ausmus*, 336 Or. 493, 504, 85 P.3d 864 (2003). Lawful orders include those directed at maintaining control of a potentially dangerous situation where the failure to obey the officer's orders creates a potential risk of harm. *State v. Neill*, 216 Or. App. 499, 508, 173 P.3d 1262 (2007). Because Mr. Rodrigues refused to obey Officer Tykol's lawful orders to sit down, there was probable cause to arrest him. Later, Mr. Rodrigues engaged in actions which constituted resisting arrest under ORS 162.315(1) or Eugene Code 4.910(1), assault under ORS 163.175, 163.208 and Eugene Code 4.729, and disorderly conduct under ORS 166.025(1) or Eugene Code 4.725. Tykol Decl. ¶ 5.

### B.  Qualified Immunity

Officer Tykol is also entitled to summary judgment on the basis of qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mueller v. Auker (Mueller II)*, 700 F.3d 1180, 1185 (9th Cir. 2012) (*quoting Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012)) (internal quotation marks omitted). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It "makes allowance for some constitutional mistakes," *Mueller II*, 700 F.3d at 1185-86, such as "when an officer reasonably believes that his or her conduct complies with the law," *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

A qualified immunity analysis requires the court to ascertain (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. 223 (two-step sequence is not mandatory).

In determining whether a government official's conduct violates clearly established law, the test is whether, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 131 S. Ct. at 2083 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (brackets, citation, and internal quotation marks omitted). The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Id*. at 2084 (citation omitted). "The inquiry . . . must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Mueller II*, 700 F.3d at 1185 (*quoting Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)) (internal quotation marks omitted).

Nor does the analysis end there. "[E]ven if the violated right was clearly established, [the Supreme Court] recognized that it may be difficult for a police officer fully to appreciate how the legal constraints apply to the specific situation he or she faces. Under such a circumstance, if the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (alteration in original) (*quoting Motley v. Parks*, 432 F.3d 1072, 1077 (9th Cir. 2005) (en banc), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc)) (brackets and internal quotation marks omitted).

Whether a particular order is 'lawful' is frequently a complex question involving some of the most vexing and intractable issues in constitutional law. The inquiry is addressed on a case-by-case basis, there are few if any bright line rules, and there is an almost infinite variety of variables.  *State v. Ruggles*, 238 Or. App. 86, 92, 242 P.3d 643 (2010). This is precisely the type

PAGE 10 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT

of situation qualified immunity is designed to address. *See Anderson*, 483 U.S. at 641 ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present.") Even when an officer makes a reasonable mistake of law they are still entitled to qualified immunity. *Heien v. North Carolina*, 574 U.S. 54, 135 S. Ct. 530, 536, 190 L.Ed.2d 475 (2014).

*State v. Navickas*, 271 Or. App. 447, 351 P.3d 801 (2015) also supports the application of qualified immunity. There the Court of Appeals held a rational fact-finder could have found that an officer had the authority to instruct the defendant to move off of the street for safety reasons. *Id*. at 450-451. Here, Officer Tykol issued his orders in light of safety concerns Mr. Rodrigues posed. Tykol Depo. at 76:3-12, 78:15-79:5.

Officer Tykol is entitled to qualified immunity because it would have been difficult for him to appreciate that his order was unlawful or that Mr. Rodrigues' actions did not constitute the crime of interfering with a peace officer. Plaintiff has pointed to *State v. McNally*, 361 Or. 314, 392 P.3d 721 (2017) to argue that Mr. Rodrigues was only engaged in passive resistance. But *McNally*, concerned jury instructions, not probable cause to arrest. *Id*. at 320. *McNally* changed the prior definition of passive resistance to mean "noncooperation with a lawful order of a peace officer that does not involve active conduct." *Id*. at 339. But the bar for active conduct is very low. It only requires something more than a mere refusal to stand or move, like stiffening the legs. *State v. Remsh*, 221 Or. App. 471, 190 P.3d 476 (2008) (holding that, in the context of resisting arrest, the defendant did not engage in passive resistance when he jerked away from the arresting officer). Moreover, *State v. Moravek*, 297 Or. App. 763, 772-773, 444 P.3d 521 (2019), decided a few months before this event, held that passive resistance is not an element of the crime of interfering with a peace officer but rather may be an affirmative defense.

Here, a reasonable officer in the position of Officer Tykol could have believed that what Mr. Rodrigues was doing amounted to more than passive resistance or that he was not required to disprove passive resistance to establish an offense. Tykol Depo. at 67:3-18, 69:1-15. Moreover, in light of the constantly changing state of the law around the crime of interfering with a peace officer at that time, it would not always be clear to a reasonable officer what he

PAGE 11 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT

needed to prove or not.

