## Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| OFELIA HERNANDEZ SANTIAGO, ) | No. 6:21-cv-07175-MK |
| Personal Representative of ) | |
| the Estate of Eliborio ) | |
| Rodrigues Jr., ) | |
|         Plaintiff, ) | |
|     v. ) | |
| SAMUEL TYKOL, JOHN DOE ) | |
| SUPERVISORS 1-3, CITY OF ) | |
| EUGENE, a municipal ) | |
| subdivision of the State of ) | |
| Oregon, ) | |
|         Defendants. ) | |

DEPOSITION OF OFELIA SANTIAGO

May 24, 2023

Wednesday

12:59 P.M.

## Page 2

THE DEPOSITION OF OFELIA SANTIAGO was taken at CC Court Reporting & Videoconferencing, 101 East Broadway, Suite 300, Eugene, Oregon, before Sara Fahey Wilson, CSR/CCR Certified Shorthand Reporter in and for the State of Oregon and Washington.

APPEARANCES

For the Plaintiff:
 Mr. Anthony Rosta
 ROSTA & CONNELLY
 795 West 7th Avenue
 Eugene, Oregon 97402
 541-343-8111
 tony@rosta-connelly.com

 Ms. Michelle R. Burrows
 MICHELLE R. BURROWS LAW OFFICE
 16869 SW 65th Avenue, #367
 Lake Oswego, Oregon 97035
 503-241-1955
 michelle.r.burrows@gmail.com

(Continued)

## Page 3

APPEARANCES (Continued)

For the Defendants:
 Mr. Ben Miller
 CITY OF EUGENE ATTORNEY'S OFFICE
 101 West 10th Avenue, Suite 203
 Eugene, Oregon 97401
 541-682-8447
 ben.j.miller@ci.eugene.or.us

Also Present:
 Ms. Ruth McBride

Reported by:
 Sara Fahey Wilson, CSR, CCR

## Page 4

INDEX

| WITNESS | PAGE |
|---|---|
| OFELIA SANTIAGO | |
|  BY MR. MILLER | 5 |
|  BY MS. BURROWS | 64 |
|  BY MR. MILLER | 68 |

| EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 3 | Plaintiff's Response to Defendants' First Set of Interrogatories | 37 |
| Exhibit 4 | Plaintiff's Response to Defendants Sam Tykol and City of Eugene's Second Set of Interrogatories | 38 |
| Exhibit 5 | Plaintiff's Response to Defendants First Request for Production | 44 |

