EXHIBIT 23
Page 1 of 116
Samuel Tykol

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

OFELIA HERNANDEZ SANTIAGO,     )

Personal Representative of     )

the Estate of Eliborio         )

Rodrigues Jr.,                 )

      Plaintiff,          )

   v.                        ) No. 6:21-cv-07175-MK

SAMUEL TYKOL, JOHN DOE         )

SUPERVISORS 1-3, CITY OF       )

EUGENE, a municipal            )

subdivision of the State of    )

Oregon,                        )

      Defendants.         )

DEPOSITION OF SAMUEL TYKOL

Monday, January 30th, 2023

9:08 A.M.

THE VIDEO-RECORDED DEPOSITION OF SAMUEL TYKOL was taken at CC Reporting & Videoconferencing, 101 East Broadway, Suite 300, Eugene, Oregon, before Deborah M. Bonds, CSR, CCR, RPR, Certified Shorthand Reporter in and for the State of Oregon.

EXHIBIT 23
Page 2 of 116

Samuel Tykol

9

officer?

A. Patrol officer.

Q. So what shift are you working right now?

A. Right now, I work Team 20, which is 7:30 in the morning to 5:30 in the evening.

Q. Okay. So that's like a day shift.

A. Yeah.

Q. Weren't you working at the -- we're here talking about an incident that occurred in 2019 when you shot and killed Eli Rodrigues.

What shift were you working then?

A. That was Team 50, which is 8:30 at night to 6:30 in the morning.

Q. Okay. So the team number is the shift?

A. Yes.

Q. Okay. All right. That helps me.

How long have you been a certified police officer?

A. For that seven years.

Q. Okay. I'm going to hand you what we'll mark as Exhibit 1. It is a report of your training records from DPSST.

(Deposition Exhibit 1 marked for identification.)

BY MS. BURROWS:

EXHIBIT 23
Page 3 of 116

Samuel Tykol

12

grad school talked me out of it.

Q.    Talked you out of being a professor?

A.    Yeah.

Q.    So you went on the road to chase bad guys for a living?

A.    I wound out -- that's where I wound -- found myself, but I did a few things before that.

Q.    Okay.  And you were in -- was it Illinois at the time?

A.    Correct.

Q.    And what made you move to Oregon?

A.    One, I like the outdoors, and I wanted to move somewhere West closer to mountains and be able to ski, snowboard, things like that.

Q.    Did you see an advertisement for a patrol officer at Eugene?  Is that what made you apply?

A.    I don't recall.

Q.    Okay.  And you were eventually then hired as a patrol officer.  Have you been -- have you worked on any specialty times at Eugene PD since you've worked here?

A.    Been on SWAT, defensive tactics.  The Oregon Physical Ability Test has a team, and then I'm also an FTO.

Q.    Okay.  Let's talk about your SWAT work.

EXHIBIT 23
Page 4 of 116

Samuel Tykol

16

Q.    What is your dominant hand?

A.    Right.

Q.    So the Taser is on your left side?

A.    Correct.

Q.    Okay.  What service weapon did you carry in 2019, if you recall?

A.    Glock G45.

Q.    Is that a 9-millimeter?

A.    Yes.

Q.    All right.  Is that department issued?

A.    Yes.

Q.    Okay.  You also said that you were on defensive tactics, and I may not have heard the full answer.  What do you mean you were on defensive tactics?

A.    It's a training team at the department.

Q.    And what does it train on?  I mean, I know it seems self-evident but...

A.    Sure.  Yeah.  Defensive tactics, so --

Q.    Go ahead.

A.    -- things like OC spray, less lethal.  We do the certifications for those.

Q.    Do you teach that?

A.    I teach OC and the 40 millimeter.

Q.    Okay.  I also understand from one of the

EXHIBIT 23
Page 5 of 116

Samuel Tykol

17

pieces of paper that I got in discovery is that your also a black belt in Taekwondo; is that correct?

A.    Yes.

Q.    And that you got that black belt many years ago; is that correct?

A.    Yes.

Q.    Have you maintained your training in Taekwondo?

A.    No.

Q.    Okay.  Do you do any hand-to-hand defensive tactics training as part of this team you've talked about?

A.    Yes.

Q.    I've never been through police training, so what does that involve, teaching hand-to-hand tactics?

A.    I don't teach the hand-to-hand or ground fighting stuff, but from being part of the training, it's focused blows, weapons retention, things along those lines.

Q.    What are focused blows?

A.    Punches.

Q.    Closed-fist punches?

A.    Closed-fist punches.

Q.    And you said that the other one was

EXHIBIT 23
Page 6 of 116

Samuel Tykol

18

clo- -- maintaining control of your weapons?

A.    Yes, weapons retention.

Q.    Weapons retention.  What does that involve?

A.    Just ways to, you know, keeping -- keep your weapon in the holster.  If somebody were to try to access it, breaking away from them if they -- if they do grab ahold of it, things along those lines.

Q.    Well, you have several weapons on your duty belt at any given time; is that fair?

A.    Yes.

Q.    And for purpose of the deposition, why don't you tell me what weapons you had on your duty belt or your uniform the night that Mr. Rodrigues was killed.

A.    I had OC, a Taser, my handgun, and then I also carry a small folding knife in my left pocket.

Q.    Okay.  So I know I have a picture of you around here somewhere, but if you could describe for me where all of those items were located on your body.

A.    So Taser is on my left hip.  The knife, like I said, is in my left -- the pants pocket.  The OC is front right and handgun is right hip.

Q.    Okay.  And you didn't -- I think you told

EXHIBIT 23

Page 7 of 116

Samuel Tykol

21

A.     He's in front of you or to your -- in front and off to the side a little bit.

Q.     Is his back to you?

A.     Yes.

Q.     So are you grabbing one of those arms?

A.     Correct.

Q.     And then what if they don't voluntarily bring that other arm back?

A.     Then you would presumably do a takedown.

Q.     Okay.  And what is a takedown?

A.     Get to -- some -- some sort of maneuver to get them on the ground.

Q.     Do you try and get them prone on the ground?

A.     Yes.

Q.     Not just sitting?

A.     Correct.

Q.     Okay.  And it -- in the -- in the course of arresting someone and handing -- handcuffing -- well, maybe I should start a little before that question.

       In order to handcuff someone, do they have to be arrested?

A.     No.

Q.     They have to be detained.

EXHIBIT 23

Page 8 of 116

Samuel Tykol

22

A.    Correct.

Q.    And they're not free to leave.

A.    Correct.

Q.    Okay.  So when you handcuff someone that is not free to leave and they won't let you handcuff them, they're resisting that, is that a justification, in your training, to use OC spray?

A.    Yes.

Q.    Is that a justification, in your training, to use a Taser?

A.    Them resisting, bringing their hand back alone --

Q.    Uh-huh.

A.    -- and nothing else, no.

Q.    Okay.  So why the difference?  Why can you spray someone with OC spray but you can't tase them in the scenario I have drawn for you?

A.    OC is a lesser -- a lower level of force.

Q.    Okay.  So -- so in your mind -- this goes back to the -- the levels of force that used to be teach -- teached -- taught at the DPSST.  What are the levels of force that you're talking about?

A.    I -- I don't understand the question.

Q.    Well, you said that gas -- OC spray was a lesser use of force than Taser.  So what is the

EXHIBIT 23

Page 9 of 116

Samuel Tykol

23

less -- the least amount of force that an officer can use?

A. Be their mere presence.

Q. Mere presence. And then what's next?

A. Physical touch.

Q. Okay. And then what's next?

A. OC.

Q. Okay. And then next?

A. Focused blows.

Q. And then -- okay. So focused blows is a greater use of force than OC spray?

A. I -- I would say it is more intrusive.

Q. People who have been sprayed might disagree with you.

So above a focused blow, what's next?

A. A Taser.

Q. Okay. How are you -- go ahead.

A. No. Go ahead.

Q. I'm sorry. I keep interrupting, and I shouldn't do that. I apologize.

A. I -- I would add that it depends on the tools that you have available to you and what you carry because you always don't have -- you know, in the police world there's lots of tools that are available, but it's impossible to carry all of them.

EXHIBIT 23
Page 10 of 116

Samuel Tykol

43

A.    Sure.    Introducing yourself as a police -- identifying your -- as a police officer instead of -- what we try to do is talk like it's just a conversation, not, you know, coming in with a heavy hand, for the lack of a better term.

Q.    Okay.    Anything else that you're taught when you first approach a suspicious person?

A.    Try to talk to them from maybe a little bit further of a distance away.

Q.    Okay.    And are there signs or clues that you're taught to maybe escalate the level of your force that you're using with that pedestrian?

A.    If they won't keep their hands out of their pockets or aren't following even just simple verbal requests or orders.

You know, going from an ask, tell, make type standpoint.    Ask them to do something.    If they don't do it, you tell them to do something.    And if they don't do it, you make them --

Q.    Okay.

A.    -- do what you want them to do.

Q.    And do you have to then have to acquire additional information to move through that chain of ask, tell, make?

MR. MILLER:    I'm going to object to

EXHIBIT 23
Page 11 of 116

Samuel Tykol

45

Q.    Okay.

A.    Those are --

Q.    All right.

A.    -- all some of them.

Q.    Smoking a joint or using some drugs in front of you?

A.    Well, not anymore.

Q.    Okay.  All right.

Okay.  So let's talk about Mr. Rodrigues then.  You note in your report that he was walking --

MR. MILLER:  Sorry.  Did you still want to keep this confidential or -- I mean, if you're going to continue to talk about this --

MS. BURROWS:  I'm going to continue to talk about this.

MR. MILLER:  Okay.  I just didn't want you to -- yeah -- didn't want you to forget.

MS. BURROWS:  Okay.

BY MS. BURROWS:

Q.    So the night that you shot Mr. Rodrigues, he -- according to the videos and your report, he was walking down the middle of the street alone.

Was he consid- -- did you consider him to be a suspicious pedestrian?

EXHIBIT 23
Page 12 of 116

Samuel Tykol

46

A.    Yes.

Q.    And what about -- just in that first initial moment, what about him was suspicious to you?

A.    He was in all black in a quiet neighborhood in the middle of the night.  There was no flashlight or reflective vest, which I had worked that portion of town for a couple of years, and most people that walk around in that neighborhood and that area of town kind of have that -- either the vest or the flashlight if they're out walking late, or maybe they're walking a dog, things like that.

Q.    So what -- so he was suspicious because of his dark clothing, lack of reflective gear, and I couldn't quite -- he didn't have a dog or he didn't seem to have a purpose; is that --

A.    Not for the lack of a dog, just my knowledge of people that were out walking late AT night in that neigh- -- that's not a heavily trafficked pedestrian area even during the daytime and less so even at night.  It's a -- it's a dead-end street that's dark.

Q.    Okay.  And anything else in that first initial view of Mr. Rodrigues did you think was suspicious?

EXHIBIT 23
Page 13 of 116

Samuel Tykol

47

A.    No.

Q.    Okay.  So did your suspicions increase over time?

A.    Yes.

Q.    So at what point did your suspicions increase?

A.    I initially drove past him in my patrol car.  And I'm on a -- you know, in a patrol car on the street.  And as I look at him, when I drive past, he doesn't acknowledge that there's a car in the street at all and just kind of keeps walking down the street.

Q.    And why is that suspicious?

A.    Generally, if somebody hears a -- a car coming down the street, they'll at least maybe look back, or when the car drives by, they'll look over and at least acknowledge it.  I started to feel like they were not wanting to be seen.

Q.    Did he move away from the middle of the road?

A.    No.

Q.    Did he run?

A.    No.

Q.    Okay.  Did he do anything physical to the car, like give you the finger or something?

EXHIBIT 23
Page 14 of 116

Samuel Tykol

48

A.    No.

Q.    Okay.   And he just didn't look at you?

A.    Correct.

Q.    Okay.   And there is a camera in the end of one driveway that you can see Mr. Rodrigues walk by, and then a few seconds later you drive by him.

Have you seen that video?

A.    No.

Q.    Okay.   So what did you do after you drove by Mr. Rodrigues?

A.    I drove to the dead end of the street and did a U-turn and then drove.   So I was driving westbound, I did the U-turn, and then I was driving eastbound, and I did a pedestrian stop.

Q.    Okay.   So when you drove around then, your headlights are on Mr. Rodrigues at that point; is that correct?

A.    Correct.

Q.    What was he doing when the headlights hit him?

A.    I don't recall exactly.   I remember he was still on the street, but in terms of what he was doing, I don't recall.

