1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                   EUGENE DIVISION

4

OFELIA HERNANDEZ SANTIAGO,      )
5  Personal Representative of the )
   Estate of Eliborio Rodrigues, )
6  Jr.,                          )
                                 )
7                    Plaintiff,  )  Case No. 6:21-cv-01715-MK
                                 )
8            v.                  )
                                 )  February 15, 2024
9  SAMUEL TYKOL, JOHN DOE        )
   SUPERVISORS 1-3, CITY OF      )
10 EUGENE, a municipal           )
   subdivision of the State of   )
11 Oregon,                       )
                                 )
12                  Defendants.  )
   _____)

13

14

15

16                  ORAL ARGUMENT

17      TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

18    BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

19  UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

20

21

22

23

24

25

1                            APPEARANCES

2    FOR THE PLAINTIFF:

3                    MICHELLE R. BURROWS
                     Michelle R. Burrows, PC
                     16869 SW 65th Ave #367
4                    Lake Oswego, OR 97035

5    FOR THE PLAINTIFF:

6                    ANTHONY T. ROSTA
                     Rosta & Connelly, PC
7                    1361 Pearl Street
                     Eugene, OR 97401

8    FOR THE DEFENDANT(S):

9                    BENJAMIN J. MILLER
                     Eugene City Attorneys Office
                     101 West 10th Avenue
10                   Suite 203
                     Eugene, OR 97401

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

(February 15, 2024)

1  (In open court:)

2          DEPUTY COURTROOM CLERK:  Please remain seated.

3  The Honorable Mustafa T. Kasubhai presiding.

4          THE COURT:  Please be seated.

5          DEPUTY COURTROOM CLERK:  Now is the time set for

6  Civil Case No. 21-01715.  Santiago v. Tykol, et al., for

7  oral argument.

8          THE COURT:  Good morning, Counsel.  Thank you for

9  making yourselves available.

10         A couple of initial housekeeping matters, just so you

11  have an idea of how we'll proceed today, then I'll ask you

12  to introduce yourselves, and we'll get underway.

13         I know it's a little confusing when we ask you to

14  remain seated.  I also know that attorneys are so used to

15  standing when addressing the Court.  I'm not going to try to

16  force you to break your habit, but you're welcome to remain

17  seated if that's more comfortable for you.  You don't need

18  to ask for permission to stand or sit.  Just do one or the

19  other.  Just don't bum-rush the bench.  That's the only

20  thing that might cause me a little bit of concern.

21         All right.  So we'll start with -- we have defendants

22  to argue in -- on summary judgment to take up first, and

23  after we're finished with your initial presentation, we'll

1    likely take a brief recess, perhaps ten minutes, and then

2    we'll come back and I'll hear plaintiff's arguments.

3        I'll give everyone an opportunity to go back and forth

4    enough just to make sure that you've satisfactorily

5    addressed all of the arguments you think would be helpful

6    for me to consider.

7        If at any time you need to take a break outside of that

8    recess that I'm likely going to call between arguments, let

9    me know.  I'll be happy to accommodate that.

10       All right.  If you would be kind enough to introduce

11   yourselves.  We'll start with plaintiff's counsel first.

12   Please give me your full name and your honorifics, such as

13   Mr., Ms. or Mx., and that way I can address you respectfully

14   throughout the course of our hearing today.

15       For the -- for the plaintiff.

16         MS. BURROWS:  Thank you, Your Honor.  I'm

17   Michelle Burrows for plaintiff.  Mr. Tony Rosta is my

18   co-counsel today.  This is Ms. Ofelia Santiago, our client.

19   And the family of the decedent is sitting in the front row

20   of the courtroom.

21         THE COURT:  All right.  Thank you.  And welcome.

22       And for the defense.

23         MR. MILLER:  Thank you, Your Honor.

24   Mr. Ben Miller.  I use he/him pronouns -- on behalf of the

25   City of Eugene, and Sergeant Samuel Tykol, who is here,

1  seated with me.

2  THE COURT:  All right.  Thank you, Mr. Miller.

3  Are there any other housekeeping matters that we need

4  to take up before we jump into argument?

5  For the defense, Mr. -- the moving party?

6  MR. MILLER:  No, Your Honor.

7  MS. BURROWS:  No, Your Honor.

8  THE COURT:  All right.  All matters that were

9  raised in the initial summary judgment are still at issue as

10  we're proceeding today -- is that right? -- as far as you're

11  both concerned?  No one has conceded anything?

12  MS. BURROWS:  There have been no surprises since

13  the briefing was filed, Your Honor.

14  THE COURT:  All right.  Very good, then.

15  Mr. Miller?

16  MR. MILLER:  Thank you, Your Honor.  I'll outline

17  some of our arguments.  Although I know you're prepared and

18  have read all of this.  So I don't want to belabor things

19  too much.

20  THE COURT:  Well, I -- even though I have read it

21  all, it's always good to cover some of the bases because it

22  may also trigger some of my own recollections that might not

23  otherwise be sparked.  So don't -- if you're -- if you're

24  already tilling soil that's been tilled before, I'll let you

25  know, and we can move on; but -- but I -- and, you know, as

1    you, I'm sure, are aware, I'll ask lots of -- I'm hoping to

2    ask lots of questions.

3              MR. MILLER:  Right.  Right.

4         So, Your Honor, this incident started with a pedestrian

5    stop on, I think, November 30, 2019, at about 12:30 in the

6    morning, on Acacia Street in North Eugene, and it ultimately

7    ended up with Mr. Rodrigues being shot by Officer Tykol

8    under -- Officer Tykol, in self-defense, while he was on top

9    of Officer Tykol.

10             THE COURT:  While Mr. Rodrigues was on top of --

11             MR. MILLER:  While Mr. Rodrigues was.  Right.

12   They had been grappling with a Taser, and then, in

13   self-defense, Officer Tykol shot him.

14        There's a period -- the initial period of this event is

15   captured on body-worn camera footage for the first,

16   approximately, two minutes, or so, before, during a struggle

17   with Mr. Rodrigues, the camera is knocked off and either

18   malfunctions or turns off.

19             THE COURT:  Is it knocked off wherever it's

20   connected so it's on the ground, or is it knocked and turned

21   off?

22             MR. MILLER:  It's knocked off and it turns off

23   or -- or is struck off.

24             THE COURT:  But it's still on -- on

25   Officer Tykol's body?

1          MR. MILLER:  No, Your Honor.  It had been affixed

2    by a magnet, and that magnet -- that day he was wearing a

3    jacket.  So it was over -- there's a magnet on his vest.  He

4    was wearing a jacket, and then the camera was affixed there.

5    So it gets bumped off.

6          THE COURT:  So it falls to the ground somewhere?

7          MR. MILLER:  Yes.

8          THE COURT:  And this may or may not be the record,

9    but, I'm curious, are these body cams designed to turn off

10   when -- when detached from whatever it's supposed to be

11   connected to?

12         MR. MILLER:  It's not designed to turn off when

13   detached, but that version of body cameras had a -- there

14   was a trigger on the top, a little tab, that just takes a

15   very light amount of pressure to turn on or off; and so the

16   supposition is that it fell and either was stepped on or the

17   way that it fell was enough to hit that trigger to turn it

18   off.

19        I know that -- I'm certain the estate wishes that we

20   had footage of the entire incident, and I know Officer Tykol

21   does as well.  We may still be here, even if that was the

22   case, but it's something that everybody wishes that we -- we

23   had.  But the fact is, is that it turned off.  And so

24   there's a period of about a minute and 50 seconds, before

25   other responding officers arrive, that's not captured on

1    camera, but there is radio traffic that occurs from

2    Officer Tykol while that's happening, and then we have his

3    account and the forensic evidence of what occurred during

4    that time period.  It's within that time period that -- that

5    Officer Tykol is in a struggle with Mr. Rodrigues.

6    Mr. Rodrigues ends up on top of him, struggling over control

7    of the Taser.

8             THE COURT:  And what I want to be able to do is

9    make sure I understand the exact sequence, because, I mean,

10   you described it as a grappling situation, and in my

11   experience, however limited it is, it's -- I can appreciate

12   that there's potentially more, sort of, just chaos in

13   exactly how it unfolded.  But I believe your briefs took

14   some pains to describe Officer Tykol's testimony about the

15   sequence of events.

16        The sequence of events are important because, as it

17   occurred to me as I was reading the briefs, there were

18   several places, along the way, in which, if -- if training

19   had been employed, it had been given, that in certain

20   grappling situations control could have been applied without

21   strikes, and we might -- we might not ever have needed to

22   have been here.

23        So --

24             MR. MILLER:  Well --

25             THE COURT:  And that may or may not have any

1  bearing, ultimately, on the issue of qualified immunity and,

2  at the same time, it's something that is very apparent to me

3  that requires some level of discussion today.

4          MR. MILLER:  Right.  And -- and -- well, we'll get

5  through all of that, Your Honor.  We would like to

6  emphasize, though, that, you know, the Supreme Court has

7  said that, you know, bad tactics that lead up to a

8  justifiable use of force aren't actionable in and of

9  themselves.  They've done away with the provocation

10  doctrine.  And a policy violation in and of itself, unless

11  it also is a violation of a constitutional provision --

12          THE COURT:  But it may speak to the issues of

13  training on the common law claims; correct?

14          MR. MILLER:  There is a negligent training claim;

15  however, you know, the standard, of course, for that is that

16  you need to show that the City, as -- that's the entity

17  being sued, was aware of the need for more training, in

18  addition to just the fact that there could have been

19  something or the training could have been applied in this

20  particular instance in a different --

21          THE COURT:  Well, whether training can be applied

22  in this instance is a question for the jury, though.

23          MR. MILLER:  No.

24          THE COURT:  Assuming we have the predicate issues,

25  in fact, that there were certain allegations made about

1  inadequate training and evidences in the record that

2  discusses the -- the inadequate training.

3         MR. MILLER:  Well, so I think it's under the

4  *Whelan* case.  For a supervisor on a negligent training

5  claim, you need to show, essentially, that the City was

6  aware or should have been aware of the need for more

7  training; and so in that -- in that case, you would need to

8  be able to have evidence in the record of prior instances of

9  other officers not applying the training or the training

10  that was applied being done incorrectly.  I think, really,

11  you would need to have evidence of Officer Tykol not

12  applying that training.

13         THE COURT:  What about best practices in the

14  general law enforcement communities?

15         MR. MILLER:  Well, you don't have any evidence of

16  that in the record, though.  I mean, there isn't anything in

17  here from an expert saying, "Here's how officers should have

18  been trained differently."  All you have submitted are, I

19  think, copies of policies that existed at the time that

20  apply to different things.

21     And a municipality like the City should be encouraged

22  to have policies that are more restrictive than the

23  parameters of the Fourth Amendment that place more emphasis

24  on how they want officers to do things other than that, and

25  I don't think that's a basis to then say they have liability

1  under a common law negligence theory or -- or the Fourth

2  Amendment.  You need to have more than that.

3       Right now, the record before you, at least, doesn't --

4            THE COURT:  Well, what is that "more" that you

5  would require?  Because negligence is negligence, unless

6  we're changing sort of the standard of negligence for the

7  purposes of holding law enforcement accountable.

8            MR. MILLER:  But what we're talking about here --

9  in some instances, this is -- I mean, negligence, in terms

10 of law enforcement, where you're looking at tactics -- this

11 isn't something that a lay jury can simply look at and

12 understand like they could about rules of the road.

13    You need have some sort of an expert to be able to talk

14 about standards of care for, you know, this area, and none

15 of that exists within this record.

16    So it isn't enough simply to say, "I think, as a

17 layperson who hasn't had all of these trainings and hasn't

18 had to apply them in a real word scenario, that it could

19 have been done differently."  You need to have expert

20 testimony about what the standards are for training

21 regionally, I think, at least.

22            THE COURT:  And at the very basic minimum, you're

23 suggesting that there's just no evidence in the record for

24 us to even ask that question -- for me to ask this question

25 and evaluate whether it's appropriate to go to the jury?

1          MR. MILLER:  Correct.  I am.

2          THE COURT:  Okay.

3          MR. MILLER:  So all --

4          THE COURT:  And be that as it may, and I

5   understand that there are some -- there's certainly legal

6   limits on what it is that can be evaluated with respect to

7   tactics and how the Supreme Court has evaluated the law

8   around that, it still, nevertheless, is important, for the

9   purposes of this case, for me to make sure we're -- I'll be

10  asking questions about them.

11      So recognizing that there may be legal -- legal

12  barriers to really proceeding on those factual issues, know

13  that I'm going to ask questions.  So I'll want the answers

14  to be substantive, as opposed to saying, "Well, the law

15  doesn't require you -- doesn't allow you to look at it."

16          MR. MILLER:  I will happily do that, Your Honor.

17          THE COURT:  Okay.  All right.

18          MR. MILLER:  So if we can step back a little bit,

19  I'll kind of walk through the claims in the case.  Unless

20  you want to -- and then detail for those, kind of, the facts

21  that apply to those various claims.

22      So --

23          THE COURT:  Let's make sure we have a common

24  understanding of what -- what the defense believes the

25  evidence is about how the grappling situation unfolded.

1          MR. MILLER:  Right.  Well, the evidence is found

2     basically in two places.  It's found in the interview that

3     was done of Officer Tykol, where he was interviewed, I

4     think, on December 2nd.  So, I believe, just a few days

5     after that, that interview is recorded.  There's a

6     transcript of that that is included in the record.

7          And then he was also deposed by Ms. Burrows last year,

8     I think, and was examined in great detail about that event,

9     both his account of it before being shown the transcript and

10    then with the transcript.  So the evidence, in terms of what

11    occurred there, is -- is that.

12         There's other physical evidence that was found at the

13    scene that corroborates that account, in terms of where

14    different things were and its location, but for 150 minutes

15    we don't have --

16         THE COURT:  What other things were found on the

17    scene?

18         MR. MILLER:  Sure.  So -- so where, for example,

19    the body-worn camera was located -- so to show where --

20    where it was that it fell off during an initial struggle

21    with Mr. Rodrigues.  Where Mr. Rodrigues had dropped his, I

22    think, bag and a plastic bottle.  Where the --

23         THE COURT:  So the -- those physical pieces of

24    evidence corroborate where the initial -- I mean, perhaps

25    the contact or struggle had occurred, and then apparently

1  where -- where the final struggle occurred helps us

2  corroborate the timing and the testimony from Officer Tykol.

3          MR. MILLER:  Correct.  Correct.

4      In addition to that, we have photographs of his wounds

5  that he received, that are in the record, to his forehead.

6  Taser marks to his side.

7          THE COURT:  "His" being Officer Tykol?

8          MR. MILLER:  Officer Tykol.  Correct.

9      And abrasions, I believe, to his legs or knees.

10          THE COURT:  That would suggest that they did go to

11  the ground?

12          MR. MILLER:  Yes.  You have, again --

13          THE COURT:  Does it help establish, at least from

14  the physical evidence, who was on top -- on top of who first

15  and then how the struggle, you know, dynamically changed?

16          MR. MILLER:  It -- I mean, it shows that there

17  were physical injuries, and it's certainly not inconsistent

18  with his testimony; but neither side offered a forensic

19  re-creation or anything from anybody medical to say these

20  injuries are inconsistent with, you know, a description.

21      So the injuries are completely consistent with his

22  description of what occurred, and they were documented, you

23  know, immediately thereafter.

24      So we have that as evidence that corroborates his

25  version of events, and then, when an officer does arrive,

1  Officer Jentzsch, we have body-worn camera footage of him

2  walking up to Officer Tykol, and Officer Tykol making

3  excited utterances about Mr. Rodrigues being on top of him

4  and trying to get his Taser, and so this is mere seconds

5  after officers have responded and maybe -- and probably less

6  than a minute after the shooting itself, and he's already

7  describing the same event that he goes on to describe in the

8  IDFIT interview and then again in his deposition.

9      So we don't have video of that 150 -- of that minute

10  and 50 seconds, but all the physical evidence that was

11  developed at the scene and -- and all the questioning that's

12  been done of Officer Tykol has remained consistent with that

13  version of events.

14      There were no other witnesses that visually saw the

15  event.  We haven't located any video from anybody that saw

16  it, you know, that could clear up -- to show you exactly

17  what occurred, but we have his testimony that's been

18  consistent throughout, and we have physical evidence that is

19  consistent with it.  We have injuries that are consistent

20  with it, and we have his excited utterances right after the

21  event that are consistent with what he's been saying this

22  entire time.

23          THE COURT:  What was -- if I recall from the

24  record, Mr. Rodrigues might have been looking for bottles

25  for -- for the deposit?

1    Was that --

2         MR. MILLER:  Perhaps.  Perhaps, yeah.

3         THE COURT:  -- your understanding?

4    Well, would the physical evidence that was found on the

5    scene corroborate that -- that inference?  I mean, he

6    had a -- I think you said he had a bag with some bottles in

7    it?

8         MR. MILLER:  Well he had a bag with at least one

9    plastic bottle.  When Officer Tykol first approached him for

10    their encounter, Mr. Rodrigues was at, I believe, a

11    recycling can, beginning to -- to look through it or looking

12    through it.  So -- so, yes, there's certainly evidence

13    that --

14         THE COURT:  Is anything illegal, by city

15    ordinance, for, I guess, salvaging recycling?

16         MR. MILLER:  Not that we have cited as a basis for

17    the stop and arrest or anything like that.  So it -- in

18    certain circumstances, it might amount to a trespass with

19    other -- but, no, that's not -- that's not what we're

20    relying on for the -- a Fourth Amendment probable cause

21    basis.

22         THE COURT:  And had any neighbors in the vicinity

23    called to report suspicious activity?

24         MR. MILLER:  There had been -- Officer Tykol, at

25    the time, who was an officer, was aware that there had been

1    prior, I think a burglary, in that --

2            THE COURT:  But on that -- at that evening --

3            MR. MILLER:  Not that evening.

4            THE COURT:  -- between the 12:00 and 1:00 hour,

5    before the incident occurred.  No reports from neighbors

6    saying --

7            MR. MILLER:  Correct.

8            THE COURT:  -- there's somebody suspicious --

9            MR. MILLER:  Correct.

10            THE COURT:  -- who's looking around our -- our

11    driveways?

12            MR. MILLER:  Correct.  No.

13            THE COURT:  Okay.

14            MR. MILLER:  Nothing like that.

15            THE COURT:  So Officer Tykol was just on a routine

16    standard patrol and on -- on his -- whatever his range was?

17            MR. MILLER:  In his beat, yes.  Uh-huh.  Right.

18        So he was on patrol on his beat, when, as he was

19    driving by, he looked down Acacia and saw an individual

20    that, you know, didn't have a light or anything, walking

21    down the middle of the street, and having served as an

22    officer in that area and sort of knowing --

23            THE COURT:  Isn't it -- is it more or less

24    suspicious for somebody to be walking down the middle of a

25    street in an unlit -- on an unlit road?

1          MR. MILLER:  Well, it's -- it stood out to him,

2    and he's the one who is out there every night in that area,

3    and so he understands what he sees for people that are

4    walking and, you know, whether they have a dog or a light or

5    reflective vest or things like that, and so it --

6          THE COURT:  What was Mr. Rodrigues wearing?

7          MR. MILLER:  He was wearing dark clothing.  I

8    think a hood that was up over his head.

9          THE COURT:  What time of the year was it?

10          MR. MILLER:  It was November.  November 30th.  It

11    was a cold night.

12          THE COURT:  Okay.  So a reason for having a hood

13    on?

14          MR. MILLER:  It was -- it was, yes.

15          THE COURT:  Okay.

16          MR. MILLER:  I mean, that wasn't -- again, just

17    the fact that he's out isn't the reason.  As he goes by, he

18    observes that he's committing, you know, two different

19    pedestrian violations.  One is, you know, not using a

20    sidewalk when it's available, and then the second is not

21    crossing the street at a 90-degree angle.

22      Those are both violations under --

23          THE COURT:  Was he crossing the street or just

24    walking the street?

25          MR. MILLER:  He was walking the street, but at one

1  point he later was on one side and then he crossed over to

2  another.  So he --

3  　　　　　THE COURT:  How long was Officer Tykol observing

4  him before the stop?

5  　　　　　MR. MILLER:  So not a tremendous amount of time.

6  He observed him initially down Acacia Street as he was

7  driving by on -- on a parallel road.  He turned around and

8  drove past Mr. Rodrigues as he's walking down the street.

9  Acacia is a dead-end street.

10  　　So Officer Tykol drove to the end of Acacia, turned

11  around, and drove, then, up to -- to face -- and that's

12  where he saw Mr. Rodrigues cross Acacia at what he described

13  as about a 45-degree angle, but then also, you know, walking

14  in the street, not utilizing the sidewalk when it was

15  available at that location.

16  　　So at that point he had probable cause for a pedestrian

17  stop to -- to look into that -- those violations, and

18  that --

19  　　　　　THE COURT:  Was there any testimony in any of the

20  depositions that -- that Officer Tykol would not have

21  stopped Mr. Rodrigues if he was on the sidewalk, with

22  everything else being the same?

23  　　　　　MR. MILLER:  Well, no, those questions weren't

24  asked.

25  　　　　　THE COURT:  And would he have been stopped if

1  there'd been any evidence -- if he had been crossing at a

2  90-degree angle?

3          MR. MILLER:  Well, if Mr. Rodrigues -- if the

4  officer didn't have probable cause to -- to conduct the

5  stop --

6          THE COURT:  True.  I'm just wondering -- I'm

7  wondering if there's any evidence in the record that answers

8  any of these questions that I have.

9          MR. MILLER:  No, huh-uh.

10          THE COURT:  Is there any evidence that he would

11  have -- he would have stopped Mr. Rodrigues if he was

12  walking a dog?

13          MR. MILLER:  There isn't any evidence in the

14  record as to what he would or wouldn't have done in those

15  instances.

16          THE COURT:  So that -- I guess that also suggests

17  that we don't know whether Officer Tykol would have bothered

18  to stop Mr. Rodrigues if he was wearing a flashy reflective

19  vest.

20          MR. MILLER:  There isn't -- there isn't evidence

21  in the record regarding whether he would or wouldn't have

22  done that.  So we have on the record -- what we focused on

23  is the establishment, which the estate frankly concedes that

24  there -- that there was a pedestrian violation and he had

25  the authority to conduct the stop.

1          Now, he didn't even start it as a stop.  He didn't turn

2     on his overhead lights to stop him.  He -- he initially

3     said, "Hello," and started this off as basically a mere

4     encounter to have a conversation with Mr. Rodrigues.

5               THE COURT:  Was Officer Tykol in his vehicle when

6     he stopped, or did he get out of the vehicle?

7               MR. MILLER:  Yes.  He was in the vehicle.

8               THE COURT:  So he drove up to Mr. Rodrigues?

9               MR. MILLER:  He drove past Mr. Rodrigues.  He went

10    to the dead end, turned around, and then drove up and

11    parked, you know, up.

12              THE COURT:  How far away was he from Mr. Rodrigues

13    when he parked the car?

14              MR. MILLER:  It's -- you can tell from watching

15    the body-worn camera footage.  I wouldn't want to provide an

16    estimate, but it's, I mean --

17              THE COURT:  Like 10, 15 --

18              MR. MILLER:  -- 20 feet?  30 feet?

19              THE COURT:  Okay.

20              MR. MILLER:  Yeah.  He doesn't turn on his

21    overhead lights.  He doesn't tell him to stop.  He starts it

22    off as a mere encounter to, again, sort of investigate

23    those -- those things.

24              THE COURT:  And there's nothing illegal about

25    doing that.  I mean, you can -- I mean, you can -- any law

1    enforcement officer can go ahead and engage anyone in the

2    public in that same way --

3            MR. MILLER:  Right.

4            THE COURT:  -- and it wouldn't be considered a

5    stop?

6            MR. MILLER:  Correct.  Right.

7        Setting aside anything about, you know, observation of

8    a pedestrian violation, an officer can go up and begin to

9    try to speak to somebody, and they can, you know, do -- they

10   can -- they can speak to them or not speak to them; but

11   there's nothing -- nothing unlawful about an officer

12   approaching somebody to have -- to have a mere conversation

13   or to have an encounter.

14           THE COURT:  And what does the evidence in this

15   record show that -- after Officer Tykol said "Hello,"

16   Mr. Rodrigues did what?

17           MR. MILLER:  Mr. Rodrigues -- there's -- I mean,

18   he makes a number of statements.  This is -- this portion of

19   it is all captured on body-worn camera footage.  We went

20   through it in great detail.

21       A number of his statements are difficult to make out,

22   and so we didn't attempt to say what he's saying because

23   he's -- it's muffled, and he was wearing --

24           THE COURT:  Is it muffled because of the

25   microphone, the quality of the technology, or --

1           MR. MILLER:  He was wearing a mask or a -- I don't

2    know if it was a baklava.  Something covering his face so

3    he's -- Mr. Rodrigues -- you can hear Officer Tykol, but

4    Mr. Rodrigues at times is wearing a cover across his face

5    and facing away from the microphone or the camera when he's

6    talking.

7           THE COURT:  Okay.

8           MR. MILLER:  So I wouldn't want to -- I wouldn't

9    want to recount exactly.  We laid it out in our motion

10   because the words are very important, but -- but, in

11   essence, Officer Tykol approaches him, you know, starts to

12   have a conversation with him about, you know, "Why are you

13   walking in the road?"  And, eventually, you know, tries to

14   escort Mr. Rodrigues.

15          THE COURT:  In what way?  How is he trying to

16   escort him?

17          MR. MILLER:  He grabs ahold of him.

18          THE COURT:  So at some point, then, Officer Tykol

19   gets out of the vehicle?

20          MR. MILLER:  Yeah.  Officer Tykol was already out

21   of the vehicle at the time -- so when Officer Tykol -- he

22   parked.  He gets out of the vehicle and walks up to

23   Mr. Rodrigues.  He initially says, "Hello."

24          THE COURT:  So the "Hello" is once he's out of the

25   vehicle?

```
1              MR. MILLER:  Correct?

2              THE COURT:  So he doesn't say "Hello" from inside

3    of the vehicle?

4              MR. MILLER:  Correct.  Correct.

5         So --

6              THE COURT:  Okay.  So he parks the car, gets out,

7    says, "Hello."

8         How far away was he from Mr. Rodrigues when he stopped

9    to say, "Hello"?

10             MR. MILLER:  He is --

11             THE COURT:  And "he" being Officer Tykol?

12             MR. MILLER:  Right.  I think he's walking during

13   this time.  So he's getting closer to him.

14             THE COURT:  Okay.  He's walking and saying,

15   "Hello"?

16             MR. MILLER:  Yes.

17             THE COURT:  Okay.  So you can get the picture that

18   I'm going to be really granular here.

19             MR. MILLER:  I got it.

20             THE COURT:  Okay.  So -- all right.

21             MR. MILLER:  Well, and, again, it's -- I mean, you

22   know, I -- I watched the video several times in the past

23   couple of days, but I want to -- I want to be careful

24   because I want to refer the Court to exactly that.

25             THE COURT:  And I appreciate that.  And given that
```

1    I'm expecting a level of granularity when I'm asking these

2    questions, if you misstate it, the presumption is, is it's

3    just hard to recall all the details.

4                  MR. MILLER:  Right.

5                  THE COURT:  You may be -- you may very well have

6    been looking at the video from a -- through a different

7    lens, and so my questions may not be the questions that you

8    were thinking about when looking at it.  So I'll -- I'll

9    give everybody some leeway.

10                 MR. MILLER:  Sure.

11                 THE COURT:  So if you get it wrong, I won't hold

12   it against you.  We have the same record.  I'll take a look

13   at it.

14                 MR. MILLER:  Right.  Right.

15       I just want to emphasize I'll refer you to the video

16   for things like distance and exact wording because that's --

17   there's no -- nobody is disputing the accuracy of what's

18   depicted.

19                 THE COURT:  So at some point he's saying, "Hello,"

20   while walking but then stops?

21                 MR. MILLER:  Yes.

22                 THE COURT:  About how far away from Mr. Rodrigues

23   is it that he stops?

