UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

OFELIA HERNANDEZ SANTIAGO,

                Plaintiff,

vs.

CITY OF EUGENE, SAMUEL TYKOL,
and JOHN DOES 1-3,

                Defendants.

Case No. 6:21-cv-01715-MK

**FINDINGS AND
RECOMMENDATION**

_____

**KASUBHAI,** United States Magistrate Judge:

On November 29, 2021, Plaintiff Ofelia Hernandez Santiago ("Plaintiff") filed this §

1983 action as a personal representative of the Estate of Eliborio Rodrigues Jr. Plaintiff alleges

that Defendant Officer Samuel Tykol violated Mr. Rodrigues's Fourth Amendment rights. Pl.'s

Compl. ¶¶ 41–66, ECF No. 1 (First and Second Claims for Relief). Plaintiff also alleges supplemental state law claims against Officer Tykol, the City of Eugene, and John Doe Supervisors 1-3 (collectively, "Defendants"). Pl. Compl. ¶¶ 67–76 (Fifth and Sixth Claims for Relief).[1] On September 1, 2023, Defendants filed a Motion for Summary Judgment. Defs.' Mot. for Summ. J. ECF No. 25 ("Defs.' Mot."). The Court heard Oral Argument on February 15, 2024. For the reasons below, Defendants' Motion (ECF No. 25) should be granted as to the First and Second Claims for Relief, granted as to the Fifth and Sixth Claims against the City of Eugene, and denied as to the Fifth and Sixth Claims against Officer Tykol. Plaintiff's Motion to Take Judicial Notice of Discrete Facts (ECF No. 45) is DENIED.[2]

## BACKGROUND

This case arises out of a November 30, 2019, encounter between Mr. Rodrigues and a City of Eugene police officer. Within minutes, this encounter ultimately resulted in Officer Tykol's use of deadly force against Mr. Rodrigues. At 12:30 a.m., Officer Tykol was conducting routine patrol in his vehicle when he observed Mr. Rodrigues walking along Acacia Street—located in a residential neighborhood. Decl. of Samuel Tykol in Supp. of Defs.' Mot. for Summ. J. ¶ 4, ECF No. 31 ("Tykol Decl."). A home security camera showed Mr. Rodrigues walking near the shoulder of the street when Officer Tykol's police cruiser drove past him. Decl. of Koren Evans in Supp. of Defs.' Mot. for Summ. J. Ex. 1, at 1:51–2:08, ECF No. 28 ("Evans Decl. Ex. 1").

---

[1] During conferral, Plaintiff agreed to voluntarily dismiss the Third Claim for Relief against John Doe Supervisors 1-3 and the Fourth Claim for Relief against the City of Eugene. Defs.' Mot. for Summ. J. 1, ECF No. 25. The Court construes this as a signed stipulation of dismissal of the Plaintiff's Third and Fourth claims, without prejudice. *See* Fed. R. Civ. P. 41(1).

[2] Plaintiff has concurrently filed a Motion to Take Judicial Notice of discrete facts as outlined in his Motion. Pl.'s Mot. to Take Judicial Notice at 2. The Motion is denied. Even if the Court were to consider this evidence, it would not have altered the Court analysis and decision on Summary Judgment. The admissibility of evidence in the documents outlined in Plaintiff's Motion can be taken up at the time of the trial.

When asked about his initial suspicions of Mr. Rodrigues, Officer Tykol testified:

> He was in all black in a quiet neighborhood in the middle of the night. There was no flashlight or reflective vest, which I had worked that portion of town for a couple of years, and most people that walk around in that neighborhood and that area of town kind of have that—either the vest or the flashlight if they're out walking late, or maybe they're walking a dog, things like that.

Decl. of Michelle R. Burrows Ex. 23, at 46:5–12, ECF No. 47-18 ("Tykol Dep."). But Mr. Rodrigues did have a flashlight—as demonstrated by Officer Tykol's body-worn camera footage. Decl. of Samuel Tykol in Supp. of Defs.' Mot. for Summ. J. Ex. 1, at 00:38, ECF No. 32 ("Tykol Decl. Ex. 1"); Decl. of Ben Miller in Supp. of Defs.' Mot. for Summ. J. Ex. 1, at 282:21–283:7, ECF No. 27 ("Miller Decl. Ex. 1"). Officer Tykol testified that Mr. Rodrigues's "behavior [did not] match the neighborhood." Tykol Dep. at 82:10–11.

Officer Tykol testified that he suspected Mr. Rodrigues of violating Or. Rev. Stat. § 814.070 and Eugene Code (EC) 4.830.[3] Tykol Dep. at 50:19–51:2. Officer Tykol made a U-turn on the dead-end street before parking and exiting his vehicle to stop Mr. Rodrigues. *Id.* at 48:12–14. Officer Tykol approached Mr. Rodrigues—who was standing by a recycling can on the curb—and asked him why he was walking in the road, rather than using the sidewalk. Tykol Decl. Ex. 1, at 00:38–00:42. Mr. Rodrigues explained that there was no sidewalk where he was walking and that he did not see when a sidewalk became available. *Id.* at 0:47–0:57. Mr. Rodrigues then said, regarding why Officer Tykol stopped him, "If that would have been the case, then the reason you stopped me should have been over there, no?" *Id.* at 0:57–1:01. Officer Tykol responded, "No, I can stop you whenever I deem necessary," before asking Mr. Rodrigues

---

[3] "A pedestrian commits the offense of pedestrian with improper position upon or improperly proceeding along a highway if the pedestrian . . . [t]akes a position upon or proceeds along and upon the roadway where there is an adjacent usable sidewalk or shoulder." Or. Rev. Stat. § 814.070.
"No unauthorized person shall make use of the portion of the street between the curbs reserved for vehicular traffic for any other purpose than vehicular traffic." EC 4.830.

twice if he had any identification on him.[4] *Id.* at 1:01–1:05. During this time, Mr. Rodrigues was attempting to put an empty bottle into an empty trash bag. *Id.* at 1:05–1:15. At this point, Officer Tykol radioed for backup. *Id.* at 1:10–1:16. Officer Tykol testified that he wanted backup because Mr. Rodrigues was not acknowledging him, and Officer Tykol thought Mr. Rodrigues was concealing his identity. Tykol Dep. at 81:17–22.