As the Supreme Court held recently, Fourth Amendment cases and the determinations of qualified immunity that often accompany them are intensely fact-specific. *Wesby*, 138 S. Ct. 577, 590 (2018) ("We have stressed that the specificity of [the applicable clearly established law] is especially important in the Fourth Amendment context.") (internal quotation marks omitted). Here, plaintiff has not provided any directly on-point precedent for the factual scenario presented in this case. *See id* at 590 (discussing the "rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," but stating that "a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause") (internal quotation marks omitted).

The Supreme Court in *Wesby* went on to address qualified immunity, noting that probable cause turns on the assessment of probabilities in particular factual contexts and is "incapable of precise definition or quantification into percentages." *Id.* at 590. Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in "the precise situation encountered." *Id.* The Court noted that neither the panel majority nor the plaintiffs had identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation "under similar circumstances." *Id.* The officers were thus entitled to summary judgment based on qualified immunity. *Id.*

*Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017) is in accord. In that case the officers arrested the wrong person when they executed a search warrant and were alleged to have conducted an unlawful search and used excessive force. The Ninth Circuit concluded that much of the defendants' conduct relating to the Fourth Amendment was unconstitutional, but still held that the deputies were entitled to qualified immunity. *Id* at 910-11, 915-17, 919. Relying on *White v. Pauly*, the Ninth Circuit noted that plaintiffs must "identify a case where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." *Id.* at 911 (emphasis in original). In other words, "plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* officers in *this case* that *their particular conduct* was unlawful." *Id.* (emphasis in original). The prior precedent must

be "controlling"—meaning from the Ninth Circuit or Supreme Court— or otherwise be embraced by a "consensus" of courts outside the relevant jurisdiction. *Id.; see also Horstman v. City of Hillsboro*, 718 F. App'x 546, 547-48 (9th Cir. 2018) (reversing the district court's decision denying qualified immunity in wrongful arrest case because the cases cited by plaintiff did not provide "adequate notice to the officers that they were violating a clearly established constitutional right under the facts before them"). In this case, plaintiff will be unable to present any clearly established law to the contrary.

## C. Arguable Probable Cause

When determining whether an officer is entitled to qualified immunity arising out of a decision to arrest, the question presented is not whether the officer had probable cause. The Ninth Circuit has repeatedly observed that officers may be entitled to qualified immunity even if a jury could find that probable cause to arrest did not exist. *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991); *see also, e.g., Alexander v. Cty. of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995) (noting the question whether qualified immunity exists is different than the question whether there was probable cause). The threshold "determination of whether the facts alleged could support a reasonable belief in the existence of probable cause . . . is [] a question of law to be determined by the court." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). S*ee also Peng v. Mei Chin Penghu*, 335 F.3d 970, 979–80 (9th Cir. 2003).

Police officers are entitled to qualified immunity if a reasonable officer could have believed the conduct was lawful. That is to say, all that is necessary to protect an officer from liability is arguable probable cause. *Ismail v. Cty. of Orange*, 676 F. App'x 690, 692 (9th Cir. 2017); *Blankenhorn v. City of Orange*, 485 F.3d 463, 475 (9th Cir. 2007) (holding it was sufficient for qualified immunity analysis for officers to show they had arguable probable cause to believe plaintiff committed a crime); *Rosenbaum v. Washoe Cnty.,* 663 F.3d 1071, 1076 (9th Cir. 2011) (noting court must determine whether it is reasonably *arguable* that there was probable cause for arrest). The inquiry is not whether another reasonable or more reasonable interpretation of events can be constructed after the fact. *Burrell v. McIlroy,* 464 F.3d 853, 857 (9th Cir. 2006).

PAGE 13 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT

Courts must examine the particularized facts known by the officers at the time of the encounter to determine whether a reasonable officer could have believed that his conduct was justified. *Id.* Information that amounts to probable cause does not have to be conclusive of guilt, and does not have to exclude the possibility of innocence. *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011). Police are not required to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence that a suspect has committed a crime. *Id.* All that is required is a "fair probability," given the totality of the evidence, that such is the case. *Id.*

Probable cause exists even if the officers made a reasonable mistake of fact or law. *Heien*, 135 S. Ct. at 536. "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009). For example, even arresting for a non-arrestable offense does not violate the constitution. *Miller v. City of Portland*, 2014 WL 320555, *9-10 (D. Or. Jan. 29, 2014) (that Oregon prohibits arrest for the jaywalking offense cannot transform the arrest into a constitutional violation if it was based on probable cause.); *see also Atwater* 532 U.S. at 354 (it is not a violation of the Fourth Amendment for an officer to arrest a person who is in clear violation of law, even if the offense is minor and nonviolent.), *Virginia v. Moore,* 553 U.S. 164, 176, 128 S. Ct. 1598 (2008) (even in the face of state law prohibiting arrest for the crime at issue, custodial arrest for an offense does not violate the Fourth Amendment where supported by probable cause.).