| MARKED TEXT | PAGE/LINE |
|---|---|
| REQUEST - Photographs | 28/10 |

```
                                                5
1              OFELIA SANTIAGO,
2    having been first duly sworn to testify the truth,
3       the whole truth, and nothing but the truth, was
4              examined and testified as follows:
5
6                        EXAMINATION
7    BY MR. MILLER:
8       Q.   Good morning.
9       A.   Good morning.
10      Q.   Ms. Santiago, my name is Ben Miller.  I'm
11   the attorney for the City of Eugene and Officer
12   Tykol who are being sued in a case brought by the
13   Estate of Eliborio Rodrigues who you are the
14   personal representative of.
15           Do you understand that?
16      A.   Yes, I do.
17      Q.   And we're here for your deposition today.
18   You've been put under oath, and it's the same oath
19   that you would be put under if you testify later in
20   court.
21           Do you understand that?
22      A.   Yes.
23      Q.   And have you ever had a deposition taken
24   before?
25      A.   No.
```

```
                                                6
1       Q.   So the attorneys have probably gone over
2    it.  I'll just very briefly kind of talk some ground
3    rules.
4            We need to be careful not to speak over
5    each other because there's a court reporter here who
6    is taking down a written transcript of my questions
7    and your answers, so we want to try to talk slow,
8    and enunciate, and make sure that we're not stepping
9    on each other's questions or answers.  Okay?
10      A.   Okay.
11      Q.   And if I correct you in any of that, I'm
12   not trying to be rude.  I'm just trying to make sure
13   the record is clear.
14      A.   Okay.
15      Q.   It's not an interrogation, so if you want
16   to take a break to get water, to confer with the
17   attorneys, to address -- whatever reason, you get to
18   do that.  Okay?
19      A.   Okay.
20      Q.   But I don't think this will take very
21   long.
22           The deposition is something that I can use
23   later as direct evidence in a case, or if you
24   testify I could use it to point out inconsistencies
25   to -- what's called to impeach you, and so for that
```

```
                                                7
1    reason I want you to listen to my questions, and if
2    you answer, I'm going to assume that you understood
3    it.
4       A.   Okay.
5       Q.   Is that fair?
6       A.   It is.
7       Q.   And -- but at the same time, if I ask a
8    question poorly, which I no doubt will do, please
9    ask me to clarify it and I'll do that until you can
10   answer it.
11      A.   Okay.
12      Q.   I really just want the best information
13   that you have as the personal representative for the
14   estate on this case.  Okay?
15      A.   Okay.
16      Q.   Anything that would interfere with your
17   ability to participate in the deposition today?
18      A.   No.
19      Q.   You understand that the reason I'm
20   deposing you here today is because you're the
21   personal representative for the estate?
22      A.   Yes, I do.
23      Q.   And so unless I say otherwise, I'm asking
24   questions of the estate.  Do you understand that?
25      A.   Yes.
```

```
                                                8
1       Q.   All right.
2            And are you best the person to answer
3    those questions?
4       A.   Yes.
5       Q.   Probably?  We'll see where we go.  Yeah.
6       A.   Okay.
7       Q.   Without telling me anything you discussed
8    with your attorneys, what did you do to prepare for
9    the deposition?
10      A.   Nothing.
11      Q.   Did you review any documents?
12      A.   No.
13      Q.   All right.
14           Did you review any recordings?
15      A.   No.
16      Q.   Did you talk or text with anyone other
17   than your attorneys?
18      A.   No.
19      Q.   Did you talk to either Shoua Yang or
20   Joshoua Rodrigues about their depositions?
21      A.   No.  I did reach out to Shoua, though, to
22   see if she needed support coming here, and that's
23   all we talked about.  We didn't -- just the timing.
24   She was going to be here at her appointment, and
25   Josh at his appointment, but that was the only thing
```

```
                                                    57
 1   do a lot of -- invite people from the community to
 2   these events.  But I asked a few questions, but that