Q.    Did he run?

A.    No.

EXHIBIT 23
Page 15 of 116

Samuel Tykol

49

Q. Did he approach you?

A. No.

Q. Okay. Was -- did he go to the garbage cans?

A. Yes.

Q. Okay. And was any of that suspicious to you?

A. Yes.

Q. And why?

A. I didn't suspect him to be canning. You know, when I had initially watched him -- when I observed him while driving on Norkenzie, he was walking past other trash bins and recycle bins that were out on the curb.

I didn't see any bags or anything that would indicate to me that he was canning, like a -- you know, traditionally, you'll see -- or normally you'll see people with bags full of cans already or they're -- they have bags out like they are ready to can, and he had walked past them, the first several houses that had cans out.

And it was suspicious to me that he was going to these cans in particular, when I'm getting out of my police car to contact him.

Q. Okay. Do you -- you don't know whether he

EXHIBIT 23
Page 16 of 116

Samuel Tykol

50

actually found cans in those garbage cans that he'd walked by or that he even looked?

A.    I did not see him look.

Q.    Okay.  Did you later learn that he and his spouse actually did that regularly, and they found the car, that they had a lot of cans in it?

A.    I did not know that.

Q.    Okay.  All right.  Fair enough.

So at that point, then, he is a suspicious pedestrian.  And I'm going to -- we're at the garbage cans, and you're facing him with your vehicle.

What crime did you think he had -- was committing?

A.    I didn't --

Q.    What --

A.    -- think that he was committing a crime at that point.

Q.    What did you -- what -- what was the reason for you stopping him then?

A.    A pedestrian violation.

Q.    Of what?

A.    There's the Eugene Municipal Code of failure to crossing the crosswalk at a -- or crossing the road at a 90-degree angle, and then

EXHIBIT 23
Page 17 of 116

Samuel Tykol

51

there's also the ORS for improper position on a -- upon a highway.

Q.   Was that a highway?

A.   Yes.

Q.   That dead-end street is a highway?

A.   It's a road that -- public roads in Eugene are considered -- or in Oregon are considered a highway.

Q.   Okay.  So your initial statement was he wasn't walking on the sidewalk, so basically you stopped him for jaywalking?

A.   For -- the 90 -- it's a 90-degree angle provision, but it's a pedestrian violation, yes.

Q.   So explain that to me, the 90-degree angle position [sic].

A.   The 90-degree angle provision basically says that unless you're dictated by a marked crosswalk, you have to cross the street at a 90-degree angle from the curb --

Q.   Okay.

A.   -- as opposed to not a 90-degree angle.

Q.   So when you first saw him, he was walking straight down the road.

A.   (Witness nodded.)

Q.   That seems to be reflected in the video

EXHIBIT 23
Page 18 of 116

Samuel Tykol

55

A.    (Marking.)

Q.    And could you circle that and put your initials.

A.    (Marking.)

Q.    Okay.  So where did Mr. Rodrigues cross the street then?

Here's your pen.

A.    Oh.  Somewhere in this general area (marking).

Q.    Did you see him cross the street?

A.    Yes.

Q.    Were you -- were you facing towards him when he crossed the street?

A.    Yes.

Q.    So could you put an X2 approximately where Mr. Rodrigues crossed the street.

A.    (Marking.)

Q.    Okay.  And he didn't cross at a 90-degree angle?

A.    Correct.

Q.    How did he cross?

A.    In a meandering manner at, say, roughly a 45-degree angle approximately.

Q.    Okay.  So your basis for stopping him was that unlawful crossing of the street?

EXHIBIT 23
Page 19 of 116

Samuel Tykol

56

A.     The 90-degree angle provision, correct.

Q.     And did you also stop him because he wasn't walking on the sidewalk?

A.     That's another, yes, portion of it.

Q.     Okay.  All right.

MS. BURROWS:  Do you guys want to see where he's marked?

BY MS. BURROWS:

Q.     Okay.  We will come back to that in a second.

A.     Yeah.

Q.     Thank you for doing that for me.

So if you could take a look in this FTEP -- and I did staple them backwards.  It's my fault.  I'm sorry.

Could you take a look at page 2327 for me.

It says General Officer Safety Practices that apparent -- according to your coach, on or around November 29th of 2016, that you were able to answer and explain and demonstrate the following common officer safety practices.

Could you take a look at that list and get yourself familiar with it.

A.     Okay.

Q.     Okay.  Would you agree that these are all

EXHIBIT 23
Page 20 of 116

Samuel Tykol

57

officer safety practices that you've been trained in?

A. Yes.

Q. Okay. And at the time you con- -- you contacted Mr. Rodrigues, on Exhibit 7, at this point, did you call for backup?

A. Not immediately on contact.

Q. Why not?

A. I didn't -- nothing made me think that I needed a -- an additional cover unit in terms of I'm just going to have -- I've had experiences, you know, several times where I've stopped people for walking in traffic or done bicycle stops for various violations. And I've -- without a cover officer, which isn't uncommon, and I've had safe interactions and reasonable interactions with them.

Q. So you didn't think he presented a threat at the point you stopped him; correct?

A. Correct, right.

Q. Okay. What is a Code 1 cover?

A. Nonemergency response from another officer.

Q. If someone calls Code 1 over the radio, you, as a potential responding officer, what are you thinking that you can respond -- what are you

EXHIBIT 23
Page 21 of 116

Samuel Tykol

58

thinking about?  What does that officer really need?

A.    Backup.

Q.    Okay.  Can you get there whenever you want to?

A.    As expeditiously as possible while still, you know --

Q.    Okay.

A.    -- following traffic laws and --

Q.    If an officer calls in Code 1 for backup, can dispatch specifically dispatch an officer for backup?

A.    Yes.

Q.    And officers can then volunteer to respond themselves; is that correct?

A.    Correct.

Q.    At some point in the encounter with Mr. Rodrigues, you did call for Code 1 backup; is that correct?

A.    Correct.

Q.    How far from this encounter on Exhibit 7, the first one that you marked -- how -- were you in the same -- this same physical location when you called Code 1?

A.    Yes.

Q.    Okay.  And then where were you physically

EXHIBIT 23
Page 22 of 116

Samuel Tykol

63

could respond to your Code 3; correct?

A.   Correct.

Q.   All right.  Now, I do need to go back a couple steps.

Earlier when we were talking about sort of the evolution of force that an officer goes through -- and specifically, I'm only asking you about your training and knowledge of these issues -- you used the term "ask, tell, make."

And in 35 years of doing this, I have never heard that term before.  Where -- you told me that was what it was, but where did you learn that "ask, tell, make?"

A.   I can't even remember which FTO, but somebody had mentioned it to me at FTEP, or during FTEP.

Q.   An FTO at Eugene?

A.   Correct.

Q.   And is there any opportunity within that continuum, "ask, tell, make" for de-escalation?

A.   Certainly.

Q.   And so can -- are you supposed to de-escalate, if necessary, at any point?

A.   According to?

Q.   Well, your policy.

EXHIBIT 23
Page 23 of 116

Samuel Tykol

69

So he's not complying with your order to sit on the ground. Just simply not complying with your order is interfering with a police officer; is that your testimony?

A. My lawful order --

Q. Okay.

A. -- to sit on the ground.

Q. All right. And isn't -- it doesn't matter whether or not he's just sitting -- he's just ignoring you, just the fact that he won't sit on the ground was enough for you to charge him with interfering with a police officer; is that correct?

A. And the fact that I'm trying to put him -- physically put him onto the ground, and he's trying to stand up to not be -- sit on the ground, yes.

Q. Okay. And so at that point, he is under arrest?

A. When I tell him -- there's the portion in the video that I'd have to watch to have that -- but I tell him he's under arrest. That is -- at that point he's under arrest, once I verbalize it to him.

Q. For not getting on the ground when you ordered him to; is that correct?

A. Correct.

Q. Okay. Do you know whether this ask, tell,

EXHIBIT 23
Page 24 of 116

Samuel Tykol

70

make is a part of Eugene policy, whether it's informal or formal?

A. It's not written in a policy, no.

Q. Do you know other officers that follow this ask, tell, make?

A. Yes.

Q. And how -- would you say it's a great number of officers file -- follow this particular model?

A. Generally, yes.

Q. Okay. And in between ask and tell, are there any other interim steps?

A. It doesn't -- no, but like anything with police work, it's fluid. Ask doesn't have to be one time; right? Tell doesn't have to be one time. It can -- you can ask them multiple times, then you realize that they're not going to, so you need to tell them to; right?

So it's -- it's very fluid.

Q. Okay.

A. It's a guideline over a rule is how I would...

Q. Okay. That's fair.

So when you stop a pedestrian -- and I'm using that specifically as the example here. When

EXHIBIT 23
Page 25 of 116

Samuel Tykol

71

you stop a pedestrian walking on the street, do you have the right to ask for their ID?

A.    If you have a violation, yes.

Q.    Okay.  What kind of violation can justify the asking for someone's ID?

A.    Like pedestrian violation.  Traffic -- you know, traffic violations as well.

Q.    Well, they're not driving.  I'm asking about pedestrian --

A.    Right, no.  So that's why I'm saying, a pedestrian violation.

Q.    Okay.  And if they don't give you their ID, can you arrest them for interfering?

A.    You can --

MR. MILLER:  I'm going to object to the extent it calls for a legal conclusion.

Go ahead.

A.    You can detain them until the point that you can identify them for the purpose of issuing them a citation.

BY MS. BURROWS:

Q.    So identifying them and asking for the ID, do you see those as the same thing?

A.    An identification -- an ID is a way to positively identify somebody.

EXHIBIT 23
Page 26 of 116

Samuel Tykol

72

Q.	Why do you need to positively identify someone for a pedestrian violation?

A.	In order to issue them a citation.

Q.	Okay.  And what if they don't have an ID?

A.	Then you can ask for their name.

Q.	Okay.  What if they refuse to give you their name?

A.	You can detain them until you can identify them.

Q.	Okay.  So you believe that you have the authority to ask someone for ID when you stop them?

A.	For a violation, yes.  When they're --

Q.	Okay.

A.	-- stopped, yeah.

Q.	And do citizens have the right to tell you, "No.  I'm not going to give you my ID"?

A.	They have the right to say that, yes.

Q.	You don't think they have the right to prevent you from taking their ID?

MR. MILLER:  I'm going to object to the extent it calls for a legal conclusion.

Go ahead.

A.	If I have a valid reason to be stopping them, they're lawfully required to identify themselves.

EXHIBIT 23
Page 27 of 116

Samuel Tykol

73

BY MS. BURROWS:

Q.   What law is that?

A.   I don't know the particular law, but in order to -- for me to positively identify who they are, if I'm -- for issuing a citation, I would -- yeah, they have to identify themselves.  If they don't, I can detain them to determine their identity.

Q.   Do you think American citizens have the right just not to talk to you?

A.   Sure.

Q.   Including giving you their name?

A.   Sure.

Q.   Sometimes the name -- their name is part of the crime, so they have the Fifth Amendment protection to withhold their name; is that correct?

A.   Sure.

Q.   Okay.  And American citizens also have the right not to give you their ID; is that correct?

A.   Yes.

Q.   And your job is to protect those citizens' rights; is that not fair?

A.   Fair.

Q.   Okay.  So again, I want to make sure -- this is sort of an important part of my questions.

EXHIBIT 23
Page 28 of 116

Samuel Tykol

74

I want to make sure I understand you. And I don't want to misconstrue what you're telling me.

Do you believe that as a police officer you have the right to get ID from a citizen that you've stopped for a pedestrian crime?

MR. MILLER: Objection. Asked and answered.

Go ahead.

A.    Yes.

BY MS. BURROWS:

Q.    And failure to get that ID can result in you detaining and/or arresting that citizen; is that correct?

MR. MILLER: Objection. Compound. Calls for a legal conclusion.

Go ahead.

A.    It can justify a detention.

BY MS. BURROWS:

Q.    Okay.

MR. MILLER: Let's take a break.

MS. BURROWS: All right. Thank you.

THE VIDEOGRAPHER: We're going off the record. It is 10:39.

(Recess: 10:39 a.m. to 10:46 a.m.)

THE VIDEOGRAPHER: We're going on the

EXHIBIT 23
Page 29 of 116

Samuel Tykol

76

Q. Okay. All right. Good. And I'm not remembering the wrong thing.

Why did you want him to go to the ground?

A. It puts him in a position of disadvantage, and it's an officer safety technique to have him just sit on the curb. As an officer, we want to be in position of advantage with the person. And also gets him away from the trash cans that I don't know what's in there accessible that could be used as a weapon --

Q. Okay.

A. -- for me.

Q. And his clothing -- could you describe his clothing to me?

A. It was, the best I recall, all black. He had his hood up. There was a mask concealing his face. It was thick, heavy clothing that wouldn't, you know, allow me to see if there's any weapons or anything like that concealed inside it or around it just because of its -- how thick it is.