24                 MR. MILLER:  I would estimate five feet.

25   Four feet.  He's -- there's two cans.  I think one is a

1    recycling and one looks like a yard waste or a garbage can.

2              THE COURT:  Are we talking about the little --

3    like the Rough tote cans, or are we talking about the --

4              MR. MILLER:  The wheeled ones --

5              THE COURT:  The wheeled ones.

6              MR. MILLER:  -- that are set out.  Large ones.

7              THE COURT:  Okay.

8              MR. MILLER:  Mr. Rodrigues, I believe, at that

9    point is in front of the blue recycling bin.

10             THE COURT:  Is there any obstacle or any object

11   between the two of them when he stops to talk to

12   Mr. Rodrigues?

13             MR. MILLER:  No.  It doesn't appear that there

14   would have been.

15             THE COURT:  So there's an open space?

16             MR. MILLER:  Yes.

17             THE COURT:  Okay.  So he stops, and then what?

18   What happens?

19             MR. MILLER:  He tells -- he asks Mr. Rodrigues,

20   you know, basically, you know, "Why -- why were you walking

21   in the road?"

22        Mr. Rodrigues responds, saying -- saying something.

23        And Officer Tykol responds, you know, essentially, "No,

24   I -- I didn't have to stop you there.  I can stop you here."

25        In other words, he didn't have to stop him, you know,

1  when he first drove by, before he had seen a violation, that

2  he could -- that he could -- he could stop him sort of at

3  this --

4          THE COURT:  So from Officer Tykol's response, what

5  is it we can surmise was Mr. Rodrigues's first response to

6  Officer Tykol approaching him?

7          MR. MILLER:  Likely, something along the lines of,

8  I mean, that "I wasn't" -- you know "I" -- there wasn't --

9  you know, "I wasn't walking in the road," or "I was walking

10 on the side of the road," or -- there was a -- there was a

11 sidewalk.  The sidewalk was intermittent on that road.  So

12 there's portions of the road where there isn't a sidewalk.

13         THE COURT:  Okay.  And where the stop first likely

14 occurred, or thereabouts, was it intermittent?

15         MR. MILLER:  No.  Well, it's --

16         THE COURT:  The sidewalk.

17         MR. MILLER:  It's intermittent in the sense that

18 there is a sidewalk there, and then, if you go up a couple

19 of houses, I think to the -- to the east -- this is on the

20 north side -- there is not a sidewalk.  And so at the point

21 where Officer Tykol first drove by Mr. Rodrigues, there

22 wasn't a sidewalk for him to have been --

23         THE COURT:  There was no sidewalk the first time?

24         MR. MILLER:  Correct.

25         THE COURT:  Okay.  So then it would have made

1   sense for him to be walking in the street?

2          MR. MILLER:  Yes.  And there's security footage

3   that -- that -- from a house at that location that shows

4   that, that we've submitted, in the record.

5          THE COURT:  Okay.

6          MR. MILLER:  So, again, we're -- we're -- what

7   Officer Tykol said is, after he turned around and saw

8   Mr. Rodrigues was now in an area where there was a sidewalk

9   he utilized, he wasn't, and that he then crossed the street

10  at a -- at not a 90-degree angle, and so --

11         THE COURT:  And after that place where there was a

12  curb or a sidewalk, was there another place where there was

13  no sidewalk follow -- if Mr. Rodrigues kept walking where he

14  was walking, maintaining his trajectory, would there have

15  been some "no sidewalk" space following?

16         MR. MILLER:  There's a photograph.  There's an

17  aerial photograph in the record that -- that shows that

18  location, but I don't -- unless I pull it up now, I wouldn't

19  be able to tell you I -- I know that the -- the sidewalk

20  is -- it's not like a sidewalk in front of one house.  It

21  continues for -- for at least several houses and possibly to

22  the end of Acacia.  It's not a very -- not a particularly

23  long street, but you do have in your record an aerial view

24  that would -- would answer that question.

25         THE COURT:  Okay.  Mr. -- Officer Tykol did stop

1    for -- one of the reasons was that he was in the street?

2                MR. MILLER:  Well, that he was crossing -- he

3    wasn't utilizing the sidewalk where it was available and he

4    had crossed --

5                THE COURT:  And is the expectation in this

6    community that -- that you hopscotch back on and off

7    sidewalks?

8                MR. MILLER:  That you utilize the sidewalk when

9    it's available.  That's the legal expectation, and that's

10   what's provided for in Eugene Code.

11               THE COURT:  So everyone trick-or-treating on

12   October 31st should be held in violation?

13               MR. MILLER:  I -- I don't know, Your Honor.  I

14   think, if we were to look at those locations.  But what I'm

15   saying is there's probable cause.  There's a provision of

16   law that allowed him to enforce that at that location.

17               THE COURT:  Okay.

18               MR. MILLER:  Force somebody not utilizing the

19   sidewalk where it was available.

20               THE COURT:  Okay.

21               MR. MILLER:  So -- so Officer Tykol approaches.

22   He has a conversation with Mr. Rodrigues and then ultimately

23   tries to escort him -- Mr. Rodrigues is essentially ignoring

24   him, or he's not -- he hasn't turned to face Officer Tykol.

25   He's -- he's busy with, I think, one of the water bottles,

1  putting it in a plastic bag.

2      THE COURT:  At that point did Officer Tykol

3  testify about -- anything about him being concerned -- about

4  him -- Officer Tykol -- being concerned for his personal

5  safety?

6      MR. MILLER:  Yes.  I mean, in terms of there's

7  unknown contents in the recycling bin.  There can be, you

8  know, hard bottles or things like that.  Mr. -- he doesn't

9  know who Mr. Rodrigues is; and, you know, it -- the

10 behavior, at least initially, you know, when an officer's

11 walked up to you to talk to you, for not -- not looking at

12 them, ignoring them, it's within somebody's rights to do,

13 but it is something that, sort of, for an officer, I think,

14 heightens their awareness that this is somebody who doesn't

15 want to --

16     THE COURT:  So at that point was Officer Tykol

17 operating on his concern for his physical safety or

18 operating on the obligations, responsibilities, and rights

19 that someone has to ignore a police officer?

20     MR. MILLER:  So he's operating on both.  I mean,

21 he's operating on -- he understands what the rights are of

22 somebody to ignore a police officer, but also he's operating

23 on -- he has probable cause to believe a violation occurred,

24 and there's statutory authority as well as constitutional

25 authority for him to conduct that investigation and, you

1    know, determine the identity of the person and decide -- and

2    investigate the violation and decide whether he wants to

3    issue a citation for it or a warning or not.  So he -- those

4    two things can coexist.

5              THE COURT:  Was there evidence -- was there

6    evidence -- is there evidence in this record that describes

7    what Officer Tykol did when he observed Mr. Rodrigues

8    fiddling with the bottles?  Did he take a step forward, or

9    did he take a step back to just maintain a safe distance?

10             MR. MILLER:  So there is testimony in the record

11   and as well as is captured on the body-worn camera

12   footage -- I believe, ultimately, he had to take a step

13   forward to be able to place Officer Tykol's right hand on

14   Mr. Rodrigues's upper right arm in an attempt to sort of

15   escort him back away from the -- the bins.

16             THE COURT:  So Mr. Rodrigues's back was facing

17   Officer Tykol when he grabs his -- when Officer Tykol grabs

18   his right arm -- Mr. Rodrigues's right arm with

19   Officer Tykol's right arm?

20             MR. MILLER:  I don't know if he -- I would look at

21   the video exactly.  I don't know if you would say it's his

22   back.  I mean, he's not turned there.  He's -- he's sort of

23   at -- on a -- on his side.  So it's not directly on his

24   side.  It's not directly on his back.

25             THE COURT:  Slightly bladed?

1          MR. MILLER:  Yeah.  I mean, I think we can have

2   different interpretations of what that term means; so I

3   would -- I would refer us to the video again, but --

4          THE COURT:  I'm not connoting anything --

5          MR. MILLER:  Yeah.

6          THE COURT:  -- other than just trying to

7   understand, like, the -- the angle in which the -- both of

8   their bodies were -- were at in relation to each other.

9          MR. MILLER:  Right.  So he gets ahold of

10  Mr. Rodrigues's right arm to try to be able to escort him

11  over.

12         THE COURT:  Was it at the upper arm or the wrist?

13         MR. MILLER:  Upper.  Upper.  So up -- up in here.

14         THE COURT:  Okay.

15         MR. MILLER:  And Mr. Rodrigues begins to say, I

16  believe, at that point, "You can't -- you can't be touching

17  me."  You know, "You can't -- you can't be touching me."

18    And Officer Tykol, I believe, at that point --

19         THE COURT:  Well, when Officer Tykol put his hands

20  on Mr. Rodrigues, what -- what was the rationale for that --

21  doing so?

22         MR. MILLER:  He -- eventually, he wanted to move

23  him over, away from the cans, for the reasons that --

24         THE COURT:  And he couldn't use verbal commands?

25         MR. MILLER:  Well, I --

1          THE COURT:  Well, let me ask it this way:  Does a

2  body cam show that Officer Tykol used verbal commands before

3  putting his hands on Mr. Rodrigues?

4          MR. MILLER:  Well, when you say "putting his

5  hands," I mean, he initially --

6          THE COURT:  I'm not trying to make sure -- hand.

7  I'm not trying to connote anything.  I'm just trying to make

8  sure that I understand what exactly happened in what --

9          MR. MILLER:  Sure.

10          THE COURT:  -- sequence.

11      So let's rewind it a little bit.

12          MR. MILLER:  Sure.

13          THE COURT:  Were there any verbal -- did Mr. --

14  did Officer Tykol provide any verbal commands to

15  Mr. Rodrigues to move away from the recycling bins?

16          MR. MILLER:  It's concurrent with him placing his

17  hand.  He says, "Why don't we do this?"  You know, "Let's

18  move over here."

19          THE COURT:  He didn't ask Mr. Rodrigues, "Hey, why

20  don't you please move away from the cans so we can have a

21  conversation"?

22          MR. MILLER:  The --

23          THE COURT:  Or something to that effect?

24          MR. MILLER:  I mean, I believe -- my memory is

25  that he was -- he did that with -- when Mr. Rodrigues was

1  sort of turned or bladed away, he placed his hand on his arm

2  to, again, get his attention.  This isn't -- and that's

3  when --

4          THE COURT:  Is it practice -- is it training such

5  that you -- you put your hands on somebody to get their

6  attention at -- concurrent to providing verbal commands to

7  move as sort of the first -- first line of trying to move

8  somebody from one location to another?

9          MR. MILLER:  Well, I don't know that there's

10 anything in the record about that, but the -- it's -- it's

11 going to be situationally dependent upon the totality of

12 circumstances that you're dealing with.  So there can be

13 instances where you want to merely provide verbal commands

14 to somebody and -- and work through all of that before you

15 make any sort of physical contact with them.

16         THE COURT:  Does the -- the force continuum still

17 apply with the EPD?

18         MR. MILLER:  We have our own use of force policy

19 that doesn't look at -- it doesn't look at a form of force

20 continuum.

21         THE COURT:  It's not a linear continuum?

22         MR. MILLER:  No.

23         THE COURT:  More of sort of a sphere circle?

24         MR. MILLER:  It's a *Graham* analysis with all of

25 the other factors that have been added on by the Ninth

1    Circuit.

2            THE COURT:  Okay.  Apparently, the FTR isn't

3    working.  So I don't know how far back it wasn't working.

4            MR. MILLER:  Oh, no.  Okay.

5            THE COURT:  I know.  Well, I -- if we have to

6    start all over, we will -- then you already know what to

7    expect.

8            MR. MILLER:  Right.

9            THE COURT:  So we're going to have to go through

10   it again to make sure that it's operating properly.

11      So, Ms. Klein, what do we need to do?

12           DEPUTY COURTROOM CLERK:  We need just a brief

13   recess (indiscernible).

14           THE COURT:  I know you might not be able to answer

15   this question, so I won't hold it against you, like I'm not

16   holding it against Mr. Miller at the moment, but do we know

17   how far back it stopped working, if it was working at all?

18           DEPUTY COURTROOM CLERK:  I don't know.  We can

19   check it.

20           THE COURT:  Okay.  Well, by now, I think we're all

21   warmed up.  Let's go ahead and take a recess.  I'll wait for

22   your further instructions.  You're fee to step outside into

23   the lobby, and we'll go from there.  Thank you.

24           MR. MILLER:  Thank you.

25                        (Recess taken.)

1              DEPUTY COURTROOM CLERK:  Please remain seated.

2    This Court is back in session.

3              THE COURT:  All right.  I don't know if you

4    received the news, but it appears that we didn't lose any

5    recording.

6              MS. BURROWS:  Yay.

7              THE COURT:  That's correct?

8              DEPUTY COURTROOM CLERK:  That's correct.

9              THE COURT:  So you were able to detect that it had

10   turned off at the precise moment that it turned off and not

11   lose anything?

12             DEPUTY COURTROOM CLERK:  It didn't turn off.  We

13   received a strange error message; so we checked just to make

14   sure.

15             THE COURT:  Great.  Thank you very much for being

16   on top of it, as always.  Excellent work.

17        All right.  So we don't get to start over.

18             MR. MILLER:  (Indiscernible) version is a much

19   better version.

20             THE COURT:  And so did I.

21             MR. MILLER:  Yeah.

22             THE COURT:  So be careful what you ask for.

23             MS. BURROWS:  Now that you've both done your dress

24   rehearsal and --

25             THE COURT:  Yeah.

1      So, if I recall where I was, I was asking questions

2   about the -- the verbal commands and -- and the idea that

3   one would put a hand to get compliance to move while

4   concurrently providing verbal commands, whereas -- oh, and

5   we were talking about the continuum or the -- the *Graham*

6   factors as well, and so the issue of why -- why was it that

7   Officer Tykol did them concurrently as opposed to step away,

8   then issue a verbal command -- or direction, rather,

9   because -- whether it's a command or a direction at that

10  point, I don't know which one would have been more

11  appropriate, but some direction to move away to sort of make

12  sure that the space was clear.

13          MR. MILLER:  Yeah.  And I pulled up my -- my

14  narrative section so I can track a little bit more closely

15  now that Your Honor --

16          THE COURT:  Okay.

17          MR. MILLER:  -- (indiscernible) some information.

18      So I do want to step back, I guess, a little bit

19  preceding this, at the point that he initially makes

20  physical contact with Mr. Rodrigues.

21      Officer Tykol had asked him several times whether he

22  had any identification on him, and Mr. Rodrigues essentially

23  ignored him and continued, you know, looking for --

24          THE COURT:  And what's the law with respect to

25  producing identification to a police officer?

1          MR. MILLER:  Outside of a vehicular stop, you're

2    required to do that.

3          THE COURT:  Okay.  So that -- that shouldn't have

4    been an issue that Officer Tykol could have acted on?

5          MR. MILLER:  It's not an issue that he can act on,

6    in terms of, you know, it's another basis for an arrest, but

7    when he's evaluating the totality of the circumstances and

8    he's encountering somebody who is -- who he has, you know --

9    is -- is acting in this way, he just -- it raises officer

10   safety concerns.

11         THE COURT:  For not -- not producing

12   identification?

13         MR. MILLER:  No.  Ignoring him when an officer was

14   asking him -- I mean, not responding verbally that "I'm not

15   going to do it," or, you know, anything like that.  It's --

16   it's the -- you know, this is -- it -- I think to an officer

17   it looks like, "Okay.  This is a person who -- who doesn't

18   want to have an encounter with me.  Is it because they have

19   constitutional rights to not do that outside of the context

20   of the stop?  Is it because they know that they potentially

21   have a warrant and they don't want their identity to be

22   discovered?"  He doesn't know.  It's a lot of unknowns.  So

23   it's just -- it's another factor in the back of his mind

24   about, "Okay.  This individual that I'm dealing with, who's

25   an unknown person" -- he doesn't recognize him.  He's

1  covered up.  He doesn't know, you know, his race, his

2  ethnicity.  I don't know if he could tell his sex even at

3  that point.  You know, what -- you know, what -- who he's

4  dealing with or what.

5      So it's just --

6          THE COURT:  And --

7          MR. MILLER:  -- getting information.

8          THE COURT:  -- and part of the challenge is -- in

9  putting hands on somebody that you -- about whom you don't

10 know their condition, it seems potentially provocative.  I

11 mean, what if the person was having a mental health issue or

12 crisis?  Putting hands on somebody might not be the best

13 thing to do.  You know, what if they are also just

14 neurocognitively abled in a different way, and so being

15 able -- you know, for them to be able to respond to a touch

16 might be very different than somebody who isn't.

17     So my concern is, is that the raising of the level of

18 the interaction, you know, even at this stage, appears to --

19 raises some -- some questions for me.

20         MR. MILLER:  Right.  Well, prior to this, Mr. --

21 Officer Tykol had told him that he was not free to go, asked

22 him to set the bag down.

23         THE COURT:  And what was the reason for

24 Officer Tykol saying that Mr. Rodrigues was not free to go?

25         MR. MILLER:  Because he was detaining him for the

1  pedestrian -- the two pedestrian violations.

2      THE COURT:  Okay.  And at that point, did

3  Officer Tykol tell Mr. Rodrigues that:  "You violated two

4  pedestrian codes, and I need to cite you"?

5      MR. MILLER:  No.  No.  I mean, the words are --

6  it's what's captured on the body-worn camera.  He radios for

7  Code 1 cover, which is to have other officers respond to the

8  scene, and he tells Mr. Rodrigues that he's not free to go.

9      THE COURT:  But does not tell Mr. Rodrigues why?

10     MR. MILLER:  He doesn't tell him the basis at that

11  point.

12     THE COURT:  And doesn't Mr. Rodrigues ask him,

13  then, why is he being stopped?

14     MR. MILLER:  Later he asks him, "Why am I

15  being" -- I believe, "Why am I being detained?"

16     And I think at that point it -- Officer Tykol responds

17  that it's interfering.  Because at that point he had refused

18  six different orders to sit down and was physically

19  resisting Officer Tykol's efforts to get him to sit down so

20  that he could conduct the investigation pursuant to the

21  pedestrian stop.

22     But, no, I believe at that point --

23     THE COURT:  And when did Officer Tykol call for

24  backup?

25     MR. MILLER:  He calls for Code 1 cover at

1    approximately a minute and 14 in the elapsed time on the

2    body-worn camera footage.

3                THE COURT:  Is that before or after he tries to

4    move Mr. Rodrigues?

5                MR. MILLER:  Before.

6                THE COURT:  Okay.  And what's the -- what's the

7    practice within the department about waiting for Code 1

8    cover before taking these next steps, if -- if the -- if the

9    suspect, the individual, isn't doing anything other than

10   ignoring the officer?

11               MR. MILLER:  I don't believe that a policy

12   regarding that is in the record.  I mean, an officer --

13   it's -- again, I -- I want to give you straight answers, but

14   it's going to get back to the totality of the circumstances

15   for what -- what an officer is going to do.

16               THE COURT:  So the police department has a

17   "totality of the circumstances" expectation?

18               MR. MILLER:  For -- for use of force, especially,

19   and then --

20               THE COURT:  And would use of force -- would that

21   term, "use of force," include putting your hands on

22   somebody -- a hand on somebody to move them from one place

23   to another?

24               MR. MILLER:  It can include -- it can include

25   physical contact, yes.

1        THE COURT:  And I can't remember.  What was the --

2   what's -- I can't remember if I -- I may have jumped to

3   another question before you answered it.  What is the

4   expectation for a police officer to wait for Code 1 cover

5   before taking the next step of moving somebody?

6        MR. MILLER:  I don't -- I don't believe -- well,

7   it's on the record, but I think the answer is going to be

8   that it's a totality of circumstances.  What is it that

9   they're encountering that they think they need to do

10  something other than just stand back and watch this person

11  do whatever it is that they are doing?

12     So there may be instances that --

13       THE COURT:  And what this person was -- what

14  Mr. Rodrigues was doing was looking around in recycling bins

15  or walking in the middle of the street and had -- I mean,

16  from what you've described so far, had not used any

17  aggressive language.

18       MR. MILLER:  He had not.

19       THE COURT:  But he may have been furtive, in terms

20  of some of the things that he was doing, that raised

21  Officer Tykol's concerns for his own personal safety?

22       MR. MILLER:  Correct.

23       THE COURT:  And the appropriate action would not

24  have been just to simply take a couple of steps back,

25  continue to observe, and wait for Code 1 cover to show up to

 1  provide some additional assistance?

 2          MR. MILLER:  I think there's a range of

 3  alternative options.  You know, there's a range of

 4  alternative options that Officer Tykol could have taken.

 5  There's a range of alternative options that Mr. Rodrigues

 6  could have taken that would have avoided us from being here

 7  today.  You know, there's -- there's a lot of -- but within

 8  those range of alternatives, Officer Tykol placing a hand

 9  to -- to try to get Mr. Rodrigues's attention after he's

10  been ignoring him and he's been told he's not free to go --

11  he now knows this is a stop -- in order to simply escort him

12  forward --

13          THE COURT:  But he doesn't know why he's being

14  stopped.  Officer Tykol has not told him, "I'm citing you

15  for violating pedestrian codes."

16          MR. MILLER:  Correct.  He hasn't.

17          THE COURT:  And --

18          MR. MILLER:  He has told --

19          THE COURT:  And is a police officer required to

20  notify somebody of why they're going to be stopped or why

21  they're being stopped?

22          MR. MILLER:  Well, he -- I mean, the time he

23  initially contacted him, Officer Tykol gets out of his

24  vehicle.  He says, you know, "Hello, how's it going?"  He

25  says, "The reason I'm contacting you is because you were

1  walking in the middle of the road."

2      So Mr. Rodrigues is going to have an awareness that

3  that's the -- there's a purpose there.

4          THE COURT:  Sure.  But what's the legal obligation

5  to notify somebody that they're being stopped now for a

6  citation for violation of the code?  I mean, stopping -- by

7  telling somebody, "Hey, I'm stopping -- I'm stopping you.

8  I'm talking to you right now because I saw you walking in

9  the middle of the road," doesn't necessarily tell me that

10  I'm being stopped because I violated a code.  It means that,

11  "Hey, I'm checking in on you.  Are you okay?"

12          MR. MILLER:  Uh-huh.

13          THE COURT:  I mean, there's so many other reasons

14  why somebody might walk in the middle of the road.  "I'm

15  afraid of walking on a sidewalk because somebody could jump

16  out of the bushes and attack me.  So I prefer to have space

17  around me."  There's one of many reasons why somebody might

18  walk in the middle of the road.

19      In any event, Officer Tykol did not give him notice

20  that he was going to be cited for -- for some pedestrian

21  violations.

22          MR. MILLER:  He told him he was not free to leave.

23          THE COURT:  But that's not my question.

24          MR. MILLER:  I know.

25          THE COURT:  He did not tell him -- Officer Tykol

1   did not tell him, tell Mr. Rodrigues, he was being cited for

2   pedestrian violations.

3           MR. MILLER:  He did not at that -- at this time,

4   no, he doesn't provide --

5           THE COURT:  Because later it wasn't about

6   pedestrian violations.  It was then about being detained or

7   arrested for resisting.

8           MR. MILLER:  Interfering.

9           THE COURT:  Or interfering.

10          MR. MILLER:  Yes.  Yes.

11          THE COURT:  Okay.  All right.  All right.

12          MR. MILLER:  So Officer Tykol puts his arm on

13  his -- right upper arm to escort him away from the cans, and

14  Mr. Rodrigues, you know, responds "You can't be touching

15  me," and they have a conversation -- or both of them are

16  talking past each other, statements, but Officer Tykol tells

17  him six different times during that period to -- to sit

18  down.

19          THE COURT:  So Officer Tykol is no longer trying

20  to move him.

21          MR. MILLER:  He is.

22          THE COURT:  Move him where?

23          MR. MILLER:  Over to the curb next to the cans.

24          THE COURT:  Okay.  So does he get him to the curb?

25          MR. MILLER:  He gets him away from right in front

1    of the cans, and it looks like part of a -- a driveway,

2    slash, you know, grassy area.  I think where the driveway

3    comes in.

4         So, yes, he -- he gets him over some distance away.

5              THE COURT:  But not to the curb?

6              MR. MILLER:  To the -- I believe it's the driveway

7    apron or -- or --

8              THE COURT:  Okay.  Well, I'm imagining that

9    Officer Tykol is trying to get him to the curb to get him to

10   sit down at the curb.

11             MR. MILLER:  Correct.

12             THE COURT:  But he doesn't get him to the curb.

13   But he's still now trying -- now giving verbal commands to

14   get him to sit down wherever he is, wherever Mr. Rodrigues

15   stopped?

16             MR. MILLER:  As they are -- as they're moving, it

17   would be to the -- to the west.  Officer Tykol is give him

18   verbal commands to sit down and -- and physically trying

19   to -- to, sort of --

20             THE COURT:  By doing what?

21             MR. MILLER:  -- push him.

22             THE COURT:  Oh, okay.  So pushing.

23             MR. MILLER:  And Mr. Rodrigues is resisting that.

24   He's not turning around and fighting.  He's not throwing

25   punches, but he's -- he's standing back up in response to

1  that.

2         THE COURT:  Standing back up or just not sitting

3  down?

4      I mean, so was Officer Tykol able to push him down

5  enough that Mr. Rodrigues was able to regain elevation by

6  standing up, or was Officer Tykol trying to push him --

7  provide downward resistance but Mr. Rodrigues was just not

8  simply moving?

9         MR. MILLER:  Officer Tykol says that -- that it

10  was -- it was the first, that Mr. Rodrigues was physically

11  resisting it, as opposed to Officer Tykol not having the

12  strength to -- to do it so that there was a physical

13  resistance component to that.

14         THE COURT:  So it wasn't that Mr. Rodrigues had

15  sort of bent his knees in -- in partial compliance but then

16  stood back up again in response to the resistance -- or in

17  response to Officer Tykol trying to put him down?

18         MR. MILLER:  The -- I -- what -- I guess at what

19  point?  Because -- because later --

20         THE COURT:  Well, the first time that

21  Officer Tykol tries to get him to sit down and uses some

22  level of physical force to do so.

23         MR. MILLER:  Well, initially, I mean, he's

24  escorting him over and saying, "Sit down."  He isn't doing

25  anything to sort of push on him.  He's giving him those

1    orders to sit down, and -- and he's not using -- other than

2    the escort hold, he's not using physical force.

3          Later, he begins to sort of try to push down on

4    Mr. Rodrigues, and that's when he has resistance.

5          Eventually --

6                THE COURT:  And this is what I'm trying to drill

7    into.  I know this might be frustrating for you, Mr. Miller,

8    but it's important for me.  So I'm going to ask you to do

9    the best you can to answer my questions no matter how, well,

10   frustrating it might be for you.

11         When he -- when Mr. -- Officer Tykol tries to put

12   him -- put Mr. Rodrigues to sit -- use some force to put him

13   to the ground or have him sit down, is Mr. Rodrigues

14   actually moving down and then pops back up, or does he just

15   simply stay straight and that that's the resistance that

16   Officer Tykol is describing?

17               MR. MILLER:  He doesn't stay straight, because

18   they eventually get him down at least to sort of his -- his

19   knees, and then towards -- towards more of a prone position

20   throughout this.

21               THE COURT:  Okay.  And this is when Officer Tykol

22   is still on his own?

23               MR. MILLER:  Yes.

24               THE COURT:  A Code 1 cover has not arrived?

25               MR. MILLER:  Correct.

1          THE COURT:  How -- how long does it take for

2     Code 1 cover to generally arrive on a scene?

3          MR. MILLER:  I mean, I -- ordinarily, it would be

4     minutes.  I mean, the -- it depends upon the location, but

5     they're there to drive, you know, not using lights and

6     sirens, and arrive there safely and expeditiously, but it's

7     a -- asking for Code 1 cover is asking for another officer

8     to respond.

9         So, later, he calls for Code 3 cover, which is emergent

10    response, and --

11         THE COURT:  And then -- then there's a response

12    soon after that?