Mr. Rodrigues dropped the empty bottle and bent over to pick it up. Tykol Decl. Ex. 1, at 1:13–1:15. Officer Tykol told Mr. Rodrigues he was not free to go and asked again if he had an ID. *Id.* at 1:15–1:18. After three seconds with no response, Officer Tykol stepped toward Mr. Rodrigues, reached for his trash bag, and said for Mr. Rodrigues to "do this, put this down" while he grabbed hold of Mr. Rodrigues's arm above his elbow. *Id.* at 1:21–1:22. Mr. Rodrigues responded, without raising his voice, "Negative. Sir, may I speak to a sergeant?" *Id.* at 1:22–1:25. Officer Tykol began pulling Mr. Rodrigues away from the recycling can and over near the curb. *Id.* at 1:26–1:28. Mr. Rodrigues said, "You cannot be touching me." *Id.* at 1:28–1:29. Simultaneously, Officer Tykol ordered Mr. Rodrigues to sit down three times in the span of four seconds. *Id.* at 1:27–1:31. Without sitting down, Mr. Rodrigues again asked, without raising his voice, to speak to a sergeant. *Id.* at 1:31–1:37. Officer Tykol told Mr. Rodrigues again to sit down. *Id.* at 1:35. It was then that Officer Tykol called for Code 3 cover. *Id.* at 1:37–1:39. "Code 3 cover" means an emergency response is required, and backup officers should respond as quickly as possible. Miller Decl. Ex. 1, at 59:6–11. Officer Tykol testified that he called for Code 3 cover to be proactive just in case the encounter rose to the level of a fight or use of force. Tykol

---

[4] It should be noted that Officer Tykol never asked to see Mr. Rodrigues's ID, nor did he order Mr. Rodrigues to produce an ID. He only asked Mr. Rodrigues if he had an ID on him. Decl. of Michelle Burrows Ex. 5, at 9–10, ECF No. 48-6 ("Police Auditor's Report") (concluding that this did not constitute a lawful order).

Dep. at 130:2–10. Officer Tykol testified that he did not feel threatened that Mr. Rodrigues would harm him during this part of the encounter. *Id.* at 85:3–6, 111:20–24.

Officer Tykol told Mr. Rodrigues he would call a sergeant if Mr. Rodrigues sat down. Tykol Decl. Ex. 1, at 1:40–1:43. From the time that Officer Tykol pulled Mr. Rodrigues over to the curb to this moment, Mr. Rodrigues was standing still, and his arms were not moving. *Id.* at 1:28–1:44. Mr. Rodrigues called out, "Can somebody call a real officer, please?" *Id.* at 1:44–1:45. Officer Tykol then grabbed the back of Mr. Rodrigues's sweatshirt near his neck and pulled him down to the ground. *Id.* at 1:45–1:47. Mr. Rodrigues fell sideways on the ground with his torso propped up slightly. *Id.* at 1:47. Officer Tykol rolled Mr. Rodrigues onto his knees and pushed Mr. Rodrigues's head toward the ground before Mr. Rodrigues asked, "Am I being detained?" *Id.* at 1:47–48. Officer Tykol tried to restrain Mr. Rodrigues's right hand and responded, "Yes, you're not free to go." *Id.* at 1:48–1:50. Mr. Rodrigues asked why not, and Officer Tykol replied, "Because. Give me your arm. You're under arrest." *Id.* at 1:50–1:55. Mr. Rodrigues shifted to a sitting position and said, "I will sit down." *Id.* at 1:55–1:58. Mr. Rodrigues would not put his hands behind his back. *Id.* When Mr. Rodrigues asked again why he was under arrest, Officer Tykol said, "For interfering." *Id.* at 1:58–1:59.

Officer Tykol shifted behind Mr. Rodrigues and placed his hands and knee on Mr. Rodrigues's back. *Id.* at 2:00–2:02. At this point, Mr. Rodrigues began yelling, "Neighbors! Hey!" *Id.* at 2:03–2:07. Officer Tykol managed to get Mr. Rodrigues down flat on his stomach, but Mr. Rodrigues would not put his hands behind his back. *Id.* at 2:06–2:13. Officer Tykol warned Mr. Rodrigues that he was going to use his pepper spray if Mr. Rodrigues did not put his hands behind his back. *Id.* at 2:14–2:17. Officer Tykol later testified that he was not afraid that he was in imminent danger when he was trying to pull Mr. Rodrigues's hands back. Tykol Dep.

at 112:20–24. Officer Tykol then attempted to pepper spray Mr. Rodrigues, but the spray appeared to be ineffective. Tykol Decl. Ex. 1, at 2:17–2:26; Tykol Dep. at 96:15–17. Officer Tykol then radioed "fighting with one." Tykol Dep. at 132:21–133:1–3; Decl. of Chris Stetson in Supp. of Defs.' Mot. for Summ. J. Ex. 1, 2:28–2:30, ECF No. 38 ("Stetson Decl. Ex. 1"). Officer Tykol and Mr. Rodrigues got into a struggle before Officer Tykol's body-worn camera appeared to become jostled and stopped recording the encounter. Tykol Decl. Ex. 1, at 02:41–2:44.