Probable cause is not a "finely-tuned standard," comparable to the standards of proof beyond a reasonable doubt or proof by a preponderance of the evidence. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed 2d 911 (1996). It is a fluid concept that takes its substantive content from the particular contexts in which the standard is being assessed, nor is it readily, or even usefully, reduced to a neat set of legal rules. *Id*. And because the mosaic which is analyzed for a probable-cause inquiry is multi-faceted, one determination seldom will be a useful "precedent" for another. *Id*. at 698.

Taken together, the evidence, even in the light most favorable to the plaintiff, was more than sufficient to provide arguable probable cause to arrest Mr. Rodrigues for the offenses described above. *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) (rejecting rule that would have limited probable cause inquiry to the specific offense invoked by the arresting officer); *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) (noting that once probable cause is established "a law enforcement officer is not required by the Constitution to investigate independently every claim of innocence").

**2.      Second Claim for Relief: Excessive Force Against Officer Tykol**

Plaintiff's Second Claim for Relief is for unreasonable use of deadly force. Complaint, ¶ 49-54 [Doc. 1.]. Plaintiff alleges that Officer Tykol used excessive force against him by shooting him. *Id*. at ¶ 52. Officer Tykol is entitled to qualified immunity under both prongs.

**A.  No Fourth Amendment Violation**

A police officer's use of deadly force satisfies Fourth Amendment standards where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985). (Deadly force can be used when a suspect threatens a police officer with a weapon.) *Flores-Haro v. Slade*, 686 Fed. Appx. 454, 456 (9th Cir. 2017) (It was reasonable to shoot an innocent neighbor that was armed but never pointed the gun at the officers.) The inquiry should be undertaken with a view towards the totality of the circumstances surrounding a particular sort of seizure. *Garner*, 471 U.S. at 8-9. In addition, the misinterpretation of the acts of the suspect by the officer does not render deadly force unconstitutional. *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (Holding that evidence that shooting victim was found to be unarmed after he was shot and killed by police officer was irrelevant in determining objective reasonableness of officer's conduct-"Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's … proper post-hoc analysis of the reasonableness of the actor's judgment.").

Here, at the time of the shooting Mr. Rodrigues was on top of and physically assaulting Officer Tykol. Mr. Rodrigues had committed a series of crimes, the most serious being the assault of Officer Tykol, a class C felony. ORS 162.208. Mr. Rodrigues fled from Officer Tykol

before turning on him and actively resisting arrest. Officer Tykol progressed through multiple warnings and lesser levels of force which had been unsuccessful. At the time he shot, Mr. Rodrigues was on top of Officer Tykol, striking him as his head was against the pavement, and attempting to wrestle the Taser from him. There were no other officers present to intervene. Officer Tykol was in fear for his life. In light of those facts, a reasonable officer in the position of Officer Tykol would have reasonably concluded deadly force was authorized in response to the threat posed by Mr. Rodrigues.

### B.  Qualified Immunity

In addition, Officer Tykol is entitled to summary judgment on the basis of qualified immunity. By design, the issue of qualified immunity is usually resolved "long before trial." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam). The Supreme Court has repeatedly stressed the importance of deciding qualified immunity "at the earliest possible stage in litigation" in order to preserve the doctrine's status as a true "immunity from suit rather than a mere defense to liability." *id*. at 227 (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

In light of the undisputed facts in this case, a reasonable officer in the position of Officer Tykol could have reasonably concluded deadly force was authorized in response to that threat. *Kisela v. Hughes*, 584 U.S. __, 138 S. Ct. 1148, 1153 (2018) ("This is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment."); *Sheehan v. City and County of San Francisco*, 575 U.S. 600, 135 S. Ct. 1765, 1775 (2015) (Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds.); *Scott v. Harris*, 550 U.S. 372, 384, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007).

The Ninth Circuit has held that where there is only one account from the surviving officer, the Court must take special care to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014). However, in this case plaintiff has never provided an alternative version of the events from those described by Officer Tykol. Miller Decl. Ex. 2 ("Santiago Depo.") at 7:19-8:6, 60:4-62:19, 67:23-68:9.