 3   was from the something else.  It's through
 4   immigration.
 5            But only one stop speeding.
 6       Q.   But other than that, you never met with
 7   Eugene police officers to discuss -- or command --
 8   to discuss this case, or anything?
 9       A.   No.
10       Q.   Okay.
11            Did you meet with the district attorney?
12       A.   Yes.
13       Q.   And how did that go?
14       A.   Not well.
15       Q.   Why is that?
16       A.   What we were told in that meeting that
17   day, it didn't make any sense for me.  And my son
18   was there.  Eli's sister and Shoua -- and it was not
19   the Eli that I knew, and I just -- I needed more --
20   I needed questions -- questions were not answered
21   there for us.
22       Q.   The other witnesses today talked about a
23   meeting they had with Scott McKee while you were
24   there.  Do you remember having such a meeting with
25   Ms. Yang and Joshoua Rodrigues?
```

```
                                                    58
 1       A.   With who?
 2       Q.   Scott McKee.
 3       A.   No.
 4       Q.   He's sort of a shaved head man.  I think
 5   he's probably your expert or investigator?
 6       A.   Oh, investigator -- when?  Recently, or --
 7       Q.   They couldn't quite place it so --
 8       A.   Yeah, I had a meeting with an
 9   investigator, yes.
10       Q.   With Ms. Yang and Mr. Rodrigues -- Joshoua
11   Rodrigues?
12       A.   Yes.
13       Q.   When did that occur?
14       A.   A few months ago.  He said he was going to
15   call us back.  That was just a brief meeting to
16   introduce himself to us.
17       Q.   And what else was discussed at that
18   meeting with the four of you?
19       A.   From what I said, you know, that I was --
20   I wanted it -- answers to what had happened that day
21   because I just -- I think and I think about what
22   happened, the way that Eli was with us, and it just
23   doesn't make any sense.
24            And I did ask a few questions.  And how
25   can a camera fall, that if that was very common, if
```

```
                                                    59
 1   it wasn't.  And I asked how long was -- had he been
 2   in the police department.  And then it was just
 3   mostly like, like I said, getting to know him.  And
 4   us, and he asked questions to Shoua and Josh, how
 5   they were doing, and -- but he said he will follow
 6   up with us to do an interview -- to discuss more
 7   things, and we have not heard back.  I haven't.  I
 8   don't know if Shoua has.
 9       Q.   Did Mr. McKee tell you that he disputed
10   Officer Tykol's version of events?
11       A.   No.
12       Q.   He never said anything about that?
13       A.   No.
14       Q.   Okay.
15            Other than what you've told me here just
16   today, is there anything else that Mr. McKee and
17   that group discussed at that meeting?
18       A.   I can't remember.
19       Q.   Okay.
20            Now, does the estate dispute Officer
21   Tykol's version of events?
22       A.   Yes.
23       Q.   All right.
24            Why?
25       A.   The little I saw him in the video, Eli
```

```
                                                    60
 1   asking for help, the way that Tykol said things
 2   happened, that's not the person that I knew, and I
 3   need answers.
 4       Q.   So I know this is hard, but I really need
 5   to break it down because I'm trying to understand
 6   what's in dispute in this case and what's not.  And
 7   you're the personal representative of the estate so
 8   you're the only one I can ask these things of.
 9            But does the estate contend that Eliborio
10   Rodrigues was not under the influence of
11   methamphetamine during the November 30th, 2019,
12   encounter with Officer Tykol?
13       A.   I don't know.
14       Q.   Does the estate contend Eliborio Rodrigues
15   was not violent at all with Officer Tykol during the
16   November 30th, 2019, encounter?
17            MS. BURROWS:  I'm sorry, Ben, I'm
18   going to object.  You haven't asked her what she
19   knows about the incident.
20            MR. MILLER:  Well, I'm asking what the
21   contentions of the estate are, which is not so
22   much --
23            MS. BURROWS:  Beyond the complaint?
24            MR. MILLER:  Well, I'm asking -- I'm
25   asking her.  I mean, for a lot of the complaint
```