Q. Did you ask him if he had any weapons?

A. No.

Q. Okay. Did you ever ask him what his name was?

A. No.

EXHIBIT 23
Page 30 of 116

Samuel Tykol

77

Q.    Why not?

A.    We never had what I would describe as a conversation or any real meaningful dialogue.

Q.    Okay.  You just asked him if he had ID; is that -- that's my memory of what is on the tape.

A.    Something similar to that, yeah.

Q.    Okay.  All right.  And my memory is he was pretty much just ignoring you through much of this exchange, and you wanted him to go the ground because it was an officer safety issue; is that correct?

A.    Yes.

Q.    Yes.  And that -- so Mr. Rodrigues -- when you were standing next to him on the street, was he taller than you?  Is he taller than you?

A.    Yes.

Q.    How much taller do you think he is?

A.    2 to 4 inches, about.

Q.    And you're 5'10"?

A.    Yeah.

Q.    So that puts him about six foot?

A.    Six-foot, 6'2".

Q.    And at the time, how much did you weigh?

A.    I believe, in my interview with IDFIT, I said about 180 pounds.

EXHIBIT 23
Page 31 of 116

Samuel Tykol

79

because it gives me a little bit more control of his movement and his hands, which, you know, in training we're taught that, you know, hands can access weapons and things like that and hurt police officers.

Q. From the time that you approached him, when you parked your car until this point where we're talking about now where you ask him to get on the ground, did he ever try to run away from you?

A. No.

Q. Did he ever take a swing at you?

A. No.

Q. Did he ever threaten you?

A. No.

Q. Did he ever actually face you?

A. No.

Q. And it seemed to me from the videotape most of his -- time his back was either fully or partially to you; is that a fair statement?

A. Yeah, it's fair.

Q. Okay. And during part of the time that the videotape was on, it appeared that Mr. Rodrigues had a plastic bag and he was fumbling with some kind of a bottle; is that fair?

A. Yes.

EXHIBIT 23
Page 32 of 116

Samuel Tykol

80

Q.    So his hands are visible and out away from his body during most of this encounter; correct?

A.    I'd say that's not correct.

Q.    Well, before you ask him to go to the ground, was there any time he put his hands in his pocket?

A.    No.

Q.    Did any kind of -- I guess the police call any kind of furtive gesture anywhere?

A.    No.

Q.    Okay.  And he called you "sir" several times.  Do you recall that?

A.    Yeah.

Q.    And he called you "officer" several times; is that correct?

A.    Correct.

Q.    Did he ever curse at you, use any foul language?

A.    Not that I recall.

Q.    All right.  So other than the fact that he wouldn't show you his ID, what other factors led you to ask him to get down to the ground?

MR. MILLER:  Objection.  Misstates his prior testimony.

Go ahead.

EXHIBIT 23
Page 33 of 116

Samuel Tykol

81

A.   Again, it was just putting him in that -- he's not complying with, like -- I told him to put the stuff he had in his hands down, to free up his hands.   And then he's just not acting as, in my experience, what a reasonable person acts when they're interacting and contacted by the police.   So I want him in that position of disadvantage while I wait for the Code 1 cover that I had requested.

Q.   So it was sometime in that part of the exchange with Mr. Rodrigues you ask for Code 1 cover?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   You have to answer out loud.

A.   Yeah -- yes.

Q.   And what was it about the situation that led you to believe that you needed a backup officer?

A.   Again, just the -- the way our interaction started out where, you know, not being acknowledged, and he wasn't really looking at me, which made me think he's, like, to trying to conceal his identity.

And I had previous knowledge -- I don't remember that -- how long ago it was before that incident -- of -- I had two subjects on the street

EXHIBIT 23

Page 34 of 116

Samuel Tykol

82

just to the north there on Holly run from me, when they saw I had the police car, and then shortly after, they had committed a robbery and stole some shoes from somebody.

So I knew that just from the previous interactions and knowledge of that area, like, I wanted another officer in case that was an instance. You know, I don't know this person, and I don't know what they have. I don't know what they're doing out here. It doesn't -- their behavior doesn't match the neighborhood.

Q. Well, the first time, according to you, that Mr. Rodrigues tried to run, or leave you, was after you pepper-sprayed him; is that correct?

A. Correct.

Q. Okay. So up to that point, he was engaged in some type of conversation with you.

A. I wouldn't classify it as a conversation.

Q. He was answering questions at some level, was he not?

A. I suppose.

Q. Or refusing --

A. Refusing to answer a question, yeah.

Q. And that's his right; correct?

A. Sure.

EXHIBIT 23
Page 35 of 116

Samuel Tykol

83

Q.    Okay.  He asked for your sergeant a couple times, didn't he?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    Okay.  Do you know why he was asking for your sergeant?

A.    No.

Q.    And then at some point he asked you to get a "real cop."  Do you remember that?

A.    Yes.

Q.    Okay.  So when you had -- when you -- he wouldn't go to the ground, you grabbed ahold of him to push him down to the ground; is that correct?

A.    Correct.

Q.    Would -- would that have been an opportunity to de-escalate the situation?

A.    I would say no.

Q.    Why?

A.    At this point I want to put him at that position of a disadvantage for my safety.  He's a -- what I would say a person that's kind of, no, not doing what I'm telling him to do.  And he's passively kind of pushing -- or not passively, but he's pushing back up at me, and I -- and that's not

EXHIBIT 23
Page 36 of 116

Samuel Tykol

84

a -- like it's not reasonable to de-escalate at that point.

Q. Because what did you think -- why? Why did you think it wasn't reasonable to de-escalate at that point?

A. Because I'm, you know, physically engaged with him at a certain level.

Q. And you're very close to him physically at that point; right?

A. Correct.

Q. You've chosen to reach out and touch him and hold him down on the street; is that correct?

A. Correct.

Q. Do you remember which hand you pushed him down with?

A. I believe it was my left. I -- I don't recall.

Q. Okay.

A. The video might be able to show it. I don't recall that -- just based off of my body position that I recall from it, I believe it would have been my -- my left.

Q. And you were trying to handcuff him too; right?

A. I guess I should clarify. Are we talking

EXHIBIT 23
Page 37 of 116

Samuel Tykol

85

about when he's on his stomach or when I'm just
trying to get him to sit down?

Q.    When you're trying to get him to -- your
hand is on him and you're pushing him down, are you
trying to handcuff him?

A.    Not at that point, no.

Q.    At what point in the encounter with him
did you first try to handcuff Mr. Rodrigues?

A.    When we were -- when he was on his stomach
and I was trying to pull his arms behind his back.

Q.    After you shot him?

A.    No, no.  At the initial encounter here.

Q.    Okay.

A.    Prior to the OC spray, there's a point
that --

Q.    I didn't see him on his belly in the
videotapes.  Was it after the videotape?

A.    No.

Q.    So -- so you tried to get him on his
belly -- let's start from the beginning.

You asked him to get down, and then you
push him to -- hands-on.

A.    Uh-huh.

Q.    Then what happened?

A.    We -- that's when he's screaming and

EXHIBIT 23
Page 38 of 116

Samuel Tykol

86

yelling for the real police officer and whatnot. And I tell him he's under arrest. And during a time with that, we -- and I can't recall exactly how, but we turn where his -- our heads are both facing east, so this way, and he's on his stomach, and his arms are, like, kind of out to his side and up in front of him. And you can see on the video that I'm trying to pull them back behind him.

Q. So when that's going on, you're actually on top of him?

A. Kind of on his legs, yes.

Q. Okay. And he's -- he's on a -- in a prone position on his belly and his hands are in front of him?

A. Right.

Q. And you're trying to -- you're trying to pull his arms back to handcuff him --

A. Correct.

Q. -- using this technique that we talked about earlier?

A. No. That technique wouldn't work in that --

Q. Okay.

A. -- with us in that position.

Q. What kind of technique are you using at

EXHIBIT 23
Page 39 of 116

Samuel Tykol

87

that point, when you're trying to handcuff him?

A.    I'm grabbing his arm or forearm area and just trying to get his arm back behind his back, and he's continuing to pull them away from me.

Q.    Okay.  Which arm are you -- of Mr. Rodrigues's are you pulling on?

A.    His right.

Q.    His right arm.  Where is the left arm? Still out in front?

A.    I'd have to refer to the video --

Q.    Okay.

A.    -- if it showed it.

Q.    Okay.  What hand are you using to pull his right arm behind him?

A.    My right.

Q.    And where is your left?

A.    Braced on his back.

Q.    In the middle of his back?

A.    Somewhere.  Again, I'd have to look at the video. I --

Q.    Okay.

A.    Yeah.

Q.    So your hand is somewhere on his upper torso.  You're on Mr. Rodrigues's legs, both of them?

EXHIBIT 23
Page 40 of 116

Samuel Tykol

88

A.    Like his legs, the buttocks area, yeah, somewhere.

Q.    Okay.  And you've got ahold of one hand here --

A.    Correct.

Q.    -- yes?

And how far back do you get his arm?

A.    Not -- I'd say approximately halfway back, never in a position where I was going to be able to put on handcuffs.

Q.    Okay.  And where are the handcuffs at this point?

A.    In the pouch --

Q.    In your pouch?

A.    -- still.

Q.    And where -- are they in the back of your uni -- right there?

A.    No.  They're right here (indicating).

Q.    So you haven't pulled the handcuffs out yet.

A.    No.

Q.    Okay.  So when Mr. Rodrigues is not letting you pull his arm back, what -- this is not a fair question, because I've never been in a physical altercation with anyone -- so how much resistance is

EXHIBIT 23
Page 41 of 116

Samuel Tykol

89

he putting on that arm?

A.    I was not able to pull it back.

Q.    Okay.  So he's stronger than you at that point?

A.    Yes, yeah.

Q.    Okay.  So was it possible at that point to break away from him and wait for your backup?

A.    At that point, I -- no.

Q.    Why?

A.    I am trying to detain this person.  I'm -- we are in, you know, physical body contact.  I -- no.  I -- nothing in -- yeah, it just didn't seem, again, reasonable at that point.  You know, he's been told he's under arrest.  I, again, with that knowledge that if -- with a Code 3 cover request, I believe -- my Code 3 cover request had been made prior -- you know, I don't know the time frame, but prior to that starting.  Knowing that usually takes about a minute, I didn't anticipate that officers were very far away.

Q.    So I guess I'm just trying to figure out what was going through your head, because it's been a couple of years, and we can slow this thing down as much as we want to, which you didn't at that time.

EXHIBIT 23
Page 42 of 116

Samuel Tykol

90

If you can't pull Mr. Rodrigues's arm back because he's resisting or stronger than you --

A.   Uh-huh.

Q.   -- and you've got him prone on the ground, why not just get up and back away and then get in your patrol car and follow him if he runs down the street?

A.   That's not in any -- I would say that's not in any of our training as a thing to do.  I mean, if he were to get up, I would continue to pursue on foot because there's houses and fences and all sorts of things to -- that he could jump over where my patrol car and whatnot can't -- can't get to.

Q.   Okay.  Well, he did at some point run away from you.

A.   Uh-huh.

Q.   Yes?

A.   Yes.  Sorry.

Q.   How fast did he run when he ran away from you?

A.   I don't know how fast.  I remember sprinting to try to catch up with him.

Q.   Did he seem like he was fit?

A.   He seemed very strong based on my --

EXHIBIT 23
Page 43 of 116

Samuel Tykol

91

Q.    Okay.

A.    -- interaction of trying to get his arm behind his back.

Q.    Okay.  So de-escalation at the point you're on top of him pulling on his arm was not an option for you; is that correct?

A.    Correct.

Q.    So walk through -- if you can -- walk through what your mental process is at this point when you're on top of him and you're not able to get his arm back to handcuff him, what are you thinking? What is your planning for the future?

A.    Planning that once I get another officer there, you know, we are in hold here and until another officer comes, we'll get him in handcuffs, but that's my thought process is I'm going to get this person in -- in handcuffs.

Q.    So you're just going to sit on him?  I mean, physically sit on him until someone gets there?

A.    Sitting -- I mean, it's a little more active than that, but, you know, try to keep him on the ground in -- in that spot.

Q.    Okay.  What physical position was Mr. Rodrigues in when he was pepper-sprayed?

EXHIBIT 23
Page 44 of 116

Samuel Tykol

92

A.    He was down on his stomach on that -- that was after I wasn't able to get his hands back, so still down on his stomach.