13         MR. MILLER:  Well, there's a response soon after

14    that.  We know that it took them at least a minute, 50.

15         THE COURT:  After the Code 3 cover?

16         MR. MILLER:  After the Code 3 cover, to -- to

17    respond.  For an officer to physically get there.

18         THE COURT:  And was there anything emergent about

19    what Mr. Rodrigues was doing, when Code 1 cover was first

20    called, that -- that informed Officer Tykol to put

21    Mr. Rodrigues to the ground?

22         I -- I didn't get the impression, from the record, that

23    Mr. Rodrigues was saying, "I'm walking away.  I'm leaving,"

24    or starts walking away or leaving.

25         MR. MILLER:  No.  He had -- he had been ignoring

1    Officer Tykol and turned his back to him.  That's when

2    Officer -- or Officer Tykol called for Code 1 cover to get

3    another officer to respond and told him that he's not free

4    to leave.

5        So it's in response to those behaviors that he asks for

6    another officer to get there and tells them that he's not

7    free to leave.

8              THE COURT:  And Mr. Rodrigues wasn't doing

9    anything to indicate that he was leaving.

10             MR. MILLER:  He was ignoring the officer and had

11   turned away from him.

12             THE COURT:  Okay.  But turning away.  But did he

13   take steps away?

14             MR. MILLER:  Well, no, he didn't take steps away.

15   But that's why you tell somebody at that point that they are

16   not free to leave -- so they don't begin to do that.

17             THE COURT:  So he was complying?

18             MR. MILLER:  He --

19             THE COURT:  Partially.

20             MR. MILLER:  He didn't -- partially, yes.

21       I mean, there's -- there are aspects of, you know,

22   whether it's -- it's compliance or things that he doesn't

23   have to do, in terms of responding to an officer.

24       But an officer is trying to conduct the investigation,

25   has to be concerned about furtive movements, doesn't know

1  who he's dealing with, and so you're balancing an

2  individual's -- you know, all the rights that they have

3  to -- and how they want to interact with a police officer

4  with the authority that they have under the Constitution or

5  statutes to conduct an investigation.

6      In this case, it really -- it was just a pedestrian

7  violation that might have resulted in a citation.

8          THE COURT:  At any time did Officer Tykol ask

9  Mr. Rodrigues if he was doing okay, what his physical

10  condition was, does he need any help?

11          MR. MILLER:  He asks the -- the second -- he said

12  "Hello" --

13          THE COURT:  I mean, I'm sorry.  I -- that -- you

14  should be frustrated with my interruption at that point.  I

15  wanted to clarify.  "At any time" meaning prior to things

16  really going bad.  It's an initial stop.  I mean, you know,

17  no exploration about whether Mr. Rodrigues just needed some

18  assistance?  I mean, no exploration to determine what his

19  mental state might have been?

20      And I -- frankly, I don't know if Mr. Rodrigues had any

21  mental issues going on.  It's just the -- sort of the idea

22  of, sort of, this, you know, community policing, engagement

23  with people, you know -- you know, who are -- happen to be

24  walking out in the middle of the street at night.  I mean,

25  there could be other reasons, other than breaking the law,

1    that somebody might be doing that.

2        MR. MILLER:  Right.  And his body-worn camera

3    footage at 31 through 41 -- I mean, the very first thing

4    Officer Tykol -- he gets out of his vehicle.  He's very

5    friendly.  He says, "Hello.  How is it going?" you know, as

6    he's walking up.  He doesn't get a response.

7        You know, "The reason I'm contacting you is because you

8    were walking in the street," you know, and then he gets this

9    muffled response from Mr. Rodrigues.

10       So he does -- he starts this off at a very low level of

11   basically an encounter where he's -- he's trying to

12   establish at least some level of rapport, keep it -- keep it

13   simple.  So that's -- that's what he does to start this off,

14   and then he's asking Mr. Rodrigues for ID.  He isn't getting

15   any response at all.  Mr. Rodrigues is still fiddling with

16   the bottle and the bag and the bin, and that's when

17   Officer Tykol calls for Code 1 cover.

18       THE COURT:  Was Mr. Rodrigues's back to

19   Officer Tykol when Officer Tykol asked him to move to the

20   curb and -- and grab -- and when he -- when Officer Tykol

21   grabs --

22       MR. MILLER:  I believe's at this -- I think we've

23   described it as "bladed."

24       THE COURT:  -- at that point?  The angle -- well,

25   how about we call it "angled"?

1          MR. MILLER:  Angled.  That's fine.

2      So, yeah, he's angled.  He's angled away from him.

3          THE COURT:  So was Officer Tykol able to see

4   clearly what Mr. Rodrigues was doing --

5          MR. MILLER:  With his hands?  No.

6          THE COURT:  -- from that angle with his hands?

7          MR. MILLER:  No.  Not at all times, no.

8          THE COURT:  Okay.

9          MR. MILLER:  So --

10          THE COURT:  There was nothing about what

11   Officer -- Mr. Rodrigues wasn't putting -- there isn't any

12   evidence about Mr. Rodrigues putting his hands in his

13   pockets?

14          MR. MILLER:  I don't -- no, I don't think that

15   there's -- there's evidence that he was or he wasn't.  It's

16   that there's times where, as you can see from the video,

17   he's sort of turned away.  He -- his hands are down here,

18   you know, near his waist area.  At times they're up a little

19   higher.

20          THE COURT:  And he had a bag in one of his hands?

21          MR. MILLER:  He had a white plastic bag, yes.

22          THE COURT:  Okay.

23          MR. MILLER:  And I think at that point one

24   plastic -- empty plastic water bottle.

25          THE COURT:  In the other hand?

1          MR. MILLER:  In the hand or in the bag at

2   various -- at various times.

3          THE COURT:  Okay.

4          MR. MILLER:  So but I think there were -- I think

5   eventually he got it in the bag, and then he had a hand

6   free, at least.

7          THE COURT:  Okay.  So there's some level of

8   resistance identified by Officer Tykol.

9          MR. MILLER:  Right.

10          THE COURT:  What happens next?

11          MR. MILLER:  He's eventually able to pull him --

12   what I'm calling it "pulling him down" to sort of a sitting

13   position, where Mr. Rodrigues is at least on his knees.

14          THE COURT:  Are they face to face?

15          MR. MILLER:  No.

16          THE COURT:  Or is this from behind?

17          MR. MILLER:  Officer Tykol is behind

18   Mr. Rodrigues, I believe, with either -- either both of his

19   hands on sort of either upper arm or one on his back and one

20   on his upper arm to sort of facilitate doing this.

21      And throughout this, Mr. Rodrigues is -- is making

22   statements, you know, again, like, "You can't be touching

23   me."  I think he asks for a sergeant, and Officer Tykol

24   confirms going to call a sergeant to respond to this

25   location.

1      So they -- Officer Tykol struggles to sort of put him

2  in a sitting position.  He asks whether he's being detained,

3  and Officer Tykol responds to him -- tells him that, "Yes,

4  yes, you're being detained," and then later says that he's

5  being detained.

6      You know, he asks -- Mr. Rodrigues asks, "What for?"

7      Officer Tykol says, "For interfering."

8      At that point it was because of the refusal to -- to

9  sit down in response to the six different orders that

10 Officer Tykol had -- had made.

11     Mr. Rodrigues is on -- or Officer Tykol enunciates that

12 he's under arrest and tells him to place his hands behind

13 his back, and Mr. --

14         THE COURT:  Being under arrest at this point is

15 for what?

16         MR. MILLER:  For interfering.

17         THE COURT:  For interfering.

18         MR. MILLER:  Yes.

19         THE COURT:  And does Officer Tykol tell

20 Mr. Rodrigues that "You are under arrest for interfering"?

21         MR. MILLER:  He had, immediately prior to that,

22 told him, when asked, "What am I being detained for?" he

23 said, "Interfering."

24         THE COURT:  And at what point did it become

25 interfering in Officer Tykol's mind?

1          MR. MILLER:  At the point where he's not following

2    the lawful orders to sit down, in conjunction with some

3    physical resistance to his efforts to get him to do that.

4         So you have a lawful order in conjunction with that

5    physical resistance that we -- that we talked about.  And

6    it -- for this purpose, as opposed to resisting, it can be

7    very minimal, under state law, in terms of what -- what

8    there needs to be.

9         So we've got Officer Tykol telling him he's under

10   arrest, to place his hands behind his back.  He's not

11   complying with Officer Tykol's commands to put his hands

12   behind his back.  He tells him he's under arrest a second

13   time, and he struggles with Mr. Rodrigues's right arm to try

14   to pull it back into position where he can place a handcuff

15   on him.

16          THE COURT:  At the time that Officer Tykol

17   communicates to Mr. Rodrigues that Mr. Rodrigues is under

18   arrest, there's really almost a point of no return.  At that

19   point hands have to be on in order to place somebody under

20   arrest.

21          MR. MILLER:  Well --

22          THE COURT:  Right?

23          MR. MILLER:  If -- and if -- if Mr. Rodrigues is

24   going to continue to resist the efforts, yes.

25          THE COURT:  Well, I mean, I guess I'm not -- I'm

1    not imagining a situation where some -- an officer says from

2    five feet away to somebody, "You're under arrest," and then

3    waits for somebody to lie prone on the ground, put their

4    hands behind their backs so they can walk up and put

5    handcuffs -- now, that might happen, and that could

6    oftentimes happen when guns are drawn and you are given

7    verbal commands from a distance because of a dangerous

8    suspect, but in most instances you're not going to withdraw.

9        I can't imagine a police officer withdrawing from

10   somebody with whom you have hands -- who you have hands on.

11   You say, "You're under arrest.  I'm going to step back, and

12   I expect you to comply now," verbally.  That's not

13   realistic.

14           MR. MILLER:  I think that's probably a less common

15   example.  I can think of examples where an officer already

16   has their Taser drawn or they know, you know, they're

17   dealing with somebody, you know, in certain circumstances

18   or -- or a mental health crisis where they're trying to hold

19   them there.

20       So I'm not going to say "never," but I agree that, no,

21   at the point, where you have an individual who's resisting

22   your efforts, who's been told they are under arrest, who

23   has, you know, refused several lawful orders to sit down,

24   who hasn't been searched for weapons, who's unidentified, an

25   officer, I think, is unlikely to simply disengage with them

1  in hopes that they're -- they're going to simply lie there

2  and put their hands behind or do something else.

3      So, yes, I -- I agree that that -- the scenario you

4  describe would be the more common scenario.

5          THE COURT:  Okay.  And, you know, in interest of

6  simply showing you my cards, I don't -- I'm not -- there's

7  no, really, hidden agenda here.  If it weren't, then I

8  probably wouldn't have oral argument to explore all these

9  things.

10          MR. MILLER:  Right.

11          THE COURT:  You know, as I review the record, it

12  seemed to me that there were -- there were several steps

13  along the way, whether constitutionally valid or not for the

14  police officer, where it could have been done so

15  differently.

16      And now I also recognize, you know, backseat driver

17  hindsight is so much easier than being, you know, on the

18  street, having to deal with real life situations.  That's

19  also where training comes in and experience comes in and

20  de-escalation comes in and -- you know, and so many other

21  tools that seem to be prevalent in our general community

22  around police -- policing, where, I mean, words could have

23  made a big difference.  Communication would have been --

24  could have made a big difference at each of these

25  preliminary steps before hands were put on Mr. Rodrigues.

1    And to me, that's the tragedy.  That doesn't mean that

2    I'm making any decision different than that which the law

3    requires me to make, but that doesn't mean that I simply

4    remain silent when I see something that could have been done

5    better.  Hence the reason for these questions.

6    You know, it's a tragedy that anyone died, and I'm,

7    frankly, also very grateful that Officer Tykol is alive and

8    well.  I want to make sure that's very clear too.  But it

9    would be a dereliction of my responsibilities in this

10   community to simply say all we needed to worry about is the

11   constitutional issue when somebody's life was lost.

12       MR. MILLER:  I understand Your Honor's

13   perspective.  There's a reason why also I have

14   Sergeant Tykol here to hear from you and to hear from our

15   community about what happened.  You know, this is -- you

16   know, we're presenting everything in this case in a light

17   most favorable to the plaintiff; and so, you know, I don't

18   think there's really a dispute about the event, at least

19   there hasn't been one that is raised in terms of what

20   happened, but I would say Officer Tykol, you know, hasn't --

21   hasn't -- aside from his deposition and his interviews,

22   hasn't really had an opportunity to articulate for the

23   community all the things that he was thinking that went in

24   to, sort of, his decision.

25       I agree that, you know, this was a simple pedestrian

1    stop that, you know, probably, ultimately, could have been

2    handled -- I mean, this would have been an encounter and --

3    but there's a response, not to -- not to cast blame on

4    Mr. Rodrigues, but there were opportunities, I think, for

5    him, as well, to have done things differently, that -- that

6    may have a resulted in a different outcome.

7         Now, we train our police officers all the time to deal

8    with people who don't want to encounter them, to deal with

9    people who are having mental health crises, to deal with

10   individuals who are going to be resistive.  So we -- the

11   expectation, of course, is that they be able to respond to

12   all those members of our community and be able to do that

13   lawfully and within the parameters of -- of the law.  But

14   there's a range of tools that we give them, and there's a

15   range of reasonableness for how it is that they -- they

16   respond to each one of those encounters.

17        And, you know, through our briefing, you know that we

18   think that the -- this thing fell within the range of that.

19   Although there's certain lessons that all of us can take

20   from -- from what happened.

21             THE COURT:  And while there may not be a

22   significant dispute of fact, the interpretation of what can

23   or should have been done still remains to -- still remains

24   an open question.  So there may not -- I'll have to wait to

25   hear what Ms. Burrows has to say about that -- the -- the

1   issues or the disagreements about fact.  It's just

2   understanding what those facts mean is also part of the

3   analysis.

4       Please continue.

5           MR. MILLER:  Well, I'm happy to continue to walk

6   you through, sort of, the facts.  Kind of, from this point

7   on, my preference really is to sort of turn towards what the

8   claims are themselves and talk about them and their

9   application to those facts, but whatever is most --

10          THE COURT:  We'll get there, but I -- I do want to

11  make sure that -- that we all have a common narrative to

12  work from because at some point, if Ms. Burrows is

13  describing something, you're going to might likely want to

14  describe it, you know, from a different -- through a

15  different lens.  I'd like to just go ahead and maybe get

16  your understanding of how the evidence plays out first in

17  the course of your argument.

18      So there was resistance, and then at some point -- and

19  then an attempt to place Mr. Rodrigues in handcuffs.

20          MR. MILLER:  Right.  So they are -- they're --

21  they're down on the ground, in terms of Mr. Rodrigues is at

22  least on his knees and -- and sort of facing forward.  I

23  don't believe he's entirely prone, not completely flat down

24  at this point, but Officer Tykol is sort of straddling his

25  lower legs/buttocks area, trying to, I think, hold him down

1   with one hand and to, with his other hand, get his right

2   hand -- Mr. Rodrigues's right hand behind him to facilitate

3   handcuffing.

4           THE COURT:  And Mr. Rodrigues is kneeling.  He's

5   on his knees?

6           MR. MILLER:  He's on his knees but more forward.

7           THE COURT:  With Officer Tykol behind him?

8           MR. MILLER:  Correct.  Right.

9       He's been told he's under arrest.  Twice he's been told

10  to give up his hands, and he's not doing that.

11          THE COURT:  And is he saying -- is Mr. Rodrigues

12  saying anything?

13          MR. MILLER:  I -- I would have to look at the

14  video.  I know he was -- he was making noise and yelling.  I

15  don't think I -- I don't remember there being a specific,

16  like, verbal refusal, but he was not -- he was not -- he was

17  certainly not saying, "I give up.  I'm complying," or

18  anything like that.

19          THE COURT:  Making noise and yelling.  You know,

20  I'll -- I'll go back and, you know, review the audio, but, I

21  mean, is it just as likely that he was yelling out of fear?

22          MR. MILLER:  I don't know.

23          THE COURT:  Or was he yelling out of anger?

24          MR. MILLER:  I don't -- I don't -- he could have

25  been yelling to get the attention of people.  I don't know.

1    I mean --

2             THE COURT:  Okay.

3             MR. MILLER:  So Officer Tykol is not getting his

4    arm behind them; so he warns Mr. Rodrigues twice that he's

5    going to spray him if he -- with OC spray if he does not

6    give up his hand, and so he has to let go of Mr. Rodrigues's

7    hand in order to retrieve the OC spray from his belt.  He

8    takes it out and --

9             THE COURT:  Is the OC spray on the left side of

10   the utility belt or the right?

11            MR. MILLER:  It's in his deposition.  I know we

12   included that section.  I -- I think that it's in the -- on

13   the right-hand side.

14            THE COURT:  Where the -- where the firearm is also

15   located?  On the same -- on the right side?

16            MR. MILLER:  The front portion of his -- the front

17   portion of his belt.

18            THE COURT:  Okay.

19            MR. MILLER:  So -- but he's able to retrieve that

20   with one hand, shake it, and tries to deploy it on the side

21   of Mr. Rodrigues.  It's -- Mr. Rodrigues's face is facing

22   down or sort of forward and --

23            THE COURT:  So the angle of the spray would not

24   have been a full front -- it would not have -- present --

25   the spray -- I guess, spray cloud would not have been right

1    into Mr. Rodrigues's face?

2              MR. MILLER:  Yeah.  It's less of a -- it's less of

3    a cloud.  It's more of a -- it's --

4              THE COURT:  Stream?

5              MR. MILLER:  Yeah.  I -- is how I would describe

6    it.

7        So between that and him having the -- I don't want to

8    call it a mask, but it was a -- a --

9              THE COURT:  The balaclava is what you described

10   it.

11             MR. MILLER:  Yeah.

12             THE COURT:  Although I think you called it a

13   "baklava."

14             MR. MILLER:  "Baklava," yeah.  Or a bandanna.  How

15   about that?  He had a covering across there.

16       So -- so between -- between those things, Officer Tykol

17   at least perceives that it's not effective.  So he --

18             THE COURT:  Mr. Rodrigues -- was he wearing any

19   eyeglasses or eye protection or any --

20             MR. MILLER:  He was not wearing eyeglasses or --

21   or eye protection.  He had, at that point, I think, his hood

22   up.  He still had -- I don't recall if he was wearing a

23   stocking cap or not, but it had the -- had the face

24   covering.

25       So Officer Tykol at this point, you know, I believe,

1    drops the spray or -- or calls back and radios, fighting

2    with one over the radio.  So he's already called for Code 3

3    cover at this point.  He's now radioed that he's fighting

4    with one.

5            THE COURT:  Does Officer Tykol have control of one

6    of Mr. Tykol -- Mr. Rodrigues's hands or --

7            MR. MILLER:  No.

8            THE COURT:  -- not?

9            MR. MILLER:  He has -- he has his -- we look at

10    the video to try to determine the position, but basically

11    his left hand is sort of grasping Mr. Rodrigues's sweatshirt

12    to kind of hold him down as best he can.

13            THE COURT:  At the upper end of the sweatshirt

14    where the hoodie is?

15            MR. MILLER:  Not the hoodie, but the -- between

16    the shoulders is sort of --

17            THE COURT:  Okay.  So with the left hand.  And it

18    was with the right hand that Officer Tykol deployed the

19    spray and then used his radio?

20            MR. MILLER:  Yes.  Yes.

21            THE COURT:  Okay.

22            MR. MILLER:  So at this point, you know, he's got

23    one hand.  He's doing this, fighting with one.

24    Mr. Rodrigues pushes up or tries to stand up and knocks

25    Officer Tykol off balance, and this is essentially where the

camera gets knocked off of its magnet.

THE COURT:  Did Officer Tykol fall to the ground?

MR. MILLER:  He fell back.  I don't know that --

THE COURT:  Did he remain -- did both of his feet
remain soles to the ground, whether it was falling back or
not?

MR. MILLER:  They hadn't been, to begin with.  So
he was down, sort of leaning over.  He wasn't doing it from
a standing position.  I mean, he's basically down,
straddling.  He was straddling Mr. Rodrigues's lower -- or
upper legs.

THE COURT:  So Officer Tykol had displaced some of
his own weight onto Mr. Rodrigues so, when Mr. Rodrigues
stood up, Officer Tykol didn't have his own balance
established at that point?

MR. MILLER:  Yes.  Right.  So I don't know whether
it's to the side or not, but Officer Tykol ends up being
knocked off balance.  He's not standing straight up.  He's
on him.

That's when the video gets knocked off, and that's
when --

THE COURT:  And there's no audio either?

MR. MILLER:  There's no audio on it.

THE COURT:  Has the police department explored
better technology to maintain a more robust body cam?

1        MR. MILLER:  We have changed that.  So they now

2   have a different mounting system and they now have a

3   different type of a trigger that's -- I believe it's a --

4   it's a type of -- rather than a slide, a physical slide

5   across the top, it's a -- it's a depressed button.

6        THE COURT:  Were the changes made, in part,

7   because of this incident?

8        MR. MILLER:  I believe -- I believe the changes

9   were changes in technology.  I mean, it -- I wouldn't say it

10  was in response to the incident, but it was in response to

11  complaints about how those tools -- you know, how effective

12  they are.  A camera falling off like this is not -- was not

13  an uncommon thing with the magnet attachments.  So

14  particularly where an officer was wearing a coat --

15  ordinarily, it would belong on their vest, but if they had a

16  coat, they had to put it on top so it could be seen.

17      Now we have exterior vests with a different mounting

18  system.  So it's -- I would say this incident is one of

19  several where we went to a different mounting system because

20  it -- you ran the risk of it falling off.

21        THE COURT:  Okay.

22        MR. MILLER:  So at this point Officer Tykol is

23  sort of knocked off balance.  Mr. Rodrigues gets up and

24  begins to run out into the street, and Officer Tykol pursues

25  him.  They get out into the street.

1          THE COURT:  How far did Officer Tykol pursue
2    Mr. Rodrigues?
3          MR. MILLER:  It's in -- Exhibit 7 to
4    Officer Tykol's deposition is -- I think both sides
5    submitted that, and it shows it's marked where -- where
6    exactly it is so I refer you to that, to look at that.  But
7    I would estimate that they made it 25 or so -- 30 feet
8    from --
9          THE COURT:  That's basically a split second,
10   really.
11         MR. MILLER:  Well, it's fairly fast, yes.
12         THE COURT:  Okay.  I'm -- I'm just -- you -- I
13   don't want you to -- well, maybe sometimes you can read
14   into -- into my questions something that might not be there,
15   or maybe it is there, but I'm just trying to get both a
16   temporal and spacial visual in our conversation, because,
17   you know, I can look at the video and -- but it's much
18   more -- it's as helpful, if not more helpful, for me to get
19   an understanding of other people's interpretations just to
20   help me get a much more -- fuller for the picture of what
21   was going on.
22         MR. MILLER:  Right.
23      And, again, I -- I -- in terms of estimating distances
24   or things like that, I'm trying to give you answers; but
25   also I want to refer you to Tykol's IDFIT testimony and his

1    deposition testimony because he said in there how far he

2    thought it was.

3        It was essentially half the distance from where the

4    shooting ultimately took place, but they run out into the

5    street, and Officer -- or Officer Tykol's pursuing him.

6    Mr. Rodrigues turns around, and I think he describes it as

7    "taking a bladed stance."

8                THE COURT:  Mr. Rodrigues took a bladed stance?

9                MR. MILLER:  Yes.  Mr. Rodrigues stopped during

10   the pursuit, turned around, took a bladed stance, lifted up

11   his arms -- Officer Tykol was in pursuit.  So he gets within

12   a close distance, and they begin to exchange blows.  So

13   they're pushing each other there in the street.

14                MS. BURROWS:  Your Honor, pardon me for

15   interrupting.  I'm a diabetic, and I'm having a really bad

16   sugar crash right now.

17                THE COURT:  Let's take a break.

18                MS. BURROWS:  I just need a piece of hard candy.

19   If anyone could volunteer a piece of hard candy, I think

20   I'll be okay.  I apologize.

21                THE COURT:  How about this:  Let's -- I -- I

22   mentioned it's very important for us to take breaks as

23   necessary.  Why don't we -- can we take five or ten minutes

24   just to make sure that you feel comfortable and ready

25   because I want to make sure you can follow along without

 1  being --

 2          MS. BURROWS:  I'm getting distracted now.  I've

 3  got to get some sugar.

 4          THE COURT:  Okay.  Let's take ten minutes.

 5  Because we're also at the 10:35 mark.  It's been well over

 6  an hour since we started, and -- and this might be a good

 7  time to take a break.

 8      Also, just so you have a sense, it seems to me that at

 9  this pace we're going to be here for a while.  So please

10  know, if you need a break, let me know, and also be prepared

11  for being here for a little while.

12          MS. BURROWS:  I've got to go plug my parking,

13  then, Your Honor.

14          THE COURT:  Yes.  Plugging the meter might be a

15  good idea.  So why don't we take at least the ten minutes,

16  and then we'll get started when counsel is back in the

17  courtroom.

18          MS. BURROWS:  Thanks, Judge.

19          THE COURT:  Okay.  Thank you.

20          DEPUTY COURTROOM CLERK:  This court is in recess.

21                  (Recess taken.)

22          THE COURT:  All right.  Ready to proceed?

23          MS. BURROWS:  Uh-huh.

24          THE COURT:  Good.  All right.

25      Mr. Miller.

1          MR. MILLER:  All right.  So thank you, Your Honor.

2      I believe where we are at, at this point, is that

3   Mr. Rodrigues and Officer Tykol are exchanging punches in

4   the street, eastbound of the location of the initial stop,

5   and that --

6          THE COURT:  And is it still on Acacia Street?

7          MR. MILLER:  It's still on Acacia Street.

8          THE COURT:  So it's on the -- I'm assuming it's

9   asphalt -- the road itself -- or is it off the road?

10         MR. MILLER:  It's on the road itself, and so --

11         THE COURT:  Okay.  And you said it was around

12  20-ish -- 21 or so feet?

13         MR. MILLER:  Yes.  I pulled up the map.  It's

14  Exhibit 7 to Officer Tykol's deposition.  You have it in

15  your record.  He has an X marked there.  It looks like half

16  a blocks block down.  So --

17         THE COURT:  Yeah.  I'd probably say we're about

18  21 feet or more, in fact.  So --

19         MR. MILLER:  So I think that -- I'm guessing it's

20  a little bit more than -- than that.  Maybe closer to 35,

21  40 feet.

22         THE COURT:  Okay.

23         MR. MILLER:  I guess I would refer you to

24  Exhibit 7 of his deposition.

25         THE COURT:  Okay.

1              MR. MILLER:  Because he -- he's the one who, you

2      know, marked on there where he thought --

3              THE COURT:  Okay.

4              MR. MILLER:  -- (indiscernible) occurred.

5              THE COURT:  Okay.  So why is exchanging blows an

6      appropriate practice in this instance?

7              MR. MILLER:  Well, Mr. Rodrigues struck him first.

8      So --

9              THE COURT:  What was Officer Tykol trying to do at

10     that point when -- when Mr. Rodrigues turned around and

11     assumed a bladed stance?

12             MR. MILLER:  He was -- well, he was fleeing

13     after -- I mean, he was -- Mr. Rodrigues was fleeing

14     eastbound on Acacia Street.  Officer Tykol had gotten back

15     on up and pursuing him.  He was either closing the distance

16     or had gotten close enough that, when Mr. Rodrigues turned

17     around, they were suddenly very close together.  So he --

18             THE COURT:  So, from the testimony of -- from

19     Officer Tykol, was -- was Officer Tykol surprised that

20     Mr. Rodrigues had stopped and turned or had -- was he -- was

21     Officer Tykol assuming that it was going to be a much longer

22     footrace?

23             MR. MILLER:  I think that's correct.  I think that

24     you can read his testimony fairly to say that he was -- he

25     was surprised.  He wasn't expecting him to suddenly stop.

1    He thought that he was going to have to -- have to catch him

2    or there'd be more time for -- for something.