Officer Tykol testified that, immediately after the video cut off, Mr. Rodrigues "popped up" and began running from him. Tykol Dep. at 133:9–21. At this time, Officer Tykol's microphone disconnected. *Id.* at 136:23–137:3. Officer Tykol began to pursue Mr. Rodrigues on foot. *Id.* at 215:3–13. By the time Officer Tykol caught up to him, Mr. Rodrigues had turned around and got into a "bladed stance." Tykol Dep. at 216:10–14. Mr. Rodrigues began throwing punches at Officer Tykol, and Officer Tykol threw punches back at him. *Id.* at 226:1–7. Both Mr. Rodrigues and Officer Tykol struck each other during the incident. *Id.* at 226:17–227:8. Officer Tykol tried to gain control of Mr. Rodrigues's arms by using a technique called "pummeling"—which occurs when one grabs a person's upper arms or forearms to hold the person from being able to strike. *Id.* at 230:19–231:1. Officer Tykol lost grip of Mr. Rodrigues, and Mr. Rodrigues ran again. *Id.* at 233:9–16. Officer Tykol then tackled Mr. Rodrigues to the ground. *Id.* at 234:22–235:8.

Initially, Officer Tykol was on top of Mr. Rodrigues. *Id.* at 234:9. Soon after, Mr. Rodrigues bumped Officer Tykol onto his back, and Mr. Rodrigues rolled on top of him. *Id.* at 240:3–241:8. Officer Tykol attempted to control Mr. Rodrigues by wrapping his legs around Mr. Rodrigues's torso and locking his feet—what is called a "guard" position. *Id.* at 234:11–15,

241:2–8. All the while, Mr. Rodrigues was punching Officer Tykol in the face. *Id.* at 240:18–241:21.

In response, Officer Tykol deployed his Taser. *Id.* at 246:22–247:2. Officer Tykol testified that he deployed the Taser in drive-stun mode in the middle of Mr. Rodrigues's upper stomach, lower chest area:

> Q: So you pull out the Taser and—with your left hand?
> A: Correct.
> Q: And you put it in sort of a drive-stun mode. Where do you physically contact his body?
> A: Correct.
> Q: Where?
> A: General stomach area, like, about here (indicating). . . .
> Q: Okay. And on his body—I think you said you put it in drive-stun mode in the middle of his chest?
> A: Correct.

*Id.* at 246:25–247:2, 248:1–4; *see also* Miller Decl. Ex. 1, at 94:6–8. Mr. Rodrigues did not appear to be affected by the Taser. Tykol Dep., at 248:12–15. Officer Tykol testified that Mr. Rodrigues was grabbing for his Taser and pressing it up against Officer Tykol's groin and leg. *Id.* at 249:2–11. Officer Tykol testified that he activated his Taser a second time and accidentally tased himself, causing his right leg to become incapacitated. *Id.* at 249:14–251:25. Officer Tykol testified that while Mr. Rodrigues was grabbing for Officer Tykol's Taser, he was also punching Officer Tykol with his free hand. *Id.* at 263:14–22.

Officer Tykol could not reach his firearm with Mr. Rodrigues in this position on top of him. *Id.* at 264:5–7. Officer Tykol proceeded to employ a technique called "shrimping," where he pulled his leg up at an angle to push himself out from underneath Mr. Rodrigues and get off to the side to escape. *Id.* at 264:8–16. After employing this tactic, Officer Tykol was able to reach his firearm. *Id.* at 265:4–20. Officer Tykol shot Mr. Rodrigues three times in the stomach. *Id.* at 265:17–266:7. Mr. Rodrigues died shortly thereafter. *Id.* at 266:18–23. The entirety of the

incident lasted less than five minutes. Stetson Decl. Ex. 1, at 0:00–4:12 (from Officer Tykol calling in "person stop" to "shots fired").

Officer Jentzsch arrived on the scene—with his body-worn camera on—and walked Officer Tykol over to his patrol vehicle. Decl. of Koren Evans in Supp. of Defs.' Mot. for Summ. J. Ex. 3, at 0:30–1:30, ECF No. 37. Officer Tykol looked visibly shaken and was breathing heavily. *Id.* Officer Tykol said, "I tried to tase him. He grabbed my Taser. He was on top of me." *Id.* at 1:39–1:51. Officer Jentzsch responded, "Hey, my camera is going." *Id.* at 1:45–1:46. Officer Tykol went on to say, "It happened on my hand mic, but I couldn't get it, you know?" *Id.* at 2:56–3:02. Sergeant Sullivan arrived and asked Officer Tykol, "Where's your body camera? At the car?" *Id.* at 3:19–3:20. Officer Tykol responded, "It fell somewhere over there." *Id.* at 3:20–3:21. Sergeant Sullivan replied, "I just want to make sure it wasn't on you, okay?" *Id.* at 3:21–3:22. Officer Jentzsch then said, "Mine's on. Can I mute it?" *Id.* at 3:22–3:26. Sergeant Sullivan said yes, and Officer Jentzsch muted his body camera. *Id.* at 3:26–3:30. It is worth noting that the Office of the Police Auditor found "numerous weaknesses in the IDFIT investigation" for this incident. Decl. of Michelle Burrows Ex. 5, at 29, ECF No. 48-6 ("Police Auditor's Report").