Rather, plaintiff's Complaint takes issue with Officer Tykol's prior decisions and argues those led him to the point where deadly force became necessary. Complaint, ¶ 52 [Doc. 1]. But poor tactics, and even prior unconstitutional actions, do not state an excessive force claim. *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1547, 198 L.Ed.2d 52 (2017) ("An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation such as an unreasonable entry.") The Supreme Court has done away with the provocation doctrine, which is what plaintiff's claim is based upon. As such, Officer Tykol is entitled to summary judgment on the Second Claim for Relief on the basis of qualified immunity.

### 3. Third Claim for Relief: Supervisory Liability Against John and Jane Does

Plaintiff's third claim for relief is for supervisory liability against unnamed supervisors at the Eugene Police Department. Complaint, ¶¶ 55-63 [Doc. 1]. During conferral, plaintiff agreed to dismiss this claim.

### 4. Fourth Claim for Relief: Excessive Force Against the City of Eugene

Plaintiff's fourth claim for relief alleges the City failed to properly supervise or train its employees. Complaint, ¶ 64-66 [Doc. 1]. Plaintiff agreed to dismiss this claim during conferral.

### 5. Fifth and Sixth Claims for Relief – State Law Claims

Plaintiff's fifth and sixth claims for relief are state law claims for wrongful death and negligence, respectively. Complaint, ¶¶ 67-76 [Doc. 1]. Where a district court dismisses "all claims over which it has original jurisdiction," it may, in its discretion, "decline to exercise supplemental jurisdiction" over pendent state law claims. 28 U.S.C. § 1367(c)(3); *Lacey v. Maricopa County*, 693 F.3d 896, 940 (9th Cir. 2012). The Court should decline to exercise supplemental jurisdiction over plaintiff's state law claims.

If the Court nevertheless considers these claims, the City makes the following arguments.

### A. Fifth Claim for Relief – Wrongful Death

Plaintiff's Fifth Claim for Relief is a state law claim entitled "Wrongful Death" brought against Officer Tykol and the City of Eugene. Plaintiff alleges, "The actions taken by defendants

and the City in shooting and killing Mr. Rodrigues were unjustified and are not supported by the law. The use of force was not in the furtherance of official duties and there was no crime to justify the actions by the officers." Complaint, ¶ 68 [Doc. 1]. No legal theory is otherwise alleged and no standard of care is alleged. Thus, assuming there is even a cause of action for the "wrongful death" of a person for shooting a person when "unjustified and not supported by the law" and done "not in the furtherance of official duties," defendants prevail on this claim.

First, it is undisputed that Officer Tykol was acting "in the furtherance of [his] official duties" in contacting Mr. Rodrigues and later attempting to take him into custody. Thus, for that reason alone, both the City and Officer Tykol prevail. Second, the use of force was justified and supported not only by the Fourth Amendment, but also by the laws of the State of Oregon.

At the time of this incident, ORS 161.239 provided that "(1) Notwithstanding the provisions of ORS 161.235, a peace officer may use deadly physical force only when the peace officer reasonably believes that:… (a) The crime committed by the person was a felony or an attempt to commit a felony involving the use or threatened imminent use of physical force against a person; or …(c) Regardless of the particular offense which is the subject of the arrest or attempted escape, the use of deadly physical force is necessary to defend the peace officer or another person from the use or threatened imminent use of deadly physical force; or (d) The crime committed by the person was a felony or an attempt to commit a felony and under the totality of the circumstances existing at the time and place, the use of such force is necessary; or (e) The officer's life or personal safety is endangered in the particular circumstances involved."

Thus, based upon the version of ORS 161.239 which was in effect at the time, Officer Tykol had the right to use deadly force in the circumstances of this case.

## B. Sixth Claim for Relief - Negligence Against the City

Plaintiff's sixth and final claim is for negligence. Complaint ¶ 71-76 [Doc. 1]. Plaintiff brings two types of negligence claims. First, plaintiff alleges that Officer Tykol was negligent in how he conducted his investigation, how he attempted to make an arrest, and how he utilized force, including deadly force. Complaint, ¶ 73 [Doc. 1]. Plaintiff's negligence claim rests on the same facts as his § 1983 claims, which concern intentional conduct. Plaintiff's negligence claim

PAGE 18 – DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT

is barred because intentional conduct does not support a claim for negligence under Oregon law. *Kasnick v. Cooke*, 116 Or. App. 580, 583, 842 P.2d 440 (1992) ("[P]laintiff may not allege facts that necessarily would constitute an intentional tort but then assert that he can prevail by proving only negligence."). Here, Officer Tykol intended to stop Mr. Rodrigues, he later intended to arrest Mr. Rodrigues, he intended to utilize force to take Mr. Rodrigues into custody, and finally he intended to shoot Mr. Rodrigues in self-defense.