61

1  it's -- it says, We're not really sure what happened
2  during this period of time, and so that's why I'm
3  focused on this. And we'll probably follow up
4  with an RFA and figure out, but I'm just trying to
5  determine what's going to be at issue or what's not.
6           MS. BURROWS:  Okay.
7       A.   Can you repeat that question again,
8  please?
9  BY MR. MILLER:
10      Q.   Sure. Yeah.
11           Does the estate contend that Eliborio
12 Rodrigues was not violent during the November 30th,
13 2019, encounter with Officer Tykol?
14      A.   I don't believe he was violent towards the
15 officer.
16      Q.   Does the estate contend Eliborio Rodrigues
17 did not strike Officer Tykol during the November
18 30th, 2019, encounter?
19      A.   I don't know.
20      Q.   Does the estate contend Eliborio Rodrigues
21 did not utilize a Taser against Officer Tykol during
22 the November 30th, 2019, encounter?
23      A.   I don't know.
24      Q.   Does the estate contend that Eliborio
25 Rodrigues was not on top of Officer Tykol when he

62

1  was shot?
2       A.   I don't know.
3       Q.   So what is the estate disputing from
4  Officer Tykol's version of the events?
5       A.   I have not read everything so I don't
6  know.
7       Q.   Did Eliborio Rodrigues resist any police
8  officers on November 30th, 2019?
9       A.   I don't know.
10      Q.   Did Eliborio Rodrigues fight with any
11 police officers on November 30th, 2019?
12      A.   I don't know.
13      Q.   Did Eliborio Rodrigues refuse to obey any
14 orders given by a police officer on November 30th,
15 2019?
16      A.   I don't know.
17      Q.   Did Eliborio Rodrigues do anything wrong
18 on November 30th, 2019?
19      A.   I don't know.
20      Q.   Do you know how often Eliborio Rodrigues
21 would use methamphetamine?
22      A.   I never knew he used methamphetamine, so
23 for me it's really hard when I read that report --
24 actually, when I saw it in the news that he tested
25 positive for methamphetamine because that was not

63

1  the Eli I knew.
2       Q.   And I'm assuming the answer is you're not
3  going to know, but do you know how he would consume
4  it or in what quantities?
5       A.   No.
6            MR. MILLER:  Let's go ahead and take a
7  break. I'll talk to Ms. McBride and see if we have
8  anything else.
9            (Recess:  2:49 to 2:56 p.m.)
10 BY MR. MILLER:
11      Q.   Those are all the questions I'm going to
12 have for you today. I'm going to hold it open at
13 least as to some other documents that I think we've
14 identified that I'll work with your attorneys to get
15 produced, so I may -- it's possible I need to ask
16 you about those.
17      A.   Okay.
18      Q.   But otherwise, I don't have other
19 questions for you today. The other attorneys might,
20 they might not, so --
21           MS. BURROWS:  I have a few questions
22 for you.
23 / / /
24 / / /
25 / / /

64

1                    EXAMINATION
2  BY MS. BURROWS:
3       Q.   Do you go by Santiago?
4       A.   Yes.
5       Q.   Ms. Santiago, I want to do a few follow-up
6  questions to what Mr. Miller had closed with you on.
7  Could you describe Eliborio Rodrigues' personality?
8  What kind of a man was he?
9       A.   Eli was a very respectful person. He was
10 very polite. He helped us at home. I mean, he --
11 if I didn't have a ride for my daughter, he will
12 pick up my daughter from school and drop her off at
13 home. When she was in high school he was -- he was
14 so friendly and so helpful. He didn't -- like, with
15 me, I didn't need to tell him to pick up, you know,
16 the garbage outside or trim the trees. He took it
17 on his self to do this.
18           I will not trust anybody with my kids, and
19 I trusted him.
20      Q.   Have you ever seen him be disrespectful to
21 anyone?
22      A.   I've never seen Eli disrespectful.
23      Q.   Have you ever seen him violent with
24 anyone?
25      A.   No, so this is why this is so hard for me.

65

1   Q.  And have you ever seen Eli interact with
2   the police?
3   A.  No.
4   Q.  So Eli is Hispanic.  Is that correct?
5   A.  That's correct.
6   Q.  And in your community of Hispanic folks do
7   you ever have difficulties from white police
8   officers because of your race?
9           MR. MILLER:  Objection.  Speculation.
10  Foundation.  Go ahead.
11  BY MS. BURROWS:
12  Q.  You can answer for yourself.
13  A.  Okay.  I haven't, but a lot of people from
14  the community come to me, and that's why I've been
15  connected with Johannes Devillo (phonetic).  He's
16  working really close with the Springfield police,
17  because we need this to stop.
18  BY MS. BURROWS:
19  Q.  What sorts of things do people tell you
20  about?
21  A.  They get pulled over.  They just had -- a
22  family contacted me that she was learning how to
23  drive.  She got pulled over.  They search her car.
24  They search, you know, her -- it was a male police
25  officer, so -- from Springfield, you know, so I