Q.    Okay.  So are you still on his legs?

A.    Yes.

Q.    And have you -- you still have two hands on his body?

A.    I'd have to look at the -- I know I came -- trying to air things on my radio, so I know I maybe moved a hand or something during the time, but I'd have to look at the video.

Q.    Okay.  And your pepper-spray is on your utility belt in front?

A.    Correct, yeah.  Front right.

Q.    So you have to release one hand to get your pepper spray; is that correct?

A.    Correct.

Q.    And while you do that, once you release his arm, what does Mr. Rodrigues do?

A.    I -- he -- it goes back up where I was trying to pull it from, yeah --

Q.    Up in front of him?

A.    -- up in front of him.  Yeah.

Q.    Is his head -- is he rearing his head back?

EXHIBIT 23
Page 45 of 116

Samuel Tykol

93

A.   He did, but I don't know if it was at that point.  I think it was after he had been pepper-sprayed.

Q.   After.  Okay.

So I -- the video is really hard to make out a lot in.  It's not the best quality of video --

A.   Sure.

Q.   -- but -- so when his -- both of his hands are up in front of him, is his head down?

A.   Not on the ground, no.  It's kind of like if there were a pillow, but the pillow is not there.

Q.   Okay.  All right.

And once you released his arm and it comes back -- his arm comes back up front -- is he making any other kind of physical reaction to you being on top of him?

A.   I mean, I can feel, like, him trying to inch up, like, a movement -- you know, our bodies are moving, and I can feel him trying -- moving underneath me.

Q.   Did he indicate whether he was having a hard time breathing?

A.   No, not that I recall.

Q.   Okay.  Those positional holds are -- require special training; is that correct?

EXHIBIT 23
Page 46 of 116

Samuel Tykol

94

A.    I wouldn't say that -- I would not say that I used any sort of positional hold.

Q.    Was -- was there weight on his chest?

A.    No.

Q.    So you weren't concerned that he might asphyxiate or that there might be breathing problems?

A.    No.

Q.    Or that -- that it might cause him some physical distress; is that --

A.    Not any breathing, no.

Q.    Okay.  And you -- so then you reach for your pepper spray.  Is it -- is it -- is it snapped on?  Do you have to unsnap something to get it out?

A.    No.

Q.    Okay.  You can just slip it out?

A.    Correct.

Q.    And some of the pepper sprays I've seen, you either have -- you have to engage them by turning them -- the top?

A.    Uh-huh.

Q.    Is that true with the pepper spray you had?

A.    No.  There's a little -- I guess, a lip that you -- excuse me -- that you slide your finger

EXHIBIT 23
Page 47 of 116

Samuel Tykol

95

underneath in order to get to the actuation.

Q. Okay. And did you -- did you try to spray -- okay. Strike that.

You eventually did spray towards Mr. Rodrigues. Was there other -- was there problems in deploying the spray?

A. I think I fumbled with getting my -- the bottle of -- it in the correct way so that I could actually get my finger to -- on the actuation. But other than that, it deployed as it should from there.

Q. Was he trying to shake you off of his back while you're doing that?

A. After I had sprayed him.

Q. After. But before, you were able to, then, get your finger under the lip, activate the spray, and then how -- what did you do with the spray?

A. I don't remember if I put it back or if I just, you know, dropped it on the side.

Q. Let me be more clear. Did you reach around and spray him in the face?

A. Oh. I attempted to, yes.

Q. What do you mean, you attempted?

A. I sprayed -- it hit, I believe, the side

EXHIBIT 23
Page 48 of 116

96

Samuel Tykol

of his face.

Q.    The right side of his face?

A.    Yes.  Instead of the -- based off when I re-watched the body camera, yeah, I believe it hit the right side of his face instead of the front of his face.

Q.    And was that because of where the head was positioned when you sprayed?

A.    Correct.

Q.    And did any of it get on you, the spray?

A.    Not enough that I noticed or that I recall noticing.

Q.    Did you cough or sneeze or anything?

A.    I don't recall.

Q.    Did Mr. Rodrigues have any physical reaction to the spray?

A.    No.

Q.    No coughing?

A.    Not that I recall.

Q.    No wheezing or anything like that?

A.    No.

Q.    Did he make any noises that it got in his eye or that it hurt?

A.    No.

Q.    And does that spray come out in a

EXHIBIT 23
Page 49 of 116

Samuel Tykol

97

different color or is it just clear liquid?

A.    It's orange.

Q.    Orange.    Did you see any orange on his face?

A.    No.

Q.    Later -- did you look at his body after you shot him and did you see any orange on his face then?

A.    I was -- no.  I was removed and -- relatively quickly and didn't have any close interactions after the shooting.

Q.    Okay.  All right.  So Mr. Rodrigues didn't appear to have any reaction to the spray.  What did you do with the canister?

A.    I can't -- I don't remember if I put it back in the holster or if I left it on the ground. I don't recall.

Q.    Do you recall whether investigators found it on the ground?

A.    I don't know.

Q.    Do you recall whether it was on your uniform when you were later photographed and questioned?

A.    I'd have to look -- refer back to the photos.

EXHIBIT 23
Page 50 of 116

Samuel Tykol

98

Q.   Okay.

A.   But I believe it was on there.

Q.   Okay.  So somehow in all of this, it somehow got back in the holster?

A.   Sure, yes.

Q.   Okay.

A.   And I -- I believe so.  Like I said, I'd have to look back at the photographs because I, quite frankly, don't remember exactly what I did with the spray after I used it.

Q.   Okay.  So why did you use the spray to begin with?

A.   I've been pepper-sprayed before, and I know that it will incapacitate people and use -- and generally make them easier to handcuff once it -- if it's applied effectively, and it's a -- again, a lower level use of force.

Q.   So is it your position that you can use OC spray to get compliance from a suspect?

        MR. MILLER:  Object as vague, and to the extent it calls for a legal conclusion.

        Go ahead.

A.   No, not for compliance.

BY MS. BURROWS:

Q.   What is your understanding of what the

EXHIBIT 23
Page 51 of 116

Samuel Tykol

99

lawful use of pepper spray is?

MR. MILLER: Object to the extent it calls for a legal conclusion.

Go ahead.

A. The -- it's a tool no different than, like, focused blows or anything like that to get -- pain compliance in order to get them into custody.

BY MS. BURROWS:

Q. So what do you mean by the term "pain compliance," Officer?

A. It causes pain, which will make subjects or -- give up, or can make suspects give up.

Q. So is it your position, then, you could use force, pepper spray in this instance, when there's no force being used against you?

A. Yes. There's a threatened use of force.

Q. What threatened use of force was Mr. Rodrigues engaged in at that point in time you used the pepper spray?

A. At that point he's resisting arrest, and I'm going to use the OC to effect an arrest. He's shown active resistance by pulling his arms away --

Q. So he's -- he's resisting arrest because he wouldn't let you handcuff him?

A. Yes. Actively -- yeah, actively

EXHIBIT 23
Page 52 of 116

Samuel Tykol

100

resisting.

Q. And the active part of it is he's not letting you pull his arm back?

A. Correct.

Q. And it -- and is he trying to roll over and punch you at that point?

A. No, not that.

Q. Is he calling you names?

A. No.

Q. Is he threatening to hurt you?

A. No.

Q. Does he grab a weapon of any sort?

A. No.

Q. And he didn't throw a punch at you or anything?

A. No.

Q. He didn't try to buck you off of the back of him before you used spray?

A. No.

Q. And he was prone on the ground. You're on top of him. And the only show of force that you saw from Mr. Rodrigues -- and please correct me -- was the pulling on the arm?

A. Right, yeah --

Q. Okay.

EXHIBIT 23
Page 53 of 116

Samuel Tykol

101

A.     -- resisting being --

Q.     Okay.

A.     -- put in handcuffs.

Q.     All right.  And when are you taught that you can use OC spray?

A.     I guess, what do you -- what do you mean? Again, it's --

Q.     Well, what sit- -- what situations are you facing that it is okay for you to use OC spray on a suspect?

A.     Are you talking this specific situation or are you just asking for a general example?

Q.     Generally speaking.  Thank you for that clarification.

A.     So, you know, I -- we can kind of proactively use force if we have, like, preassault indicators, like somebody clenching their hands, or their fists.

       If we think going hands-on with them is going to cause them to struggle or fight with us, we can apply it there, or in the effect -- in effecting an arrest.

Q.     Okay.

A.     I mean, there's -- there's multiple, but again, it's -- it's not black-and-white, so it's --

EXHIBIT 23
Page 54 of 116

Samuel Tykol

102

coming up with scenarios off the top of your head, it's a little difficult. And then just, you know, going with the totality of the circumstances of everything, with, you know, what's happening also goes into force decision-making.

Q. Have you heard of Graham v. Connor?

A. Yes.

Q. Tell me what Graham v. Connor is.

A. Basically the -- how uses of force are done from the position of a reasonable officer based off the severity of the crime, whether the person is resisting arrest, attempting to flee, or the immediate use of force against you.

Q. So Graham v. Connor indicates that you can use for- -- that is force objectively reasonable --

A. Right.

Q. -- at the point in time the force is used; is that fair?

A. Yeah.

Q. And when did you first receive training on Graham v. Connor, if you recall?

A. I would -- not for certain, but I would imagine during the preacademy, if not certainly at DPSST in Salem.

Q. I seem to have not brought Policy 800,

EXHIBIT 23
Page 55 of 116

Samuel Tykol

104

Does that sound right to you?

A.    Yes.

Q.    And I'm reading from Eugene Policy 800, and it's on Bates stamp 1841.

Did you notice whether or not the subject, Mr. Rodrigues, was under the influence of alcohol?

A.    No.

Q.    Drugs?

A.    Based off the --

Q.    At the point in time you used the OC spray.

A.    Based off the strength that I -- that he had when I tried to pull back his arms, I did have the thought that I thought he was under the influence of some sort of drug, yeah, because his strength seemed incommensurate with what I would expect of a person that size.

Q.    And what kind of drug are you talking about?

A.    Like, a stim- -- some sort of stimulant.

Q.    Like methamphetamine?

A.    Yes.

Q.    So you suspected he might be under the influence of methamphetamine?

A.    Yes.

EXHIBIT 23
Page 56 of 116

Samuel Tykol

111

Q.    All right.

A.    -- depending on where you are in the city.

Q.    And you -- did you think that there were any other options other than going on hands-on with Mr. Rodrigues at that point in the encounter?

A.    Not to -- at that point in the encounter, no.

Q.    Okay.  And at the point in time when you sprayed him with the OC spray, did you consider there to be other reasonable options other than spraying him with OC spray?

A.    No.  I think that was -- my using a low level -- that was a low level use of force.

Q.    Okay.  And -- and did you -- well, in the seriousness of the suspected offense, how serious is crossing the street at a non-right angle?

A.    That offense is -- it's a violation.

Q.    It's a -- you can't be jailed for that; is that correct?

A.    Correct.

Q.    And then the -- of course, the interfering with a police officer is a misdemeanor; correct?

A.    Correct.

Q.    And you can be jailed for that.

A.    Correct.

EXHIBIT 23
Page 57 of 116

Samuel Tykol

112

Q.     Okay.  And then I think that you said that you were also considering resisting arrest at some point; is that correct?

A.     At the -- yes.

Q.     And at that point, that's also a misdemeanor; is that correct?

A.     Correct.

Q.     So you start out with the -- basically a jaywalking, and now we have two potential misdemeanors.

A.     Correct.

Q.     Okay.  And you had been on the job roughly three years at that point?

A.     Yeah.  It would have been -- it would have been four years that next February.

Q.     So two, two and a half years, two and three-quarters years?

A.     Three and three-quarter years, yeah.

Q.     Three -- okay.  All right.  Fair enough.
       And at that point in time when you're on Mr. Rodrigues's back and you're pulling on his arm, did you feel that you were in physical danger from him?

A.     No.

Q.     Okay.  Were there any civilians out in the

EXHIBIT 23
Page 58 of 116

Samuel Tykol

114

self-defense or to defend a third person

from what the officer reasonably believes to

be the use or imminent use of physical force

while making or attempting to make an arrest

or while preventing or attempting to prevent

an escape.

Is that correct?

A.    Correct.

Q.    So towards this situation we're on, you didn't feel that you were in danger from Mr. Rodrigues at the time you used the pepper spray, and there were no other people present at the time you used the pepper spray.

So what did you believe Mr. -- what facts did you rely on to believe that Mr. Rodrigues was going to use, or imminently use, physical force against you?

MR. MILLER:  Objection.  Misstates his prior testimony.