3            THE COURT:  And what -- what is a police officer

4    generally going to do if they catch somebody from behind in

5    a footrace?

6            MR. MILLER:  Well, they hopefully --

7            THE COURT:  Is it -- let me just tell you what

8    I'm -- I'll be more specific with it.

9        I mean, is the expectation that you're going to tackle

10    the person to the ground?

11            MR. MILLER:  I think that you're going to try to

12    effect an arrest and, ultimately, if some --

13            THE COURT:  But you're not going to, like, catch

14    him and put him in handcuffs while still standing.  I mean,

15    is it a tackle to the ground and then control on the ground?

16            MR. MILLER:  Most likely, yes, that you're going

17    to be -- you're going to want to have control over them and

18    take them to the ground, particularly in a case like this

19    where there's been previous resistance and he struggled

20    to -- was unable to get handcuffs on him.

21        So, yes, I think the -- the expectation is -- I mean,

22    unless -- and people do suddenly give up and say, "I'm

23    done," or they're winded and -- you know, after running a

24    short distance; but if the officer has to physically get

25    ahold of the person, they're likely to take them to the

1    ground.  They're likely, if it's available, look for an area

2    where there's softer substance to -- grass or a median or

3    something to do that.

4            THE COURT:  If you control -- if you can control

5    the location that you take somebody down, then -- ideally,

6    it's soft ground, but --

7            MR. MILLER:  Ideally, yeah.

8        But, ultimately --

9            THE COURT:  Was there any soft ground in the

10   vicinity that they --

11           MR. MILLER:  There -- I mean, there's yards and --

12   yes.  I mean, there's -- there's yards.  But at this

13   location, I think on the map, at least, it shows this is --

14   there's asphalt.  And on the north side, at least, there's

15   a -- there's a sidewalk.  On the south side there's not a

16   sidewalk.  There's yards, arc, driveway, (indiscernible),

17   things like that; so --

18           THE COURT:  The testimony is that who threw -- who

19   threw the first punch?

20           MR. MILLER:  Mr. Rodrigues.

21           THE COURT:  And did it land?

22           MR. MILLER:  I don't know if the first one did,

23   but several did during that.  I would have to look at the

24   testimony exactly; but, yes, Officer Tykol was struck by

25   punches at that location, and he -- he attempted to punch

1    back.

2           THE COURT:  And so is -- I mean, is -- is striking

3    that, in -- in that instance, something that is trained?

4           MR. MILLER:  Well, in terms of defensive tactics,

5    it is trained, I mean, to -- I mean, to do -- to respond to

6    force with force with (indiscernible) you have.

7           THE COURT:  And training is to strike back as one

8    of the tools?

9           MR. MILLER:  Well, to block -- I mean, there's a

10   number of different tools that, I mean, you can look at.

11   You can look at, you know, attempting to -- to block,

12   attempting to take control.  You can attempt to --

13          THE COURT:  Was there evidence that Officer Tykol

14   attempted to block?

15          MR. MILLER:  No.  I think his testimony -- I mean,

16   this is a dynamic situation that he's trying to describe

17   after, you know, this -- this happened.  I mean, he -- he

18   describes it as, you know, he turned, and they started

19   exchanging punches there within the street.

20          THE COURT:  So the evidence does not include

21   attempts, on Officer Tykol's part, to block the strikes?

22          MR. MILLER:  Well, I would -- I would cite you to

23   his deposition testimony to see if there's anything in

24   there.  It's not coming to mind at this moment.  I think he

25   describes it as them exchanging punches.  You had asked

1    about training overall.  How is -- how -- you know, if

2    that's something that they trained.  So I was trying to

3    describe while there's --

4              THE COURT:  The other tools available?

5              MR. MILLER:  -- other tools.

6              THE COURT:  Yeah.

7              MR. MILLER:  And including -- I know I -- I

8    anticipate what you're going to say.  You know, taking --

9    you know, getting distance back from him and utilizing

10   another tool, like a Taser or something like that, there's a

11   range of reasonable things that an officer can do, and that

12   may have resulted in a -- in something different.  We don't

13   know.  But when an officer is being struck, he can respond

14   by -- by trying to strike back.

15             THE COURT:  And that's part of police department

16   policy, protocol, or training?

17             MR. MILLER:  I would say that it falls within the

18   use of force.  Our use of force policy, which, again,

19   incorporates all of the *Graham* factors and the -- the

20   additional Ninth Circuit factors that are included within

21   there.

22        So it's not -- I wouldn't say, no, they -- they aren't

23   trained one-for-one, you should, you know, always do this or

24   never do this; but, you know, if you're in a situation

25   where, all of a sudden, you're in close quarters and you're

1  being struck, you know, you can, in order to disable or

2  disarm that individual, one of the tools that's permissible

3  for you to be able to use is to -- is to strike back.

4          THE COURT:  Would you say that's more like -- more

5  or less likely to escalate the situation, to engage in -- in

6  striking -- in striking in a -- sort of a fisticuffs, in a

7  situation like this --

8          MR. MILLER:  Well --

9          THE COURT:  -- than using any of the other tools

10  that were available to Officer Tykol?

11          MR. MILLER:  I don't -- I mean, I -- I don't know.

12  Because I think it depends a lot on where the strike is, how

13  it lands, how somebody receives it.  I mean -- so, you know,

14  if -- if there's a strike to somebody's side, I think, you

15  know, towards, you know, a kidney area or something that can

16  disable them, they can decide they're done.  A strike that

17  could --

18          THE COURT:  So now we're talking about, sort of,

19  targeted strikes, but --

20          MR. MILLER:  Right.

21          THE COURT:  -- what I understood in the testimony

22  was that this was kind of blow by blow back and forth.  I

23  mean, it really wasn't any description of, "I was attempting

24  to target a particularly sensitive area to disable the

25  individual to take him into custody and to" --

1          MR. MILLER:  Right.  And I think that that's -- I

2     think that's what his testimony is.  Again, he's describing

3     a dynamic situation that sort of is -- was maybe not the

4     details he was focusing on, as opposed to the -- what

5     happened subsequently.  He describes it, I believe, and

6     there's -- I mean, he stopped.  He punched him.  They

7     exchange blows for a period of time, and then Mr. Rodrigues

8     fled again.

9          So Mr. Rodrigues broke free and attempted to flee

10    eastbound and --

11          THE COURT:  I know you would have reasonably read

12    my pause to think it was appropriate to move on, but I --

13    I'm trying to -- again, I'm really trying to incorporate as

14    much of my awareness of what's happening into this so I

15    understand it.

16          There -- it was -- first, I mean, I can appreciate that

17    a normal human interaction -- a reaction, if you aren't

18    trained, is to -- is to swing back, which, you know, begs

19    the question to me as, "What is the training that -- that

20    Mr. -- that Officer Tykol received when dealing with the

21    close quarters engagement like this?"  I mean, because

22    there's, frankly, quite a bit of defensive tactics training

23    out there that includes closing the distance, clinching,

24    making sure that somebody can't actually punch you out

25    because you've closed the distance rather than maintaining

1    strikes from arm's length distances, which knocks everybody

2    out, or frankly making an even greater distance to ensure

3    that the strikes don't -- don't cause the injury or disable

4    the police officer, which is frankly a much greater risk --

5    right? -- and the reason why we find ourselves, in a few

6    more moments, where Officer Tykol found himself.

7              MR. MILLER:  Uh-huh.

8              THE COURT:  Now, I also want to make sure that I

9    underscore in this record, because at any point you can take

10   whatever I'm asking out of context -- I want to make it very

11   clear that I -- it's easier said than done for me to be able

12   to ask these questions from the bench without having been in

13   a situation like Officer Tykol and Mr. Rodrigues were in

14   that night.  I don't pretend to be able to say that

15   something could have absolutely been avoided, but I don't

16   know if that's the standard either.  But it's also important

17   for me to explore these -- you know, explore what happened

18   and to understand it more fully so I can, as a court and as

19   a judge, evaluate the appropriate legal standards down the

20   road.

21             MR. MILLER:  Well, to answer your question

22   regarding training, the evidence that we have here in the

23   record is attached to Officer Tykol's declaration.  It's one

24   of the exhibits.  I'm not sure which number, but it's

25   essentially his DPSST training record that shows all the

1   training that he has.  It's going to include a number of

2   trainings on defensive tactics.  However, other than the

3   titles of those trainings and the amount of time that they

4   lasted, there isn't any more detail in the record about the

5   substance of the training or, you know --

6              THE COURT:  The format even.

7              MR. MILLER:  -- or the format.

8              THE COURT:  So we don't know if it was just

9   classroom behind-the-desk training or actually on-the-mat

10  practicing situations and -- and in, you know, real life

11  scenario realtime training.

12             MR. MILLER:  Well, you -- from the descriptions

13  within there, I don't know that it would be necessarily

14  obvious what all that is.

15      There are paragraphs, in addition, in his declaration,

16  and I think also the -- Chief Skinner's declaration that

17  talk about the -- that the City does train on a number of

18  these things, including defensive tactics and that I believe

19  they both say that those -- those meet standards or at least

20  the courses that he's taking are courses that are -- that

21  are certified by DPSST -- or receive credit from DPSS --

22  Oregon DPSST.

23      But there isn't in this record, I think, a lot of

24  detail about the format or the exact substance of any

25  particular class.

1          THE COURT:  Okay.  Now, in this instance where

2    Officer Tykol and Mr. Rodrigues were bladed and throwing --

3    and throwing strikes at one another, the other tools

4    available and that the police department provide as

5    reasonable tools would have been to create distance, employ

6    the -- employ a Taser?

7          MR. MILLER:  That is -- that is -- that is an

8    alternative, yes.

9          THE COURT:  Okay.  Is clinching and taking someone

10   to the ground one of the tools?

11         MR. MILLER:  That is -- that is a tool that

12   officers are trained on, yes.

13         THE COURT:  Okay.  Any other tools?

14         MR. MILLER:  I don't -- I want to avoid

15   speculating too much because I'm not a defensive tactics

16   trainer and I haven't looked at this from this perspective.

17   You know, the -- I think at this point he either disregarded

18   or the OC spray was ineffective, and so I don't -- I don't

19   think that would be something that they would -- would look

20   towards.

21      So I think you have, you know, within -- there's a

22   range of reasonable options.  I mean, at this point, at

23   least, you know, he's not going to utilize a firearm; but,

24   you know, I think, potentially, a Taser.

25         Although, you know, Mr. Rodrigues was wearing, I think,

1    a lot of clothing.  A Taser is likely to be just -- they

2    have a tendency not to penetrate those types of things.

3    They end up pretty ineffective, and now you have lot of

4    other wire you're kind of messing with.

5              THE COURT:  Right.

6              MR. MILLER:  So is it a possible alternative?

7    Yes.  But --

8              THE COURT:  And what about just simply letting him

9    go and then --

10              MR. MILLER:  And following until other officers

11    arrive?

12        I mean, even with Code 3, we knew it took a minute and

13    50.  He doesn't know how far they're responding from.

14    Perhaps.  But, you know, I mean, then Mr. Rodrigues -- you

15    know, it's -- we're kind of speculating about what he --

16    what he would have done or where he would have gotten to.

17    Does he -- does he get to a car that's parked on the street

18    that's his and that happens to have a weapon in it?  Does he

19    go into somebody's backyard?  Does he encounter a jogger

20    there and try to use that person as a shield?

21        You know, so, yes, conceptually.

22              THE COURT:  And prior to this particular incident,

23    you know, where they were exchanging blows, other than --

24    and I don't want to minimize the impressions that that --

25    that Officer Tykol had.  There had not been any reports of

1   somebody dangerous prior to this, so to -- to raise the

2   level of concern that Officer Tykol might have had about

3   Mr. Rodrigues's presence on the street.  I'm not hearing

4   from this evidence -- and it might be also just my ignorance

5   about what had been communicated or what would trigger a

6   higher level of concern.

7       I'm not hearing from this evidence that -- that

8   Mr. Rodrigues had presented or done anything in particular

9   that would have suggested that he was a danger to the

10  community, other -- again, other than he was resisting being

11  taken into custody.

12          MR. MILLER:  Well, I would respectfully submit,

13  then, I mean, if somebody -- yes, and resisting physical

14  custody is -- is one thing, trying to stop and throw punches

15  at an officer, I think, is another.

16          THE COURT:  Fair enough.

17          MR. MILLER:  If you're -- if you're willing to do

18  that, when you know that you've been -- an officer has told

19  you, "You are under arrest," they have tried to utilize

20  other force, you are -- I think that presents a danger.

21          THE COURT:  And that occurred after the chase, the

22  initial chase and stuff.  So what I was focusing on is, you

23  know, up to the point where Officer Tykol was trying to put

24  him into handcuffs and even before the pepper spray was

25  deployed, there hadn't been anything about that encounter

1    that -- or any information that Officer Tykol had received

2    from anybody that -- that Mr. Rodrigues was a potential --

3    was a potential threat to the community?

4              MR. MILLER:  Well, they're -- correct.  I will say

5    you -- you are correct that he wasn't stopping Mr. Rodrigues

6    because he -- he thought that he was a suspect in any

7    particular thing, and nobody had called in that night to say

8    there's a suspicious person or a dangerous person.  So, yes,

9    he wasn't -- that wasn't information.

10    But Mr. Rodrigues's reaction and him being an unknown

11    individual who, again, hadn't been searched for weapons at

12    all and -- and had, you know, in what had -- had started off

13    as a fairly simple pedestrian encounter, had gotten to the

14    point where -- at that point where he's resisting being

15    taken into custody and is -- is pushing the officer off of

16    him.  I think a reasonable officer in that position is going

17    to wonder, you know, why is -- why is this person doing this

18    in response to, you know, something -- even something as

19    simple as, you know, an arrest for interfering, which, you

20    know, is a misdemeanor.  That's -- I think an officer is

21    going to suspect there's something else that this person

22    wants to get away from because this didn't have to be.

23              THE COURT:  What is EPD's policy on engaging in a

24    chase of a suspect with -- as -- as a -- as a single

25    officer?  Do you wait for backup, or -- or is there some

1    sort of interim consideration that you have to make before

2    you decide to go on your own?

3              MR. MILLER:  I know that Ms. Burrows submitted the

4    pursuit policy into the record, and so you have that.  I

5    would have to refer to that.  I didn't, in preparing for

6    today, so I don't want to guess too much on it.  I think,

7    again, you know, I -- I believe it talks sort of generally

8    an officer would do this or, you know, "Think about these

9    things."  I don't know that there's black, hard-and-fast,

10   you know, "Never pursue somebody as a single officer," or --

11             THE COURT:  Is it recommended that it not be

12   single officer pursuit?

13             MR. MILLER:  I think -- I don't want to -- I don't

14   want to guess, because I didn't look at it to prepare for

15   this argument, but I know it's in the record.  And we can

16   look at it or I can look at it during the break.  I can pull

17   it up.  I do have it with me, but I don't want to guess for

18   you.

19             THE COURT:  So how long were they engaged in this

20   exchange of strikes?

21             MR. MILLER:  I don't know that Officer Tykol was

22   able to provide an estimate of the amount of time.  I mean,

23   this is a dynamic situation.  I mean, it -- they -- there

24   was an exchange, and it went on for some time, but I don't

25   know that, in this testimony, he ever said it was --

1          THE COURT:  And the total amount of time between

2    when -- I mean, there are some ranges of time that had been

3    identified; right?

4          MR. MILLER:  Yes.

5          THE COURT:  And so the total amount of time

6    between when Officer Tykol called for a Code 1 -- or it was

7    Code 3 in a fight with one and when Mr. Rodrigues died, that

8    was -- what? -- a minute and 53 seconds?

9          MR. MILLER:  I would -- I would say this:  The --

10   from the time that the body-worn camera went -- was -- was

11   knocked off and lost video or audio until the time

12   Officer Russell pulled onto the street and you could -- you

13   could see it through his in-car video -- Officer Tykol and

14   Mr. Rodrigues -- a minute and 50 seconds elapsed.  That's --

15   that's the amount of time that elapsed between those.

16        Now, we have audio --

17          THE COURT:  So that amount of time also included

18   time after the shooting?

19          MR. MILLER:  Correct.

20        So, I mean, we can look at when Officer Tykol radioed

21   out "Shots fired."  That would have occurred after, I mean,

22   he fired the shots, obviously.

23        And so the shooting itself would have happened at some

24   point, like I said, after -- after the body-worn camera

25   video turned off and before Officer Tykol called out, "Shots

1    fired."  And then this fight in the street that we've been

2    talking about and then the subsequent struggle occurred

3    within that narrower time frame.

4              THE COURT:  It's been my experience that generally

5    people overestimate the amount of time that somebody is in a

6    fight, and so the strikes probably didn't take very long

7    between each other before it moves to the next stage.

8              MR. MILLER:  Yeah, I'm not -- I --

9              THE COURT:  I'm talking, I'm thinking, seconds,

10   not half minutes, but --

11             MR. MILLER:  Well, and I -- I believe

12   Officer Tykol -- I don't think that he provided an estimate

13   of how long because -- for exactly that reason.  It's

14   hard -- it's hard to estimate it in a dynamic situation.  So

15   I don't know that I can say that he -- he described it how

16   he did, and --

17             THE COURT:  Right.

18             MR. MILLER:  -- and I -- I don't know that we have

19   an answer for how long that took within that -- that period

20   that wasn't video- or audio-recorded.

21             THE COURT:  Okay.

22             MR. MILLER:  So --

23             THE COURT:  So somehow and for some reason the

24   exchange of blows stops.  Mr. Rodrigues turns and runs.

25             MR. MILLER:  It stops, yes.  Mr. Rodrigues turns

1    and run and continues in a north -- I think a northeasterly

2    direction on Acacia, still on the street.

3                THE COURT:  Before they hit the cul-de-sac?

4                MR. MILLER:  No.  The cul-de-sac would be to the

5    west.

6                THE COURT:  Okay.

7                MR. MILLER:  So this is -- they were headed out on

8    Acacia, out towards whatever the (indiscernible) street is

9    that -- that comes in there.

10               THE COURT:  So in the other direction?

11               MR. MILLER:  Other direction.  Right.  From the

12   dead end.  Correct.

13        So they continue in that direction.  Officer Tykol

14   catches up to Mr. Rodrigues, and I think the way that --

15   that he describes it, they -- they go a shorter distance and

16   (indiscernible) really tackles him to the ground.

17   Officer Tykol is initially on top of him.

18               THE COURT:  And do you know if he was on top with

19   his knees on either side of Mr. Rodrigues's waist or body,

20   or was Mr. Rodrigues -- you know, did he have his legs

21   wrapped around the back of Mr. -- of Officer Tykol's body?

22               MR. MILLER:  The -- we -- we would look at the

23   interview and then his deposition because he described it in

24   detail there.  I don't want to guess, I mean, because he was

25   only in that position for a short period of time.

1          I mean, he described it as sort of attempting to make

2    this tackle, being on top of him, and then --

3                THE COURT:  Getting thrown off?

4                MR. MILLER:  Thrown off or overshot.  I mean,

5    maybe?  That in the -- in the process of trying to bring him

6    down, gets -- overshoots?  I mean, it's -- it's not a --

7    he's not flipped off.

8                THE COURT:  It's dynamic, and if you've got

9    momentum behind you, you can overshoot and -- and people

10   start tumbling.  But he -- but he was on top for a moment?

11               MR. MILLER:  For a moment, yes.

12               THE COURT:  Okay.  So it would appear that if he

13   overshot and then lost that position it was more likely that

14   he -- he had his body -- Officer Tykol had his body over

15   Officer -- Rodrigues rather than being inside of

16   Mr. Rodrigues's sort of closed legs or locked in position?

17               MR. MILLER:  I -- I would -- I would -- again, I

18   would want to defer to how Officer Tykol described it, but

19   I mean, I --

20               THE COURT:  So does it describe anything about the

21   positioning of legs and -- and knees and where he was in

22   relation to Mr. Rodrigues's body when he was on top for that

23   moment?

24               MR. MILLER:  Yes.  I believe that he does in that.

25   I'm happy to pull up the deposition section as to tell you,

1    but I -- I -- we summarized it as essentially he attempted
2    to make this tackle, and it -- it -- he -- he got him --
3    started to get him down and then he was knocked off or --
4    or --
5         THE COURT:  Were there any questions in the
6    deposition to Mr. -- Officer Tykol about what he was
7    planning on doing if he had maintained the mount position?
8         MR. MILLER:  Well, I think -- I believe that there
9    were questions about, I mean, what his intent was with using
10   that, which, of course, is to -- as we described, he's --
11   he's trying to stop Mr. Rodrigues, get him onto the ground
12   so that he can effect an arrest.  Once he's on the ground,
13   the officer is going to hopefully have more control over him
14   to be able to again attempt to handcuff his arms and effect
15   the arrest.
16        THE COURT:  Which would have required him to turn
17   Mr. Rodrigues around onto his stomach, if -- if Mr. Tykol
18   was -- if Officer Tykol was, like, on top of him with
19   Mr. Rodrigues's back to the ground?
20        MR. MILLER:  Right.  I don't -- I don't think that
21   it's -- I believe Officer Tykol, in describing the -- the
22   tackle -- I don't think he was describing Mr. Rodrigues with
23   his back to the ground, rather that he -- he -- sorry -- he
24   grabbed Mr. Rodrigues's back to bring him down, and so
25   Mr. Rodrigues would have been going forward with his -- his

1    stomach on the ground.

2            THE COURT:  Okay.  So it was -- it was a forward

3    push.  And I'm not trying to connote any -- any ill will or

4    intention.

5            MR. MILLER:  Right.

6            THE COURT:  I'm really just trying to understand

7    the -- the mechanics of what happened here.

8        So it was -- it was, in some way, a tackle forward, and

9    then Officer Tykol went to the ground with Mr. Rodrigues,

10   may have been on top of him for a moment, but

11   Mr. Rodrigues's stomach to the ground, or somewhere like --

12   it's something in that fashion, rather than flat back to the

13   ground?

14           MR. MILLER:  That's my understanding.

15           THE COURT:  And then there was an overshooting.

16           MR. MILLER:  Yes.

17           THE COURT:  Okay.  And let's make it clear for the

18   record.

19           MR. MILLER:  Yeah.

20           THE COURT:  I mean, he -- he went too far, in

21   terms of whatever it was, and then lost control of -- of

22   being -- being on Mr. Rodrigues's back.

23           MR. MILLER:  Right.  Either from going too far

24   or -- or being pushed off.  I mean, however -- again, it's a

25   dynamic situation.  He kind of knows where he was.  How

```
1   exactly the mechanics of how he got there are harder for him
2   to say because he's in the middle of it.
3              THE COURT:  Right.
4              MR. MILLER:  Right.
5              THE COURT:  Okay.
6              MR. MILLER:  So Officer Tykol ends up on the
7   ground where -- where he is on his back with his stomach
8   then facing up, Mr. Rodrigues on top of him, sort of on
9   his -- I'd say on his knees, straddling his waist, sort of
10  lower.
11             THE COURT:  Straddling Officer Tykol's waist?
12             MR. MILLER:  Officer Tykol's waist.  Low --
13  upper -- upper legs, I think, area.
14             THE COURT:  So, you know --
15             MR. MILLER:  Maybe it -- probably a little
16  further -- further down than that, actually.
17             THE COURT:  How much further down can you straddle
18  the waist without flattening somebody's legs to straddle
19  those too?
20        And just context for the question --
21             MR. MILLER:  Yeah.
22             THE COURT:  -- there are oftentimes two generally
23  described positions that somebody can be on when you're on
24  sort of the top of a fight.  One is mount when you're
25  straddling their hips, with knees on -- a knee on either
```

1   side of a hip, or sort of between -- on the top but between

2   the person who's on the bottom between their legs with their

3   legs either wrapped around or opened, but -- but you're --

4   you -- you're on top, but -- but it's -- but then it also --

5   it's just a different position.  I want to make sure I

6   understand which one of those it might have been or --

7           MR. MILLER:  Yeah, I think -- I think the way that

8   we -- I would describe it -- and I refer you to his

9   testimony because he's -- he's the one that went through it

10  and did it -- because -- but I know that he ends up --

11  Officer Tykol ends up wrapping his legs around Mr. Rodrigues

12  to try to -- to try to do that to keep him close, but then

13  while they're struggling over the Taser --

14          THE COURT:  So if that's the case, if -- if he's

15  able to wrap -- if Officer Tykol is on the ground with his

16  back to the ground and he's able to wrap his legs around

17  Mr. Rodrigues, then -- I mean, I -- you know, I know I might

18  be injecting terminology that's not in the record, but, you

19  know, you can look it up.  It's sort of the guard position

20  where you have your legs wrapped around somebody who's above

21  you, on top of you, but you're on the ground with your legs

22  wrapped around them.

23          MR. MILLER:  Yes.

24          THE COURT:  Is that what you're describing

25  Officer Tykol testified that he did?

1          MR. MILLER:  Yes.  Yeah.  But I don't think it was

2     a complete guard position.  I think that's what he was

3     attempting to -- to do.

4          THE COURT:  And -- and real life scenarios are

5     always a little messier anyway.

6          So, again -- all right.

7          Go ahead.

8          And given that we don't have this on video, that's why

9     I'm going to get even more granular with you, Mr. Miller, if

10    that's possible.

11         MR. MILLER:  All right.  That's fine.  Yeah.

12         So they're -- they're in this position, and

13    Mr. Rodrigues is punching or attempting to punch

14    Officer Tykol.  He makes, you know, a number of strikes,

15    including to his head, which is, you know, against the

16    pavement.  Officer Tykol, with his --

17         THE COURT:  So Mr. Rodrigues is -- if he's in

18    somewhat of Officer Tykol's guard, there's some distance

19    between the -- the upper torso of -- of Mr. Rodrigues to

20    Officer Tykol's body as well.  Unless he's leaning very

21    forward in.  But Officer Tykol has his legs wrapped around,

22    to some extent, Mr. Rodrigues's upper torso or hips.  So

23    he's able to maintain some distance.

24         MR. MILLER:  I think that it's lower down than

25    that.  I think that -- I believe the way that -- that he

1    describes it is that Mr. Rodrigues is essentially sort of on

2    his knees, kind of in between him.

3              THE COURT:  Okay.

4              MR. MILLER:  So he's wrapping it, but it's -- this

5    is down on sort of the lower leg.  So Mr. Rodrigues still

6    has control over his torso and upper portion.  So he's able

7    to maintain some distance.  It's close.  It's not like he's

8    standing up over him, but he's -- so Officer Tykol is trying

9    to sort of wrap around that -- I'm calling it sort of the

10   upper -- upper legs or middle part of the legs where then

11   Mr. Rodrigues still has -- is able to get some distance.

12   It's not -- they're not doing a hug or anything else like

13   that where he was able to wrap him.

14             THE COURT:  Is there any defensive tactics or

15   techniques that are trained in the police department with

16   respect to holding somebody in a closed guard position, such

17   that they cannot end up striking from any distance?

18             MR. MILLER:  I know that they're -- I know that

19   they do train on different tactics to do that, yes.

20             THE COURT:  So that would have been a tool

21   available to Officer Tykol?

22             MR. MILLER:  I think these are tools he's

23   attempting to use.  And it wasn't a reasoning -- he wasn't

24   being successful in being able to fully do that.

25             THE COURT:  Was there any -- was there anything in

1  the record, from Officer Tykol's testimony, that describes

2  that he was attempting to put Mr. Rodrigues in a closed

3  guard sort of punch-blocked position to protect

4  Officer Tykol from -- from blows?

5          MR. MILLER:  I know that in the record, in his

6  IDFIT testimony, and then, again, in his deposition, he

7  describes a lot of detail where -- where his legs are on him

8  and what he's -- what he's attempting to do and -- but

9  it's -- so I -- yes, I know that --

10          THE COURT:  It's there.

11          MR. MILLER:  -- it's there.

12          THE COURT:  I'll look back on it to get the

13  clarity.