Eugene Police Department has a policy on de-escalation. Decl. of Michelle Burrows in Resp. to Defs.' Mot. for Summ. J. Ex. 14, ECF No. 47-10. According to the Police Auditor's Report, Officer Tykol violated the de-escalation policy:

> EPD policy 820.3 directs officers to make "every reasonable effort to de-escalate confrontations to prevent the need to use force." The policy delineates several de-escalation techniques and tactics available to officers, including communication, asking for additional officers for assistance, and leveraging time to slow down the situation.
>
> In this case, Officer Tykol physically engaged with Mr. Rodrigues within a minute of initially contacting him. Officer Tykol did not respond when Mr. Rodrigues

repeatedly asked him to contact a sergeant, and while he mentioned Mr. Rodrigues's pedestrian violation, he failed to clearly articulate his reasons for the stop. It is clear from the video of their interaction that Officer Tykol and Mr. Rodrigues were not successful in their communication with each other; the video also shows no apparent effort from Officer Tykol to slow down the situation or use time to his benefit.

It is possible that the same result would have occurred had Officer Tykol made efforts to de-escalate this situation; however, engaging in hypotheticals does not assist in this analysis. EPD policy is clear on the importance of de-escalation. Officers "should make every reasonable effort to de-escalate." Officer Tykol's actions prior to physically engaging with Mr. Rodrigues do not meet this standard.

Police Auditor's Report at 15. Eugene Police Department also has guidelines for foot pursuits.

Decl. of Michelle Burrows in Resp. to Defs.' Mot for Summ. J. Ex. 7, ECF No. 47. That policy

reads—in pertinent part—as follows:

Unless the officer reasonably believes that exigent circumstances exist (e.g., a serious threat to the safety of personnel or members of the public), officers should consider alternatives to engaging in or continuing a foot pursuit [if] . . . [t]he officer is acting alone[,] . . . [or] [t]he officer loses radio contact with Central Lane Communications or with backup officers."

*Id.* at 2–3. According to the Police Auditor's Report, Officer Tykol violated the department's

foot pursuit policy:

While not talked about often, solo foot pursuits can be dangerous, as articulated in the foot pursuit policy. Training is required for personnel to become proficient in its practical application. Officers should consider every action based on the suspect's probable next move. Slowing down this process provides more time to determine a best course of action and allows backup units additional time to respond to the scene.

Officer Tykol twice initiated a foot pursuit after Mr. Rodrigues was able to escape the first attempt at a physical arrest. Officer Tykol also stated he was exhausted after the first fight. There was significant risk to Officer Tykol in this situation. While he hoped for backup to arrive shortly because he heard sirens, he was not certain when they would arrive. We recognize that in a rapidly evolving situation, slow and logical thinking may be taken over by adrenaline. However, the primary points of the EPD policy are to avoid exactly what occurred here. Up until the time he resisted arrest, Officer Tykol only had probable cause that Mr. Rodrigues committed a pedestrian violation (although never directly and concisely articulating that to Mr. Rodrigues). Yet, Officer Tykol continued to re-engage in

fighting with Mr. Rodrigues twice more. There is a preponderance of evidence that the final engagement lead [sic] to a risk of serious physical harm to Officer Tykol.

The policy is clear that officers, when acting alone in particular, need to consider each situation with a risk-versus-reward analysis, determining what they will and will not do. Rapid assessment of the situation should be ongoing, but officers should not quickly commit themselves. They must consider the weather, lighting, terrain, and physical environment, as well as personal conditioning and stamina—theirs and the offender's. Prior to the third and fatal engagement, Mr. Rodrigues twice fought off Officer Tykol and began to move away. I also recognize that had Officer Tykol waited for backup, it still could have been a tragic result; however, the numbers would favor the police. To reduce risk, officers should determine who holds the tactical advantage in a fluid situation and adjust their tactics accordingly.

Police Auditor's Report, at 21–22.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved

against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

Defendants argue they are entitled to judgment as a matter of law on Plaintiff's Section 1983 claims because Officer Tykol did not violate Mr. Rodrigues's Fourth Amendment rights, and even if he did, that Officer Tykol is entitled to qualified immunity. On Plaintiff's state law claims, Defendants argue the Court should decline to exercise supplemental jurisdiction, or alternatively, enter judgment in their favor. Defs.' Mot. at 2. Plaintiff asserts that there is a genuine issue of material fact regarding Officer Tykol's credibility as the sole available witness. Pl.'s Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Resp.") 12–13, ECF No. 46.[5] Plaintiff also argues that qualified immunity has no legal foundation and asks this Court to decline to allow it as a defense in this case. *Id.* at 30–33. For the reasons discussed below, the Court should grant summary judgment for Defendant Tykol on Plaintiff's Section 1983 claims, but not his state law claims. The Court should grant summary judgment for Defendant City of Eugene on Plaintiff's state law claims.

## I.    42 U.S.C. § 1983 — Fourth Amendment Claims

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (internal quotation omitted). Under the Fourth Amendment,

---

[5] The Ninth Circuit has held that where there is only one account from the surviving officer, the Court must take special care to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014). This includes looking at "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Plaintiff presents no circumstantial evidence, competent expert evidence, or inconsistencies in Officer Tykol's testimony that undermine his account, however, so the Court adopts his testimony as uncontested for purposes of this Motion. *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

"[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. As a threshold matter, the Court must determine whether Officer Tykol is entitled to qualified immunity to shield him from suit for damages in this matter. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).[6]

To determine whether a defendant is entitled to qualified immunity, the Court considers two questions: (1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As the Ninth Circuit explained in *Isayeva v. Sacramento Sheriff's Department*, 872 F.3d 938, 945 (9th Cir. 2017), an officer may be denied qualified immunity at summary judgment in a § 1983 case "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." 872 F.3d at 945 (internal quotations omitted). "If there is no constitutional violation, the inquiry ends and the officer is entitled to qualified immunity." *Ioane v. Hodges*, 939 F.3d 945, 950 (9th Cir.