At the summary judgment stage such a claim cannot be maintained. *Saberi v. City of Portland,* No. CV 04-1396-MO, 2006 WL 2707995, at *4 (D. Or. Sep. 18, 2006) ("Here, the negligence claim is based on the same operative facts as the § 1983 claim. It is therefore not a proper basis for a separate negligence claim.") "[I]ntentional conduct, such as arresting and handcuffing a person, cannot support a claim for negligence." *Wagoner v. City of Portland*, 2017 WL 2369399, *11 (D. Or. May 31, 2017). See *also Hartman v. Brady*, 2016 WL 6126962, *5 (D. Or. Sep. 9, 2016)("to the extent plaintiff alleges Vernonia and Columbia County are negligent (through its officers) for arresting plaintiff, his claim fails because plaintiff attempts to categorize an intentional tort as negligent conduct"); *Rodriguez v. Jackson County,* 2015 WL 404577, at *4 (D. Or. Jan. 29, 2015) (allegations of intentional conduct do not support a claim for negligence); *Aranda v. City of McMinnville*, 942 F. Supp.2d 1096, 1110 (D. Or. 2013) (granting summary judgment on state law negligence claim as barred by *Kasnick*); *Coleman v. Hubbard*, 2013 WL 3047306, * 4 (D. Or. June 15, 2013) (same); *Woods v. Gutierrez*, 2012 WL 6203170, * 12 (D. Or. Dec. 12, 2012) (same).

In addition, an arrest supported by probable cause is authorized by law. ORS 133.235, ORS 133.310(1). Since defendants had probable cause to arrest plaintiff, the arrest could not have harmed any legally protected interest that he had. *Denucci v. Henningsen*, 248 Or. App. 59, 69, 273 P.3d 148 (2012) *citing Picray v. Sealock*, 138 F.3d 767, 770 (9th Cir. 1998). Defendants are entitled to summary judgment on the first part of plaintiff's negligence claims because Officer Tykol had probable cause to arrest plaintiff. His actions were, therefore, authorized and harmed no legally protected interest.

Plaintiff's second negligence claim is that the City is liable for failing to train in certain particulars. Complaint, ¶ 74 [Doc. 1]. To prove this claim, plaintiff must show the City knew or should have known of the need for better or different training and supervision of its employees, and that the City's failure to address the issue was a substantial contributing factor in causing his injury. *Whelan v. Albertson's, Inc*., 129 Or. App. 501, 507, 879 P.2d 888 (1994). Plaintiff will be unable to provide any evidence to support this claim. The City does not fail to train or supervise in the ways described. Declaration of Chris Skinner in Support of Defendants' Motion for Summary Judgment, ¶¶ 3-6, 8-11; Tykol Decl. ¶¶ 8-15. As a result, the City is entitled to summary judgment on this portion of the claim.

## CONCLUSION

For the foregoing reasons, the Court should grant defendants Officer Tykol and the City of Eugene's Motion for Summary Judgment. The court should enter judgment in favor of these defendants on all claims, award them their reasonable costs, and grant such further and additional relief as is just and proper.

DATED this 1st day of September, 2023.

**CITY OF EUGENE**

By: ___s/ Ben Miller_____
Ben Miller, OSB #074690
BMiller@eugene-or.gov
Telephone: (541) 682-8447
Facsimile:  (541) 682-5414

Of Attorneys for Defendants
Samuel Tykol and City of Eugene

**CERTIFICATE OF SERVICE**

I certify that on this 1st day of September, 2023, I served or caused to be served a true and complete copy of the foregoing **DEFENDANTS SAMUEL TYKOL AND CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT** on the party or parties listed below as follows:

    **X**    Via CM / ECF Filing

    **X**    Via First Class Mail, Postage Prepaid

    _____    Via Email

| | |
|---|---|
| Michelle R. Burrows | Anthony Rosta |
| 16869 SW 65th Ave #367 | 795 W 7th Ave |
| Lake Oswego, OR 97035 | Eugene, OR 97402 |
| | |
| Attorney for Plaintiff | Attorney for Plaintiff |

**CITY OF EUGENE**

By:   s/ Ben Miller
       Ben Miller, OSB #074690
       BMiller@eugene-or.gov
       Telephone: (541) 682-8447
       Facsimile:  (541) 682-5414

       Of Attorneys for Defendants
       Samuel Tykol and City of Eugene