66

1   brought it to their attention.  I sent them over.
2   I can't -- I don't do -- I can't handle
3   complaints because I don't even know where to start
4   so I refer them out there to now Johannes Devillo in
5   Springfield, and then contacting with Centro Latino
6   and see how we could help our community more.  I
7   just feel like as a community we're failing.
8           My daughter asked me, "Mom, why are you
9   working so hard on this case?"
10          And I go, "Mina, I'm doing it for all of
11  us."
12          This is really, really hard for me.
13  Q.  And did Eli ever share with you problems
14  he was having with the white police officers?
15  A.  He was -- like sometimes we'll sit down --
16  like, he will hear a family call me or bringing me
17  their stories, and he'll say, you know, like, "You
18  need to always stand up for what's right."
19  Q.  But do you think that ever changed the way
20  he interacted with police?
21  A.  No.  No.
22          MR. MILLER:  Objection.  Speculation.
23  BY MS. BURROWS:
24  Q.  Now, you've listened to some of the body
25  cam footage from the night Eli was shot.  Is that

67

1   correct?
2   A.  Yes.
3   Q.  And you recognize Eli from that video?
4   A.  Yes.
5   Q.  And you could hear what he was saying?
6   A.  Yeah.  He was pleading.
7   Q.  He was pleading?
8   A.  For his sergeant to come.
9   Q.  And could you tell anything from his
10  voice?
11  A.  He was scared.  He was scared.  He just --
12          MR. MILLER:  Object.  Speculation.
13  A.  And that's what hurts me the most because
14  we're never going to find out what really happened
15  that night.
16  BY MS. BURROWS:
17  Q.  But you could tell based on your
18  familiarity with Eli that he was afraid?
19  A.  He was.
20  Q.  He was afraid?
21          MR. MILLER:  Objection.  Speculation.
22  BY MS. BURROWS:
23  Q.  So when Mr. Miller was asking you if you
24  knew whether Eli had taken action against the police
25  officer, your answers were "I don't know."  Why did

68

1   you answer "I don't know"?
2   A.  There's nothing I could -- the video --
3   the end of the video -- so there's no eyewitnesses,
4   there's no video cam.  There's nothing.
5   Q.  So nobody knows?
6   A.  Nobody knows.
7   Q.  The only person who knows is Officer
8   Tykol?
9   A.  That's correct.
10  Q.  So what does the family want to know?
11  A.  We want to know the truth.  That's all.
12          MS. BURROWS:  Thank you.
13          MR. MILLER:  I have a couple of
14  follow-ups.
15
16              EXAMINATION
17  BY MR. MILLER:
18  Q.  Mr. Rodrigues was wearing a hood and a
19  mask during his encounter with Officer Tykol,
20  correct?
21  A.  That's correct.
22  Q.  And does the estate have any reason to
23  believe that Officer Tykol knew Mr. Rodrigues
24  was?
25  A.  No.

69

1    Q.   Does the estate have any reason to believe
2  Officer Tykol knew Mr. Rodrigues was Hispanic?
3    A.   I don't know.
4         MR. MILLER:  All right.  That's what I
5  have except for other follow-up.
6         MS. BURROWS:  Thank you.
7         (The deposition was concluded
8          at 3:03 p.m.)
9              --oOo--

---

1   State of Oregon   )
                      )  ss.
2   County of Lane    )
3
4      I, Sara Fahey Wilson, CSR, a Certified Shorthand
5  Reporter for the State of Oregon, certify that the
6  witness was sworn and the transcript is a true
7  record of the testimony given by the witness; that
8  at said time and place I reported all testimony and
9  other oral proceedings had in the foregoing matter;
10 that the foregoing transcript consisting of 69 pages
11 contains a full, true and correct transcript of said
12 proceedings reported by me to the best of my ability
13 on said date.
14     If any of the parties or the witness requested
15 review of the transcript at the time of the
16 proceedings, such correction pages are attached.
17     IN WITNESS WHEREOF, I have set my hand this 5th
18 day of June 2023, in the City of Eugene, County of
19 Lane, State of Oregon.
20
21
22  *[Signature: Sara Fahey Wilson]*
23  Sara Fahey Wilson, CSR
24  CSR No. 06-0400
25  Expiration Date:  March 31st, 2026

ccreporting.com