Go ahead.

A.    I was -- yeah.  I was going -- I was using the force to effect the arrest.

BY MS. BURROWS:

Q.    Okay.  So you didn't think he was going to use any force against you or felt that it was

EXHIBIT 23
Page 59 of 116

Samuel Tykol

115

imminent?

A. At that point, no.

Q. Okay. Now, this may be different in an officer-involved shooting case, but after this event with Mr. Rodrigues, did you have to complete a use of force report?

A. No.

Q. And someone else did that though; is that correct?

A. Correct.

Q. How did that happen?

A. That's done through IDFIT. It's -- yeah, it's done differently with the officer-involved shootings as opposed to, like, using a Taser or show of force or something like that where -- that's on the officer to write the police report and do the reporting that our department has.

Q. Okay. Prior to the arrest of Mr. Rodrigues -- well, strike that.

Prior to using OC spray on Mr. Rodrigues, when was the last time you used OC spray on a suspect?

A. I don't know.

Q. Ever?

A. I can't say for certain. I believe I had

EXHIBIT 23
Page 60 of 116

Samuel Tykol

127

Q.    Okay.  All right.  And -- and the uniform you wear now and the new cameras, do they also adhere with a magnet?

A.    It's the same mounting system.

Q.    All right.  All right.

So let's look at Exhibit 10.  And you were -- you said you're -- F Edward 16 is your -- is your call sign for that night?

A.    5 Edward 16.

Q.    5 Edward.  Sorry.  Sorry.  Sorry.

This little box there is -- appears to be kind of a summary of a number of events, but it says that you called for Code 1 cover at 3308, so that's, what, 12:33 in the morning?

A.    Yes.

Q.    Okay.  Do you know how the event ID at the very top of this box was assigned?

A.    The event -- sorry -- the -- oh, every -- my understanding of it is any time there's a -- police activity or a phone call to police, that one of those numbers is created.

Q.    So can you look straight across on the right side, and it said (as read):

Date/time received, 11/30/2019 at 32:08.

What does that information tell you?

EXHIBIT 23
Page 61 of 116

Samuel Tykol

128

A.    32:03.

Q.    Sorry.  I -- get my glasses better. 32:03.

A.    Okay.  That's the time that I called the stop on the -- then it was entered into the CAD system.

Q.    Okay.  So did you call that stop in before you exited your patrol vehicle?

A.    Yes.

Q.    So you're still sitting in the driver's seat, you call this in, and by 33:08, you were -- called Code 1 cover?

A.    Yes.

Q.    So all of the events that we've talked about from you driving up the street, doing a U-ey, and parking, and then until you called for Code 1 cover, we're here at the garbage cans where you've marked X on Exhibit 7 -- all that happened in about a minute?

A.    So if I re- -- the video -- after reviewing my video, I call out this stop before I even park.

Q.    Okay.

A.    And that's just the way we're taught to do it in case we get out and, you know, we're all of a

EXHIBIT 23
Page 62 of 116

Samuel Tykol

129

sudden getting shot at or something along those lines. So when I call the stop, I'm slowing down to park, but I'm still in the car moving.

Q. Okay. So then it's even less time until you call a Code 1 cover --

A. Correct.

Q. -- from when you exit. Okay.

And then at 33:57, which is roughly 45 to 50 minute -- seconds later, you called Code 3; is that correct?

A. Correct.

Q. And we've talked about -- you called Code 3 once you were down -- had Mr. Rodrigues prone on the ground; is that correct?

A. No. That's incorrect. Code 3 cover is when I was escorting him to try to have him sit on the curb.

Q. Okay. All right. So that's before you use the pepper spray?

A. Correct.

Q. And that's before you actually put him to the ground; is that correct?

A. Correct.

Q. And at the point in time you called Code 3 cover, what was it about the situation that made you

EXHIBIT 23
Page 63 of 116

Samuel Tykol

130

call Code 3?

A.   Being proactive and getting other officers there based on prior contacts that I've had where people aren't super compliant or going -- doing what I'm asking -- I, you know, can feel, as I'm escorting him, a little bit of tension, the yelling, and just -- I'll use the word "disorderly."  I wanted more officers coming quickly in case it rose to the level of the -- of a struggle or fight or use of force.

Q.   So you've use the word "yelling" before. "Yelling" and "screaming" are two terms that you've used to describe Mr. Rodrigues at some point in your encounter with him.

When -- what were you doing at the point in time he started yelling?

A.   Escorting him over to that curb and then trying to get him to sit down.

Q.   Okay.  And when you say "yelling" and "screaming," was there a difference between those two?

A.   No.

Q.   Okay.  And what was he yelling and screaming?

A.   For a real officer.  That's -- that's the

EXHIBIT 23
Page 64 of 116

Samuel Tykol

132

what made you do that?

A. No. I -- people have said way more mean things to me prior to that. You know, as a po- -- you can't take anything personal as a police officer, like, it's --

Q. You have -- people have called you terrible names in your career; correct?

A. Yeah.

Q. Have people threatened to kill you?

A. Yeah.

Q. People threatened to hurt you?

A. Yep.

Q. And so all sorts of terrible words come out of their mouth when you arrest them; is that correct?

A. Correct.

Q. So on a scale of -- compared to all of those other folks, was Mr. Rodrigues in that same category?

A. No. In terms of insult, no.

Q. Okay. Again, reading on Exhibit 10, down -- it says (as read): Fighting with one, 34:20.

So this is again about -- I don't know -- about 30, 40 seconds after you called Code 3. Yeah?

EXHIBIT 23
Page 65 of 116

Samuel Tykol

133

It's the fourth line down.

A.     About 23 seconds.

Q.     23 seconds?  Okay.

So walk me through what happened then from the time you -- because we've left off this -- this continuum where -- where you're trying to get Mr. Rodrigues's arm back and you're on his legs, and then you spray him.

When you -- fighting with one, what happened between where I left you off in your story and you call in "fighting with one," what's going on?  What has happened?

A.     That's when I'm attempting to push him down onto the ground, and I don't know if I'd gotten him on -- I'd have to review the video again.  I -- if I had gotten him on his stomach or not at that point, but me trying to put him in -- again, like I said, I can't remember if I put -- was trying to get him in handcuffs at that point or -- or not -- or trying to get -- I'm sorry, trying to get his arms back and not.

I'd have to look at the video just to get -- of the -- accurate, but it's basically me trying to get him set on the ground.  He's trying to stand up and then -- so he hasn't been pepper- -- I

EXHIBIT 23
Page 66 of 116

Samuel Tykol

134

don't believe he had been pepper-sprayed at that point when I said, "Fighting with one."

Q.   So he tried to stand up after you got him on the ground?

A.   No.   He's -- as I am trying to sit him on the curb, he's still trying to stand up.

Q.   Okay.

A.   Yeah.   That's -- so we're doing that.   I think when he was on his stomach is when I -- I was able to get on the radio, but again, I'd have to look at the video.

Q.   And as far as your memory is, somewhere in there is when you called in "fighting for one" --

A.   Yes.

Q.   -- "with one."

A.   Yes.

Q.   And that exchange of trying to get Mr. Rodrigues to the ground was what you considered to be fighting.

A.   Yes.

Q.   Okay.  All right.  And then the next line down is "Shots fired, 36:08."

Now, I know that your radio became somehow disconnected in all of this scuffling.  How long after you actually fired the shots did you call in

EXHIBIT 23
Page 67 of 116

Samuel Tykol

136

Russell and, I believe, Drumm.

Q. Okay. Where did Russell go?

A. He came and helped me -- I was trying to put Mr. Rodrigues in handcuffs or -- and I think he helped me put, like, the last handcuff on or the -- yeah.

Q. Okay. But I think -- but didn't Drumm arrive like with Russell? They were like bumper to bumper going down the street.

A. I remember running -- or when they came up, they were pretty close, but -- or, you know, in time to each other, but, yeah, I don't -- that part's -- I don't have a strong recollection of it.

Q. Okay.

A. I'd have to look at -- I think it's, yeah, Russell's in-car video.

Q. Okay.

A. Yeah.

Q. All right. And did you -- do you recall making any other calls to dispatch before "shots fired" other than the ones we've talked about?

A. No.

Q. And do you -- do you happen to recollect when your microphone got pulled loose from your uniform?

EXHIBIT 23
Page 68 of 116

Samuel Tykol

137

A.   It was sometime after -- or after or during -- I believe after -- we popped up off the ground after he had been pepper-sprayed.

Q.   Okay.  So let's go back to that point in the story, because it's kind of where we left it off.

      After you pepper-sprayed Mr. Rodrigues, what was his reaction to that?

A.   Didn't react to the spray.  What he did do is pop up, and it caused me to kind of bump off of him, and he got up and started running.

Q.   And that's after you sprayed him --

A.   Correct.

Q.   -- he got up and started running.

      Which direction did he run?

A.   Generally east to northeast.

Q.   Could you maybe --

A.   Yeah.

Q.   -- make a sign on here which way is north --

A.   Sure.

Q.   -- on Exhibit 7?

A.   (Marking.)

      MR. MILLER:  Ms. Burrows, it's 11:54, just to put notice for -- I don't know when you want

EXHIBIT 23

Page 69 of 116

Samuel Tykol

140

that neighborhood.

Q.   And that's not -- that neighborhood is -- it looks like it's just a working-class neighborhood from -- I walked the scene out there, the street. It's just a working-class neighborhood; correct?

A.   It's a neighborhood.  I wouldn't -- you know, I had no indication on anything other than a person in the -- in the -- but just -- Beat 1, based on my knowledge, was -- from having worked there -- there wasn't a lot of foot traffic out in that night, in the evening, anything like that, as opposed to, you know, downtown or out on West 11th, things like that, where it's common for people to be out and about.

Q.   Okay.  And I know -- I can't remember if I actually asked you the -- the ultimate question here, but what -- did you -- why did you stop him? I mean, you've talked about the jaywalking.  You've talked about that, but what were you stopping him for?  What was so curious about him?

A.   The 90-degree angle provision.

Q.   But that didn't happen until after you drove past him and you did the U-turn.

A.   Correct.  But he'd committed the violation in front of me that I observed.  And then also

EXHIBIT 23
Page 70 of 116

Samuel Tykol

141

walking in the roadway.  At the point where I had seen him after I did the U-turn, he was also in the roadway when there was a sidewalk available as well, which is --

Q.    So you --

A.    -- another violation.

Q.    -- so from my perspective, having done a lot of these kind of cases and talked to a lot of officers, that seems like a pretext stop.  That's just my assessment.

What were you really suspecting him of?

A.    Well, there was a pedestrian violation, but I -- like I mentioned earlier in my testimony that there was -- I was familiar with UEVs, burglaries, the robbery on the street just north of there on Holly that I had had -- you know, the two subjects run from me and then later robbed a person and identifying who is in that neighborhood.

Q.    Okay.  And that Holly Street incident that you've talked about, did you apprehend those suspects?

A.    No.

Q.    They got away?

A.    Yes.

Q.    And what were they suspected of

EXHIBIT 23
Page 71 of 116

Samuel Tykol

142

burglarizing?

A.    They were not suspected of burglarizing. They were also walking in the middle of the street, and I think one of them was on a bicycle without lights.  I don't -- I didn't even get to a point of where I was even what I would describe as close to them to go contact them.  They saw my police car and -- and fled.

Q.    So you -- you don't know if those two suspects on the Holly Street incident actually committed a crime?

A.    From the suspect descriptions that was aired to the officer -- by the officers that investigated that crime, they matched generally those two.

Q.    Okay.  Was there any such call-out about Mr. Rodrigues prior to you stopping him in November of 2019?

A.    No.

Q.    Okay.  Did you know Mr. Rodrigues prior to your detention of him?

A.    No.

Q.    Had you heard anything about him?

A.    No.

Q.    And, of course, you didn't know his name

EXHIBIT 23
Page 72 of 116

Samuel Tykol

143

at that point, so you couldn't have run a -- you know, run his name through your system to see if there were any warrants out for his arrest; is that correct?

A. Correct.

Q. All right. So I'm going to hand you what's been marked as Exhibit 11. Just take a look at this.

(Deposition Exhibit 11 marked for identification.)

BY MS. BURROWS:

Q. You might not recognize it, but just take a look at it, and take your time if you need to.

Have you seen any of those reports before?

A. No.

Q. Okay. So at any time after the shooting -- let me -- strike that. Let me start over.

You were placed on administrative leave after the shooting; is that correct?