14          MR. MILLER:  Yeah.

15          THE COURT:  Okay.

16          MR. MILLER:  So he continues to punch

17  Officer Tykol, and -- while Officer Tykol is attempting to

18  sort of grab his hands or arms and sort of control those

19  and -- and that's not being effective.  So Officer Tykol

20  transitions over with his left hand to his Taser and tries

21  to deploy that in dark mode once towards Mr. Rodrigues's

22  (indiscernible), and it -- it --

23          THE COURT:  Dark mode is where the projectiles --

24  where the -- where the points are -- are projected out, not

25  contact mode?

1              MR. MILLER:  Correct.  Yeah.

2         So it's where the projectiles are out.  So you have

3    within a very short distance here, now, a lot of wire that's

4    loose and this Taser that is cycling for a five-second

5    period.

6              THE COURT:  It cycles for five seconds with every

7    trigger pull?

8              MR. MILLER:  With every deployment.  Well, after

9    a -- yes.  After a full five seconds, then the next trigger

10   pull will -- will do another --

11             THE COURT:  Five seconds?

12             MR. MILLER:  -- five seconds, yes.

13             THE COURT:  And how many trigger pulls are

14   available?  Is that --

15             MR. MILLER:  According to policy or physically?

16             THE COURT:  I mean battery wise.

17             MR. MILLER:  Oh, I -- I couldn't estimate.

18   It's -- it would be a lot.

19             THE COURT:  A lot.

20        And then how many according to policy?

21             MR. MILLER:  Ordinary -- absent extraordinary

22   circumstances, I think it's ordinarily three.

23             THE COURT:  So three -- three deployments of --

24   three trigger pulls and then you move to a different

25   technique?

1           MR. MILLER:  Yeah.

2           THE COURT:  Force -- force level?

3           MR. MILLER:  Right.

4           THE COURT:  Force level or force tool?

5           MR. MILLER:  Yes.

6           THE COURT:  One or the other; right?  I mean,

7    depending on the situation.

8           MR. MILLER:  Totality of the circumstances, yes;

9    but that's -- again, that's the policy piece of it.

10       So --

11           THE COURT:  At this point, Mr. -- Officer Tykol

12   didn't have any control of -- of Mr. Rodrigues's hands or

13   upper body?

14           MR. MILLER:  He did not.

15           THE COURT:  And -- and then deploying a Taser,

16   when somebody has full -- again, somebody who has full use

17   of their arms at that distance, at that close distance, also

18   seems dangerous.

19           MR. MILLER:  Well, he had been getting punched and

20   struck in the body, and he -- and head, and he moved to the

21   tool that was sort of closest available.  It's not an ideal

22   tool in that circumstance, obviously, because you're not

23   going to have very much distance between the barbs.  So

24   you're not likely going to get an intermuscular lock on the

25   individual.  And with the head and clothing he was wearing,

1    you're not --

2            THE COURT:  Because you're going to need to have

3    the electrodes farther -- enough apart to cause the muscular

4    block?

5            MR. MILLER:  Right.  And you're likely not going

6    to have, you know -- so that and -- and the clothing he was

7    wearing, you're likely not going to get good contact anyway.

8    I don't think there was any contact to him because of, sort

9    of, heavy clothing.

10           THE COURT:  Was that ever forensically

11   established, or was it just surmised by virtue of the amount

12   of clothing he was wearing?

13           MR. MILLER:  I -- well, they -- I mean, I don't

14   know that it's in the record that we submitted to you, but

15   they do account in -- elsewhere in police reports they

16   account for where the Taser barbs are in the -- I think in

17   the clothing.  So I know that it is accounted for.

18       So you're sort of, at best, hoping that this is a --

19   this is going to cause pain that might distract the person

20   enough for you to roll them off or -- or, you know, do

21   something, or it's -- it's going to work and then now you

22   have that; but, again, you're -- at a very short distance,

23   I -- I don't remember how long the wires are on this

24   particular version, but it -- I mean, it's many, many feet.

25   I want to say, you know, 15 or 20, or perhaps more.  So you

1    have a lot of coiled up wire that is also now in this area.

2        So --

3            THE COURT:  Is deploying the Taser in this kind of

4    a close proximity indicated by police policy?

5            MR. MILLER:  Well, certainly -- certainly, in the

6    response to what is now amounting to, you know, a serious

7    threat of -- of death -- death or physical injury, yes.

8            THE COURT:  But given what you've described to me

9    about the likelihood being a little bit -- have the

10   electrodes, you know, engage further apart and these other

11   complications with extended wiring and also a period to be

12   now that we have -- that I'm aware of, through the record,

13   that -- that they may -- may have remained live and had --

14   and had been -- and that -- that Officer Tykol ended up

15   getting tased in the process.

16       And in this kind of an incredibly close quarters

17   situation with somebody who's actively resisting and

18   fighting back and you're -- you're on the ground on the

19   bottom of a fight in -- even if you have guard position, is

20   it indicated with -- does the police department suggest or

21   recommend or support the use of a Taser in that kind of a

22   situation?

23           MR. MILLER:  Well, what I would say is that

24   Officer Tykol chose to try another nonlethal tool in

25   response to him being at risk of death or serious physical

1    injury, and I don't think, for all the reasons we described,

2    you know, there -- there's a chance it could have worked,

3    and I don't think that we should fault him for trying to --

4    to use a nonlethal tool, when even at that point we would

5    take the position, because of where he is, that he's being

6    struck, that he's at likelihood of being knocked out or

7    disarmed with his head against the pavement, you know,

8    that -- that deadly force would have been authorized even

9    then.  He -- he tried to use something else first to not.

10         THE COURT:  And I'm not in any nonlegal way trying

11   to fault him for using something that was available to him

12   in a very dynamic situation, but I'm trying to understand

13   how this happened, why it happened; and, ultimately, I get

14   to apply the law and the rule of law in determining whether

15   there's culpability.

16        Returning to the issue of being in that physical

17   proximity and being on the bottom of a fight, what is it

18   that -- that the police department trains their police

19   officers to do with respect to maintaining control of -- of

20   somebody who is fighting back in that kind of a situation?

21        And I'm referring to defensive tactics.  Because

22   there's, again, from what I -- what I generally am aware of

23   and -- and I don't think it's in the record, there is ample

24   training around the country that trains law enforcement

25   officers to be able to control somebody from the bottom of a

1    fight in that situation.

2        So does the police department have that training, and

3    did Officer Tykol receive that training?

4                MR. MILLER:  The police department does have that

5    training.  It's not in the record.  I mean, I -- I -- he has

6    received defensive tactics training.  That's an aspect of

7    defensive tactics training.  So, you know, the inference

8    certainly is that -- that he did.

9        I can't -- I mean, we didn't include that.

10                THE COURT:  You can't argue it because it's not in

11    the record, but I also told you --

12                MR. MILLER:  I'm trying to give you answers even

13    if they're not.

14                THE COURT:  And I fully expect that you do, and --

15    and, again, I can appreciate that I'm taking you completely

16    off what the -- the trail that you were hoping to go.

17                MR. MILLER:  Well, and I'm --

18                THE COURT:  But it's important for me to

19    understand the entire environment of -- of the space in

20    which we are walking so I -- I can make sure that I fully

21    appreciate the incredible complexity of a dynamic situation

22    that Officer Tykol found himself in.

23                MR. MILLER:  Right.  But I -- I just want to

24    emphasize I'm not a defensive tactics trainer.  I have never

25    taken any of these trainings, and so I don't -- I want to be

1  careful about not misspeaking about any of this either.  I

2  would be happy to provide you, you know, additional briefing

3  that answers some of these questions.

4         THE COURT:  If I find it necessary, I'll

5  definitely let you all know.

6         MR. MILLER:  Yeah.

7         THE COURT:  And also to assure both parties I'm

8  not going to incorporate in my -- my legal decisions

9  anything that isn't in the record.

10     So I want to assure you that -- that these questions

11  are for -- are important for me to understand the breadth of

12  this -- the context of what happened here so I can more

13  fully analyze and write an opinion that upholds the rule of

14  law.

15         MR. MILLER:  Uh-huh.

16         THE COURT:  Okay.  So Mr. Rodrigues is in

17  Officer Tykol's guard, and Officer -- Officer Tykol has

18  deployed the Taser.  It wasn't working.

19         MR. MILLER:  Yeah.  I mean, it initially isn't

20  working.  It's cycling at this point, when Mr. Rodrigues

21  grabs the -- the -- it's the barrel of the Taser, and turns.

22         THE COURT:  There's nothing about the grabbing of

23  the barrel to cause it to cycle or not cycle?

24         MR. MILLER:  It's -- it's going for five seconds,

25  sort of, irrespective, but there is a police tactic where --

1  where you don't get a lot of distance between the -- the

2  barbs, where an officer will then -- I think they call it a

3  three-point -- well, they will -- they will press the Taser

4  itself against the person to then have large -- larger

5  distance.

6      So Officer Tykol --

7          THE COURT:  And that requires at least one of the

8  barbs to be engaged?

9          MR. MILLER:  Yeah.

10         THE COURT:  So if neither barb is engaged, then

11 pressing the Taser isn't going to create another connection

12 point unless you are independently using the contact mode?

13         MR. MILLER:  It's not going to independently

14 create a connection point if the barbs aren't, but it is --

15 still is -- it still could provide pain compliance, just

16 the -- the Taser itself, that being -- that being pressed

17 on, because --

18         THE COURT:  Because they're pointy?

19         MR. MILLER:  Because the wires, in addition to

20 the -- so the barbs, the wires, and then there's

21 additional -- I'm going to use the wrong term.  I'll call

22 them, you know, "points" on the -- the Taser itself that are

23 all for that five-second period.

24         THE COURT:  All live?

25         MR. MILLER:  All live.

1          THE COURT:  Okay.

2          MR. MILLER:  And so -- so --

3          THE COURT:  So -- so not only is it in projectile

4   mode, when you're using the projectiles, it's also in

5   contact mode?

6          MR. MILLER:  It would -- you could use it to make

7   contact, and it would have that effect.

8          THE COURT:  Okay.

9          MR. MILLER:  So Mr. Rodrigues gets ahold of the

10  barrel of the Taser and is struggling with it while

11  Officer Tykol is holding onto it and eventually, you know,

12  sort of pushes it down or gets it around Officer Tykol's --

13  I think we'd call it his groin area, and whether it's the

14  wires sweeping over or that he -- he begins to get shocked.

15         THE COURT:  Officer Tykol?

16         MR. MILLER:  Officer Tykol does.  And at some

17  point within there, you know, while they're -- by the way,

18  he's holding onto it with his left hand while they're

19  struggling to control it.

20         THE COURT:  "He" being Officer Tykol?

21         MR. MILLER:  Officer Tykol.  It gets triggered

22  again.  Not because he's necessarily trying to, but because

23  it's being pulled or they're fighting with it.

24         THE COURT:  Sure.

25         MR. MILLER:  And --

```
1          THE COURT:  Or just trying to hold onto it and not
2    lose your grip.
3          MR. MILLER:  And not lose it.
4          THE COURT:  You might also incidentally pull the
5    trigger?
6          MR. MILLER:  Right.
7       So I believe it's on that second one that
8    Officer Tykol -- Mr. Rodrigues is able to sort of direct the
9    Taser to make contact with him on his -- I think it's his
10   right hip, and those are --
11         THE COURT:  So it comes across Officer Tykol's
12   body and -- and engages triggers and tases Officer Tykol's
13   right hip area?
14         MR. MILLER:  Right.  Where -- where we have the --
15   it's been submitted into evidence the -- the marks that are
16   on him, I think, later on.  So it left -- it left two burn
17   marks.
18         THE COURT:  Is there any evidence in this record
19   that suggests that it was intentional on Mr. Rodrigues's
20   part, or is it -- well, I think maybe they come back as
21   well.  This is all part of an intentional act of --
22         MR. MILLER:  Yeah.
23         THE COURT:  -- of an altercation, but with respect
24   to the specific targeting of Officer Tykol's leg with a
25   Taser, is there any observations from Officer Tykol or any
```

1    questions put to Officer Tykol that -- that he observed

2    Mr. Rodrigues very, you know, intentionally -- appearing to

3    intentionally move the Taser, or was it -- is it just part

4    of the -- the dynamic, you know, unpredictability of -- of

5    movement in a, you know, close-quarters situation?

6            MR. MILLER:  What Mr. -- what Officer Tykol

7    described it as is that Mr. Rodrigues drove it into them.

8    So that, I think, indicates some level of intentionality

9    that he's -- he's forcing it either intentionally away from

10   himself, being Mr. Rodrigues, or into Officer Tykol.

11       But Officer Tykol perceives that -- all these actions

12   are a potential effort to, at a minimum, disarm

13   Officer Tykol of the Taser so that it either can't be used

14   as a tool against Mr. Rodrigues or it can be taken and then

15   used as a tool against Officer Tykol.  But there isn't

16   anything in the record that indicates, you know, he was

17   saying, "I'm going to tase you," or the -- that

18   Mr. Rodrigues had familiarity with Tasers, you know, knew

19   all -- you know, was trained on them or anything like that.

20       So I -- I think the -- the fair reading of the record

21   is that these are intentional acts to -- to move it around

22   so that it either doesn't strike -- hit Mr. Rodrigues, or it

23   does have impact on Officer Tykol.  And the result of that

24   is these contacts against Officer Tykol.

25            THE COURT:  Okay.

1          MR. MILLER:  So at this point, you know,

2    they're -- they're struggling over the Taser, and

3    Officer Tykol's still holding it in his left hand.  He

4    decides, you know, he -- if he's incapacitated, you know, by

5    the Taser --

6          THE COURT:  And when you say "incapacitated," is

7    it whole-body incapacitation or is it just -- not "just" --

8    so remove the "just" from the question.  Is it a pain in the

9    right leg?

10          MR. MILLER:  Well, it's pain on the right leg and

11   side or wherever else he's -- you know, they're -- they're

12   able to direct the Taser or the Taser wires to be.  So it --

13   it's -- it's -- he's concerned because he's beginning to

14   feel, sort of, I think -- I think he describes it as, sort

15   of, numbness and tingling on that -- that right side, which

16   is the side he keeps his firearm on, and is worried about

17   his ability to maintain control of the firearm or to

18   maintain control of, sort of, anything else.  I mean, the --

19   you know, he's not suffering the --

20          THE COURT:  I'm -- I haven't been tased before; so

21   I -- but I -- when I have seen people get tased in videos

22   and in training situations, it looks like their whole body

23   locks up, and that -- that didn't -- that isn't what

24   happened here to Officer Tykol?

25          MR. MILLER:  No.

1          THE COURT:  And why is that?

2          MR. MILLER:  Because the -- what we're talking

3   about are either contacts with the barrel of the Taser

4   itself or the -- the Taser wires sort of sweeping across

5   him.  But any one of those -- these are kind of coiled-up

6   uncoiled wire.  Think of a Slinky that you sort of have

7   pulled out.  That's sort of what it was like.  Every one of

8   those contacts where it's touching somebody is -- is giving

9   off an electrical (indiscernible) --

10         THE COURT:  It --

11         MR. MILLER:  So --

12         THE COURT:  So it has live voltage in it?

13         MR. MILLER:  Right.

14         THE COURT:  So even if the barb is not embedded in

15  somebody's skin, the wire, if you close the circuit, is

16  going to shock somebody or -- or do whatever a Taser would

17  do.

18         MR. MILLER:  Correct.

19         THE COURT:  But it has to have bare skin, doesn't

20  it?

21         MR. MILLER:  No.  No.  I mean, with at least

22  the -- you know, I mean, with -- you know, with a small

23  amount of clothing, you can still get -- you can still get

24  that electrical impulse.

25         THE COURT:  And was Officer Tykol wearing his full

1    duty uniform?

2         MR. MILLER:  Yes.

3         THE COURT:  And vest and utility belt and

4    everything else?

5        And yet it still -- was it the live wire that -- that

6    had closed the circuit, or was it the barbs or the -- or the

7    points in the contact mode of the Taser that caused the --

8    that caused the debilitation in -- for Officer Tykol?

9         MR. MILLER:  Well, I believe both at different

10   times.  So I believe that the first time that he describes

11   sort of the -- the wires being swept over him and that

12   towards his -- his groin area or right leg and then later,

13   when the barrel is driven into the area, I think, of his

14   right hip, that's -- that's -- that's from those and -- and

15   maybe less so the wires.  He wasn't focused on the wires at

16   that point.

17       So it's not causing neuromuscular incapacitation to

18   Officer Tykol.  This isn't a situation where all of a sudden

19   the barbs are now on him.  It's -- it's causing pain and --

20   across a -- sort of a wide area, but especially in the case

21   of the wires, because they're now sort of over this bigger

22   area, and it -- it having contact in there can provide

23   electrical impulse.

24        THE COURT:  Okay.  So the Taser is still live or

25   has Officer -- now affected Officer Tykol?

1          MR. MILLER:  Right.  So Officer Tykol transitions

2     to his firearm.  He retrieves it from his duty belt on his

3     right-hand side and shoots Mr. Rodrigues three times in the

4     abdomen from, you know, whatever the distance is.  Very,

5     very close.

6          THE COURT:  And prior to that no verbal commands?

7          MR. MILLER:  No.  Huh-uh.  No.  He did not -- he

8     did not provide a warning what he was going to do; but, I

9     mean, they had been in all of this.

10          THE COURT:  And not one shot, but three?

11          MR. MILLER:  Three, yes.

12          THE COURT:  Which is consistent with training when

13     deploying a firearm?

14          MR. MILLER:  Well, I think their training is, in

15     essence, to -- to -- if you are at the point where deadly

16     force is necessary to eliminate that threat so it -- it can

17     be one.  It can be more than three.  He -- he chose three,

18     but they're -- they're trained to eliminate what they

19     perceive as that threat of -- of, you know, serious bodily

20     injury or death or some of the other parameters, and so

21     that's what they're trying to do.

22          THE COURT:  Then Mr. Rodrigues fell?

23          MR. MILLER:  He rolled off, I think, to his -- to

24     the side, or Officer Tykol was able to sort of -- at that

25     point, I think he described it as sort of crabbing or kind

1    of scooting out, and then --

2              THE COURT:  Kind of like shrimp or scooting off to

3    the side.

4              MR. MILLER:  Right.

5              THE COURT:  And was aid rendered?

6              MR. MILLER:  Yes.  By the -- well, by the

7    responding officer.

8        So, initially, I think Officer Tykol gets on the radio,

9    calls out, "Shots fired," and -- and was then in the process

10   of getting Mr. Rodrigues handcuffed so that he's -- he's

11   controlled.  He doesn't know how much he's been -- you know,

12   how incapacitated he is or isn't.

13             THE COURT:  Who -- who handcuffs the --

14   Mr. Rodrigues?

15             MR. MILLER:  Officer Tykol begins to, and then

16   gets one handcuff on before -- at that point other officers

17   are showing up, and so whether it's Officer Russell or

18   Saylo -- other officers respond, get -- get him in

19   handcuffs, roll him over, and then begin providing

20   lifesaving measures.

21             THE COURT:  And is it an agent -- agency protocol

22   to handcuff somebody who has been in this situation like

23   this with the police officers?

24             MR. MILLER:  I think, initially, until you can

25   determine sort of the severity of the injuries and then --

1        THE COURT:  What were -- were the cuffs ever

2   removed?  Were the cuffs removed after realizing that --

3   that Mr. Rodrigues was, you know, in a life-threatening

4   situation?

5        MR. MILLER:  I don't -- I don't believe so, but

6   the -- but the cuffs weren't interfering with what the

7   officers at the scene were equipped to do, which was to pack

8   wounds with gauze and other things.  They summoned medics

9   and so, you know, had -- had this been something where, you

10  know, medics needed to respond, I don't -- I -- I want to be

11  careful with that.  I -- they're -- they're -- I'm not sure

12  if they did because I know later they provided chest

13  compressions and other -- other things, so I'm not sure if

14  he remained --

15       THE COURT:  Can chest compressions and other

16  life-saving measures be appropriately conducted when

17  somebody's hands are behind them in cuffs?

18    Remember, these are not loaded questions.  I'm really

19  trying to understand the -- the -- you know, the reality of

20  the situation, like, what -- about what was really happening

21  there and --

22       MR. MILLER:  Yeah.

23       THE COURT:  -- you know, in the field.

24    I mean, can it be done?

25       MR. MILLER:  I -- I --

1          THE COURT:  Is it effective, rather?

2          MR. MILLER:  I believe it can be.  I mean, it

3    depends a lot on where -- where the wounds are, their

4    severity, and all of that; so I don't have -- I don't -- I

5    don't have anything in the record here to be able to tell

6    you if it's ineffective, more effective, less effective,

7    or -- or what.

8          THE COURT:  Okay.  And we don't know whether the

9    cuffs were removed during -- during the providing of -- of

10   medical -- medical treatment?

11         MR. MILLER:  I -- I don't want to guess on that --

12         THE COURT:  Okay.

13         MR. MILLER:  -- just because I'm not --

14         THE COURT:  Was there testimony about how long

15   after the shots Officer Tykol fired that -- that the backup

16   arrived?

17         MR. MILLER:  I don't know that there's testimony

18   about --

19         THE COURT:  Or evidence.

20         MR. MILLER:  Well, there's evidence about it.  So,

21   I mean, the evidence is that he calls out on the radio,

22   "Shots fired," and we know where that is on the timestamp.

23   You can hear it on Officer Russell's in-car video, and then

24   he shows up.

25       It is -- I mean, I would estimate around ten seconds.

1    It's -- it's close.  It's -- it's -- from when he calls it

2    out to when you visually can see Officer Tykol in

3    Officer Russell's in-car video.

4              THE COURT:  Is there evidence that helps determine

5    the amount of time between when the shots were, in fact,

6    fired and when Officer Tykol calls on the radio that shots

7    were fired?

8        So we know that there are about ten seconds from the

9    radio call from Officer Tykol to when another officer shows

10   up.

11       Is there evidence that helps determine how much time

12   had elapsed between when shots were fired and when the radio

13   call was made?

14             MR. MILLER:  No, I don't.  Other than -- other

15   than Officer Tykol describing sort of the actions that he

16   took and, you know, how long, you know, those would take in

17   extrapolating out; but, no, I don't know of other -- of

18   other, sort of, record evidence that -- that establishes

19   that exact -- that exact time frame.

20             THE COURT:  And the entire one minute and 50

21   seconds that we talked about earlier, that was from when?

22   What was the starting point of that one minute and 50

23   seconds?

24             MR. MILLER:  The starting point is when the

25   body-worn camera dislodged from its magnet and then turns

1    off until Officer Russell's in-car video turns on

2    Acacia Street and comes into view of the Officer Tykol and

3    Mr. Rodrigues.

4              THE COURT:  Okay.  Okay.  And so the amount of

5    time before the body cam is dislodged is also yet to be --

6    is not determined?

7              MR. MILLER:  It is determined.  I mean, it's --

8    because it -- I think it only is about a two-minute period.

9    So the first 30 seconds of it are Officer Tykol.  It -- when

10   it's -- when it's turned on, it automatically captures.

11   You're familiar?

12             THE COURT:  Okay.  Yeah, yeah, yeah, yeah.

13             MR. MILLER:  So, no, we know that time period.  I

14   mean, that's --

15             THE COURT:  Okay.

16             MR. MILLER:  We have all those elapsed times in

17   our motion itself.

18             THE COURT:  It's just that we don't know the

19   timing of -- of certain events between when the -- when

20   Officer Tykol's body cam turns off and when Officer --

21   Reynolds? --

22             MR. MILLER:  Russell.

23             THE COURT:  -- Russell shows up on the scene.

24             MR. MILLER:  We know ranges.

25             THE COURT:  Right.  Right.  But not actual

1    timestamps of -- of when those incidents were -- or, for

2    example, we don't know how long the exchange of strikes were

3    or what was happening, you know, in terms of when -- how

4    much time elapsed when -- when Mr. Rodrigues was in

5    Officer Tykol's guard and how long they were struggling

6    before a Taser was deployed and then how long after that

7    before the gun was withdrawn and shots fired.

8              MR. MILLER:  Correct.

9              THE COURT:  Okay.  After the other officers

10   arrive, I understand that there's body cam footage from

11   Officer Russell, or -- or someone else, that that officer

12   recorded some -- some statements from -- from Officer Tykol.

13             MR. MILLER:  Right.  So Officer Jentzsch -- I

14   think it's J-e-n-z-c-h? [sic] -- and he -- other officers

15   began to provide aid to Mr. Rodrigues.  Officer Tykol

16   stepped aside, and then Officer Jentzsch walked up to him

17   and walked him back over to -- to his patrol car, and

18   while -- while he was doing that or -- or -- you can see the

19   wound to Officer Tykol's head, and Officer Tykol is making

20   excited utterances about, you know, "him trying to grab my

21   Taser" or "being on top of me."  So he's making statements

22   there, and we've included that in the record as well.

23             THE COURT:  And there was at some point a question

24   from one officer to another about turning -- turning the

25   body cam off.

1          MR. MILLER:  Yeah.  I believe, Officer Jentzsch

2    asked Sergeant Sullivan whether -- whether he should turn

3    his camera off or mute it.

4          THE COURT:  Is that -- is that protocol?

5          MR. MILLER:  Well, it isn't -- it isn't anymore.

6    We keep them -- we keep them basically running.

7          THE COURT:  Running.

8          MR. MILLER:  And we don't mute on anything.

9          THE COURT:  And it -- so it was or wasn't protocol

10   at that time?

11         MR. MILLER:  It was -- well, the -- the -- it

12   followed policy because the contact itself was -- that

13   contact was over and Officer Jentzsch was going to be

14   operating in sort of a different capacity than as -- than as

15   an investigator investigating Officer Tykol.  So he was

16   going to be operating in a capacity as sort of getting him

17   to medical care and getting him sort of stabilized.  So it

18   met policy at that time, but it's not, I think, the policy

19   that we would have now.

20         THE COURT:  And what is the policy now?

21         MR. MILLER:  Well, basically, that officers -- I

22   mean, once -- you know, until -- until they secure, you

23   know, we're not muting for (indiscernible) communications

24   or -- or other things.

25         THE COURT:  So everything is supposed to be

1  recorded?  It's like a black box at that point?

2          MR. MILLER:  Yeah.  I mean, assuming that --

3  they're still like -- sometimes they don't go on or

4  somebody's got a coat over it; but, you know, they're --

5  yes, that's -- that's the expectation.

6          THE COURT:  Anything else about the factual record

7  and narrative that you think would be important to also

8  point out that we haven't discussed?

9          MR. MILLER:  Not -- not about the -- no, not about

10  these facts at least, yeah.

11          THE COURT:  Are there other facts?

12          MR. MILLER:  Well, no.  I mean, only if you -- to

13  the extent you're going to be getting into, you know, just

14  arguing about negligent training or supervision and what --

15  you know, what the City does or doesn't do and -- and those

16  things.  I mean, I -- I may have some more, but -- but, no.

17  In terms of the facts -- I mean, we've laid it all out in

18  our motion, and so I -- I would refer you to that and all of

19  those.  There are a voluminous amount of records; so

20  that's -- that's what I want to refer you to, to --

21          THE COURT:  So you're trying to say I didn't have

22  to ask you all these questions.

23          MR. MILLER:  You did.  I mean --

24          THE COURT:  I could have -- I could have read your

25  brief?

1          MR. MILLER:  You -- I think it's perfectly fair

2     to -- to try to drill down on this, but I also want to be

3     careful that the -- the words of the deponent and of the

4     defendant are what I think matter more than my best memory.

5          THE COURT:  And I appreciate you indulging me in

6     asking all of these questions.  It is important for me to

7     understand the full picture.  Reading the -- reading the

8     deposition, reading the briefs, and asking the attorneys

9     their depth of knowledge and exposure to the case all

10    provide important lenses through which to understand what --

11    what happened there.

12        So I'm not going to hold -- frank -- you know, there's

13    no reason for me to hold anybody responsible for having

14    misstated what is otherwise in the record.  So I want to

15    make that very clear.

16        I appreciate your -- your willingness to engage in this

17    conversation.