---

[6] Plaintiff asserts that qualified immunity has no foundation as a matter of law. Pl.'s Resp. at 30–32. And to be sure, qualified immunity has its critics, both in the academy and in the judiciary. *See, e.g., Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) (Thomas, J., statement respecting the denial of certiorari) (discussing issues with the qualified immunity doctrine, including its lack of grounding in text or history); *Kisela v. Hughes*, 584 U.S. 100, 109 (2018) (Sotomayor, J., dissenting) (disagreeing with the use of qualified immunity "as an absolute shield" and misuse of the "clearly established" standard); *see generally* Scott Michelman, *The Branch Best Qualified to Abolish Immunity*, 93 Notre Dame L. Rev. 1999 (2018) ("[Q]ualified immunity is a mess of the Supreme Court's making, and the Supreme Court should clean it up."); William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 88 (2018) ("[T]he doctrine lacks legal justification, and the Court's justifications are unpersuasive.").

This chorus has grown in recent years. But until the Supreme Court abolishes qualified immunity, this Court is bound to apply it in cases like these. *Egbert v. Boule*, 596 U.S. 482, 523, n.5 (2022) ("The doctrine of qualified immunity will continue to protect government officials from liability for damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.").

2018). Lower courts have discretion in deciding which of the two prongs to discuss first. *Pearson*, 555 U.S. at 236.

The Ninth Circuit has held that when "a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). For Fourth Amendment violations, a genuine issue of fact exists where: (1) "a determination of reasonable suspicion or probable cause requires an inquiry as to the facts and circumstances within an officer's knowledge," and (2) "the determination of what conduct underlies the alleged violation—what the officer and claimant did or failed to do—is a determination of fact." *Id.* However, "the determination whether those facts support an objective belief that probable cause or reasonable suspicion existed" is a question of law. *Id.*; *see also Johnson v. Barr*, 79 F.4th 996, 998 (9th Cir. 2023).

### A.    First Claim for Relief: Unreasonable Seizure

To prevail on a § 1983 claim against an individual official, a plaintiff must show that the official, acting under color of state law, caused the deprivation of a federal right. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). A public official sued in an individual capacity may assert a defense based on qualified immunity. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015). The court considers two questions, in either order, to determine if qualified immunity applies: (1) whether the facts, taken in the light most favorable to the non-moving party, show that the official's conduct violated a constitutional right, and (2) whether the law at the time of the challenged conduct clearly established that the conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A plaintiff must prove both steps to establish the official is not entitled to immunity from the action. *Marsh v. County of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012). As the Supreme

Court has repeatedly explained, courts are "not to define clearly established law at a high level of generality." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018). "The law must have been clear enough that 'every reasonable official' would know he or she was violating the plaintiff's rights." *Id.* (quoting *Sheehan*, 575 U.S. at 611).

Plaintiff claims that Officer Tykol violated his Fourth Amendment rights by stopping, and then arresting him without a warrant during their encounter, but Officer Tykol did not violate his rights in either instance. A police officer has probable cause[7] to arrest a person without a warrant (i.e. make a reasonable seizure of that person) if, under the totality of the circumstances known to the arresting officer, there exists a "fair probability" that the person has committed a crime. *Conner v. Heiman*, 672 F.3d 1126, 1132 (9th Cir. 2012). Officer Tykol first stopped Plaintiff on the suspicion of violating Or. Rev. Stat. § 814.070(1)(a) or Eugene Code 4.830. Tykol Dep. at 50:19–51:2. As part of that stop, Officer Tykol could reasonably detain Plaintiff to determine his identity, conduct any investigation related to the observed violations, and to issue a citation. Or. Rev. Stat. § 153.039(3). Plaintiff concedes that this initial stop was lawful. Pl.'s Resp. at 24 ("The original stop for the pedestrian violation does not immediately violate any Constitutional restrictions . . . ."). After telling Plaintiff that he was "not free to leave" during the initial stop, Plaintiff fled, and Officer Tykol seized him again after a short pursuit. Tykol Decl.

---

[7] Plaintiff asserts that this Court should use the Oregon law probable cause standard—rather than the federal standard—to assess whether Officer Tykol had probable cause to arrest Mr. Rodrigues. Pl.'s Resp. at 19. There is no precedent for this approach. Both the Supreme Court and the Ninth Circuit have ruled that the federal probable cause standard—a purely objective standard rather than the Oregon standard that includes a subjective component— applies in Fourth Amendment cases. *Devenpeck v. Alford*, 543 U.S. 146, 152–153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002) ("Our precedent requires a conclusion that the officers had probable cause to arrest [the defendant] if 'under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'"). The Supreme Court "counsel[s] against changing th[e] calculus when a State chooses to protect privacy beyond the level that the Fourth Amendment requires" and has "treated additional protections exclusively as matters of state law." *Virginia v. Moore*, 553 U.S. 164, 171 (2008); *see also Cooper v. California*, 386 U.S. 58, 62 (1967).

Ex. 1, at 1:13–1:15; Tykol Dep. at 133:9–21, 234:9. At that point, Officer Tykol had probable

cause to arrest Plaintiff for the crime of interfering with a peace officer. Or. Rev. Stat. §

162.247(1) (2019 version) (Interfering includes, inter alia, "[r]efus[al] to obey a lawful order by

the peace officer."). *Id.* There is no dispute in the record that Officer Tykol gave Plaintiff a

lawful order to stop, that Plaintiff violated that order, and that Officer Tykol had probable cause

to arrest pursuant to Oregon's "interfering with a peace officer" statute. Because Officer Tykol

did not violate Plaintiff's Fourth Amendment rights against unreasonable seizures, the Court

should find Plaintiff's first Section 1983 claim fails at this first step of the qualified immunity

analysis.