A. Correct.

Q. How long were you on leave?

A. Approximately a month and a half.

Q. And your duty station was at home?

A. Yeah.

Q. Okay. Well, did you have to call in

EXHIBIT 23
Page 73 of 116

Samuel Tykol

193

A.    This way (indicating).

Q.    Can I write it?

A.    Yep.

Q.    And "North."  So you were -- you were going south on Norkenzie?

A.    Correct.

Q.    And you passed Acacia, and you saw Mr. Rodrigues here where you've marked with an X.

And how -- how fast did that happen?  Did you -- how long a period of time were you watching him down on Acacia?

A.    Approximately two seconds --

Q.    Okay.

A.    -- just as I crossed over the intersection.

Q.    Okay.  And you said that you did a U-ey and you came back northbound on Norkenzie.  Do you know where you did the U-turn on Norkenzie?

A.    Not exactly, no.  Roughly in the area there's a -- off -- it's off-map.  There's a church right here, but --

Q.    Okay.

A.    -- in that area.

Q.    So whatever you saw in that two min- -- two seconds of glancing down Acacia made you turn

EXHIBIT 23
Page 74 of 116

Samuel Tykol

195

Q.     All right.  You wrote -- then you write -- line 3 -- you (as read):  Stopped him at roughly the 1400 block of Acacia for walking -- essentially not walking on the sidewalk because there was a sidewalk available.

Officer, I have walked this entire street, and there's not a sidewalk available everywhere on this street.  There's sporadic sidewalking.

So did you take that into account when you stopped Mr. Rodrigues?

A.     I did.

Q.     Okay.  And how did you take that into account?

A.     The space that I stopped him, there was a sidewalk on the north side of the road that was available.  I don't know the address of the house, but it starts, I believe, a property or so east of where I had stopped him.

Q.     Okay.  So if a person -- I'm asking what's going on in your head, so I'm trying to get to the objective reasonableness of what you eventually did.

So if someone is walking on the sidewalk where it is available on the street, but then they run out of sidewalk and walk on the street, is that

EXHIBIT 23
Page 75 of 116

Samuel Tykol

196

a violation?

A.    It depends.

Q.    On what?

A.    Where they are positioned on the -- the street.

Q.    Why does that make a difference, because if there's no sidewalk and they only can watch on -- walk on the street, why does that matter to you?

A.    They have -- per the ORS, they have to walk on the -- as close to the shoulder as practicable.

Q.    Okay.  And as I recall, when I was there -- and again, it was during the day, so maybe it's different at night, there was cars parked all along, generally both sides of the street on this little road.

Were there cars parked along the street the night that you were there?

A.    I don't recall.

Q.    Okay.  So in that situation that I've outlined for you, when you come to a place where there's no sidewalk and there's cars along the curb, how close is "close as practical" can someone walk on the road?

A.    Close to the cars pretty much.

EXHIBIT 23
Page 76 of 116

Samuel Tykol

197

Q.    Okay.  All right.

And then you write back on your interview, line 6, (as read):  And then I also knew that there's a lot of unlawful entry to motor vehicles that happen up there, burglaries.

When was the last time that you heard about an unlawful entry to a vehicle in this neighborhood?

A.    There's bulletins put out frequently.  I couldn't give a time frame, but I see bulletins of a -- businesses, homeowners, neighborhoods request patrol checks of areas because of issues that they've been having.

Q.    Okay.  On line 18 you write (as read):  So I stopped him just to talk to him to see what he was up to.  He -- when I got out of the car, I turned on my camera and said, "Hey, I'm talking to you, because you're walking in the road."

When you looked at the videotape, did your memory of the video from your body cam comport with this version of what happened?

A.    It said something similar to that.

Q.    Okay.

EXHIBIT 23
Page 77 of 116

Samuel Tykol

198

A.    I don't remember the exact verbiage.

Q.    And in here -- we might get back to something you said to me earlier -- on line 22 (as read):  I remember him making a comment like, quote, Well, don't you have to stop me up there when you drove past the first time, closed quote, or something like that.

Is -- is that a fairly accurate statement of what he -- what comments he made to you?

A.    Generally, yes.

Q.    Okay.  Line 25, page 143, (as read):

And I explained that I didn't.

So you have the discretion whether or not to stop him at any point; is that correct?

MR. MILLER:  Objection.  Asked and answered.

Go ahead.

A.    If I have probable cause that a violation -- that I've observed a violation.

BY MS. BURROWS:

Q.    Okay.  You could have just driven away and not done anything; is that correct?

A.    Yes.

Q.    Okay.  And then you write -- we're on page again Bates-stamped 143, to -- let's see --

EXHIBIT 23
Page 78 of 116

Samuel Tykol

199

continuing that sentence (as read): And he -- then flipping the page to 144 -- was kind of putting on this front that he was like canning.

So what do you mean by "he was putting on this front"?

A. That I didn't -- based off, you know, previous knowledge and experience, people canning or carrying, you know, bags full of cans or have carts or things they put bags in. I had watched him, as I drove behind him, walk past other cans, and he didn't have -- I didn't see a -- the white bag that you saw in the body camera. That would -- didn't come out until I had initially contacted him.

My perception was that if -- when I stopped, like I was going to contact him, that's when he took out the bag despite there being other receptacles and whatnot up the street that I -- I watched him walk past.

Q. So when you use the word "front," you thought he was pretending?

A. Correct.

Q. Okay. And "canning" -- just for the record, what is "canning"?

A. Taking -- recycling cans for the deposits,

EXHIBIT 23
Page 79 of 116

Samuel Tykol

200

to turn in for the deposits.

Q.    Do a fair -- in your experience, do -- are there people who regularly do this canning activity?

A.    Yeah.

Q.    Okay.  Has it increased over time?

A.    I don't know.

Q.    Okay.  And then you go -- (as read):  I asked him for his ID.

Is actually what you did -- did you ask him to see his ID or did you ask him if he had ID?

A.    Asked him -- I -- I would have to refer to the video, but I believe I asked him if he had an ID.

Q.    Okay.  Why -- and again, I know we've gone through this before -- why did you want his ID?

A.    To identify him with the -- for -- you know, to issue a citation.

Q.    Okay.  (As read):  And I think he said something similar to, like -- and I'm on line 10, page 144 -- have a good day, quote/unquote.

Is that a fair approximation of what he said to you?

A.    Or something similar to that, yes.

Q.    And then you requested Code 1 cover at

EXHIBIT 23
Page 80 of 116

Samuel Tykol

201

that point; is that correct?

A.     Correct.

Q.     And we've gone through the dispatch records, so we know approximately what time dispatch says that you called for Code 1.

So my question is:  While you're standing there and he says, "Have a nice day," do you right then get on the radio and call Code 1?

A.     To the best of my -- I'd have to look at the -- the video.

Q.     Okay.  (As read):  And then I went to escort him to have a seat on the curb just to have him sit down.

And again, you only suspect of him a violation at that point, and you want him to sit down?  Was it -- and you wanted to do that -- I think you testified earlier -- to maintain better control of him; is that correct?

A.     To put him at a position of disadvantage.

Q.     And sitting him on the curb would put him in a position of disadvantage in what way?

A.     He's sitting.  If he wanted to stand up or flee or anything like that, it takes him a minute to do that.  It also -- me asking him to sit there tests his level of compliance with what I'm asking.

EXHIBIT 23
Page 81 of 116

Samuel Tykol

202

Q.    Okay.  And he did not want to sit down; correct?

A.    Correct.

Q.    And just to clar- -- to wrap up one small line of questioning that we had touched on earlier, you didn't know how long he had been canning that night; is that correct?

A.    Correct.

Q.    At the point in time when you asked for his ID, was he free to go at that point?

A.    No.

Q.    And why or why not?

A.    Because I was detaining him for the pedestrian violation.

Q.    Okay.  So it's been a long time since I've done criminal law defense.

So you have the right to detain someone on a violation; is that correct?

A.    Correct.

Q.    And if I understand your previous testimony today, if they don't cooperate with you in the issuance of that citation, it can then become interfering with a police officer; is that correct?

MR. MILLER:  Objection.  Misstates his prior testimony.

EXHIBIT 23
Page 82 of 116

Samuel Tykol

203

                    But go ahead.

BY MS. BURROWS:

     Q.     Correct me if I did that wrong.

     A.     It's incorrect.  The -- it is interfering with police when he's not following lawful commands to sit down on the ground after he's been detained --

     Q.     Okay.

     A.     -- I'm sorry -- been detained, while I attempt to identify him to issue the citation.

     Q.     Okay.  Okay.  That's correct.

           So he wasn't free to go when you asked for his ID.  And that's just on the violation.

     A.     Correct.

     Q.     There's no misdemeanor or felony involved at that point.

     A.     Correct.

     Q.     So you don't think he was free to just not talk to you, and he could just walk away.

     A.     I didn't -- yes, he could not walk away.

     Q.     Were you going to give him a citation at that point?

     A.     At that point, I hadn't made a decision.

     Q.     Okay.  Back to the transcript, page Bates stamp 144.  This is after you called Code 1 cover.

EXHIBIT 23
Page 83 of 116

Samuel Tykol

204

(As read): Then I went to escort him to have a seat on the curb, just to have him sit down. And he started screaming that he wanted a supervisor or something like that.

So "screaming," did he raise his voice?

A. I can't -- I -- I believe so. I'd have to look back at the video.

Q. Well, when was the last time you watched that video?

A. Saturday.

Q. Was he screaming on the video?

A. The -- he did at -- start yelling. I can't remember if that was the "help" or -- he started screaming. I just -- I can't remember if that's the screaming, "I want a supervisor." I'd have to recall to -- exactly. I know he was yelling.

Q. How many times did he ask you to see a sergeant?

A. I don't recall.

Q. On the video do you remember how many times he asked to see a sergeant?

A. I don't recall from the video. I'd have to rewatch it.

EXHIBIT 23
Page 84 of 116

Samuel Tykol

205

Q.    And it was after he asked to see a supervisor you called for emergency cover, Code 3; is that correct?

A.    Correct.

Q.    (As read):  When he wouldn't sit down, and then started kind of pulling away from me, I told him he was under arrest for interfering.

And I -- I think we went over this in some detail before, and I don't want to repeat myself, but when he wouldn't -- he didn't sit down at all, ever; is that correct?

A.    Correct.

Q.    Did he kneel?

A.    I would describe it as a crouch.

Q.    Like, hunkered down?

A.    No.  Like -- maybe a squat is better, a better term for it.

Q.    Could you stand up and for the video show me what he was doing in this squat?

MR. MILLER:  Just -- can we clarify exactly when -- when this is in the time frame?

BY MS. BURROWS:

Q.    When we're right here, and he's not free to go, and you're trying to get him to the ground,

EXHIBIT 23
Page 85 of 116

Samuel Tykol

206

but he didn't go all the way to the ground, and he's in the crouch. What does that look like?

A. So I'm trying to have him sit down, and he's kind of like this (demonstrating), like, his legs aren't -- you know, when you sit, your legs would go in front of you?

Q. Yeah.

A. He's kind of still on his feet but lower to the ground.

Q. Are you pressing him down?

A. I'm attempting to, yes.

Q. Okay. You can put your microphone back.

How much of that crouch was you pressing him down and how much of it was he just going down?

A. I-- I don't know. I --

Q. Are you -- go ahead.

A. I don't -- I mean, his legs are much stronger than my arm.

Q. Right. That's what I was getting at. So are you -- you have one arm pressing him. Are you strong enough to force him into a crouch?

A. Not for an extended period of time.

Q. Okay. But -- and you're not -- you weren't strong enough to pull his arm back to handcuff --

EXHIBIT 23
Page 86 of 116

Samuel Tykol

207

A.    Correct.

Q.    -- so -- so some of what the crouch was, he was performing himself, do you think?

A.    That's fair.

Q.    Okay.  All right.

So he was -- he was going down.  He just wasn't sitting down; is that correct?

A.    Yes.

Q.    Okay.

And then (as read):  When he wouldn't sit down, then started kind of pulling away from me -- line 19, page 144 -- I told him he was under arrest for interfering, and then I said it was -- because I believe I even told him the reason, because I remember him asking, "For what?"

And then you never said -- did you tell him why you were arresting him?

A.    Yes.

Q.    What did you tell him?

A.    For interfering.

Q.    Okay.  Did he say anything in response to that?

A.    I believe he said something similar to "Interfering with what?"

EXHIBIT 23
Page 87 of 116

Samuel Tykol

209

A.   Yes.

Q.   All right.  So in the videotape it shows -- again, as I mentioned earlier, almost as soon as he says, "I want a real cop," you take ahold of his arm.

Do you remember that from the video?

A.   Yes.

Q.   And he goes, "Oh, whoa, whoa, whoa, whoa. Wait."

Do you remember that?