18        I also want to be mindful of the time, and I want to

19    give people a chance to eat before we return, and you

20    haven't argued any law yet.  So I figure you are probably

21    wanting to do that.

22          MR. MILLER:  Yes.

23          THE COURT:  Argue the law.

24          MR. MILLER:  Yes.  I would be happy to.

25          THE COURT:  And I take it your arguing of the law

```
 1  will be more than about five or ten minutes?
 2              MR. MILLER:  If only --
 3              THE COURT:  Unless you're going to say --
 4              MR. MILLER:  Only if you have questions.
 5              THE COURT:  Yeah.  Unless you're going to say,
 6  "Just read the brief, Your Honor."
 7              MR. MILLER:  Yeah.
 8              THE COURT:  And leave it at that.
 9              MR. MILLER:  I thought we did a good job on our
10  reply; so --
11              THE COURT:  Well, I mean, I -- I want to give you
12  the opportunity to argue the law.
13       And, Ms. Burrows, I -- we haven't even started with
14  your -- your understanding of what happened and my
15  questions; so I'm sure -- let's take a break.  But let's
16  take a -- normally it's an hour and a half, but how about we
17  take an hour, and that will give you a chance to stretch,
18  get some food, just regroup, and -- and then -- then
19  we'll -- we'll keep at it.
20       You know, death of anybody in our community is always
21  significant, and I -- I don't think anybody here takes it
22  lightly.  I want to make sure that is also very clear.  And
23  for me, my obligation is to determine whether there's
24  responsibility under the law.  And going to the first point,
25  I -- I just don't think, as a judge in this community and a
```

1  public servant, you know, treating the fact that a human

2  life was lost lightly, because we can just focus on the rule

3  of law, is also an appropriate way to conduct my work as a

4  public servant.

5       And to that end, I just want to simply make sure

6  that -- that I -- I want to acknowledge that loss of life

7  and also that I can't imagine any decent human being, having

8  taken a life, takes that lightly either.

9       There's no winners, but there still needs to be

10  accountability, and that's why we're here and for me to

11  determine whether that is appropriate under our law to

12  happen, and so I want to make sure I -- I acknowledge the --

13  the reality and under -- and then I know that the attorneys

14  certainly appreciate my obligations, as do I, about what the

15  law requires me to do, and you are both going to argue why

16  the law should be decided in a particular way, and that --

17  that has yet to be determined.

18       But we took great pains and we had to go through a lot

19  of specifics.  I know there's family members here that have

20  had to bear witness to hearing all of that, and I -- I just

21  simply want to make sure that I -- that I acknowledge the --

22  the weight of that.

23       In addition to the -- that acknowledgment, I also want

24  to make sure -- and I'm sure maybe the attorneys are

25  certainly aware of this, as I'm sure are family members,

1    that just even a few days before this incident,

2    Mr. Rodrigues was stopped by a police officer from the

3    University of Oregon and had been assaulted and taken down,

4    and there's a law -- there's a law -- there was a lawsuit

5    pending in that regard.

6         So when I'm looking at the situation and perhaps the

7    situation that Mr. Rodrigues found himself in with

8    Officer Tykol, there's a -- there's a human side to the

9    story here that may very well have been formed off of

10   Mr. Rodrigues's behavior and his fear and concern for his

11   own safety.  That doesn't necessarily mean that there's

12   legal accountability on the department, and at the same time

13   it's important for me to recognize that, you know,

14   Mr. Rodrigues was a human with a life before this, with

15   experiences that informed how he behaved, perhaps, on that

16   date too.

17        I say all of this with the recognition by saying it out

18   loud and in public, it should necessarily make my decision a

19   difficult one, as it should be, if we are doing our jobs

20   right.

21        All right.  We're in recess until 1:00.  Thank you.

22             MS. BURROWS:  Thank you, Your Honor.

23             MR. MILLER:  Thank you, Your Honor.

24                  (Recess taken.)

25             DEPUTY COURTROOM CLERK:  Please remain seated.

1    This court is back in session.

2              THE COURT:  Thank you.  Please be seated.

3         All right.  Mr. Miller, anything else that you wanted

4    to cover before we jump into discussions on the law?

5              MR. MILLER:  No.  Not -- not from a factual

6    perspective for what we laid out, Your Honor.

7              THE COURT:  All right.  All right.  Let's -- let's

8    talk about the law.

9              MR. MILLER:  Okay.  So, Your Honor, as you know,

10   there's four claims that are at issue in the motion for

11   summary judgment that we have pending.  I'll talk about the

12   first one first, which is a claim against Officer Tykol for

13   violation of the Fourth Amendment for an unreasonable

14   seizure, an unreasonable arrest; and there, you know, the

15   standard is whether there was probable cause for him to take

16   the actions that he took in the context of that

17   investigation and stop.

18             THE COURT:  Seizure or arrest.  What was -- was

19   the seizure or arrest incident the one in which -- at the

20   time in which Officer Tykol makes physical contact with --

21             MR. MILLER:  So there -- there -- the second claim

22   for relief, though, we'll get to is the excessive force

23   claim that, you know, we've always interpreted as a deadly

24   force claim, but in their response they sort of expanded

25   upon it to address other non-deadly uses of force.

1      I'll address kind of all of those contacts in that

2  claim.

3      Right now I'm really talking about their first claim

4  for relief, which is a false arrest claim.  So the authority

5  that Officer Tykol had to -- to do the stop to detain him

6  and then ultimately whether there was probable cause for an

7  arrest.

8          THE COURT:  Okay.  At the end of the day, if -- if

9  there was a reasonable or probable cause for a pedestrian

10 violation, then he was able to stop him for that.  Is that

11 what you're referring to, or is there something after that

12 that is the basis for the -- for the first Fourth Amendment

13 claim?

14          MR. MILLER:  So the first Fourth Amendment

15 claim -- I believe they characterize it as -- as a false

16 arrest claim -- that there wasn't -- there wasn't a basis to

17 stop him.  So, yes, we talk about the pedestrian stop.  And,

18 you know, the Estate has -- has conceded in their response

19 that there wasn't any constitutional violation for that stop

20 itself, but then we went on to analyze the interfering

21 because, you know, a -- while Officer Tykol could issue

22 citation for a violation and he could conduct an

23 investigation and he's statutorily authorized to use force,

24 if necessary, to do that, to -- to make the arrest, you

25 know, we're looking for probable cause for an arrestable

offense, which -- which we referred to as the interfering

for failing to follow the -- the orders to -- to sit down.

The six orders that he provides there --

THE COURT:  And interfering is no longer a

violation?

MR. MILLER:  Interfering, I don't think, has ever

been a violation.  So there's two -- interfering has been --

has, I believe, always been a misdemeanor.  It was amended

to take out the lawful order provision that we're relying

on, but in 2019.  So I think it was in 2020 that the -- the

ORS was amended and Eugene Code was amended to conform to

that a few years later.  But in 2019 we're talking about a

version that included the -- it's subsection (b).  It's

ORS 162.247(1)(b), which is failure to disobey a lawful

order by a peace officer.

And so we outlined how the orders to sit down in the

context of, you know, that detention or that stop for the

violation were lawful orders that Officer Tykol could make,

and therefore he developed probable cause to then be able to

make an arrest for -- for Mr. Rodrigues.

So we talked about the sufficiency of the evidence as

sort of one of the elements in defense of that claim.  We

talked about qualified immunity in terms of identification

of any cases for, you know, this arrest where an officer

should have known that he couldn't apply interfering in this

1    context, and we -- we -- the -- none of that was brought up

2    by the plaintiff.

3        And then we also argue that -- our third point, that

4    arguable probable cause -- because under the Ninth Circuit,

5    if an officer has arguable probable cause, that's enough,

6    and that's its own separate analysis, aside from just --

7            THE COURT:  Has arguable probable cause?

8            MR. MILLER:  Arguable probable cause.  Right.

9            THE COURT:  So, in essence, sort of a good faith

10   belief probable cause, then?

11           MR. MILLER:  Yeah.  I mean, you need to have --

12   you need -- if it's -- if reasonable officers could disagree

13   about whether it exists, that's -- that's, I think, the

14   standard that -- that they've articulated.

15           THE COURT:  Okay.

16           MR. MILLER:  So I'm happy to go into more details

17   about the analysis on all those or --

18           THE COURT:  It might be helpful and perhaps --

19   yeah, it might be helpful for me if you take that up on

20   rebuttal so I have a better sense of how -- how the

21   plaintiff will argue those issues.

22       Did you want to address the other aspects of it?

23           MR. MILLER:  I can go through those, or if you

24   want to go back and forth on topics, it's -- it's entirely

25   up to you.

1          THE COURT:  Well, is there anything different

2     about the -- the lethal use of force, in terms of the

3     analysis that you want me to consider, than compared to what

4     it is what you've argued regarding the initial -- the

5     initial arrest?

6          MR. MILLER:  Well, the -- yes.  I mean, we argued

7     in there -- so for -- the second claim for relief is a claim

8     for excessive use of deadly force, and so we argued in there

9     two bases for summary judgment.  One was the insufficiency

10    of the evidence, and the second one was qualified immunity;

11    and we're looking at, you know, the claim, as it was pled,

12    was based upon the use of deadly force.  So at that time

13    when Officer Tykol decided to utilize his firearm.  And we

14    explained, you know, this is, you know, his account of what

15    occurred and -- and it -- and, under that account, it

16    justified use of deadly force because he was in a situation

17    where, you know, he -- he had reason to believe that death

18    or serious physical injury was -- was imminent, and he was

19    fighting for his life.

20         Now, the Ninth Circuit, particularly in cases such as

21    this, where there's a decedent and the only other witness to

22    the event can't testify as to what occurred, says you don't

23    have to take the officer at their word, but you have to have

24    something.  You have to have some evidence.  And they looked

25    at it and --

1          THE COURT:  You don't have to take the officer at

2     their word for what?

3          MR. MILLER:  Well, for what I'm -- what I'm saying

4     is you don't have a decedent there that you can get

5     information from.  So just because the officer says this is

6     what occurred, you can construct the decedent's version of

7     events from competent direct or circumstantial evidence.

8       So the Ninth Circuit allows, for example, a plaintiff

9     to introduce testimony from an expert witness about what

10    occurred and that it -- it wouldn't have risen to a level

11    where deadly force would have been permissible or that the

12    count provided by Officer Tykol doesn't -- doesn't line up

13    with some physical evidence or timeline.

14      So there's that.  That didn't occur here.

15         THE COURT:  Meaning there's no expert that

16    described something to the contrary?

17         MR. MILLER:  Correct.  Correct.

18      You are allowed also to provide sort of your own

19    forensic re-creation of the same to sort of demonstrate how,

20    based upon the evidence you have, you think that it played

21    out and that it played out differently than the officer

22    has -- has shown, and we don't -- we don't have that.

23         THE COURT:  And do both of those scenarios require

24    expert -- expert evidence to -- to --

25         MR. MILLER:  It requires, I think, for the -- for

1    the expert one, I think it does.  For having a competent

2    expert.  For the forensics, I think it generally might.

3    Although you might be able to point to, sort of, obvious

4    forensic evidence to say, "This doesn't comport with his

5    version of events."  So if the bolt casings are found at a

6    location that doesn't match up where he says he fired them

7    from, you know, that's -- that's an example.

8        If --

9            THE COURT:  What about all the events leading up

10   to the use of lethal force?  And -- and perhaps you can

11   infer, from the -- the questions that I've asked you

12   about -- through the course of the description of the

13   factual narrative, you know, one could -- could conclude --

14   well, maybe I was also suggesting that there are places

15   along the way where it seemed like non- -- nonlethal

16   force -- but force could have been used, in terms of

17   maintaining control of Mr. Rodrigues's body, such that it

18   didn't have to end up getting out of control to the point of

19   requiring lethal force.

20            MR. MILLER:  Right.

21            THE COURT:  So that's part -- that's Question

22   Part A.

23       Question Part B is are you -- would you argue that the

24   Court would require expert testimony to describe that it

25   could -- that there -- there would be a greater likelihood

1   of being able to have avoided lethal use of force if, along

2   the way, other means were used?

3         MR. MILLER:  Okay.  So as to -- as to your Part A

4   for this claim, the second claim for relief for excessive

5   use of deadly force, the Supreme Court has addressed this

6   issue.  It's *County of Los Angeles v. Mendez*, the citation

7   is 137 S. Ct. 1539.  It's a 2017 case.  So it's a recent

8   case, and they unequivocally said, you know, an excessive

9   force claim is -- is not a claim that an officer used

10  reasonable force after committing other Fourth Amendment

11  violations, such as unreasonable entry or other bad tactics.

12      So you can't look at what -- this was kind of called

13  the provocation doctrine, that an officer used bad tactics

14  or -- or there was some -- an earlier violation of the

15  Fourth Amendment from an entry or a search that then, you

16  know, was causally related to the need to later use deadly

17  force.

18      And the U.S. Supreme Court in *Mendez* was clear that for

19  analyzing deadly force you don't look at that.  You look at

20  what was existing at the time.  And so you can't consider

21  any evidence about, you know, what somebody might argue are

22  bad tactics or things that might have, you know, led to a

23  different result.  You just look at what an officer was

24  confronting at the -- at that exact time.

25      So I don't think that you -- you get there under *Mendez*

1  because we're limited to looking at the facts as they

2  existed at the moment that the officer was -- made the

3  decision to -- to use deadly force.

4       THE COURT:  So there's no amount of provocation --

5  and I'm stepping away from the facts in this case.  I'm

6  trying to explore the *Mendez* reasoning.  Are you saying the

7  Supreme Court has said that there's no amount or kind or

8  degree of provocation that could support or corroborate the

9  finding of excessive use of force, lethal force, in the

10 final instance?

11      MR. MILLER:  At least in the -- in the facts of

12 the *Mendez* case, in there they were very clear that you

13 don't -- they -- they did away with what the Ninth Circuit

14 had called its provocation rule and said, "You don't get to

15 consider evidence of all these bad tactics leading up to --

16 leading up to this or even an independent Fourth Amendment

17 violation of something else.  You just look at this."

18      So --

19      THE COURT:  So what's the "this" we're looking at,

20 at the end of the day?

21      MR. MILLER:  The -- the circumstances that existed

22 at the time that the officer decided to employ deadly force,

23 and so it's -- it's basically at that moment.

24      So, for example, in the *Mendez* case, the officers had

25 made an unlawful entry into somebody's -- was a -- either a

1    shack or in -- in somebody's backyard.  There was an

2    individual who was in there sleeping.  He noticed people

3    getting in there, and so he stood up, holding a -- what

4    ended up being a pellet gun.  But the officer saw, all of a

5    sudden, somebody standing up and pointing a gun sort of

6    generally in their direction.  They shot him and they killed

7    him, and the Supreme Court said, "We're -- we're not going

8    to look at the fact that the officers were there because

9    they committed an unlawful entry.  We're just going to look

10   at the circumstances they were confronted with at the time

11   that they employed deadly force," and there it was an

12   individual with a gun pointed somewhat in their direction,

13   and that justified their use of deadly force under the --

14   under the Fourth Amendment.

15        So it's that kind of --

16             THE COURT:  And where was the provocation in that

17   particular scenario?

18             MR. MILLER:  The provocation was that they had

19   made an unlawful entry into somebody's home, and they didn't

20   knock and announce, and so they -- in essence, it's -- we

21   call it provocation, but it's bad tactics for an independent

22   Fourth Amendment violation.

23             THE COURT:  So if a -- under the *Mendez* analysis,

24   as you're suggesting, if a police officer does something --

25   well, you know, a police officer enters a home and, for --

1  for whatever reason, believing that there's something afoot

2  and the -- the homeowner thinks it's a burglar and, you

3  know, lawfully uses self-defense and the use of a gun and

4  gets shot and killed by the police officer, that wouldn't --

5  all other things being considered or equal, that wouldn't

6  amount to, in any way, an -- a level of provocation that

7  takes us outside of *Mendez*?

8          MR. MILLER:  I don't think so.  I mean, it

9  wouldn't, under the -- under *Mendez*'s analysis of the Fourth

10 Amendment, it says, you know, you can -- you can look at --

11 you can attribute it to -- for instance, it -- it doesn't

12 make the use of deadly force its own independent

13 constitutional violation now so that a -- you don't think

14 I'm saying there's never any remedy for that kind of a

15 thing.  The unlawful entry may have damages that are

16 causally related to that, if you can initially -- establish

17 that initial unlawful entry.

18      And so -- but it wouldn't be because you prevailed on

19 the claim for excessive force.  It would be because you

20 prevailed on unlawful entry and then the damages that are

21 caused related to that, if that distinction makes sense.

22          THE COURT:  I think it does.

23          MR. MILLER:  Okay.

24          THE COURT:  Okay.

25          MS. BURROWS:  Your Honor, could I ask Mr. Miller

1  to give me the citation again?

2         THE COURT:  The *Mendez* citation?

3         MS. BURROWS:  Yes.

4         MR. MILLER:  Yes.  It's 137 S. Ct. 1539, and

5  the -- it's a 2017 case.  The specific cite I think I have

6  is 1547.

7         MS. BURROWS:  Do you have the U.S. citation?

8         MR. MILLER:  It didn't have it at the -- yeah.

9         MS. BURROWS:  Okay.  Thank you.

10        MR. MILLER:  So --

11        THE COURT:  Are you able to look up the U.S.

12 citation for U.S. Courts?

13     We'll see if we can pull it up for you as well.

14        MS. BURROWS:  Okay.

15        THE COURT:  All right.

16        MR. MILLER:  So I think the second part of your

17 question was, "Well, would you need expert testimony to --

18 if he decided to get to there anyway, would you need expert

19 testimony about tactics," or, "Well, this could have done

20 this"?  I think that you -- I think that you would.  I don't

21 think that these are things that were within, sort of,

22 common understanding of where -- where exactly it would have

23 gone or -- or wouldn't have gone.

24     So you -- I don't think that the Court, with the record

25 that we have here, we can say, you know, a jury could find,

1  well, had he, you know, decided to let him run off.  We know

2  that -- you know, that there would have never ended up being

3  a need to use deadly force or that had he -- had he tried to

4  utilize a Taser the first time that he stopped, that, you

5  know, there would have never ended up being a need to

6  utilize deadly force.

7       So I don't -- I don't think that you get to those

8  tactics, but I also think that even if you -- even if you

9  could, there needs to be some -- something in there.  In

10  some ways it's a little -- it's too speculative about, well,

11  what might have happened or not.

12       Like we talked about, you let him continue to run

13  westbound on Acacia Street, he gets up to -- you know, he --

14  the officer doesn't know does he have a vehicle there with a

15  window down and there's a weapon in there?  I mean, we -- we

16  just -- we don't know what is going to happen.

17       So I think it is too speculative for -- for that to be

18  the basis when an officer --

19            THE COURT:  Was there any investigation in the

20  area that shows that Mr. Rodriguez had a vehicle nearby

21  after -- after he died?

22            MR. MILLER:  He did have a vehicle nearby.

23            THE COURT:  He did have a vehicle nearby?

24            MR. MILLER:  Not parked on Acacia, but parked, I

25  think, around the corner, yes.

1                THE COURT:  I imagine there was an inventory

2    search?

3                MR. MILLER:  Yes.

4                THE COURT:  And any weapons found?

5                MR. MILLER:  I don't -- I -- I -- no firearms

6    found, but I believe there were other implements that could

7    have been used.  I don't want to guess on them because I

8    haven't looked at that part.

9                THE COURT:  Okay.

10                MR. MILLER:  But, no, no firearms.

11                THE COURT:  Okay.

12                MR. MILLER:  So --

13                THE COURT:  I recognize my question involves sort

14    of a post hoc assessment rather than in a realtime

15    situation, but since you raised the point of a potential

16    vehicle, I thought I'd ask.

17                MR. MILLER:  Right.

18        So, you know, that's -- in some ways, that's our

19    argument about the excessive force claim, is you look at it

20    at the circumstances at -- in which Officer Tykol was in,

21    where, at that point, he's on the ground.  He's having his

22    Taser utilized against him.  He's been struck, and he's

23    been -- he's in danger of, you know, death or serious

24    physical injury.  And so lethal force, under the existing

25    case law, is authorized under those circumstances.

1      The -- the other argument you made as to that claim was

2   qualified immunity, again, arguing about the -- that -- you

3   know, there would need to be a case on point that says, "No,

4   you -- you should have done something else," you know, and

5   there wasn't anything that I saw, from plaintiff's response,

6   that addressed -- that identified a case that says an

7   officer in this circumstance should have known that they

8   couldn't at that point resort to the use of deadly force.

9           THE COURT:  Okay.

10          MR. MILLER:  The other two claims that are left

11  here are state law claims.  It's the fifth claim for relief

12  for wrongful death and the sixth claim for relief for

13  negligence, which essentially has two parts in it.

14      We had said, if you decline to -- if you -- if you

15  decide for us on the federal claims, you have the option to

16  decline supplemental jurisdiction or not; but if you do keep

17  them, we argued, under the wrongful death claim, that

18  Officer Tykol's conduct was justified under ORS 161.239,

19  which provides a number of different justifications for an

20  officer to be able to utilize deadly force because -- for

21  the same reasons that we articulated that it was okay for

22  him to be able to do --

23          THE COURT:  And is there a parallel qualified

24  immunity consideration in state law?

25          MR. MILLER:  There can be.  We didn't raise that

1    here.

2           THE COURT:  So if not raised, is it waived?

3           MR. MILLER:  Well, that's -- so -- well, it's --

4    it's -- we're not asserting it here in the summary judgment

5    stage at least.  So I don't know that it's waived, that we

6    can't -- we can't argue about that later on if there's, you

7    know, aspects of a trial or something.

8           THE COURT:  Okay.  So if it's not raised, then I

9    don't really address whether there is a parallel state

10   analogued qualified immunity for summary judgment.

11          MR. MILLER:  I'm not asking you to in this case,

12   no.

13          THE COURT:  Okay.  So if I find that sufficient

14   facts have been -- sufficient evidence is present for the

15   state law claims to survive, then what happens after --

16   after those matters are resolved in plaintiff's favor before

17   trial?

18      Do we proceed -- does it proceed to trial in those

19   state law claims?

20          MR. MILLER:  Well, if you retain supplemental

21   jurisdiction, then, yes, we proceed to trial on -- on state

22   law claims.  So that would -- that would be -- more likely

23   be the -- there's -- I don't -- yeah, I think that would be

24   the -- sort of the next step on that.

25          THE COURT:  And is that when or how you would

```
1    raise issues of qualified immunity?

2            MR. MILLER:  Well, we -- I haven't decided, sort

3    of, how we would end up raising that.  I mean, it could be

4    through jury interrogatories.  It could be that, you know,

5    just through directed verdict, based upon the evidence that

6    comes in at that point, but there is -- within the Oregon

7    Tort Claim Act, there is a -- there is an analogue to

8    qualified immunity, but it's not -- it's not the same.  So

9    we didn't -- we didn't raise it here, but we have asserted

10   it as -- it and other provisions of the Tort Claim Act as

11   affirmative defenses.

12           THE COURT:  Okay.  So they have been asserted.

13   It's not as if you are thinking about it for the first time

14   today?

15           MR. MILLER:  Correct.

16           THE COURT:  Okay.

17           MR. MILLER:  Well, I'm not -- like I said, I'm not

18   asking you to decide the state law claims on that basis, at

19   least.

20           THE COURT:  Yeah.

21           MR. MILLER:  But since you brought up waiver, you

22   know, I would -- we talked about, in our reply, you know, we

23   had set forth our arguments on all of the state law claims,

24   and in plaintiff's response I never saw anything that really

25   addressed any of those, particularly, as it relates to sort
```

1  of the negligence claims about, you know, we -- we set forth

2  evidence about training that was provided, said that it met

3  the standard, and then we argued about how, on the

4  negligence claim, intentional conduct, like intending to

5  make an arrest, intending to use force, and intending to --

6  to stop somebody, those intentional acts can't create a

7  negligence claim under -- under controlling state case law.

8       So we had raised all these substantive arguments about

9  the state law claims.

10      In plaintiff's response, they -- they didn't address

11  those.  So in our reply we provided you with case law that

12  says, you know, when somebody at summary judgment has raised

13  these and they don't get addressed, that is a waiver, and so

14  you've then waived those claims.

15      So we would argue to you that, to the extent you're

16  looking at issues of waiver, that plaintiff has waived the

17  state law claims because they didn't address them in

18  response to the City's evidentiary supported motion for

19  summary judgment.

20          THE COURT:  And tell me again why the wrongful

21  death on the -- on the factual merits there's insufficient

22  evidence to proceed -- for the plaintiff to proceed on the

23  wrongful death claim.

24          MR. MILLER:  So on the wrongful death claim -- I

25  mean, our argument is about justification under ORS 161.239.

1    So that's -- it's -- those are state -- that's a state law

2    justification for an officer to be able to utilize deadly

3    force.

4        It's been -- I think it's been modified since this

5    time, but at the time of the incident -- this is on page 18

6    of our MSJ.  It's -- Document 25 is where we -- we list it

7    out.  But it lists, I think -- I think we have four

8    different sub-provisions within there that -- where, under

9    state law an officer is justified in using deadly force,

10   that this incident -- instance fell into.

11       So, for instance, the officer's life or personal safety

12   is in danger in the particular circumstances involved.

13           THE COURT:  Is there -- is there a provocation

14   doctrine available under state law claims?

15           MR. MILLER:  I don't believe so for a wrongful

16   death.  I mean, that certainly isn't anything that has --

17   has been -- was raised in the briefing or --

18           THE COURT:  All right.  So that kind of goes back

19   to your -- your plaintiffs waiver argument.  If they didn't

20   raise anything to argue why, for whatever reasons, the

21   wrongful death claim would -- nevertheless survives?

22           MR. MILLER:  Correct.

23           THE COURT:  Okay.

24           MR. MILLER:  Had -- had they ever researched it

25   and addressed it, but they didn't.

1          THE COURT:  Okay.

2          MR. MILLER:  And the Ninth Circuit's, I think,

3    clear that if you don't, then -- then those claims get

4    waived where -- where we directly addressed them initially.

5          THE COURT:  Do I apply the law waiver of claims

6    under federal law or -- the federal law principles or state

7    law?

8          MR. MILLER:  I believe --

9          THE COURT:  I mean, it may not be any different,

10   but since I have you here, you might have a thought on the

11   matter.

12         MR. MILLER:  Yeah.  I -- we -- I cited you to some

13   recent -- I mean, a 2023, a 2016, and a 2020 case that --

14   that collected all of these that talk about these issues.

15   All district court cases, but --

16         THE COURT:  District of Oregon?

17         MR. MILLER:  Well, yes, one of them is, and one of

18   them is Western District of Washington, and one of them is

19   the Central District of California.

20         THE COURT:  Okay.

21         MR. MILLER:  So --

22         THE COURT:  All right.  And the negligence -- the

23   negligence claims, you're saying, don't survive because this

24   is an intentional act?

25         MR. MILLER:  Right.  Well, I'm saying two things.

1    They -- they don't survive because of waiver.  But even if

2    we look past that, the negligence -- the negligence claims

3    that address things that Officer Tykol, I think, should have

4    done, that -- that are really addressing his intentional

5    conduct, those don't state a negligence claim.  So you --

6    you know, "You were negligent in shooting him," well,

7    that's -- you can't -- can't get there under a negligence

8    standard.  It needs to be -- you're alleging intentional

9    conduct.  It's an intentional act that he did.

10           THE COURT:  And it would seem that the negligence

11   claim would -- would be addressed with the success of

12   tactical choices that were made that led, ultimately, to the

13   shooting.

14           MR. MILLER:  Well, but, again, the -- a lot of

15   these things that he's -- that -- that we're looking at

16   didn't harm a legally protected interest of Mr. Rodrigues.

17        So Officer Tykol, if you accept that he had probable

18   cause to make the arrest, which we think he did, making the

19   arrest -- you can't negligently make a lawful arrest.  So

20   things that went into making that arrest don't harm legally

21   protected interests.  Once you had the authority to make an

22   arrest, how it is that you go about, you know, attempting to

23   take the person into custody, when you have statutory legal

24   rights to do that, don't harm a legally protected interest.