    Even if Officer Tykol's seizures did violate Plaintiff's Fourth Amendment rights, those

rights were not sufficiently clearly established at the time of arrest to evade qualified immunity's

protections. When applying a qualified immunity analysis to claims of unlawful arrest, the

clearly established inquiry boils down to "whether it is *reasonably arguable* that there was

probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of

the arrest such that the arresting officer is entitled to qualified immunity." *Johnson v. Barr*, 79

F.4th 996, 1005 (9th Cir. 2023) (emphasis in original) (internal citation omitted). First, Plaintiff

does not identify any Supreme Court or Ninth Circuit case which would have clearly established

that Officer Tykol's actions in arresting Mr. Rodrigues were clearly prohibited. *See* Pl.'s Resp. at

30-33. In fact, Defendants identify a number of cases that would have put Officer Tykol on

notice that his orders to Plaintiff were lawful, rendering his belief that he had probable cause to

arrest reasonable. *See, e.g., State v. Navickas*, 271 Or. App. 447, 450-51 (2015) (officer had the

authority to instruct the defendant to move off of the street for safety reasons); *see also State v.

Remsh,* 221 Or. App. 471, 478 (2008) (holding that, in the context of resisting arrest, the

defendant did not engage in passive resistance when he jerked away from the arresting officer). In sum, even construing all facts in Plaintiffs favor, the law did not clearly establish to Officer Tykol that probable cause was lacking; he would not have been on notice that his actions were unreasonable unless "all reasonable officers would agree that there was no probable cause in this instance." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1078 (9th Cir. 2011). That was not the case here. Without any authority to suggest Officer Tykol violated one of Plaintiff's clearly established rights, the Court should find Officer Tykol entitled to qualified immunity on the second step of the test as well.

### B.    Second Claim for Relief: Unreasonable Use of Deadly Force

Plaintiff also alleges that Officer Tykol violated his Fourth Amendment right against the unreasonable use of deadly force. In determining whether a Fourth Amendment violation occurred, an excessive force analysis begins by assessing the "quantum of force used" by the officer. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). Whether an officer violated this right depends on "the objective reasonableness of a particular use of force to determine whether it was indeed excessive." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The factors used to evaluate the government's interest include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Gravelet-Blondin*, 728 U.S. at 1091. According to the Ninth Circuit, the

most important factor is the second: whether the suspect poses an immediate safety threat. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

The Supreme Court has stated that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9 (1985). "Deadly force is permissible only 'if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm.'" *A.K.H. by and through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 11). "The objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional," rather than being tied to prior alleged Fourth Amendment violations. *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428 (2017). Plaintiff's second claim challenges the seizure by use of deadly force that occurred at the end of the parties' encounter. Compl. ¶ 51-54.

Under the totality of circumstances, viewing the evidence in the light most favorable to Plaintiff, Officer Tykol's use of deadly force did not violate Plaintiff's Fourth Amendment rights. There is no genuine dispute from the evidence that Plaintiff posed a threat to Officer Tykol. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (explaining that the "most important single element" from *Graham* is "whether the suspect poses an immediate threat to the safety of the officers or others"). The record demonstrates that Plaintiff was on top of Officer Tykol, punching him, and trying to take his Taser from him at the time that Officer Tykol used his firearm. Tykol Dep. at 264:22–265:20. Plaintiff has not presented evidence to dispute Officer Tykol's account of the incident. *See* Pl.'s Resp. Moreover, the evidence is undisputed that Plaintiff was actively resisting arrest. *See United States v. Willfong*, 274 F.3d 1297, 1301 (9th Cir. 2001) ("[A] person does not have the right to resist arrest even if the

charges are false or the arrest unlawful."). A plaintiff's combative and resistant behavior are factors the Ninth Circuit further weighs in favor of a finding that an officer's use of force was justified. *Luchtel v. Hagemann*, 623 F.3d 975, 981 (9th Cir. 2010) Under these circumstances, Officer Tykol's behavior met the Ninth Circuit and the Supreme Court's definitions of a reasonable use of force, and the Court should find he did not violate Plaintiff's Fourth Amendment rights against unreasonable use of deadly force.

Even assuming Officer Tykol violated the Constitution when he shot Plaintiff, this constitutional violation was not "clearly established" at the time of the shooting. A clearly established right is "sufficiently clear [when] every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam). Although it is well settled that using excessive force violates the Fourth Amendment, *see Graham*, 490 U.S. at 109, general statements of the law do not by themselves create clearly established law outside "an obvious case." *White v. Pauly*, 580 U.S. 73, 80 (2017) (per curiam). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* Plaintiff identifies no precedent establishing that Officer Tykol's conduct under the circumstances he confronted was unreasonable "beyond debate." *Sheehan*, 575 U.S. at 611. Nor is this a case in which a constitutional violation is "obvious." *Id.* the Court should therefore find Officer Tykol is entitled to qualified immunity as to Plaintiff's § 1983 claim for excessive force as well.

## II.    Supplemental State Law Claims

"A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). When considering whether to exercise supplemental jurisdiction, courts consider factors such as judicial economy, convenience,

fairness, and comity. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010). In the interest of judicial economy and providing finality to the parties, the Court recommends exercising supplemental jurisdiction over Plaintiff's state law claims.