A.   Something similar to that, yeah.

Q.   Do you believe that his demeanor changed at the point that you put hands on him?

A.   Yes.

Q.   And how did his demeanor change in your mind?

A.   Became more -- he was a little bit confrontational.

Q.   Okay.  And when you put your hands on him, is that when you started to force him into the crouch?

A.   Not immediately --

Q.   Okay.

A.   -- no.

Q.   And what were you trying to do once you

EXHIBIT 23
Page 88 of 116

Samuel Tykol

215

point?

A.    Correct.

Q.    And what did he do?

A.    Started running, generally, northeast.

Q.    Northeast on Acacia?

A.    Yeah.

Q.    And how close behind him were you, if you can recall?

A.    10, 15 feet maybe.

Q.    10 to 15?

A.    Maybe.

Q.    And you were able to catch up to him?

A.    Yes.  Because he stopped.

Q.    And it said -- there's an arrow that said, "Location of the body."  Is this also where Mr. Rodrigues stopped, or did he stop before then somewhere?

A.    Before then somewhere.

Q.    Where did he stop then?

A.    Somewhere in maybe -- I don't have a good --

MR. MILLER:  Don't guess, but give her your best answer.

BY MS. BURROWS:

Q.    So you were pointing to an area which

EXHIBIT 23
Page 89 of 116

Samuel Tykol

216

looks, on at least Exhibit 7, halfway between the initial stop point and where Mr. Rodrigues was shot. Is that fair?

A.    I think halfway is accurate.

Q.    Okay.  And so it's like you -- there's a mark here on the picture already.  So we're somewhere in the middle of the street, about halfway between the beginning and the end point of this encounter.

What did Mr. Rodrigues do at this halfway point?

A.    He stopped and turned around and took, like, an athletic, what I would describe as a fighting position, and had his hands up.

Q.    Can you show the camera what that looked like?

A.    Like just bladed stance, and like this (indicating).

Q.    So both hands are up, fists --

A.    They were -- like, chest high or -- so they're not up over, you know, protecting a head, but, like, chest height, yeah.

Q.    Okay.  And you said, "bladed stance." What do you mean by bladed stance?

A.    At a general 45-degree angle.  If I'm

EXHIBIT 23
Page 90 of 116

Samuel Tykol

217

facing somebody straightaway, he had a foot back and was offset with me.

Q. Okay. So -- go ahead. You can have a seat.

Prior to this position of the halfway point, had Mr. Rodrigues ever faced you in a fighting stance before?

A. No.

Q. So this was the first time?

A. Yes.

Q. And this was after he was pepper-sprayed?

A. Correct.

Q. Okay. Do you -- what are the typical responses to being pepper-sprayed, if you know?

A. Burning sensation on the affected area, watery eye -- it will cause your eyes to close. Rhinorrhea, so your sinuses will clear out. Sometimes it can cause, like, excessive tearing.

Q. Okay. So it -- it works to sort of blind the suspect and maybe make it hard to breathe so that they're somewhat incapacitated?

A. Correct.

Q. Okay. And have you ever been pepper-sprayed before?

A. Yes.

EXHIBIT 23

Page 91 of 116

Samuel Tykol

218

Q.    And how many times?

A.    Once.

Q.    What was your reaction to the pepper spray?

A.    I had to hold my eyes open.  It caused me -- my sinuses to clear out, burning sensation in the face, coughing.

Q.    How long did those symptoms last?

A.    A few -- hour or so.

Q.    Okay.  When Mr. Rodrigues took off running, why didn't you just let him run?

A.    He was under arrest, and I was going to -- I did not want him to get away.

Q.    So if I understand the situation at that point, you'd already had trouble physically handcuffing him.  He was strong.  He'd already thrown you off of his back.

Did you think that it was going to get any easier to physically restrain Mr. Rodrigues at that point?

A.    No.

Q.    Okay.  And as I remember, at that point you lost the -- the camera at that point.  And you'd lost your mic at that point; is that correct?

A.    Correct.

EXHIBIT 23
Page 92 of 116

Samuel Tykol

225

Q.    -- punched me before.

So he is -- "started to punch at me," what does that look like?

A.    Like, swinging, like, throwing punches.  I think I describe them as "haymakers" somewhere in here.

Q.    Yeah.  What's a "haymaker"?

A.    Like a very wide, lot-of-power-behind-it punch.

Q.    Okay.  Did it come from, like, way back here --

A.    Yes.

Q.    -- the punch?

A.    Yes.

Q.    Okay.  And so he had, like, muscle and upper body into it?

A.    Correct.

Q.    Okay.  Did he ever contact you physically with any of those haymakers in the beginning?

A.    Yes.

Q.    And where did he hit you?

A.    In the -- like, face and hands -- or arms because my hands are up and out at this point.

Q.    Where are your hands at that point?

A.    In the same fighting position.

EXHIBIT 23
Page 93 of 116

Samuel Tykol

226

Q.    Okay.  So he's throwing punches at you. You drop yourself into a fighting position, and you're throwing punches back at him?

A.    Correct.

Q.    So you two are boxing each other at that point?

A.    Yes.

Q.    Did he ever try to reach for you and embrace you?

A.    No.

Q.    Did he move in to tackle you or anything like that?

A.    No.

Q.    So he's just throwing these haymakers at you?

A.    Yes.

Q.    How many times did he connect with you?

A.    Two, according to the statement --

Q.    Okay.

A.    -- which is going my best recollection.

Q.    How many times did you connect with him?

A.    I don't know.  I don't know -- I wouldn't say that I had a good connection on any of my punches, my strikes.

Q.    Did you strike him at all?

EXHIBIT 23
Page 94 of 116

Samuel Tykol

227

A.    Yes.

Q.    Okay.  More than once?

A.    Like, his arms.

Q.    Okay.  His arm?  Okay.  More than once?

A.    Yes.

Q.    And you started punching because he was punching towards you; is that correct?

A.    Correct.

Q.    And at that point, there was no -- did you feel that there was a possibility to de-escalate, step away, try and calm him down?

A.    I didn't think it was reasonable at that point, no.

Q.    And why is that?

A.    Because he's at this point assaulted a police officer, who he knows to be a police officer, so now he's committed a felony.

Q.    Okay.  And he's in that position of assaulting a police officer, because now he's gone from a jaywalking violation to being chased by the police.

A.    Correct.

Q.    Okay.

A.    Well...

Q.    Do you feel that your conduct had anything

EXHIBIT 23
Page 95 of 116

Samuel Tykol

230

punches?

A.    I don't believe so, no.

Q.    Were there any marks at all from the punches?

A.    I had a -- in one of the photographs there is a piece, like, a lac- -- I don't want to call it lac- -- I don't know if you call it a laceration or abrasion above my right eyebrow, but I don't know if it was caused from that instance or the one after that.

Q.    Okay.  All right.

A.    Then on line 13 (as read):  I threw -- I attempted to punch him back to subdue him but also gain control of his arms, just to drag his -- him back on to the ground, because at this point I know that my cover cars and most of the city is hopefully coming to me.

How did you try to gain control of his arms?

A.    The terms, like, called, like, pummeling is kind of what they called it at DPSST, but where you try to grab, like, control of the upper arms or forearms to, like -- and hold them to -- it's essentially, like, a -- I think a wrestling thing,

EXHIBIT 23
Page 96 of 116

Samuel Tykol

231

but to hold them from being able to -- to strike.

Q.      So you reached up and --

A.      Trying to --

Q.      I hate to be on the camera but -- but you reached up and you grabbed him here --

A.      To grab --

Q.      -- or up here (indicating)?

A.      Yeah, that general --

Q.      Right there?

A.      -- elbow to, yeah, mid-forearm to elbow. Somewhere in the arms, trying to grab -- like, in an ideal situation, I would try to grab the upper arm.

Q.      Uh-huh.  And -- and with both hands? You've had it on his upper -- both upper arms?

A.      One on each arm.

Q.      Okay.  And so you were able to get physically in close enough to do that, to grab his arms?

A.      Yes.

Q.      Okay.  Was he throwing punches at you as you're moving in to grab ahold of his arms?

A.      Yes.

Q.      Okay.

A.      That's how he got that close.

Q.      And were you able to hold his arms --

EXHIBIT 23
Page 97 of 116

Samuel Tykol

232

A.   No.

Q.   -- at that position?

A.   No.

Q.   Line 18 (as read):   We exchanged punches there.

Do you see where I'm reading?

A.   Yes.

Q.   So this is after you say that you're attempting to subdue him, and we exchange punches there.  So how are you exchanging punches if he's being subdued by you on the upper arm?

A.   My -- he's not being subdued.  I'm attempting to subdue him, attempting to, but it's basically pulling back, and I'm trying to grab on to -- hold on to a jacket with my hands.  It's not --

Q.   Okay.

A.   What this is referring to is just that space in time, at the paragraph kind of above it, where at that location, that halfway point --

Q.   Okay.

A.   -- is where we're exchanging punches.

Q.   Okay.  So I'm sorry if I missed this.  Were you able to actually grab ahold of his arms, like, get your hand around his arms?

EXHIBIT 23
Page 98 of 116

Samuel Tykol

233

A.    Not -- not gainful control, no.

Q.    Oh, but -- but you did get his [sic] hands somewhere on his arms?

A.    Yes.

Q.    Might not have been a good grip, but you had some kind of a grip on him.

A.    Correct.  That was broken from us both still just moving.

Q.    And he's -- is he trying to fight his way off of that grip?

A.    Correct.

Q.    Okay.  And then you said that he was able to break free.  Break free from?

A.    The grip.

Q.    The grip.  And he ran again; correct?

A.    Correct.

Q.    And how are you feeling at this point?

A.    I'm getting tired.

Q.    Okay.  And he ran up -- on Exhibit 7, he ran up here to about where this yellow dot and the arrow is pointed at "location of body"?

A.    That's generally accurate, yes.

Q.    So we go from the halfway point up to here.  About how far is that in distance, do you know?

EXHIBIT 23
Page 99 of 116

Samuel Tykol

234

A.    I don't know.

Q.    Well, what happens at there, when we get to this second location?

A.    The -- I try to, like -- he stops running again, and then turn around, and -- or, like, turns around and -- I don't know -- we come in contact with each other.  Like, our bodies are touching.

And I don't know how, but at some points I'm on top of him, like, while he's kind of crouched, like, hunched over like this.

And I don't know if I flip over him or how -- like, I don't know how the mechanism of it worked, but I wound up on my back with him kind of between my legs in my "guard," is the term that is used.

Q.    Okay.  All right.  Let's go through this a little bit slower.  Let's read down to last line, 25.  On page 146, line 25, page 146 (as read):
He stops again --

Do you see where I'm reading?

A.    Yes.

Q.    (As read):  He stops again, turns around, and I was close enough behind him where I tackled him to the ground and was on top of him.

EXHIBIT 23
Page 100 of 116

Samuel Tykol

235

So, again, I've never tackled anyone. How did you tackle him? How did that mechanically work out?

A. I don't recall the exact, like, type of tackle it was.

Q. Did you hit him from behind?

A. From the side is the way I -- like, half turned, and I hit from the side.

Q. So if -- if you're -- you're running up the street, is his right side towards you?

A. I don't recall what side.

Q. Okay.

A. I just remember, like, a turn.

Q. And you go in -- do you use your shoulder to tackle him?

A. I don't recall it.

Q. Did you ever play football?

A. I did.

Q. Did you ever tackle anybody?

A. Yes.

Q. And did you go into that football player mode when you went in to tackle him? Yeah?

A. Presumably.

Q. What position did you play when you played football?

EXHIBIT 23

Page 101 of 116

Samuel Tykol

237

Q. Okay. All right.

You tackled him to the ground -- I'm on page Bates stamp 147, lines 1 and 2 (as read):

And I was on top of him.

How did you land -- did you land on top of him?

A. Correct.

Q. And in what -- what were your physical positions with Mr. Rodrigues and yourself when you landed on the ground?

A. The best of my recollection would be kind of crisscrossed over each other, like --

Q. Okay. So which way was his head facing, if you recall?

A. East.

Q. East. So towards --

A. So towards --

Q. -- Norkenzie?

A. Correct.

Q. And your -- your head is facing north? Am I understanding you?

A. Generally.

Q. Crisscross?

A. Generally, north, yes.

Q. Which part of his anatomy are you

EXHIBIT 23
Page 102 of 116

Samuel Tykol

240

resisting"?

A.    Not that I recall.

Q.    Okay.  Line 7, (as read):  At some point -- and I don't know the term for this, but he's able to bump me -- I was on top of him -- and he was able to bump me from on top to where he was on top of me.