25        Same thing with -- with, then, you know, deadly force.

1    Well, at the point where you're utilizing your -- you --

2    deadly force, you're intending to do that, if it's

3    justified, then you are not harming a legally protected

4    interest, and that's, I think, the *Denucci* case that we cite

5    to within there that talks about -- about that aspect of it.

6         So -- so the intentional conduct piece is you can't --

7    you can't prevail on it by just showing negligence.  Most of

8    what they're addressing really doesn't involve a harm to

9    legally protected interests, and then, to the extent they

10   have negligent training or supervision claims, the standard

11   for that is -- is high.

12        Basically, they needed to show the City knew or should

13   have known the need for better or different training and

14   supervision of its employees and that the failure to address

15   that issue was a substantial contributing factor in causing

16   the injury.

17        So it's a "knew or should have known" that training and

18   supervision was needed and the substantial causing factor.

19        So, in essence, there would need to be evidence of what

20   the City's training was prior to this time.  You know, other

21   instances, for example, where, you know, that the -- the

22   other officers did something similar to this, that -- that

23   the City, you know, then failed to correct.  I mean, there

24   needs to be more here, and there isn't anything like that

25   in -- in this record at all.

1          THE COURT:  Okay.  And then also the waiver
2    argument, primarily.
3          MR. MILLER:  Correct.  Correct.
4          THE COURT:  And any of the other claims you want
5    to address?
6          MR. MILLER:  The other ones, I believe, were all
7    conceded.
8          THE COURT:  Okay.
9          MR. MILLER:  So I think that there's just these
10   four that are at issue.
11         THE COURT:  Okay.  All right.  And anything else
12   that you want to cover before I turn to Ms. Burrows?
13         MR. MILLER:  No.  I have spoken long enough,
14   Your Honor.
15         THE COURT:  So you want to get out of the hot
16   seat?
17         MR. MILLER:  No.  I'm happy to come back in.  I
18   just -- I'll give her a chance.
19         THE COURT:  Oh, I'm sure.  I'm sure I'll invite
20   you back into the -- into the hot seat.
21      Okay.  Thank you, Mr. Miller.
22      Ms. Burrows -- and to give both parties a sense of the
23   schedule ahead, I have a 2:00 arraignment that shouldn't
24   take too long, but we'll have to break for a little bit at
25   around the 2:00 hour to take that matter up.  I don't think

1    any of the -- the documents were -- are sealed; right?  So

2    it's otherwise open -- so people are welcome to -- you know,

3    it's a public courtroom, a public courthouse --

4        It is sealed?

5        Oh, sorry.  All right.  So it is sealed.  So we'll

6    probably need to clear the public from the -- from the

7    courtroom, given the sealed document -- or the charging

8    instruments, and then we'll bring everybody back in as soon

9    as -- as soon as we can get started.

10       You're -- I don't see too many boxes of documents.  You

11   know, you're welcome to leave what you want to the side --

12   to the side here, but I think we'll have counsel and the

13   parties at the two front tables.  So you're welcome to clear

14   what you want or just move it off to the side so you don't

15   have to carry it around.

16       All right.  Ms. Burrows, are you ready to start up?

17           MS. BURROWS:  I'm ready.

18           THE COURT:  All right.

19           MS. BURROWS:  Same sort of format, then,

20   responding to the factual --

21           THE COURT:  Well, I mean, there was a great --

22   there was a lot of detail, and -- and so I -- I don't want

23   to tell you that I -- I have it all so, therefore, you can

24   just go -- you know, bypass it, but I want to make sure that

25   you have a chance to help me understand what the -- what the

1  record says, from your understanding of the record, and I'll

2  probably ask questions to make sure I am understanding what

3  it is you're saying, or if -- if you, you know, agree, in

4  sum, what it is that Mr. Miller described in the record, you

5  know, we don't have to go over already -- already-plowed

6  ground.

7         MS. BURROWS:  Perfect.

8      I would like to start from our perspective.  We have

9  a -- an issue that really hasn't come up too frequently in

10  my police force cases in the past.  It's that the only

11  witness, the only evidence of what happened, is

12  Officer Tykol.  Usually, there are body cam footage or

13  recordings, dash cam footage.  Oftentimes, in a shooting

14  case, there's a full homicide investigation where there are

15  forensic reconstruction, you know, firearms testing.  I have

16  not found myself, in all the years I have done these, in a

17  case where the majority of the critical facts rest on the

18  shoulders of a single person without any other eyewitnesses

19  or cell phone footage or anything of that nature.  It is a

20  very isolating sort of situation.

21      So, as a plaintiff, the only thing we really have to

22  rely on are Officer Tykol's statements -- except for the

23  first, I believe, few minutes or two minutes of that little

24  bit of body coverage -- body cam coverage that is in the

25  record.  Both of us submitted the video to Your Honor, and

1    in that particular video we can see the initial contact

2    between the officer and Mr. Rodrigues, which I think sets a

3    different stage than what the Government is arguing here

4    today.

5         But the -- but my theme, my essential comment here to

6    Your Honor is that, because there's only one witness alive

7    and there's not a lot of supporting forensic or

8    circumstantial evidence to support that, what we have is to

9    have to believe everything that Officer Tykol has said.  We

10   have to believe every subjective assessment that he has

11   made.  Did Mr. Rodrigues intentionally drive the Taser into

12   his groin?  That's Tykol's interpretation.

13        When we're down to that situation, we have to assess

14   whether or not Tykol is a believable, credible, or

15   reasonable officer in the circumstances presented to him,

16   and we can't do that in a Rule 56 motion.  Only the jury can

17   assess credibility and believability and make those

18   assessments on the entirety of this case.

19             THE COURT:  So as -- if I'm trying to chart out

20   how this might all look, are you asking this Court to defer

21   determination of qualified immunity until after trial --

22             MS. BURROWS:  Yes.

23             THE COURT:  -- and after a jury renders a verdict?

24             MS. BURROWS:  Yes.

25             THE COURT:  And that the question of qualified

1    immunity still remains with the Court?

2              MS. BURROWS:  Yes, Your Honor.

3         And I realize that the Supreme Court, who has a very

4    negative view towards qualified immunity, has said that it

5    should be decided at the earliest possible stage, and that's

6    usually if the facts are not in dispute and those facts

7    support a reasonable officer would have done this, but in

8    this case, I don't believe the facts are undisputed, and --

9    and if they are, then the jury has to decide that.

10             THE COURT:  So you should just sing a -- and be a

11   different principle in the consideration of evidence and

12   summary judgment, whereby, you know, operation of -- well,

13   what -- or the fact that -- that the -- you know, the other

14   key witness, who would be Mr. Rodrigues, can't testify, such

15   that then it would go to the -- it would go to the jury

16   when, in any other normal circumstance, the absence of

17   evidence would have -- you know -- you know, would argue for

18   summary judgment to be granted.

19        So there's -- there's sort of a -- you're making me

20   think -- think out loud without me having to think as

21   deeply; so please forgive my inartful choice of descriptions

22   here.  It's almost like you're arguing, well, there's a

23   spoliation issue here, in that we don't know what

24   Mr. Rodrigues would have said because he's dead.  He died.

25   And so because of that, then the credibility of

1    Officer Tykol has to be evaluated before a jury to determine

2    if that evidence that we've been discussing for the last few

3    hours is -- is credible.

4              MS. BURROWS:  That's exactly what I'm saying,

5    Your Honor.

6              THE COURT:  So is there a legal -- is there any

7    precedent for this?

8              MS. BURROWS:  Yes.

9              THE COURT:  Is there a body of case law that helps

10   connect the dots from one end to the other?

11             MS. BURROWS:  The -- I believe that our briefing,

12   and I think Mr. Miller also included a lot of the same

13   cases, is that we don't -- the -- the finding is that

14   conclusory allegations by a sole surviving officer are

15   not -- cannot be relied upon, unless -- and I think

16   Mr. Miller used the term "credible collateral information,"

17   and there just isn't any.

18        There's a bag and a water bottle at the foot of one

19   driveway.  There is a -- you can -- there are a couple of

20   videos that show Mr. Rodrigues walking in the street.  He's

21   not doing anything illegal.  This street doesn't have a lot

22   of sidewalks on it.  It does show the initial contact with

23   Officer Tykol, but Officer Tykol's deposition testimony and

24   even his IDFIT interview are somewhat different, subtly

25   different in many respects, and so, at the end of the day, I

don't think he expected to shoot anybody.  I think that he
thought that this would just be a regular stop of somebody
that was suspicious to him.

     But what we do have are little bits and pieces of video
that may or may not be relevant to some issue, but what the
body cam footage does show us, Your Honor, is that
Mr. Rodrigues was generally cooperative.  He didn't run
away.  He didn't attack Officer Tykol.  He didn't curse at
him.  He didn't call him a name.  He didn't use any obscene
gestures.  And we've all seen videos where people do that to
the police.

     But what we see is -- is Mr. Rodrigues was questioning
what he -- what the officer was doing there.  "Why are you
touching me?  I need a sergeant."  He was yelling to the
neighbors to help him, but he's not running away.  He's not
fighting.  He's not striking the officer.  And, in fact, in
our briefing, there are several points in Tykol's deposition
where he said, "I wasn't afraid of him.  I didn't -- I
wasn't worried about him.  He was not a threat to me."  All
the way up to the first time Mr. Rodrigues ran away from
him.

     And I think that those facts could be -- that's all
that we have to support Tykol's statement, is the facts that
we see in the video.

     Once the video camera falls off the uniform, Tykol also

1   loses radio contact with dispatch because his

2   shoulder-mounted mic falls off.  So, really, all we have --

3   we don't have any blood spatter.  We don't have any tire

4   tracks.  We don't have anybody's Ring camera.  All we have

5   is Tykol.

6           THE COURT:  So it would have -- I mean, this is an

7   evidentiary issue and sufficiency of the evidence.  So if I

8   accept this idea that we -- I mean, that a credibility

9   determination would need to be made of Officer Tykol by a

10  jury, if the jury were to find him not credible, does the

11  plaintiff carry its burden of proof?

12          MS. BURROWS:  I'm sorry.  I didn't catch.

13          THE COURT:  Well, I'm not -- I'm not close enough

14  to the microphone.

15      So even if a jury were to find that Officer Tykol's

16  testimony is not credible, it doesn't affirmatively

17  establish what did happen, which is, then, the plaintiff's

18  burden anyway.  So how do we get around the -- the problem

19  with the sufficiency of the evidence, even if -- so let's

20  say today I find that Officer Tykol's testimony doesn't have

21  credibility.  I don't have a -- where -- where do I find the

22  alternative version that -- the alternative description of

23  events such that there's enough for it to go to a jury?

24          MS. BURROWS:  Well, I -- number one, Your Honor, I

25  don't think you -- you can make credibility decisions at

1  this stage.

2        THE COURT:  Oh, I know, but -- but since you've

3  raised this question, I'm just trying to -- I'm trying to

4  isolate the -- you know, the hypothetical here.

5      So even if -- forget my poor hypothetical constructive.

6      If I were to let it go to a jury and the jury says

7  Officer Tykol wasn't -- wasn't credible, then what?

8        MS. BURROWS:  Well, I mean, that -- that's a good

9  question, Judge.  I think when -- when Mr. Rosta and I think

10  about how we would try this case, because there is nothing,

11  really, to put your hands on as a plaintiff's lawyer, we can

12  argue reasonable inferences.  We can tell the jury, "Here's

13  what we know happened," because we have that objective

14  information.  But does it make sense, then, that all of a

15  sudden Eli Rodrigues turns around and takes a bladed stance

16  and now he's going to go hands on with the officer?

17      Does that make sense, given everything that had

18  happened to that point?  Rodrigues was running away.  He was

19  not engaging the officer.

20      So from -- to answer your question, it would just be a

21  matter of arguing those reasonable inferences, taking the

22  data that we can prove, that we can introduce, and arguing

23  this is likely what happened. Nobody knows what happened

24  except Officer Tykol.

25        THE COURT:  There's no forensic evidence on the

1  scene that establishes that there was this initial -- the

2  first -- the first stop, when Mr. Rodrigues ran, and it's

3  the testimony from -- that Mr. Miller described, that --

4  that Mr. Rodrigues turned around, there's -- there's no --

5  there's no evidence on that side that shows that there was

6  this initial stop.

7       Now, I'm using "stop" not in the term of art here, but

8  just that -- that initial stop, run, and turn.

9            MS. BURROWS:  Who the -- first time Mr. Rodrigues

10 ran away?

11           THE COURT:  Yes.

12           MS. BURROWS:  There's nothing, no.

13           THE COURT:  Okay.  So we just have evidence from

14 the video camera of the --

15           MS. BURROWS:  The --

16           THE COURT:  -- first stop and encounter and then

17 at the scene where Mr. Rodrigues was shot, but -- but not

18 whatever -- whatever happened in the middle of that

19 situation.

20           MS. BURROWS:  Or the shooting.

21      If Tykol had had his camera on, we would have seen the

22 punching, we would have seen Mr. Rodrigues on him, but there

23 is nothing, other than Mr. Tykol -- or Officer Tykol's

24 statement.

25      There also isn't a lot of forensic evidence to support

1    Tykol's version of what happened.  There is a mark on his

2    forehead, but if he was engaged in a pummeling, a

3    fisticuffs, a fighting, tackling, falling on the ground,

4    there's not a lot of damage to his face, and there's no

5    blood on his uniform if he shot, and I -- I believe that he

6    shot Mr. Rodrigues up close, but there's no blood on his

7    uniform.  So we're left with a lot more questions than we

8    are answers.

9        And, Judge, that's what the jury is for.

10        THE COURT:  Okay.  What else?  Anything else that

11   you wanted to say about -- well, what you seem to be able to

12   do is perhaps poke holes in the testimony and record, but do

13   you have an alternative version that is -- is based on the

14   evidence or any evidence that exists to describe something

15   that -- that overcomes qualified immunity?

16        MS. BURROWS:  Well, there is body of law, and I

17   believe I cited to a lot of it, is that the assessment about

18   the factors to be considered for probable cause,

19   establishing probable cause, basically also contribute to

20   whether or not there was qualified immunity.

21        Qualified immunity is the officer's -- was he entitled

22   to an immunity based upon well-established law?

23        Now, if -- if, in fact, Officer Tykol did not have the

24   authority to handcuff and arrest Mr. Rodrigues, that

25   violates established -- well-established law.

1        Was, in fact, the use of force, then, unreasonable?

2   And there's that whole Ninth Circuit jury instruction about

3   what reasonable force is.  Does the officer perceive -- the

4   objectively reasonable officer perceive sufficient facts

5   of -- that he is aware of that justifies the use of force?

6        And I -- I just want to say one thing.  Mr. Miller has

7   raised this issue about whether or not all of those other

8   uses of force before the shooting are being litigated in

9   this case.

10       Your Honor, the analysis that we must use in the Ninth

11  Circuit is the temporal analysis.  That is, we have to

12  assess the entire timeline up to the use of force because

13  the officer at any given point is required to either

14  de-escalate or may escalate force given the circumstances.

15  And if the circumstances call for de-escalation that are --

16  that the officer is faced with, that officer has to

17  de-escalate.  And if he doesn't, that's a violation of the

18  Fourth Amendment.

19            THE COURT:  Under Ninth Circuit law.

20            MS. BURROWS:  Ninth Circuit.  Yes, Your Honor.

21            THE COURT:  But it sounds to me that Mr. Miller

22  was arguing that the -- the *Mendez* case, Supreme Court case,

23  undermines that principle.

24            MS. BURROWS:  I don't think it does, Your Honor.

25  I -- it's a Justice Alito opinion.  I -- I couldn't remember

1    if I had read it before.  Basically, it's reemphasizing that

2    *Graham v. Connor*, the four corners of *Graham v. Connor*, is

3    the law, that you don't get to go beyond that.

4        So it's the same -- we're back to just, basically, did

5    Tykol use reasonable force, under the totality of the

6    circumstances, at each point of force that he used,

7    including the ultimate deadly force?

8        Now, the provocation theory has always been one that's

9    been kind of strange to me, but under the theory that the

10   City is raising here, it seems like there -- they're arguing

11   that the *Mendez* case says that no matter what an officer

12   does is a license to kill.  No matter what happens before,

13   we can ignore it, and all we get is to the end point when

14   the officer kills someone.  And that's -- that's not what

15   *Mendez* says.

16       *Mendez* says you have to evaluate the totality of the

17   circumstances.  And they also cite to *Tennessee v. Garner*

18   which is the deadly force case that evaluates when deadly

19   force is available.

20       But as to your original point --

21            THE COURT:  And what about --

22            MS. BURROWS:  Go ahead.

23            THE COURT:  -- the -- so along the way, if we take

24   what you've described as steps in -- or there were stages

25   along the way in which Officer Tykol may have been able to

1   de-escalate instead of escalate, but didn't, where is the

2   evidence, or do I -- am I -- am I required to consider only

3   expert testimony about what those -- what those stages might

4   have been?

5           MS. BURROWS:  Well, Your Honor, it's interesting

6   because I have done this a really long time, and I have seen

7   defense attorneys now citing to the lack of expert testimony

8   at Rule 56 stages as some kind of defect.  Experts are only

9   offering opinions about what the evidence says about what

10  the information provides.

11          Opinions is not evidence, Judge, and I have often found

12  that certain kinds of experts, like use of force experts,

13  for example, are trying to supplant the jury's role.  There

14  is no mandate that I should bring in an expert here to offer

15  their opinion.  My job is just to show that there are

16  disputed issues of fact that the jury must decide, and I

17  don't know what expert I could offer that will say, no,

18  if -- if my expert said what Tykol did was wrong and it

19  violated every known standard of care and policy, that's

20  just his opinion.  That cannot replace the jury's role here.

21          So I don't think that providing expert testimony,

22  particularly in a case like this, is necessary or oftentimes

23  tactically even wise.

24          Now, if you have a different case that has a scientific

25  basis, like a medical malpractice case or a patent case, you

1  may very well want those technical scientists to offer their

2  assessment of what went wrong, but this is a -- these are

3  basically the officer is being assessed for his

4  reasonableness, his judgment calls.

5      How is an expert going to sound off on that?

6          THE COURT:  I mean, in the context of defensive

7  tactics, it would appear to me to be a far more complicated,

8  you know, area of inquiry.  It may shed light on what is

9  reasonable and what isn't, given what law enforcement

10  officers have to contend with, the training that they have

11  or don't have.

12          MS. BURROWS:  We do include testimony from one of

13  Officer Tykol's officers in our briefing about that officer

14  believed that Tykol was too precipitous, went hands-on too

15  fast, should have diffused the situation, should have taken

16  time.

17          THE COURT:  In this particular case or generally

18  speaking?

19          MS. BURROWS:  No.  In this case.

20          THE COURT:  Okay.

21          MS. BURROWS:  So that is included, and -- and

22  that -- and the -- the city auditor provided an analysis.

23      Now, again, it's just their report, but I'm not

24  required here to introduce admissible evidence, but I can

25  make an offer of proof to show what evidence I would offer

1   at trial.

2       And so the city auditor's office did a full analysis of

3   this and they were very critical of Officer Tykol's use of

4   force, his decisions, the pursuit policy he violated.  And

5   so while I cannot use the auditor's opinion, I can have an

6   auditor talk about the process they went to and that they,

7   the auditor's office -- one part of Eugene -- disagreed with

8   the management of the police department.

9       So even they disagree on what happened out there.

10              THE COURT:  "They" being?

11              MS. BURROWS:  The police department and the

12  auditor's office, and there -- and there are --

13              THE COURT:  What did the police department --

14  remind me what the record shows about what the police

15  department's findings were.

16              MS. BURROWS:  The police chief basically said that

17  Tykol complied with all policies and everything he did was

18  within policy.

19              THE COURT:  Okay.

20              MS. BURROWS:  And the auditor had a different

21  assessment.

22              THE COURT:  Was the chief of police deposed in

23  this --

24              MS. BURROWS:  Pardon me?

25              THE COURT:  Was the chief of police deposed in

1    this case?

2            MS. BURROWS:  No, Your Honor.

3            THE COURT:  Okay.

4            MS. BURROWS:  This became a very public

5    politically hot case when it happened.

6            THE COURT:  In what ways?

7            MS. BURROWS:  It was in the media a lot.  The

8    district attorney did her own evaluation.  There was a lot

9    of media coverage, a lot of social media.  Still, today,

10   people are still talking about the death of Eli Rodrigues.

11   So we did not depose the chief.  I think Chief Skinner was

12   the chief at the time.

13           THE COURT:  Okay.  What about the state law

14   claims?

15       Mr. Miller suggests that the arguments they've raised

16   about the appropriateness for granting summary judgment in

17   its -- in its favor and plaintiff's nonresponse --

18           MS. BURROWS:  He might be right.  He might be

19   right at least on the negligence claim.

20       The Ninth Circuit has rendered a few opinions that talk

21   about whether or not you can have co-existing negligence

22   claims with a 1983 claim, that if they rest on the same

23   facts, same operative facts, you cannot have both.

24           THE COURT:  Okay.  And then on the wrongful death

25   claim?

1              MS. BURROWS:  Well, the wrongful death claim --

2    you know, the facts basically suffer from the same problem

3    as the 1983 case.  What are the facts?  What did happen?  Is

4    that officer really entitled to a self-defense defense?

5         And, you know, I don't mean to -- I mean, sometimes I

6    have told federal judges, "Well, it's not fair."  Well,

7    nothing is fair, I've learned, from some responses from

8    federal judges over the years.  But what is due process for

9    this gentleman who died on the street?  Does he not deserve

10   the opportunity to have a jury assess whether or not this

11   officer is telling the truth, whether or not this officer

12   really had an objectively reasonable basis to use force?

13   And I think he does.

14        I think Mr. Rodrigues deserves a voice.

15              THE COURT:  The challenge is the -- well, it may

16   not be in the same way in the state law claims, but with

17   respect to the federal claims, qualified immunity may

18   resolve the matter before it goes to a jury.  So that's --

19   that's -- I mean, that's sort of what -- that's what our --

20   the law of our land directs.

21        I mean, on summary judgment, I think I have a two-step

22   process; right?  I can address the issue of excessive use of

23   force first or qualified immunity first; but I, you know,

24   address one or the other.  I guess it's within my discretion

25   to do one or the other first.

1        It sounds to me like you -- I mean, you would want me

2   to evaluate the excessive use of force issue first and then

3   determine whether qualified immunity would attach.

4            MS. BURROWS:  Well, I became a plaintiff's lawyer

5   in these cases when *Saucier v. Katz* was still the big case.

6   And then *Hope v. Pelzer*, sort of, to me, is the bellwether.

7   *Hope v. Pelzer* is the case that we should look at on

8   analysis of qualified immunity, and I think it's the *Pearson*

9   case that says you can do it in any order you want to.

10       From my perspective, I think it's best to look to see

11  whether there's established law, well-established law, and

12  in this case, if, in fact, Officer Tykol truly feared that

13  he was going to die or he was in imminent danger -- all we

14  know is what he says -- if he felt that way, then he --

15  then, likely, there is a justification he gets qualified

16  immunity for the shooting.  But if the jury believes that

17  there wasn't imminent danger, that Mr. Rodrigues wasn't

18  going to kill him, then he doesn't get qualified immunity.

19       So my take has always been -- I use *Hope v. Pelzer* as

20  the basis for how to analyze a qualified immunity claim, and

21  then *Saucier v. Katz* is incorporated into that and is still

22  relied upon as the basis.

23       And, yes, Your Honor, you can use either one you want.

24  I would suggest establishing the law first and then whether

25  or not the officer's behavior -- or we know what the

1  officer's conduct was, and was it objectively reasonable?

2  But we don't always know what this officer's conduct was.

3          THE COURT:  And in this case, as you've described,

4  there's an evidentiary problem.  I mean, based on what

5  Mr. Rodrigues's testimony would be if it were to be

6  different.

7          MS. BURROWS:  Well, Your Honor, there's a body of

8  law.  I don't have it in front of me, and I apologize.  But

9  there is a body of law in the Ninth Circuit that, if the

10  Government is in total control of the information and the

11  evidence in a case, that should not be the basis to deny the

12  plaintiff their right to litigate a particular issue, and --

13  and this is a little tricky argument, Your Honor, and I

14  admit it right up front, but this department did a crappy

15  investigation of this shooting.  They didn't do the full

16  homicide investigation that I'm used to seeing.

17          THE COURT:  And why do you think that is?

18          MS. BURROWS:  Because they believed Tykol.  This

19  is a one-and-done.  Tykol said, "He was on top of me.  He

20  was pummeling me.  He was going to kill me.  I had to shoot

21  him."

22      And the video that you talked about where Tykol makes

23  those so-called excited utterances to Officer Jentzsch and

24  the video goes off, well, Officer Jentzsch was not making

25  himself available for a deposition, and the sergeant who

1  ordered the video to be turned off doesn't remember what

2  Tykol said after that.  So we don't know what other

3  statements Tykol would have made at that point.

4      I think that it's unfortunate that officers turn off

5  their body cams like that.  It looks bad.  It adds to the

6  old aura of credibility and believability of these public

7  servants, but -- and there was a statute at the time that

8  seems to forbid doing that, but a lot of departments ignore

9  the statute, and their policies allow officers a lot of

10  discretion in turning those video cameras off.

11              THE COURT:  And that's an Oregon statute?

12              MS. BURROWS:  Huh?

13              THE COURT:  Is that an Oregon statute --

14              MS. BURROWS:  Yes.

15              THE COURT:  -- that prevents the --

16              MS. BURROWS:  Yes.

17              THE COURT:  -- turning off of the body cam?

18              MS. BURROWS:  Yes.

19              THE COURT:  Okay.

20              MS. BURROWS:  I think I lost your original point,

21  Judge.  I'm sorry.

22              THE COURT:  I'm not sure I had a -- I'm not sure

23  what it might have been, other than that I'm just wanting to

24  make sure that I've covered all the bases.

25              MS. BURROWS:  I will -- I do want to say one other

1    thing --

2            THE COURT:  Oh, it was the evidentiary -- it was

3    the issue around evidence and the fact that we don't have

4    Mr. Rodrigues's testimony to -- to controvert that of Mr. --

5    of Officer Tykol's.

6        And so I -- I'm -- I'm working through this challenging

7    puzzle regarding evidence.  I mean, you know, I -- it's

8    obvious that Mr. Rodrigues can't testify.  We don't know

9    what he would have said, and -- and I have the very real

10   obligation to consider evidence in the record in making a

11   determination about -- you know, on summary judgment.

12       And if -- if you're asking me to analyze something that

13   sounds to me like a likely matter of first impression

14   here -- I mean, you're asking me to go down a road that I

15   don't think a district court has done before.

16           MS. BURROWS:  I've asked you to go down two

17   untraveled roads, which one are you talking about?

18           THE COURT:  So you're not asking me to take the

19   one less traveled.  You're taking -- you're asking me to

20   take both of them that might lead somewhere.  I have no idea

21   where.

22           MS. BURROWS:  Well --

23           THE COURT:  So what are these two roads you're

24   asking me to take?

25           MS. BURROWS:  The two that I ask you to travel --

1    and you're not the first judge I've asked -- is whether or

2    not we should rely upon the state probable cause standard,

3    which I personally think is fairer to police officers, and

4    the second road I ask you to travel was the qualified

5    immunity being an ultra vires act.  It's not authorized by

6    statute.  And those sort of kinds of defenses, avoidance

7    defenses, must be contained in the statute.  They cannot be

8    inferred from common law.

9        Those are the -- those are the two untraveled roads

10   I've asked Your Honor to go down.  At least that's my

11   interpretation.

12            THE COURT:  And even if I were inclined to take

13   those roads, other than your invitation to do so, it would

14   seem to me that I would have to make some kind of finding

15   that this evidence is inadequate, incomplete as it stands,

16   and that it's the defendant, City, that is responsible for

17   the inadequate record.