As a threshold matter, Defendants argue that Plaintiff waived his state-law claims by not responding to summary judgment arguments about those claims in his responsive briefing. Defendants cite to three district court cases to support this proposition, none of which is persuasive.[8] Failure to raise an argument at summary judgment can waive a party's right to raise it on appeal, *see Moreno Roofing Co. v. Nagle*, 99 F.3d 340, 343 (9th Cir. 1996), but it does not relieve the moving party of its burden at the summary judgment stage. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970) (noting that when the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence). This Court retains discretion to consider the record as a whole to determine whether there are genuine issues of material fact.

A.     **Sixth Claim for Relief — Negligence**

1.     Officer Tykol: Negligent Investigation, Arrest, and Use of Force

In Claim Six, Plaintiff alleges Officer Tykol was negligent in his investigation, seizure, and use of force, resulting in conscious fear, pain and suffering, and ultimately death. Pl. Compl. ¶¶ 73, 75. Defendants argue Officer Tykol is entitled to judgment as a matter of law on this claim for three reasons: (1) the allegations are based on intentional conduct, which do not sound in negligence, (2) they are duplicative of the Section 1983 claims, and barred as a result, and (3)

---

8 Defendants cite *Versluys v. Weizenbaum*, 2023 WL 6880412, *2, (D. Or. Oct. 18, 2023), *DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins. Agency, Inc.*, 2016 WL 631574, at *25 (W.D. Wash. Feb. 16, 2016), and *Kroeger v. Vertex Aerospace LLC*, 2020 WL 3546086, at *8 (C.D. Cal. June 30, 2020).

because the underlying arrest was supported by probable cause, and therefore "the arrest could

not have harmed any legally protected interest that [Plaintiff] had." Defs.' Mot. 18–19.

First, Defendants mischaracterize Plaintiff's negligence claim as alleging intentional

conduct. True, intentional conduct, such as arresting and handcuffing a person, cannot support a

claim for negligence, *Kasnick v. Cooke*, 116 Or. App. 580, 583 (1992) (evidence of intentional

conduct cannot give rise to a negligence claim), but allegations of *omissions* can. *See Box v.

Dep't of Oregon State Police*, 311 Or. App. 348, 367 (2021). And here, Plaintiff's negligence

claim is almost entirely allegations that Officer Tykol's failure to take reasonable steps in the

investigation and arrest for the alleged crime created a foreseeable and unreasonable risk of

harm, causing Plaintiff's death. Pl. Compl. ¶ 73 (alleging Plaintiff's death was caused by a

variety of negligent omissions). Any of these alleged omissions, such as failure to "use methods

of non-lethal force to de-escalate the situation" supports a negligence claim, and none is an

allegation of an intentional tort. *Id.* The Court should therefore find Plaintiff's negligence claim

is not barred for improperly smuggling intentional tort allegations into negligence.

Second, the Court should not jettison Plaintiff's negligence claim because of its purported

overlap with his Section 1983 claims. Defendants do not identify any binding authority to this

Court to suggest Plaintiff cannot maintain a state law negligence claim alongside his federal civil

rights claims. Defs.' Mot. at 19. The reality is just the opposite: the Ninth Circuit has allowed

state-law negligence claims to proceed alongside a § 1983 action where the law of the forum

state contemplates consideration of more than just the situation at the moment of a police

officer's use of deadly force. *See Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1082 (9th Cir.

2018). Oregon law recognizes just such a negligence action for preshooting conduct in a deadly

force case. *Box*, 311 Or. App. at 369. Because Oregon law carries greater protections than

Section 1983, and Plaintiff specifically alleges omissions in his negligence claim that are absent from his 1983 claims, the Court should disregard Defendants' second argument for summary judgment on Claim Six.

Finally, the Court should not grant judgment as a matter of law to Defendant Tykol on Plaintiff's negligence claim because the arrest was supported by probable cause. Defendants' arguments reduce down to an assertion that whenever there is probable cause to arrest, a Plaintiff cannot maintain a negligence action because the officer's actions were "authorized and harmed no legally protected interest." Defs.' Mot. at 19. Plaintiff's negligence claim focuses on Officer Tykol's many alleged failures to de-escalate the situation and use proper police tactics, rather than his lack of probable cause to arrest. Compl. ¶ 73. Oregon law allows such claims for preshooting negligence regardless of whether probable cause existed. *Box*, 311 Or. App. at 369. The Court should therefore decline to entertain this argument at the summary judgment stage.

Ultimately, there are genuine issues of fact regarding whether Officer Tykol's preshooting conduct was negligent. "When, as here, reasonable persons might reach different conclusions about the facts, the establishment of those facts is for the jury . . . ." *Gilker v. Baker*, 576 F.2d 245, 247 (9th Cir. 1978). In the summary judgment record, there are several facts that could lead a reasonable juror to conclude Officer Tykol negligently carried out the investigation, arrest, and use of force. For example, the Eugene Police Auditor's Report concluded that Officer Tykol failed to use proper de-escalation techniques and failed to follow the department's foot pursuit policy. Police Auditor's Report at 15, 21–22. The report also discussed the auditor's concerns regarding the reasonableness of Officer Tykol's use of force when effecting the initial arrest:

> [A]t the point that Officer Tykol engaged physically with Mr. Rodrigues, Mr. Rodrigues had committed a pedestrian violation and appeared to be passively

resisting Officer Tykol's orders. Officer Tykol's physical engagement should be reviewed for reasonableness, pursuant to EPD policy and Supreme Court precedent in *Graham v. Connor*, 490 US 386 (1989).