Tell me how that looked.

A.    The best way to describe it is, like, a bridge, like, a strong bridge motion with your -- you have your -- bump your hips up off the ground, and it causes the person to -- that's on top of you to lose balance.

Q.    Okay.

A.    Essentially raises their center of gravity.

Q.    So then --

A.    And I fall off and over.

Q.    To your back?

A.    To my back.

Q.    And then he immediately rolls over on top of you?

A.    Correct.

Q.    Okay.  (As read):  And I was able to at least get him in my guard.

EXHIBIT 23

Page 103 of 116

Samuel Tykol

241

What does that mean?

A.    Between -- he's essentially between my legs, like, towards my crotch, and I wrap my legs around -- I was trying to wrap my legs around his back and, like, lock my feet together, which I wasn't able to lock my feet, but it's a way to control a person and keep them from being able to kind of maneuver more around you.

Q.    Okay.  And while you're doing that, you're trying to lock your legs around his torso, line 11

    (as read):  But he's on top of me throwing
    punches, and we're both still trying to --
    I'm still trying to grab his hand and at
    least control those because if he can't hit
    me -- but a couple of those punches hit me
    in the face, and then I remember taking
    punches into the body also.

        So he's on top of you, and you're trying to get your legs around his torso.  Is he punching up into your face?

A.    Correct.

Q.    Are you punching him at all?

A.    I'm attempting to push back, and I'm attempting to punch him and deflect.

Q.    Okay.  And you said in here that he

EXHIBIT 23
Page 104 of 116

Samuel Tykol

246

the face, so I'm concerned that I --

I already read this to you.

So line 25, (as read):  So I end up pulling out my Taser basically directly into his stomach and deploying it.

So I want to make sure I visualize -- because this seems like a super critical juncture also in this -- in this timeline.

You're on your back; correct?  Anything I say that's not a fair statement?  You're on your back.  He's on top of you.  Your legs are around his waist, and he's punching at you; is that correct?

A.    Correct.

Q.    Are his punches connecting with your face during this particular point in time?

A.    Some of them had, yes.

Q.    Okay.  And your Taser is on your left hip; correct?

A.    Correct.

Q.    And you're right dominant; correct?

A.    Correct.

Q.    So you pull out the Taser and -- with your left hand?

A.    Correct.

Q.    And you put it in sort of a drive-stun

EXHIBIT 23
Page 105 of 116

Samuel Tykol

247

mode.  Where do you physically contact his body?

A.    Correct.

Q.    Where?

A.    General stomach area, like, about here (indicating).

Q.    Okay.  And you pull the trigger?

A.    Correct.

Q.    Did you have to turn on the Taser?

A.    Yes.

Q.    So you click it on.  That's that one second, arming it; correct?

A.    I don't know if it was, but, yeah -- it's armed, yeah.

Q.    Okay.  It wasn't armed until you pulled it out and flipped the switch; is that right?

A.    Correct.

Q.    And does it beep and tell you it's now armed?

A.    No.

Q.    You're just hoping that it's armed by the time you deploy it?

A.    It -- a little flashlight on it turns on, and the laser on it turns on, and you basically -- if you flip the switch, it should just, you know, be on.

EXHIBIT 23

Page 106 of 116

Samuel Tykol

248

Q.     Okay.   And on his body -- I think you said you put it in drive-stun mode in the middle of his chest?

A.     Correct.

Q.     While he's above you, with your --

A.     Correct.

Q.     -- left hand; right?

And you pull the trigger.

A.     Correct.

Q.     Did you hold the trigger down?

A.     I don't recall.

Q.     Because it was just a five-second deployment.  So did it have any effect on him?

A.     He didn't have any physical -- noticed physical effect, no.  He -- I remember him yelling.

Q.     Okay.  So does he take any response to being tased?

A.     I'm sorry.  Can you ask that again?

Q.     Did he respond -- did he -- was there a response from him after you tase him?

A.     He said something -- I believe he said, like, "Don't do that" or something like that.  And then he grabbed kind of the front of it, the -- how do you say -- the barrel portion, for the lack of a better term for it -- but the front of it.  He ended

EXHIBIT 23

Page 107 of 116

Samuel Tykol

249

up grabbing it.

Q.   Okay.   So if the barrel is pointed at his stomach in your left hand, and he reaches to grab the barrel --

A.   Correct.

Q.   -- with his -- do you remember what hand?

A.   No.

Q.   That probably doesn't make a difference. And what does he do with that barrel?

A.   Drives it down into, like, my crotch area and leg --

Q.   Okay.

A.   -- that area.

Q.   And then it goes off a second time?

A.   Correct.

Q.   Do you pull that trigger?

A.   Yes.

Q.   Okay.   So you sort of tased yourself at that time?

A.   Inadvertently, yeah.

Q.   Sure, sure.   Did he ever make a gesture for the trigger?

A.   No.

Q.   So where -- his hand is always on the barrel as he's twisting it around into your hip?

EXHIBIT 23
Page 108 of 116

Samuel Tykol

250

A.    Correct.

Q.    And he never made a gesture to take the Taser away from you?

A.    That's what -- my interpretation of what he was doing when he grabbed it was to take it away from me because I'm fighting to retain control of it with my left hand.

Q.    And then that's when you pull the trigger on it.  And did he -- did he respond to that when you were tased?  Did he make any gestures, statements, anything like that?

A.    No.

Q.    Okay.  Line 5, page 148, or maybe above line 3, (as read):  But what he ended up doing was grabbing -- calling it the "barrel" for lack of better term -- of my Taser and drove it into my crotch, and he was -- I could tell he was trying to pull it away from my hands.

How -- what was he doing that made you believe he was trying to pull it away from your hands?

A.    Grabbing it and controlling it and --

Q.    Okay.

A.    -- I had to fight to maintain control of

EXHIBIT 23
Page 109 of 116

Samuel Tykol

251

it.

Q. So line 8, (as read): So because of that, I'm holding on to it for dear life and holding the trigger back, so it's constantly operating it -- operating, but he drives it into my crotch and into the inside of my leg to the point where the best I can describe it -- because I've never been tased before, before this scenario -- was like those muscle stimulators that they use for physical therapy. Essentially having one of those, a giant one of those, draped down your legs and turned on as high as it will go. My legs were totally incapacitated at that point. And, you know, I could tell he was fighting not to get away, but he was trying to hurt me.

That -- is that what you were going through at the point in time when you were tased?

A. Sure.

Q. Okay. So you said that it -- both your legs were incapacitated; is that fair?

A. No.

Q. Okay. So it's just -- which leg was it?

A. Right leg.

EXHIBIT 23
Page 110 of 116

Samuel Tykol

263

A.    Still has a left hand.

Q.    So it's like this (indicating), he's got his left hand going across, and his right arm is holding a Taser?

A.    I don't -- after it had cycled, I don't think that we're -- it's still held just static in this area.  We're still tussling, and it's being moved between us.  Like, it's -- or, you know, between our body.  It's not just held there now, static.

Q.    Okay.

A.    I'm still trying to retain it and break his grip off of it.

Q.    So does that look like -- if you are -- if you're on the bottom and one of you -- both -- each of you have at least one hand tussling with the Taser.  Is Mr. -- Mr. Rodrigues then throwing punches with his free hand?

A.    Correct.

Q.    So he's fighting for the Taser, and he's punching at the same time?

A.    Somehow getting hit, yes.

Q.    Okay.  Page 150, line 1, (as read):
     I was able to kind of keep fighting and
     slide out, and I think they use -- shrimping

EXHIBIT 23
Page 111 of 116

Samuel Tykol

264

is, like, the -- from -- partially from underneath him where I was able to create enough space where I was able to draw my firearm.

So when he's on top of you, can you actually physically reach your firearm?

A.    Not when he's on top of me, no.

Q.    Okay.  And what does the term "shrimping" mean?

A.    It's a defense defensive tactics-type thing where you pull -- and this guy's kind of pulled, like, my left leg up into, like, an angle and push myself -- try to get traction and push myself out from underneath him -- just, like, not be underneath him, and be on -- get off to the side to try to escape from getting out from underneath him.

Q.    So you had to unwrap your legs from his waist that you were holding him with and then put one foot on the ground to push yourself from underneath him?

A.    Essentially, yes.

Q.    And during that whole time, are you still fighting over the Taser?

A.    Correct.

Q.    And you're still -- he's still punching

EXHIBIT 23
Page 112 of 116

Samuel Tykol

265

you?

A.    Correct.

Q.    Okay.

(As read):  I was able to draw my firearm -- line 5 -- and then I essentially shot until he -- into the -- into his abdomen until he slid -- he stopped fighting and slid off to the side and I was able to kind of get up and -- completely from underneath him and reholster.

So you're drawing your weapon, your sidearm, with your right hand.  Where is the Taser?

A.    Either -- I don't know if I've let go or still had it but somewhere --

Q.    Okay.

A.    -- between us -- or how we are.

Q.    And how -- and I think the ME's report said it was almost point-blank range when you fired your weapon.

A.    Correct.

Q.    Could you -- did the barrel come up against his stomach?

A.    Not that I recall.  It was close, but I don't --

Q.    Well, there couldn't be too much

EXHIBIT 23

Page 113 of 116

Samuel Tykol

266

distance --

A.    Correct.

Q.    -- because of your positioning; is that correct?

A.    Correct.

Q.    You fired three times; is that correct?

A.    Correct.

Q.    Into his belly?

A.    Correct.

Q.    And -- and did you pause in between each shot or were they three fire -- shots in rapid succession?

A.    In rapid succession.

Q.    And is that what you're trained to do once you start shooting, you're supposed to keep shooting until the suspect is no longer a threat?

A.    Until the threat stops, yes.

Q.    Okay.   And Mr. -- Mr. Rodrigues eventually died at the scene; is that correct?

A.    Correct.

Q.    Mr. Rodrigues was not dead immediately; is that correct?

A.    Correct.

Q.    And what did you do to check on him right after you shot him?

EXHIBIT 23
Page 114 of 116

Samuel Tykol

282

critical point.  Great.

                    (Video played.)

BY MS. BURROWS:

    Q.    So right here where we're watching, that is your body cam recording you driving?

    A.    Correct.

    Q.    Okay.  Why did you have your body cam on while you're driving?

    A.    It wasn't.  It has a 30-second buffer.

    Q.    Okay.

                    (Video played.)

BY MS. BURROWS:

    Q.    So he's standing next to some garbage cans here, and he then turns his back to you when you're talking to him.  Did you perceive any kind of a threat right there?

    A.    No.

    Q.    Okay.

                    (Video played.)

BY MS. BURROWS:

    Q.    He has a flashlight in his hand.  Do you see that?

    A.    Yes.

    Q.    So earlier you testified that you thought it was unusual that he didn't have a flashlight

EXHIBIT 23

Page 115 of 116

Samuel Tykol

283

while he was walking.  Does this jog your memory about what was going on with Mr. Rodrigues?

A.      In my testimony before I was -- as he was walking down the road, I did not observe a flashlight --

Q.    Okay.

A.      -- until this point.

Q.    Okay.

(Video played.)

BY MS. BURROWS:

Q.    So he's got a plastic bag and a plastic bottle in his hand.  You said before you thought that he was -- and you used a different term, but you thought he was faking canning?

A.    That he was using this as a kind of a -- I didn't believe that he was canning, yes, until he walked up here, because I had watched him walk past other containers without a bag or anything in his hands.

Q.    So is this -- in the videotape, is this the first time you see the bag?

A.    When I contacted him here, yes, this is the first time.

Q.    So when you got out of your car and you approached him, he had the bag in his hand?

EXHIBIT 23
Page 116 of 116

Samuel Tykol

308

STATE OF OREGON        )

                        )    ss.

County of Lane         )


    I, Deborah M. Bonds, CSR-RPR, a Certified Shorthand Reporter for the State of Oregon and Washington, certify that the witness was sworn and the transcript is a true record of the testimony given by the witness; that at said time and place I reported all testimony and other oral proceedings in the foregoing matter; that the foregoing transcript consisting of 307 pages contains a full, true and correct transcript of the proceedings reported by me to the best of my ability on said date.

    If any of the parties or the witness requested review of the transcript at the time of the proceedings, correction pages have been inserted.

    IN WITNESS WHEREOF, I have set my hand and CSR seal this 14th day of February 2023, in the City of Eugene, County of Lane, State of Oregon.


Deborah M. Bonds, CSR, CCR, RPR

Oregon CSR No. 01-0374, Expires September 30, 2023

Washington CCR No. 21014344, Expires May 5, 2023