18       And I'm trying to understand, like, how do I get to

19   this point where I'm going to take a -- I'm going to take an

20   unknown, uncertain, and unpredictable road, which is not

21   what judges tend to do, trial judges particularly, because

22   we have to answer to the rule of law and that which is

23   precedent.  If I were even, you know, thinking that would be

24   a viable approach in this case, it seems like I -- I can't

25   just simply say, "Well, yeah, let's go."

1        I -- I have to make -- I have to -- it seems like I

2    would have to at least make some pretty extraordinary

3    conclusions or findings that on this summary judgment record

4    there -- there remains questions that only the State or --

5    only the City had control over, and therefore we -- I cannot

6    make such conclusions on summary judgment, and the jury

7    would have to make -- make certain -- make certain

8    decisions.

9             MS. BURROWS:  I -- I think, Your Honor, that on

10   one of those untraveled roads the qualified immunity

11   analysis that I've raised, probably the law would require

12   you to adhere to our concept of stare decisis.

13        As to the probable cause standard, that is a question

14   of federalism at this point, and the Supreme Court has

15   deferred an awful lot of issues in 1983 cases to the state

16   law to define.  Statute of limitations.  It has, however

17   abrogated state immunities and privileges to be raised in a

18   1983 case, but it defers an awful lot of discretion to the

19   State to define the body of law on certain issues in 1983

20   cases so long as the state law does not offend the federal

21   mandates of, in this case, the Fourth Amendment.

22        So the -- the other -- what I want to ask or maybe

23   offer or suggest, Your Honor, is I think the best approach

24   in this case -- and I don't say this in every case, but I

25   think the best approach in this case is if you determine

1    that the facts are not adequately developed to determine

2    probable cause and qualified immunity and we defer that to

3    the jury, then those legal issues can be raised by

4    Mr. Miller at trial again.

5         That, to me, would be --

6              THE COURT:  Well, what -- what further evidence

7    would be developed and offered at trial that has not yet

8    been developed and offered on summary judgment?

9              MS. BURROWS:  Well, we would put on a full case.

10   I don't tend to put on my full case at this stage.  I raise

11   enough issues and provide enough information to the Court to

12   find that there are issues of fact, and -- and I would

13   probably bring in a little more emphasis on those things --

14   the training officers, the use of force experts.  I would

15   probably do all of that.  But my general theme, my general

16   tactical approach, is Tykol.  He is -- he's got to be

17   assessed for whether or not his version makes sense to a

18   fact-finder.

19             THE COURT:  And in your case-in-chief you would be

20   presenting those experts?

21             MS. BURROWS:  I'm -- I'm --

22             THE COURT:  In your case-in-chief, you would be

23   presenting those experts that provide greater -- greater

24   detail and analysis of -- of the conduct -- of

25   Officer Tykol's conduct at that -- on that day?

1          MS. BURROWS:  Yes.

2      I only get 30 pages of briefing at this stage, but --

3          THE COURT:  There's -- that doesn't stop people

4  from asking for more and --

5          MS. BURROWS:  I know.  I know.

6          THE COURT:  So --

7          MS. BURROWS:  But I think my job in these cases,

8  where I'm defending these, is to raise issues of fact.  This

9  should be tried to a jury.  That's what we're here for.

10  That's a -- that's what this is for.

11      And the cases that we have cited say motions for

12  summary judgment should be granted sparingly when the cop is

13  the only witness.  We should approach their testimony with a

14  critical eye.

15          THE COURT:  Let me check in on our timing.

16      Jackie, are we ready for the criminal docket?

17      All right.  Why don't we take a recess.  And if you

18  have additional argument to make, I'll receive it.  Finish

19  up, and then I'll turn to Mr. Miller for rebuttal.

20      And given that we are taking up a matter involving a

21  sealed complaint -- is that correct?

22          UNIDENTIFIED SPEAKER:  It will be unsealed.

23          THE COURT:  It will be unsealed?

24          MS. BURROWS:  Do we have to leave the courtroom?

25          THE COURT:  Well, if the complaint is going to be

1  unsealed, then you don't have to leave the courtroom;

2  however, you're welcome to.  Again, it's a public building

3  and a public courtroom.

4      But if you would be able to clear the counsel table so

5  we can bring the other parties to the table -- to counsel

6  table, I would appreciate it.

7          DEPUTY COURTROOM CLERK:  Court is in recess.

8                  (Recess taken.)

9          DEPUTY COURTROOM CLERK:  Court is back in session.

10          THE COURT:  Ms. Burrows, was there anything else

11  that you wanted to tell me before I turn back to Mr. Miller?

12          MS. BURROWS:  I'm speaking a little more

13  extemporaneous than I usually do, Judge, but I just -- I

14  don't think so.

15      I have -- I've hit the high --

16      Oh, is -- would Your Honor be open to us supplementing

17  the record at all?  I see that the Taser policy is not in

18  the record or the Taser training materials.  I think the

19  pursuit policy is one of our exhibits, and that's all I was

20  asking -- if Your Honor had any objections to supplementing

21  the record for anything that we think we want to add?

22          THE COURT:  Obviously, this is where Mr. Miller

23  objects.

24          MR. MILLER:  Well, I mean, I -- I don't

25  necessarily object.  I want to make sure it was the policy

1  that was in existence at the time.  I mean, I --

2             THE COURT:  Okay.

3             MR. MILLER:  We argue why it is or isn't relevant.

4  I mean, you have the briefing on that for everything else;

5  so --

6             THE COURT:  Why don't the two of you confer, and

7  if you -- you're both in agreement of what policy it is that

8  you'd like to supplement the record with, then I'll receive

9  it.  If there's -- if there's a disagreement, then we'll

10  probably take that up in a telephone conference call to

11  resolve the dispute, whatever it might be.

12             MS. BURROWS:  Thank you, Your Honor.

13             THE COURT:  I'll also say that after I -- now that

14  I've had a very full discussion of -- and -- and argument

15  here, I'm going to go back and look at the briefs and, you

16  know, my -- my review of -- of notes, and I'm -- I may ask

17  for some additional legal supplement here.

18        I mean, you've raised some interesting questions,

19  Ms. Burrows, about, you know, the -- you know, the

20  evidentiary conundrum with the lack of Mr. Rodrigues's

21  testimony, but I don't know at this point whether that would

22  certainly trigger this higher process or this additional

23  process, and I -- I'll want to think about that and whether

24  there's -- there's an avenue.

25        But before I ask you to start briefing the legal issues

1   in greater detail -- and I think you've raised some of that

2   in your brief already -- I may have some more pointed

3   questions for both of you about, you know, whether -- I

4   might have some more pointed questions to take up with both

5   of you, at which point, then, I'll -- I'll send you some

6   correspondence outlining what my questions I have are and

7   how I would like for you to address them.

8        Okay.  Was there anything else, Ms. Burrows?

9            MS. BURROWS:  I -- I can't think of anything.

10  There were some minor points that Mr. Miller raised in his

11  reply brief that he hasn't actually argued today, but maybe,

12  just for the record, I should make a couple of comments.

13       Mr. Miller talked about the auditor's report.  Right

14  now I can't remember what the reply brief argued, but I'm

15  not required, as I mentioned earlier, to introduce

16  admissible evidence today, but just to show what I could

17  enter, and Mr. Miller had argued that the auditor's report

18  was somehow privileged under ORS 181A.674.  Those state

19  privileges, evidentiary privileges, are inapplicable in

20  federal cases.  That is well-established.

21       If Your Honor would like additional briefing -- I

22  happen to have just briefed this in another case -- so I

23  would be able to provide those authorities for you.

24       And I think Judge Simon, actually, was the last

25  district court judge to rule on that specific narrow issue.

1          THE COURT:  On the status of the privilege of an

2    auditor's report?

3          MS. BURROWS:  Of state privileges, whether or not

4    they preempt evidence in a federal question case.

5          THE COURT:  Okay.

6          MS. BURROWS:  And then I do have some what I

7    thought was really good legal analysis on the concept of

8    federalism and my argument on the probable cause standard

9    that I raised in our briefing, but --

10         THE COURT:  And you wanted to orally present them,

11   or do you feel like they're satisfactorily presented in your

12   written -- written materials?

13         MS. BURROWS:  I think they're adequately in the

14   briefing that I've submitted to Your Honor today.  I'm not

15   arguing a state constitutional claim.  I know that

16   Mr. Miller has raised that concern in his reply brief.

17   There is no authorizing mechanism to allow me to bring an

18   Oregon constitutional claim anywhere, but what I am arguing

19   is that the standard of probable cause should be the Oregon

20   mix subjective/objective standard.  I think it's only fair

21   to officers.  That's what they're trained.  That's what they

22   use.

23       Using the totally objective federal standard, which,

24   for some reason, about 50 percent of the defense attorneys I

25   run into want to use that, but I don't think it is a

1    realistic balance of what goes on in a scene, and the Oregon

2    Supreme Court has talked about the rights of individuals and

3    what Oregon law is on probable cause, and my issue is can

4    this Court -- can a federal court tell Oregon what the

5    proper standard is for federal, for probable cause, and does

6    it suddenly change to the objective standard once you file a

7    1983 claim?

8         And you are the third or fourth judge I've raised this

9    with; so it's become sort of a -- a mission for me.

10         THE COURT:  What have the other judges done when

11   presented with this question?

12         MS. BURROWS:  Judge Acosta used the Oregon

13   standard.  Judge Mosman said, "No, we'll use the objective

14   federal standard."  Judge Brown let us agree -- stipulate to

15   what we wanted to do, and I talked Steve Cramer into using

16   the state standard.  Let me see.  I'm trying to remember.

17   Oh, Judge Clarke.  Judge Clarke just say, "Nah, Michelle,

18   we're not going to do that.  We're just going to use the

19   objective standard."  So --

20         THE COURT:  All right.  So basically a little bit

21   of everything?

22         MS. BURROWS:  Yeah.

23         THE COURT:  Okay.  To what advantage is it for

24   your client that we use the state standard?

25         MS. BURROWS:  Well, the subjective analysis of the

1  officer then can be inquired upon for the jury to see

2  whether or not that officer's subjective standard was really

3  based upon the facts he was seeing, was really based upon --

4  it goes to his credibility.  It goes to his believability,

5  his reasonableness as an officer, his assessment.  This

6  officer moved immediately to force.  He escalated the

7  situation nonstop.  He never once backed down.  He

8  subscribed to and he talked about some very questionable

9  legal standards, in the beginning of his deposition with me,

10 about the use of force continuum, which has been disregarded

11 by training and by most departments.  I know at the time

12 Eugene was -- had adopted the Lexipol use of force

13 standards, which disregards and has just discontinued using

14 the use of force continuum.

15     And then Officer Tykol said something interesting in

16 his deposition, which we noted in our briefing, about, you

17 know, you ask, and if they don't comply, you make them do

18 something.  It's like this three-part process that he had

19 been trained to do, which, of course, violates any existing,

20 you know, concept of probable cause or force.

21     So there were a lot of issues in Tykol's training that

22 were very difficult.  So if he is talking on the stand about

23 his training and what these older officers had told him to

24 do and it doesn't meet the law, then -- then that is part of

25 his subjective analysis that the jury can then assess.

```
1              THE COURT:  So you're describing it as
2   Officer Tykol testifying about you ask and then you make.
3              MS. BURROWS:  Yes.
4              THE COURT:  I mean, I have often heard the -- the
5   anecdotal phrase to be you ask, tell, then make.
6              MS. BURROWS:  Yes.
7              THE COURT:  And is either -- both of them not
8   appropriate under whatever the standard is you're referring
9   to?
10             MS. BURROWS:  I don't believe they are,
11  Your Honor.
12             THE COURT:  Okay.
13        All right.  Anything else, Ms. Burrows?
14             MS. BURROWS:  No.  No, Judge.  I've talked too
15  much.
16             THE COURT:  I think Mr. Miller would beg to
17  differ.  I mean, I think he's been in the seat far longer
18  than you; so you might have gotten off a bit easier.
19        Mr. Miller?
20             MR. MILLER:  Thank you, Your Honor.  I'll go
21  through kind of a list, unless you have something you want
22  me to address starting off.
23             THE COURT:  No.  No.  Why don't you go down your
24  list.
25             MR. MILLER:  Okay.
```

1              THE COURT:  How long is your list?

2              MR. MILLER:  It's, like, ten things.

3              THE COURT:  All right.  Well, that's not --

4              MR. MILLER:  But I have short answers to all of

5    them.

6              THE COURT:  Okay.

7              MR. MILLER:  So we -- we talked a little bit about

8    this question of, "Well, what do you do when the decedent

9    can't provide their own version of events and how is that

10   answered?"

11        The Ninth Circuit has answered that.  *George v. Morris*

12   is a 2013 case where there -- it involved an

13   officer-involved shooting as well, where the Ninth Circuit

14   talks about, basically -- I think the language is, "In cases

15   where the best and usually only witness who can offer direct

16   testimony for the plaintiff about what happened before

17   shooting has died, Ninth Circuit precedent permits the

18   decedent's version of events to be constructed

19   circumstantially from competent expert and physical evidence

20   as well as from inconsistencies in the testimony of law

21   enforcement," and this is on page 10 of our reply, which is

22   Doc 50.

23        And then we go through those different areas.  The

24   Ninth Circuit has allowed sort of that version of events to

25   be constructed and show how they're not met in this case.

1       So this is a question that isn't new.  It comes up

2   where we don't have the decedent present to provide a

3   version of events.  Ninth Circuit precedent allows it to be

4   constructed through other means, but that didn't happen in

5   this case.  So there's still -- there's insufficient

6   evidence here.

7           THE COURT:  So insufficient because it's not

8   enough to simply poke holes in the defendant's version of

9   the events in the absence of presenting, argumentatively --

10  or maybe argument, but -- but in the absence of actually

11  presenting evidence of your own?

12          MR. MILLER:  Some of these -- some of these

13  categories.  So like I kind of mentioned expert evidence,

14  forensic recreation, inconsistencies in testimony or

15  versions.  So those are the three categories the Ninth

16  Circuit has said that that's where you can sort of create a

17  version or a version that calls into question, and that

18  didn't occur here.  We -- the next several pages we go

19  through that, and that's in our reply.

20      Ms. Burrows talked about a duty to de-escalate, and I

21  don't know that that's the law within the Ninth Circuit, at

22  least at this time.  Page 11 we cite to *Reed v. Hoy*, which

23  is a 1989 case for the Ninth Circuit.  That said a police

24  officer isn't under a duty to retreat from any situation

25  before resulting to the use of deadly force if the force is

1   otherwise proper.

2       And *Reed v. Hoy*, you know, remains good law, as far as

3   I'm aware.

4           THE COURT:  I mean, isn't that kind of, sort of,

5   circular reasoning?  If the force is otherwise proper, begs

6   the question of whether there was a duty to de-escalate in

7   the first place.

8           MR. MILLER:  Or a duty to retreat.

9       I mean, the argument, I think, in that case had been

10  that you should have -- you should have gotten more

11  distance.  You should have done other -- other things, but

12  it didn't say that that -- there's an affirmative duty for

13  an officer, at least, to do -- to do that.

14          THE COURT:  And if the law today is that there's a

15  duty to de-escalate, does it apply to the events that

16  occurred back in 2019?

17          MR. MILLER:  Well, I -- I haven't seen a case

18  cited that talks about a duty to de-escalate in those terms.

19  Of course we look at any of these events, in terms of the

20  totality of circumstances.  So the *Graham* factors.  But

21  also, you know, an officer considering alternatives that are

22  available to him; considering, you know, the -- the quantum

23  of force; considering, you know, the ability to provide

24  warnings or if those are given.

25          So there are -- there are permissible factors that

1    we -- we do look at that kind of get at that question of an

2    officer pausing and thinking about what tool is reasonable

3    within that range, within those circumstances, but I've

4    never seen one of those elements being a -- you know, a -- a

5    requirement, at least, to -- to de-escalate, as I think that

6    that term is more commonly used right now.

7             THE COURT:  And so there were -- there was one

8    explicit question and perhaps one implicit.  If the law is

9    "X" today, do I apply "X" law that exists today to the

10   events occurring in 2019 if the law was "Y" back then?

11            MR. MILLER:  Right.  You apply the law that

12   existed as of November 30, 2019.  And in the case of the

13   federal claims, you apply the law that was clearly

14   established.

15            THE COURT:  Okay.

16            MR. MILLER:  So if there's just one case that said

17   that that's in a different district, that wouldn't.  So we

18   look at that.

19        But that's why, again, we -- we look at -- I'm pointing

20   back to the criminal statutes that existed at that time and

21   the justification statutes that existed at that time.

22   That's where we judge his -- his -- the officer's actions

23   on.

24        The -- there's -- there's a little bit of mention about

25   the auditor's report.  There's some talk here about an

1    assertion of privilege.  I think probably there's -- maybe

2    there's some confusion.  The -- we didn't assert that it's

3    privileged, in that it's not capable of ever being

4    considered by a Court, but rather plaintiff filed a motion

5    to take judicial notice of that report and some other

6    things, and there were certain documents within there that

7    we objected to taking judicial notice of.

8        One of the reasons in case -- in case of the auditor's

9    report is because it's not -- it's not something that's sort

10    of publicly available knowledge to everybody, and it's --

11    because it is -- it's sort of confidential, and there's law

12    regarding that.

13        So in our response to the motion for judicial notice,

14    that's where we address --

15            THE COURT:  You're not arguing that it shouldn't

16    be considered as potential -- as evidence.  You are just

17    arguing that I shouldn't -- that the Court shouldn't take

18    judicial notice?

19            MR. MILLER:  Well, you certainly shouldn't take

20    judicial notice of it.  I think that there are some problems

21    substantively with -- with looking at it because it is

22    basically offering -- in some ways, it's offering legal

23    opinions about whether or not somebody violated particular

24    internal policies, and you -- you can't -- and no expert can

25    come in and provide any sort of a legal opinion, number one;

1  and number two, it contains, you know, a lot of different

2  hearsay, and things like that, that I don't think can end up

3  being admissible, and it's using a different standard than

4  what we're here about today.  I mean, it's looking at the

5  internal policies that the City has, which are -- which are

6  rightfully more than, you know, what are required under the

7  state law claims or under the 1983 claims.

8      And there isn't -- there isn't a 1983 action for

9  violation of an internal policy, unless the action would

10  have also independently violated the -- the Constitution.

11      So, you know, we -- we don't think that it's something

12  that you could really consider.  Even if you did, I would

13  note that he found that his recommendation was that the use

14  of deadly force was justified.  It's the same what the chief

15  found.  It's the same what the district attorney found.

16      The -- this -- this issue kind of gets to what was

17  raised about the Government being in control of the evidence

18  in this case and sort of the quality of the investigation.

19  The investigation into this wasn't conducted by, certainly,

20  Officer Tykol and not even by the Eugene Police Department.

21      When there is a use of deadly force in Lane County, an

22  independent team, the Interagency Deadly Force Investigation

23  Team, is -- is stood up and -- and done under the control of

24  the district attorney.

25      So out-of-department investigators are brought in to

1    conduct that investigation, and they do all of the forensic

2    work.  They do all the interviews.  They are the ones who

3    interviewed Officer Tykol.  They are the ones that do all

4    that work and present their results to the district attorney

5    for her to make the decision about what to pursue, if

6    anything, for -- for charges.

7        So Eugene has -- has no control over that portion of

8    the gathering of evidence or even the scope or course of

9    investigation.  So it's not -- it's not something that we

10   had, really, any ability to direct or control.

11       There was a mention of one of the officers,

12   Officer Jentzsch, being unavailable.  He's no longer a city

13   employee, and he's moved out of state; so he's not somebody

14   I could compel to sit for a deposition.  He could have been

15   subpoenaed, but he wasn't; so that's -- that's --

16           THE COURT:  He could have been subpoenaed by the

17   plaintiff.

18           MR. MILLER:  Right.

19           THE COURT:  But was not.

20       And the sergeant couldn't remember.  I think that was

21   the other information that Ms. Burrows --

22           MR. MILLER:  Yeah.  I -- I think that's his

23   testimony from -- he couldn't remember what or if anything

24   was said.

25           THE COURT:  What or if anything that Officer Tykol

```
1   said?
2           MR. MILLER:  Right.  Right.
3       I mean, we have -- it's Sergeant Sullivan.  I'm sure
4   you have his deposition -- plaintiff submitted his
5   deposition testimony.  So that would tell you what he --
6   what he did or didn't remember.
7           Plaintiff asked you to take two different roads down
8   the -- that have been untraveled.  One of them was on
9   qualified immunity.  We would -- we would say that you
10  should not, for all the reasons that are listed out in our
11  reply on page 7, kind of all the recent Supreme Court cases
12  still adopting qualified immunity and that analysis, and
13  then this question about the state standard for probable
14  cause, we think, again, that you should -- you should reject
15  that for the reasons articulated on pages 5 through 6, of
16  the City's reply.
17          Essentially, the Supreme Court has said, you know,
18  whatever state protections, you know, may exist, there --
19  the Fourth Amendment is independent of that.  It's a purely
20  objective standard, and Judge Clarke, in that case we cited,
21  Malaer v. Kirkpatrick, on page 6, rejects exactly this
22  argument that plaintiff was making; so -- but there's
23  Supreme Court case law that -- that --
24          THE COURT:  Why did Judge Acosta decide otherwise?
25          MR. MILLER:  I'm not aware of the case; so I don't
```

1  know.

2  THE COURT:  Okay.  Did -- did Judge Acosta

3  distinguish in his -- in the opinion any reasoning why --

4  why his decision was different than any of the other judges'

5  decisions?

6  MS. BURROWS:  He did not.  He didn't know what to

7  do.  It was Chris Gilmore, who was county counsel from

8  Washington County, and me, and I had been on my campaign to

9  change the probable cause standard in these cases, and we

10  both, Chris and I -- Mr. Gilmore and I -- were arguing

11  basically the same thing, and Judge Acosta just said, "Okay.

12  We'll -- we'll use that standard."  There was no legal

13  analysis or findings about it.

14  THE COURT:  Okay.  All right.  And it wasn't

15  appealed anywhere?

16  MS. BURROWS:  No.

17  THE COURT:  Okay.  All right.

18  MR. MILLER:  So those are -- those are the main

19  points we wanted to sort of address in rebuttal.  If you

20  have any specific questions -- otherwise, we thank you for

21  your involvement and the amount of time that you have put

22  into -- into looking into this issue.  It's important, I

23  know, for the plaintiff and -- and his family.  It's

24  important for our community.  It's also very important for

25  Officer Tykol.  So we appreciate your very sincere attention

1    to all of it.

2           THE COURT:  Thank you, Mr. Miller.

3       Ms. Burrows, was there anything else that you wanted to

4    say before we finish up?

5           MS. BURROWS:  Well, we're talking -- it's like

6    that part in oral argument where everybody is winding down

7    quite a bit.

8       On the de-escalation issue, Your Honor, it's not --

9    it's not a backing down.  It's not a duty to retreat.  It is

10   the core of the *Graham v. Connor* standard.  The officer must

11   assess and reassess the circumstances in front of them when

12   they're -- when and if to proceed with more force.

13      So my example would be the officer's testimony about

14   why he arrested Mr. Rodrigues isn't supported by the law,

15   but then when Mr. Rodrigues ran away, he was only being

16   looked at, really, for jaywalking.

17      So at that point I think that Officer Tykol could have

18   reassessed the amount of force he used and reconsidered the

19   future -- his approach.  So it's not that he retreated.

20   It's that he should have reevaluated the amount of force he

21   needed to use.  So de-escalation.

22      And there's a de-escalation policy with Eugene PD, and

23   it is a really cool thing that departments are doing right

24   now, is training in de-escalation techniques, but it's

25   basically a way of being reasonable with a suspect so that

1  you don't have violent encounters.

2        THE COURT:  When was that policy implemented or

3  adopted?

4        MS. BURROWS:  Before this incident, I believe.

5  2018, I think.  They adopted -- I think they adopted the

6  Lexicore [sic] policy on it; so -- but it was adopted before

7  this incident.

8        THE COURT:  I mean, even if I were to find there's

9  still sufficient evidence to conclude that -- that

10  Officer Tykol violated the de-escalation policy -- I may be

11  using terms unartfully, but just the gist of it -- I mean,

12  how does that address the standard under qualified immunity,

13  which is a clear -- a violation of somebody's clearly

14  established constitutional rights?

15        MS. BURROWS:  Well, violating a policy does not

16  constitute a constitutional claim.  It cannot be used as the

17  basis for a constitutional claim.  It goes to the officer's

18  awareness of the law, the clearly established law.  And when

19  you're talking about probable cause and use of force, it

20  talks about the officer's objective reasonableness.

21     If this officer continually violates policies and he's

22  doing these things, the jury can assess whether or not that

23  officer is really engaged in reasonable conduct.

24        THE COURT:  All right.

25     You wanted to respond, Mr. Miller?

1        MR. MILLER:  No.

2        THE COURT:  It looked like it was.  But if you

3   don't, I'm not inviting you to, if you -- if you didn't need

4   to.

5        MR. MILLER:  I do not need to, no.

6        THE COURT:  Okay.  All right.

7      Counsel, I don't have any other questions for -- for

8   both of you for now.

9        MS. BURROWS:  Plaintiff has nothing further,

10  Your Honor.

11       THE COURT:  Okay.  Thank you.  Thank you,

12  Ms. Burrows.

13     Now, I'm going to go back to chambers, review the

14  materials, review the briefs again, because the context that

15  you have provided me to -- has in very -- it's in-depth, and

16  I want to make sure I look at it again -- all of it -- to

17  fully understand the -- you know, the -- the issues and,

18  frankly, the evidence and understanding how that impacts my

19  analysis.

20     I might have some additional questions for supplemental

21  briefing, but I don't know that yet; but I -- I just wanted

22  to give you a heads-up that that could happen, but I'll try

23  to keep you apprised.  And also, if I do need additional

24  briefing, I'll try to get that decision figured out sooner

25  so you have time to brief it, and that way I can incorporate

1  that into my decision-making so this case doesn't delay any

2  longer than -- than necessary.

3            MS. BURROWS:  Thank you, Judge.

4            THE COURT:  You know, the comments that I made at

5  the end, before we recessed for lunch, continue to remain

6  true, and I have -- it is completely consistent to care

7  about everyone in this room and the community and also do

8  the law right, and I want to make sure people hear that,

9  that they are not separate, they're not mutually exclusive,

10  and I'm -- I'm very sorry to the family here of

11  Mr. Rodrigues for their loss and I'm sorry that we're in

12  this situation, and I appreciate Mr. Miller's recognition of

13  the challenges to our community in its effort to try to make

14  sense of this and to perhaps be better in the future.  And I

15  also appreciate the need for legal accountability as part of

16  the reason we're here.

17       To that end, I will continue to work hard on getting

18  the decision out in a timely way so both parties will have

19  an opportunity to assess next steps.

20       If anything else changes about the circumstances of the

21  case, please let me know as soon as you know, so that way we

22  can -- we can pivot as necessary.

23            Be well.  Take care.

24            MR. MILLER:  Thank you, Your Honor.

25            MS. BURROWS:  Thank you, Judge.

1          DEPUTY COURTROOM CLERK:   This court is adjourned.

2                    (Hearing concluded.)

1                    C E R T I F I C A T E

2

3        Ofelia Hernandez Santiago v. Samuel Tykol, et al.

4                       6:21-cv-01715-MK

5                          Oral Argument

6                        February 15, 2024

7

8            I certify, by signing below, that the foregoing is

9    a true and correct transcript of the record, taken by

10   stenographic means, of the FTR-recorded proceedings in the

11   above-entitled cause.  Where (indiscernible) has been

12   indicated, the audio file was unable to be heard due to

13   simultaneous crosstalk, fast speaking, mumbling, or other

14   room noises overriding what was being said.  A transcript

15   without an original signature, conformed signature, or

16   digitally signed signature is not certified.

17

18   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
19
     Transcriber/Official Court Reporter      Date: 3/19/2024
20   Oregon CSR No. 98-0346     CSR Expiration Date:  9/30/2026

21

22

23

24

25