*Id.* at 17. Officer Tykol's deposition reflects the fact that he was the first one to use physical force, and his role in the rapid escalation of the physical nature of this conflict further supports the inference that he unreasonably created a foreseeable risk of harm to Plaintiff. These facts demonstrate that there is a genuine issue of fact regarding whether Officer Tykol breached his duty of care owed to Mr. Rodrigues. *See, e.g.,* Tykol Dep. at 1:24-25. After assessing these facts, the jury may reasonably determine that this conduct was not negligent. But it is ultimately up to the jury—and not this Court—to make that determination at trial. *Box*, 311 Or. App. at 374. Defendants' motion should be denied as to Plaintiff's negligence claim against Officer Tykol.

2.    City of Eugene: Negligent Training and Practice

Plaintiff's negligence claim also extends to the City of Eugene. Plaintiff alleges the City was negligent "in one or more of the following particulars":

> A. In having a policy and/or custom and/or practice of ratifying and approving unreasonable shooting deaths of citizens by City police officers without implementing methods and training necessary to prevent future deaths;
> B. In failing to properly train officers in the proper and legal use of deadly force and tasers;
> C. In failing to properly train officers to respect the exercise of protected Constitutional rights by citizens;
> D. In failing to properly train in the use of force against passively resistant suspects;
> E. In failing to properly train how to de-escalate a situation; and
> F. In failing to properly train in the use of force against a compliant suspect.

Pl.'s Compl. ¶ 74. Defendants move for summary judgment, arguing that Plaintiff is unable to point to any facts supporting an essential element of a failure-to-train negligence claim: that the City knew or should have known of the need for better or different training and supervision of its employees. Defs.' Mot. 20 (*citing Whelan v. Albertson's, Inc.*, 129 Or. App. 501, 507 (1994)).

The Court should dismiss Plaintiff's failure-to-train negligence claim against the City. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 323. To prevail at trial, Plaintiff would need to present some evidence that the City knew or should have known it needed to better train its officers on de-escalation and use of force policy. *Whelan*, 129 Or. App. at 507.[9] Plaintiff does not point to such evidence in his brief. *See* Pl. Resp. In fact, Plaintiff cites several aspects of the record reflecting that Officer Tykol received training in use of force policy, and the *Graham v. Connor* factors. Pl.'s Resp. at 10-11 (citing Tykol Dep. at 102:8-19). Because Plaintiff has failed to produce evidence on an essential element of his negligence claim against the City, and the only evidence in the record undermines his claim, the Court should grant summary judgment to the City of Eugene on Plaintiff's state law claims.

### B.    Fifth Claim for Relief — Wrongful Death

Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's wrongful death claim because "[n]o legal theory is otherwise alleged and no standard of care is alleged," and Officer Tykol's conduct in shooting Mr. Rodrigues was otherwise justified. Defs.' Mot. 15–16. Plaintiff offers no response. *See* Pl.'s Resp.

The Court should deny Defendants' motion because Plaintiff's fifth "claim" for relief is one in pursuit of damages based on his negligence claim, rather than a standalone claim of its own. Oregon's wrongful death statute authorizes the personal representative of a decedent to "maintain an action" against the wrongdoer when the decedent's death was caused by the

---

[9] The Court notes that the availability of supervisory liability for failure-to-train against a municipality in this context is not entirely clear under Oregon law. The only case either party cites notes that such supervisory liability for failure-to-train only exists in narrow circumstances of a "special relationship" between the parties or where the employer "should have known of the necessity of controlling the [tortfeasor]." *Whelan*, 129 Or. App. at 507.

wrongdoer's wrongful act or omission. Or. Rev. Stat. § 30.020. The Oregon Supreme Court has recognized that a negligence claim can suffice to prove the "wrongful act or omission." *Martineau v. McKenzie-Willamette Med. Ctr.*, 371 Or. 247, 268 (2023). For the reasons stated above, issues of material fact remain regarding whether Officer Tykol's conduct was negligent, and whether that negligence caused Plaintiff's death. Defendants' argument that statutory authority to use violence in certain situations (they do not specify which) renders Officer Tykol's actions reasonable is a defense they may raise at trial. For the moment, Plaintiff has identified "evidence from which a reasonable juror could infer that, absent [the department's or the officer's] negligence, there was a reasonable probability that the shooting would not have occurred." *Box*, 311 Or. App. at 369 (rejecting the same arguments Defendants make here, and concluding "that plaintiff is not precluded from proving, as a matter of law, that the preshooting negligence was a cause of [Plaintiff]'s death"). Interpreting the evidence in the light most favorable to the Plaintiff, the Court should find a reasonable juror could conclude Officer Tykol's negligence could have caused Plaintiff's death, and allow the negligence claim to proceed notwithstanding Defendants' argument that Officer Tykol was statutorily authorized to use deadly force at the end of the encounter.

## RECOMMENDATION

For the reasons above, Defendants' Motion for Summary Judgment (ECF No. 25) should be GRANTED as to the First and Second Claims for Relief, GRANTED as to the Fifth and Sixth Claims against the City of Eugene, and DENIED as to the Fifth and Sixth Claims against Officer Tykol. Plaintiff's Motion to Take Judicial Notice of Discrete Facts (ECF No. 45) is DENIED.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1)

should not be filed until entry of the district court's judgment or appealable order. The Findings

and Recommendation will be referred to a district judge. Objections to this Findings and

Recommendation, if any, are due fourteen (14) days from today's date. *See* Fed. R. Civ. P. 72.

Failure to file objections within the specified time may waive the right to appeal the district

court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED this  19th  day of August, 2024.


  /s/Mustafa T. Kasubhai

Mustafa T. Kasubhai (he/him)
United States Magistrate Judge